**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| 100REPORTERS LLC, |
| Plaintiff, |
| v. |
| UNITED STATES DEPARTMENT OF JUSTICE, |
| Defendant, |
| and |
| SIEMENS AKTIENGESELLSCHAFT, |
| Defendant-Intervenor, |
| and |
| DR. THEO WAIGEL, |
| Defendant-Intervenor. |

Civil Action No. 14-1264 (RC)

**MEMORANDUM OF POINTS AND AUTHORITIES**
**IN SUPPORT OF SIEMENS' MOTION FOR SUMMARY JUDGMENT**

DAVIS POLK & WARDWELL LLP

Paul Spagnoletti (*pro hac vice*)
Michael Scheinkman (*pro hac vice*)
Gerard McCarthy (*pro hac vice*)
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000

Raul F. Yanes (D.C. Bar No. 990221)
901 15th Street, N.W.
Washington, D.C.  20005
Telephone: (202) 962-7000

*Counsel to Defendant-Intervenor*
*Siemens Aktiengesellschaft*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................1

BACKGROUND .....................................................................................................3

    A.   The Siemens Monitorship ............................................................................3

    B.   Siemens' Compliance Program ...................................................................6

    C.   Materials at Issue in this Litigation .............................................................8

         1.   Annual Monitor Reports and Associated Documents.............................8

         2.   Work Plans, Report Exhibits, and Related Documents ........................10

         3.   Trainings, Internal Presentations, and Compliance Policies..................11

STANDARD OF REVIEW .....................................................................................11

ARGUMENT .......................................................................................................12

I.   THE DOCUMENTS WITHHELD BY THE DOJ ARE EXEMPT FROM
     DISCLOSURE UNDER FOIA EXEMPTION 4 ................................................12

    A.   The Information at Issue Is Plainly "Commercial" ......................................13

    B.   The Materials at Issue Are Confidential......................................................16

         1.   Release of the Withheld Information Would Cause Siemens
             Competitive Harm.............................................................................17

         2.   Disclosure of the Materials at Issue Would Impair the Government's
             Ability to Obtain Necessary Information in the Future ........................23

II.  PORTIONS OF THE MATERIALS AT ISSUE ARE EXEMPT FROM
     DISCLOSURE UNDER EXEMPTION 6.........................................................26

CONCLUSION.....................................................................................................27

# TABLE OF AUTHORITIES

## CASES

PAGE(S)

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)........................................................................................11

*Baker & Hostetler LLP v. U.S. Dep't of Commerce*,
   473 F.3d 312 (D.C. Cir. 2006) ........................................................................13

*Boeing Co. v. U.S. Dep't of the Air Force*,
   616 F. Supp. 2d 40 (D.D.C. 2009 ) ..................................................................17

*Cawthorn v. U.S. Dep't of Justice*,
   No. 05-0567, 2006 WL 581250 (D.D.C. Mar. 9, 2006) ........................................26

*Cotton v. Adams*,
   798 F. Supp. 22 (D.D.C. 1992) ........................................................................26

*Critical Mass Energy Project v. NRC*,
   975 F.2d 871 (D.C. Cir. 1992) (en banc) ....................................................16, 23

*Hersh & Hersh v. U.S. Dep't of Health & Human Servs.*,
   No. C 06-4234, 2008 WL 901539 (N.D. Cal. Mar. 31, 2008)...............................24

*James v. U.S. Secret Serv.*,
   811 F. Supp. 2d 351 (D.D.C. 2011) ..................................................................11

*Judicial Watch, Inc. v. Export-Import Bank*,
   108 F. Supp. 2d 19 (D.D.C. 2000) ....................................................................23

*Judicial Watch, Inc. v. U.S. Dep't of Justice*,
   No. 13-cv-0949, 2014 WL 1878022 (D.D.C. May 12, 2014)................................26

*Judicial Watch, Inc. v. U.S. Secret Serv.*,
   726 F.3d 208 (D.C. Cir. 2013)..........................................................................12

*Keys v. Dep't of Homeland Sec.*,
   570 F. Supp. 2d 59 (D.D.C. 2008)....................................................................11

*Landfair v. U.S. Dep't of Army*,
   645 F. Supp. 325 (D.D.C. 1986) ......................................................................13

i

*M/A-Com Info. Sys., Inc. v. U.S. Dep't of Health & Human Servs.*,
   656 F. Supp. 691 (D.D.C. 1986) ...................................................................24

*McGehee v. CIA*,
   697 F.2d 1095 (D.C. Cir. 1983) ..................................................................12

*Nat'l Ass'n of Home Builders v. Norton*,
   309 F.3d 26 (D.C. Cir. 2002) ......................................................................13

*Nat'l Parks & Conservation Ass'n v. Morton*,
   498 F.2d 765 (D.C. Cir. 1974) ..............................................................16, 23

*Oglesby v. U.S. Dep't of the Army*,
   79 F.3d 1172 (D.C. Cir. 1996) ....................................................................12

*Public Citizen v. U.S. Dep't of Health & Human Servs.*,
   975 F. Supp. 2d 81 (D.D.C. 2013) ....................................................... *passim*

*Public Citizen v. U.S. Dep't of Health & Human Servs.*,
   66 F. Supp. 3d 196 (D.D.C. 2014) ...................................................... *passim*

*Public Citizen Health Research Grp. v. Food & Drug Admin.*,
   704 F.2d 1280 (D.C. Cir. 1983) .......................................................13, 14, 17

*Public Citizen Health Research Grp. v. Nat'l Institutes of Health*,
   209 F. Supp. 2d 37 (D.D.C. 2002) ..............................................................13

*SEC v. WorldCom, Inc.*,
   273 F. Supp. 2d 431 (S.D.N.Y. 2003) .........................................................24

*United Techs. Corp. v. U.S. Dep't of Defense*,
   601 F.3d 557 (D.C. Cir. 2010) ....................................................................17

*Worthington Compressors, Inc. v. Costle*,
   662 F.2d 45 (D.C. Cir. 1981) ................................................................18, 20

<u>STATUTES & RULES</u>

5 U.S.C. § 551(2) ...........................................................................................13

5 U.S.C. § 552 ..................................................................................................1

5 U.S.C. § 552(b)(4) ...................................................................................2, 13

5 U.S.C. § 552(b)(5) ........................................................................................1

5 U.S.C. § 556(b)(6) ...........................................................................................................26

5 U.S.C. § 556(b)(7)(C) ......................................................................................................27

Fed. R. Civ. P. 56................................................................................................................11

Siemens Aktiengesellschaft ("Siemens" or "the Company"), by and through the undersigned counsel, hereby submits this memorandum of points and authorities in support of its motion for summary judgment.  Siemens also joins in the motions for summary judgment submitted by the United States Department of Justice (the "DOJ") and Dr. Theo Waigel ("Dr. Waigel" or "the Monitor").

## PRELIMINARY STATEMENT

Plaintiff 100Reporters LLC ("Plaintiff" or "100Reporters") brought this action to compel the DOJ to disclose under the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA"), information submitted to the DOJ as a result of the corporate monitorship of Siemens required by its 2008 plea agreement with the DOJ and consent decree with the Securities and Exchange Commission (the "SEC").  Among other things, these materials document the Monitor's detailed descriptions and evaluations of the Company's financial controls and compliance program, his recommendations for improvements, and his assessments of the Company's ongoing efforts to improve its internal controls.  Simply put, the documents at issue in this action touch upon nearly every aspect of the Company's operations and are replete with highly sensitive commercial information that Siemens intervened to protect.

Now, Siemens is entitled to summary judgment because—as demonstrated in detail in the DOJ's *Vaughn* index and in the accompanying declarations—there is no genuine issue of material fact that the documents and records at issue are protected from disclosure under multiple statutory exemptions.

As an initial matter, as set forth in the motions of the DOJ and the Monitor, the documents fall squarely within the scope of Exemption 5, 5 U.S.C. § 552(b)(5), as "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other

than an agency in litigation with the agency."  Siemens joins in those motions in full, but does not repeat those arguments here.

As relevant to this motion, the vast majority of the material at issue is protected from disclosure under Exemption 4, 5 U.S.C. § 552(b)(4).  There can be no serious dispute that these documents are "commercial," and they are "confidential" under the D.C. Circuit's well-settled Exemption 4 jurisprudence for two separate and independent reasons.

First, release of the information is likely to cause Siemens substantial competitive harm. The documents at issue contain probing reviews and descriptions of every part of Siemens' robust compliance program.  As courts within this District have recognized in analogous circumstances, release of this type of information would allow competitors to make affirmative use of Siemens' compliance program and financial controls without incurring any of the costs that Siemens expended in its development and ongoing refinement.  Moreover, in describing how the Company applied these tools and processes in particular circumstances, the documents reveal many other competitively sensitive details of the Company's business operations, including preferred vendors and business partners, and bidding strategies—precisely the type of information Exemption 4 was intended to protect.

Second, release of the material at issue is likely to impair the government's ability to obtain similar information in the future.  The Monitor's reports and work plans were derived from documents and information Siemens and its employees provided to the Monitor with an expectation of confidentiality.  As the DOJ has made clear, "[t]he confidentiality of [monitor] reports ensures . . . that the corporation feels free to provide the monitor access to its operations

without fear that the process could be exploited by the corporation's competitors."[1]  Conversely, courts have held that releasing similar information to the public would make it more difficult for corporate monitors and, in turn, the government, to receive the unprecedented level of cooperation and access to information that Siemens extended during its monitorship.

For these reasons, the DOJ correctly withheld the requested information under Exemption 4, and Siemens is entitled to summary judgment.

## BACKGROUND

**A.     The Siemens Monitorship**

In December 2008, Siemens entered into a plea agreement with the DOJ and a consent decree with the SEC to resolve criminal and civil allegations that Siemens committed certain violations of the Foreign Corrupt Practices Act.  (*See* "Notice Regarding Corporate Monitorship," *United States v. Siemens Aktiengesellschaft*, Crim. No. 08-367 (RJL) (D.D.C. Dec. 18, 2012) (Dkt. No. 23) ¶¶ 1-4.)  The terms of those agreements required the engagement of an independent corporate monitor, Dr. Theo Waigel (the "Monitor").  (*See, e.g.*, "Plea Agreement," *United States v. Siemens Aktiengesellschaft*, Crim. No. 08-367 (RJL) (D.D.C. Dec. 15, 2008) (Dkt. No. 14) ¶ 12; "Consent," *SEC v. Siemens Aktiengesellschaft*, 1:08-cv-02167 (RJL) (D.D.C. Dec. 12, 2008) (Dkt. No. 1-3) ¶ 3.)  The DOJ required the Monitor to evaluate:

> the effectiveness of the internal controls, record-keeping and financial reporting policies and procedures of Siemens as they relate to Siemens' current and ongoing compliance with . . . provisions of the FCPA and other applicable anti-corruption laws . . . and take such reasonable steps as, in his or her view, may be necessary to fulfill the foregoing mandate.

---

[1] Hearing before the H. Subcomm. on Commercial and Admin. Law of the H. Comm. on the Judiciary, 111th Cong. 78 (2009) (prepared statement of Gary G. Grindler, Deputy Ass't Att'y Gen., Crim. Div., U.S. Dep't of Justice), available at http://www.justice.gov/ola/testimony/111-1/2009-06-25-crm-grindler-corporate-agreements.pdf.

("Statement of Offense, Attachment 2," *United States v. Siemens Aktiengesellschaft*, Crim. No. 08-367 (RJL) (D.D.C. Dec. 15, 2008) (Dk. No. 15) ¶ 1.)  The Monitor was also tasked with providing Siemens with "recommendations reasonably designed to improve the effectiveness of [its] program for ensuring compliance with anti-corruption laws," and Siemens, in turn, was required to implement those recommendations.  (*Id.* ¶¶ 4-6.)  To enable the Monitor to fulfill his mandate, the DOJ required Siemens to provide the Monitor with broad access to its most confidential and commercially sensitive information, documents, and records—including privileged information subject to a non-waiver agreement.  (*See id.* ¶¶ 2, 7.)

The length of the Siemens monitorship was variable, not fixed.  (*See id.* ¶ 6.)  After conducting three yearly reviews of Siemens' compliance program and financial controls, the Monitor could apply to the DOJ for permission to forego a fourth review if the Monitor and Siemens "mutually agree[d] that Siemens' compliance program [was] reasonably designed and implemented to detect and prevent violations of anti-corruption laws, and that further monitoring and review [was] not warranted."  (*See id.*)  Conversely, if after four reviews the DOJ and the Monitor "agree[d] that Siemens . . . ha[d] not successfully satisfied its obligations under the plea agreement with respect to the Monitor's [m]andate," the DOJ could extend the monitorship for a period of time it deemed appropriate.  (*Id.*)

Prior to commencing each of his yearly reviews, the Monitor provided the DOJ with a work plan that "include[d] such steps as [were] reasonably necessary to conduct an effective . . . review in accordance with the [Monitor's mandate]."  (*See id.* ¶ 3.)  The DOJ, in turn, was afforded an opportunity to comment on the work plan.  (*Id.*)  In drafting each of his work plans, the Montior was encouraged to, and did, "coordinate with Siemens personnel, including auditors

and compliance personnel" and to "rely on Siemens processes, [and] on the results of studies, reviews, audits and analyses conducted by or on behalf of Siemens."  (*Id.*)

The plea agreement required the Monitor to formulate the conclusions he reached during each of his reviews from "(a) inspection of relevant documents, including Siemens'  . . . anti-corruption policies and procedures; (b) on-site observation of selected systems and procedures of Siemens at sample sites, including internal controls and record-keeping and internal audit procedures; (c) meetings with, and interviews of, relevant employees . . . and (d) analyses, studies and testing of Siemens' compliance program with respect to anti-corruption laws."  (*Id.* ¶ 7.)  Each review was required to culminate in a detailed written report that set forth the Monitor's assessment of Siemens' compliance program and made reasonable recommendations for improvements.  (*Id.* ¶ 4.)

For its part, Siemens understood that it would benefit most from the monitorship if it cooperated with the Monitor to the greatest extent possible, including by providing him with access to information it would otherwise keep strictly confidential.  (*See* Declaration of Joel Kirsch ("J. Kirsch Decl.") ¶¶ 17, 23, 26, 27.)  Siemens, therefore, went to great lengths to ensure that the Monitor could inspect all relevant documents, conduct on-site observations of Siemens' internal controls and internal audit procedures, meet with and interview attorneys, employees, officers and directors, and analyze and test Siemens' compliance program and controls.  (*See* Declaration of F. Joseph Warin ("F.J. Warin Decl.") ¶¶ 21-23.)

Siemens' Project Office was specifically tasked with serving as Siemens' liaison to the Monitor and facilitating the Monitor's access to Siemens' documents and other resources.  (Statement of Offense, Attachment 2 ¶ 2.; F.J. Warin Decl. ¶ 21.)  The Project Office worked closely with the Monitor and his team throughout the monitorship to schedule employee

interviews and provide the Monitor with requested confidential information concerning Siemens'

compliance system and operations.  (F.J. Warin Decl. ¶¶ 21, 23.)  The information provided to

the Monitor included, among other things, documents and other materials describing compliance

policies, training modules, disciplinary records, information on specific Siemens contracts, bids,

and other business activities, and periodic reports summarizing Siemens' implementation of the

Monitor's recommendations.  (*Id.* ¶¶ 21, 23.)

In 2012, the monitorship concluded after four annual reviews.  During that period, "the

Monitor conducted on-site or remote reviews of Siemens' activities in 20 countries; conducted

limited or issue-specific reviews in or relating to an additional 19 countries; reviewed over

51,000 documents totaling more than 973,000 pages in 11 languages; conducted interviews of, or

meetings with, over 2,300 Siemens employees; observed over 180 regularly scheduled

[C]ompany events; and spent the equivalent of over 3,000 auditor days conducting financial

studies and testing."  (Notice Regarding Corporate Monitorship ¶ 7.)  He made more than 150

recommendations for the improvement of Siemens' compliance program and financial controls,

all of which Siemens implemented, and annually certified that "Siemens' compliance program is

reasonably designed and implemented to detect and prevent violations within Siemens of anti-

corruption laws."  (*Id.* ¶¶ 8, 10.)  On this basis, the DOJ informed the district court in December

2012 that Siemens fully satisfied its obligations with respect to the corporate monitorship

imposed by the plea agreement.  (*Id.* ¶ 11.)

## B.    Siemens' Compliance Program

Siemens' current compliance program was developed in large measure in response to the

systemic violations of anti-corruption and accounting laws exposed by the civil and criminal

investigations undertaken in 2007 and 2008.  (J. Kirsch Decl. ¶ 6.)  The Monitor—with his

unfettered access to the Company and mandate to ensure that Siemens' internal controls and anti-corruption compliance program functioned effectively—played an integral role in the program's improvement.  (*Id.* ¶ 10.)

As set forth in the accompanying declaration of Joel Kirsch, Siemens has made compliance a leading corporate priority and has expended significant time and resources in continuing to refine its compliance program.  (*Id.* ¶¶ 7, 8.)  It invests millions of dollars into compliance annually, and a significant number of Siemens employees now attend to compliance-related issues worldwide.  (*Id.* ¶ 8.)

Tools, processes, and policies developed during and in the aftermath of the 2007 and 2008 investigations—including those reviewed by, and improved by, the Monitor—continue to form the basis of Siemens' proprietary compliance program today.  They include tools, policies, and practices concerning the approval of customer projects and business partners, compliance investigations, reporting of potential misconduct, audit and accounting functions, and due diligence of business partners, vendors, and counterparties.  (*Id.* ¶ 9.)

Like any successful compliance program, Siemens' compliance program is fully integrated with its myriad business operations and is critical to its business success.  (*Id.* ¶¶ 11-14.)  Among other things, it mitigates legal exposure and regulatory risk for Siemens, its customers, and its counterparties, and enables Siemens to detect possible violations of internal policies and applicable laws.  (*Id.* ¶ 13.)  In the highly regulated industries in which Siemens operates, compliance is important to Siemens' ability to win and maintain business, and the strength of its compliance program has provided Siemens with business opportunities and customers that it would otherwise not have received.  (*See id.* ¶ 14.)

**C.      Materials at Issue in this Litigation**

The materials that Plaintiff seeks contain confidential commercial information about Siemens' compliance program, policies, practices, and tools as well as its business operations. During the course of the monitorship, the Monitor submitted to the DOJ three categories of information that are now the subject of this litigation: (1) four annual reports prepared by the Monitor setting forth the Monitor's assessment of Siemens' compliance program and recommendations for improvement of the same, as well as presentations and correspondence submitted about or in conjunction with, or relating to, the Monitor's reports and reviews; (2) work plans drafted by the Monitor detailing the manner in which he intended to—and did— perform his annual reviews (some of which were compiled into exhibits to the Monitor's annual reports), as well as associated correspondence and documents; and (3) various Siemens training material, internal presentations, and compliance policies.  Siemens treats these documents as confidential and protects them from disclosure to both competitors and the public alike.  (J. Kirsch Decl. ¶¶ 16-28.)

1.      *Annual Monitor Reports and Associated Documents*[2]

As required by the plea agreement, the Monitor submitted four confidential written reports to the DOJ that set forth his assessment of Siemens' compliance program and financial controls.  The DOJ also received presentations and other materials from the Monitor and Siemens itself that summarized the reports or provided additional information with respect to aspects of Siemens' compliance program.  (*Id.* ¶ 16.)

---

[2] These documents and materials include those found at DOJ_0000029-0293, 0419-0937 (duplicate of 1107-1625), 0938-0939, 0940-1017, 1018-1040, 1041-1061, 1062-1106, 2606-3187, 3188-3340, 3351-3394, 3395-3884, 3885-3387, 3888-3889, 4068-4328, 5251-5255, 5265-5266, and 5275-5276.

Although the Monitor's reports vary slightly in format, each contains a description of the Monitor's methodology in conducting the review, including sites and offices the Monitor visited, compliance and business processes and tools the Monitor evaluated, and employees the Monitor interviewed.  (*Id.* ¶¶ 17-19.)  The reports also provide the Monitor's assessments of Siemens' compliance and business processes and the Monitor's recommendations for improvement of the same, which were "based in large part on sensitive and other confidential information" and address "particular risks and business processes that were understood to be extremely sensitive." (F.J. Warin Decl. ¶ 25(c).)  Later reports address Siemens' implementation of the Monitor's recommendations for improvement of Siemens' compliance practices from previous years.  (J. Kirsch Decl. ¶ 17.)  In short, these reports and related materials constitute an "extensive, detailed review of the effectiveness of Siemens' internal controls, record-keeping, financial reporting policies and procedures, and compliance processes, policies and tools."  (F.J. Warin Decl. ¶ 25(c).)

The analysis and evaluation found in each of the Monitor's reports is comprehensive and wide ranging.  The Monitor evaluated, among other things, the efficacy of proprietary compliance tools, anti-corruption training provided to Siemens employees, the manner in which Siemens conducts internal investigations into misconduct and disciplines employees, and Siemens' compliance policies more generally.  (J. Kirsch Decl. ¶ 18.)  Other topics include Siemens' finance and controllership functions, contracting and procurement, mergers and acquisitions, mitigation of risks associated with third-party business partners, and sales and marketing.  (*Id.* ¶¶ 18, 20.)

Because the effectiveness of Siemens' compliance program cannot be accurately measured in a vacuum, the Monitor's reports provide an analysis of Siemens' compliance

program with respect to **specific** contracts, projects, operations, and bids (both successful and

unsuccessful) that the Monitor evaluated during the course of the Monitorship.  (*Id.* ¶¶ 19, 20;

*see* F.J. Warin Decl. ¶ 21.)  Some of the reports even provide an analysis of how Siemens'

compliance program would work when presented with hypothetical risks and challenges.  (J.

Kirsch Decl. ¶ 19.)

    2.    *Work Plans, Report Exhibits, and Related Documents*[3]

Plaintiff also seeks disclosure of the Monitor's work plans and related documents—

which include the yearly work plans that the Monitor submitted to the DOJ, site and process-

specific work plans appended as exhibits to the Monitor's yearly reports, and related

presentations and correspondence.  The work plans and related documents address the topical

focus areas of the Monitor's review (including proprietary business processes the Monitor

evaluated), the Monitor's planned methodology for conducting the review, employees the

Monitor intended to interview, and countries in which the Monitor intended to review Siemens'

operations, contracts, projects, and bids.  (*Id.* ¶ 22; F.J. Warin Decl. ¶ 25(a).)

As required by the plea agreement, in drafting the work plans the Monitor collaborated

closely with Siemens' personnel to understand Siemens' business structure and operations, and

to identify the areas presenting Siemens with the greatest corruption risk.  (*See* J. Kirsch Decl. ¶

23; F.J. Warin Decl. ¶ 21.)  The Monitor and his team reviewed confidential documents related

to Siemens' business operations and compliance program as well as met with Siemens'

personnel, and the work plans reflect the Monitor's "assessments, based in large part on sensitive

financial and other confidential information, of particular risks and business processes that were

---

[3] These documents and materials include those found at DOJ_0000001-0028, 0294-0324, 0384-0418, 2053-2099, 2100-2605, 3890-3893, 3894-3897, 3898-3915, 3916-4067, 4329-4748, 4749-5216, 5228-5229, 5232-5233, 5246-5247, 5248-5250, 5280, 5281-5283, and 5285-5286.

understood to be extremely sensitive." (*See* F.J. Warin Decl. ¶¶ 21, 25(a); J. Kirsch Decl. ¶ 23;

Statement of Offense, Attachment 2 ¶ 3.)  The Monitor's work plans thus necessarily reflect

information about Siemens compliance program and business operations that Siemens maintains

in confidence.  (J. Kirsch Decl. ¶ 24; F.J. Warin Decl. ¶ 25(a).)

      3.     *Trainings, Internal Presentations, and Compliance Policies*[4]

Finally, during the course of the Monitorship, the DOJ was provided with a number of

Siemens internal compliance training modules and other internal presentations, and compliance

policies.  (J. Kirsch Decl. ¶¶ 25, 27; F.J. Warin Decl. ¶ 21.)  As set forth in more detail in the

accompanying declaration of Mr. Kirsch, Siemens devotes significant resources to developing

and refining these sensitive materials, which are maintained in confidence and necessarily reflect

confidential information concerning Siemens' compliance program, organization, and other

processes.  (J. Kirsch Decl. ¶¶ 26, 28.)

## STANDARD OF REVIEW

Summary judgment is appropriate when the pleadings and evidence demonstrate that

"there is no genuine issue as to any material fact and that the moving party is entitled to

judgment as a matter of law."  Fed. R. Civ. P. 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

247 (1986).  Courts resolve nearly all FOIA disputes on motions for summary judgment.  *Keys v.

Dep't of Homeland Sec.*, 570 F. Supp. 2d 59, 66 (D.D.C. 2008); *see James v. United States

Secret Serv.*, 811 F. Supp. 2d 351, 355 (D.D.C. 2011).  To establish their entitlement to summary

judgment, defendants in FOIA actions submit detailed declarations and/or a "*Vaughn* Index" that

set forth detailed descriptions of documents at issue and the justifications for non-disclosure.

---

[4] These documents and materials include those found at DOJ_0000325-0383, 1627-1707 (duplicate of 1746-1826), 1721-1738, 1739, 1740-1742, 1743, 1744, 1745, 1827-1838, 1839-1895, 1900-1984, 1985-2037, 2038, 2039-2050, and 2051.

*Oglesby v. Dep't of the Army*, 79 F.3d 1172, 1178 (D.C. Cir. 1996).   Courts, in turn, award

summary judgment when an agency's supporting declarations and exhibits "describe the

documents and the justification for nondisclosure with reasonably specific detail, demonstrate

that the information withheld logically falls within the claimed [FOIA] exemption, and are not

controverted by either contrary evidence in the record [ ] [or] by evidence of agency bad faith."

*McGehee v. CIA*, 697 F.2d 1095, 1102 (D.C. Cir. 1983) (internal quotation marks omitted); *see*

*Judicial Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208, 215 (D.C. Cir. 2013).

## ARGUMENT

Siemens is entitled to summary judgment because the *Vaughn* index and declarations

submitted by the DOJ, Siemens, and the Monitor demonstrate that there is no genuine issue of

material fact as to whether the DOJ justifiably withheld the documents at issue.   Courts in this

District and elsewhere have recognized that confidential commercial information substantially

identical to the monitorship materials Plaintiff seeks comfortably falls within the protection from

disclosure afforded by Exemption 4.   Indeed, the release of this material would not only cause

Siemens considerable competitive harm but would also undermine the DOJ's use of independent

corporate monitorships and thus make it more difficult for the government to obtain similar

information in the future.   Portions of the materials identifying specific individuals are also

protected under Exemptions 6 and 7(C) because release of this information would constitute a

clearly unwarranted invasion of personal privacy.

## I.      THE DOCUMENTS WITHHELD BY THE DOJ ARE EXEMPT FROM DISCLOSURE UNDER FOIA EXEMPTION 4

Exemption 4 protects "trade secrets and commercial or financial information obtained

from a person [that is] privileged or confidential" from release by a government agency.   5

U.S.C. § 552(b)(4).  Here, there can be no genuine dispute that Siemens is a person,[5] and the

information at issue is both (1) "commercial or financial," and (2) "privileged or confidential."

## A.  The Information at Issue Is Plainly "Commercial"

In construing the language of Exemption 4, the D.C. Circuit has held that the terms

"commercial" and "financial" should be given their "ordinary meanings."  *Public Citizen Health*

*Research Group v. Food & Drug Admin.*, 704 F.2d 1280, 1290 (D.C. Cir. 1983).  "[I]nformation

is 'commercial' under this exemption if, in and of itself, it serves a commercial function or is of a

commercial nature."  *Public Citizen v. U.S. Dep't of Health & Human Servs.*, 975 F. Supp. 2d

81, 99 (D.D.C. 2013) (quoting *Nat'l Assoc. of Home Builders v. Norton*, 309 F.3d 26, 38 (D.C.

Cir. 2002)).  Thus, courts "have little difficulty in regarding information as 'commercial or

financial' if it relates to business or trade" and have found a wide array of materials to be

commercial under Exemption 4.  *See* Exemption 4, Department of Justice Guide to the Freedom

of Information Act, at 266 (collecting cases).

Typical examples of commercial information include "business sales statistics, research

data, technical designs, overhead and operating costs, and information on financial condition."

*See, e.g.*, *Landfair v. United States Dep't of Army*, 645 F. Supp. 325, 327 (D.D.C. 1986).

However, it is well established that "Exemption 4 is *not* confined only to records that reveal

basic commercial operations . . . or relate to the income producing aspects of a business."  *Baker*

*and Hostetler LLP v. U.S. Dep't of Commerce*, 473 F.3d 312, 319 (D.C. Cir. 2006) (emphasis in

original).  Rather, courts interpret the term "commercial" broadly to apply to any information in

which the submitter has a "commercial interest."  *Id.*; *Public Citizen Health Research Group*,

_____

[5] It is well-established that a corporation like Siemens is a "person" for the purposes of
Exemption 4.  *See* 5 U.S.C. § 551(2); *Public Citizen Health and Research Group v. Nat'l*
*Institutes of Health*, 209 F. Supp. 2d 37, 44 (D.D.C. 2002).

704 F.2d at 1290 (holding that Exemption 4 covers information in which defendant has a commercial interest and is not limited to records containing information on sales statistics or profit and losses).

In fact, materials substantially identical to those at issue here have been held to constitute commercial information.  For example, in *Public Citizen v. United States Department of Health & Human Services*, 975 F. Supp. 2d 81 (D.D.C. 2013) (hereinafter "*Public Citizen I*") and *Public Citizen v. United States Department of Health & Human Services*, 66 F. Supp. 3d 196 (D.D.C. 2014) (hereinafter "*Public Citizen II*"), two pharmaceutical companies entered into "Corporate Integrity Agreements" with the Department of Health and Human Services to resolve civil and administrative health care fraud cases.  *Public Citizen I*, 975 F. Supp. 2d at 88.  These Corporate Integrity Agreements required the companies "to implement, update and/or review [their] policies and procedures relating to compliance with relevant federal regulations, and to submit . . . an Annual Report [to the government for at least five years] that addressed at least twenty enumerated items."  *Id.* at 89.  These annual submissions included, among other things, reports of an Independent Review Organization ("IRO") that functioned in a role in many ways analogous to that of an independent corporate monitor.  The reports submitted by the IRO included an "extensive, probing review of [the companies'] confidential business systems and policies, as well as selected samples of individual transactions," and "contained such information as the identity of customers and the underlying business practices that gave rise to the need for corrective action."  *Id.* at 108.  The court found that there was "no doubt" that the IRO reports were commercial under Exemption 4, *id.* at 108, holding that materials that, among other things, described the companies' interactions with third-party business partners and customers, procedures for disciplining their employees, and provided information about the "way the

companies implement their compliance programs" all constituted commercial information,

*Public Citizen II*, 66 F. Supp. 3d at 208.

Here, all of the withheld material constitutes commercial information under Exemption 4

for the same reasons.  As an initial matter, the Monitor's annual reports, presentations

summarizing those reports, and related materials provided to the DOJ are plainly commercial.

Like the documents at issue in the *Public Citizen* litigation, the Monitor's reports contain

comprehensive reviews of Siemens' compliance practices, policies, and tools as well as

recommendations for improvement.  (J. Kirsch Decl. ¶ 17; *see* F.J. Warin Decl. ¶ 25(c).)  They

address topics such as the efficacy of proprietary compliance tools, anti-corruption training

provided to Siemens employees, the manner in which Siemens conducts internal investigations

into misconduct and disciplines employees, Siemens' finance and controllership functions,

contracting and procurement, mergers and acquisitions, mitigation of risks associated with third-

party business partners, and sales and marketing.  (J. Kirsch Decl. ¶ 18.)  The reports and

presentations contain the Monitor's evaluations of these topical focus areas with respect to

specific transactions, projects, and bids.  (*Id.* ¶¶ 19, 20.)  For all these reasons, Siemens has a

commercial interest in these materials, which detail the nuts and bolts of its compliance program

and financial controls.  *See Public Citizen I*, 975 F. Supp. 2d at 108; *Public Citizen II*, 66 F.

Supp. 3d at 208.

The Monitor's work plans and related presentations are "commercial" as well.  These

documents describe the specific company sectors, compliance processes, and business operations

the Monitor intended to review during each year of the monitorship.  (J. Kirsch Decl. ¶¶ 22, 24.)

These particular areas of focus were selected based on the Monitor's review of confidential

documents and meetings with and interviews of Siemens personnel to leverage their knowledge

of Siemens' operations, compliance program, and corruption risks.  (*See id.* ¶ 23; F.J. Warin

Decl. ¶¶ 21, 25(a).)  The work plans, therefore, necessarily provide information concerning

Siemens' most basic business operations and are thus commercial under Exemption 4.

Finally, Siemens internal trainings, presentations, and compliance policies plainly

constitute commercial information under Exemption 4.  These documents consist of proprietary

trainings and guidebooks developed by Siemens for its employees to ensure compliance with its

policies and procedures.  (J. Kirsch Decl. ¶ 25.)  Also included are compliance circulars and

policies setting forth internal regulations governing Siemens' interactions with third parties,

reporting of compliance violations, and corporate discipline.  (*Id.* ¶ 27.)  These documents are all

commercial because they "detail basic business operations and techniques" and "contain

information about . . . the way [Siemens] implement[s] [its] compliance program."  *Public

Citizen II*, 66 F. Supp. 3d at 207, 208.

## B.     The Materials at Issue Are Confidential

All of the withheld materials that Plaintiff seeks also constitute "confidential"

information under Exemption 4.  Information is confidential if its disclosure would be likely to

either (1) "cause substantial harm to the competitive position of the person from whom the

information was obtained"; or (2) "impair the Government's ability to obtain necessary

information in the future."  *National Parks and Conservation Ass'n v. Morton*, 498 F.2d 765, 770

(D.C. Cir. 1974); *see Critical Mass Energy Project v. NRC*, 975 F.2d 871, 878 (D.C. Cir. 1992)

(en banc).  Here, release of the documents and records at issue—which Siemens protects from

disclosure to both competitors and the public alike—would ***both*** cause Siemens substantial

competitive harm ***and*** impair the government's ability to obtain information in the future.

1.      *Release of the Withheld Information Would Cause Siemens Competitive Harm*

To satisfy the competitive harm prong of the *National Parks* test, "the parties opposing

disclosure need not show actual competitive harm; evidence revealing actual competition and the

likelihood of substantial competitive injury is sufficient to bring commercial information within

the realm of confidentiality."  *Public Citizen Health Research Group*, 704 F.2d at 1291 (internal

quotation marks omitted); *see also Boeing Co. v. U.S. Dep't of the Air Force*, 616 F. Supp. 2d 40,

45 (D.D.C. 2009) (holding that a party "is not required to prove that substantial harm is 'certain'

to result from disclosure, but only that such harm is 'likely'").  Moreover, courts typically "defer

to the agency's predictive judgments as to the repercussions of disclosure" because such

judgments are not capable of exact proof.  *United Techs. Corp. v. U.S. Dep't of Defense*, 601

F.3d 557, 563 (D.C. Cir. 2010).

In factually analogous circumstances, the court in *Public Citizen I* and *Public Citizen II*

determined that a wide array of reviews and descriptions of companies' compliance efforts was

confidential under Exemption 4 because its release would cause the submitters competitive harm.

For example, the court found that the release of the IRO reports—similar to the Monitor's reports

here—would competitively harm the two pharmaceutical firms at issue because competitors

could affirmatively use the "extensive, probing review[s] of [the companies'] confidential

business systems and policies, as well as selected samples of individual transactions."  *Public*

*Citizen I*, 975 F. Supp. 2d at 116-17.  The court also determined that release of descriptions of

the companies' compliance programs and potential violations of the same would cause the

companies obvious competitive harm, reasoning that the materials constituted:

> a free roadmap as to what works in . . . marketing without violating the legal
> framework of regulatory enforcement and laws that govern the industry . . . and
> release of this roadmap would allow competitors to avoid incurring the
> experiential or monitoring costs [the company] did in gaining the information.

*Public Citizen II*, 66 F. Supp. 3d at 210.  As the court observed, companies "invest in their compliance programs" and activities undertaken pursuant to those programs "represent a savings in exposure to risk."  *Id.*

The holdings of *Public Citizen I* and *Public Citizen II* are deeply rooted in longstanding Circuit precedent.  "[C]ompetition in business turns on the relative costs and opportunities faced by members of the same industry, [and] there is a potential windfall for competitors to whom valuable information is released under FOIA."  *Worthington Compressors, Inc. v. Costle*, 662 F.2d 45, 51 (D.C. Cir. 1981).  Put simply, if competitors "are charged only minimal FOIA retrieval costs for the information rather than the considerable costs of private reproduction, they may be getting quite a bargain."  *Id.*

Release of the information at issue in this litigation would cause Siemens considerable competitive harm for that very reason.

a.      Annual Monitor Reports and Associated Documents

As an initial matter, the Monitor's reports and related presentations and materials set forth the detailed inner workings of every aspect of Siemens' compliance program and financial controls, and thus necessarily reveal how Siemens conducts its business operations.  The reports contain thorough assessments, analyses, and recommendations for improvement in a number of functional compliance and control areas, including, but not limited to, "(1) compliance policies; (2) anti-corruption training provided to Siemens employees; (3) proprietary compliance tools, including those that govern confidential reporting, lines of approval authority, and competitive bidding; (4) reporting of compliance violations; (5) guidelines, policies, and internal investigations conducted with respect to compliance issues; (6) disciplinary procedures; (7) finance and controllership functions, including Siemens' audit plans; (8) contracting and

procurement with suppliers; (9) mergers and acquisitions; (10) mitigation of risks related to

third-party business partners; and (11) sales and marketing."  (J. Kirsch Decl. ¶ 18.)

      The accompanying declaration of Mr. Kirsch provides examples of just some of the

numerous proprietary operational details of Siemens' compliance processes and financial

controls found in the reports.  These include, among others:

- Descriptions and analysis of Siemens' tools, processes, and procedures that regulate the Company's financial transactions and which are designed to prevent and detect fraudulent and corrupt payments.

- Descriptions and analysis of Siemens' processes for identifying and mitigating risk associated with projects and customers, including observations and confidential assessments with respect to specific Siemens' projects and customers.

- Descriptions and analysis of Siemens' systems, policies, and practices concerning how Siemens addresses compliance and business related risk throughout various phases of M&A transactions, including the Monitor's confidential observations and assessment of these practices with respect to particular M&A transactions.

- An analysis with respect to a particular investigation by Siemens into an allegation of public corruption in the Middle East, including details of the business investigated, names of the target of the investigation and Siemens personnel conducting the investigation, and an evaluation of Siemens' response and adherence to its confidential practices and policies governing internal investigations.

(*Id.* ¶ 20.)  For several reasons, Siemens is likely to suffer considerable competitive harm if the

Monitor's reports and related materials are disclosed to Plaintiff and the broader public.

      First, release of the materials "would provide competitors with a roadmap of Siemens'

system and allow those competitors to make affirmative use of the program and information

derived from the program without incurring the substantial investment cost that Siemens has

incurred in developing and continually refining its compliance program."  (*Id.* ¶ 21.)  Siemens

has invested significant time and resources in developing and refining its compliance program

and related business practices.  (*Id.* ¶ 8.)  There can be no serious question that companies

compete, at least in part, on their reputations for clean business and adherence to applicable laws,

and this is particularly true in the heavily regulated energy, transportation, and engineering industries in which Siemens operates.  Its controls provide Siemens with a competitive advantage by, among other things, mitigating exposure to legal and regulatory risk for itself, its business partners, and its customers.  (*Id.* ¶¶ 13-14.)  In fact, the very materials at issue in this litigation describe instances where Siemens' compliance practices have attracted new customers and influenced existing customers to expand their business with Siemens.  (*Id.* ¶ 14.)  If Siemens' competitors were able to replicate Siemens' compliance system and related business practices for just minimal FOIA retrieval costs, its competitive advantage would be seriously jeopardized. *Worthington Compressors, Inc.*, 662 F.2d at 51; *Public Citizen II*, 66 F. Supp. 3d at 209-10.

Second, release of these materials would allow competitors to learn about—and make affirmative use of—information about the way in which Siemens conducts activities that are critical to its business, such as M&A processes and due diligence, identifying risks associated with projects and customers, and monitoring and assessing risks associated with its business partners.

Third, release of this information would allow competitors and counterparties alike to identify and exploit strengths and weaknesses and could make it more difficult for Siemens to detect compliance violations.  (J. Kirsch Decl. ¶ 21.)  The reports contain the Monitor's frank assessments of various components of Siemens' controls and systems, including those applicable to due diligence on prospective business partners, customers, and counterparties.  Competitors "could certainly use" these details against Siemens to its detriment.  *Public Citizen I*, 975 F. Supp. 2d at 117.

Lastly, because Siemens' compliance efforts are fully incorporated into its broader business operations, the reports and related materials contain proprietary and competitively

sensitive information having nothing to do with its compliance program.  For example, these materials describe strategies and tactics that Siemens employed on competitively bid projects, identify preferred business partners and agents, and other operational information Siemens maintains in confidence, all of which competitors could use to Siemens' competitive detriment. *See Public Citizen II*, 66 F. Supp. 3d at 213.

For all these reasons, release of the Monitor's reports and related presentations would cause Siemens considerable competitive harm.

b.   Work Plans, Report Exhibits, and Related Documents

For similar reasons, release of the Monitor's work plans and related documents would also cause Siemens substantial competitive harm.

As the plea agreement required, the Monitor developed these documents in coordination with Siemens personnel and in reliance on Siemens processes and analyses, to ensure that the Monitor would obtain cross-sector insight into the practical workings of Siemens' compliance program.  (*See* J. Kirsch Decl. ¶ 23; F.J. Warin Decl. ¶¶ 21, 25(a).)  As a result, these documents necessarily reflect the same type of confidential information about Siemens' compliance program and business operations described above.  For example, the work plans describe Siemens' operations in particular countries and regions, listing detailed figures about orders and sales and the extent to which particular countries and business sectors relied on public sector customers.  As with the Monitor's reports, the release of the work plans and related documents would provide competitors with detailed information about how Siemens' compliance program works in practice, and its perceptions of the countries, sectors, and projects with higher corruption risks that competitors would be able to exploit to Siemens' detriment.  (*See* J. Kirsch Decl. ¶ 24; F.J. Warin Decl. ¶¶ 21, 25(a).)

21

c.       Trainings, Internal Presentations, and Compliance Policies

Finally, Siemens would suffer substantial competitive harm if its internal training

materials, presentations, and compliance policies were released.  These materials include, among

other things,

- An 81-page internal training presentation that provides Siemens' employees with training on (1) major national and international anti-corruption laws; (2) how Siemens conducts diligence on business partners; (3) internal guidelines on gifts and hospitality; (4) internal guidelines and tools related to sponsorships and donations; and (5) collective action;

- A 59-page internal training presentation given to new Siemens compliance officers that describes (1) how Siemens conducts due diligence on business partners; (2) Siemens' proprietary tool for assessing risk concerning business partners; and (3) Siemens' contract approval process; and

- A 59-page internal web-based training for Siemens' employees that addresses Siemens' supplier code of conduct and presents a number of hypothetical scenarios to train employees on proper and improper conduct and potential corruption risks.

(J. Kirsch Decl. ¶ 25.)  All of these materials are the product of great effort and document,

among other things, internal regulations governing conduct of Siemens' employees, reporting of

compliance violations, and corporate discipline.  (*Id.* ¶ 26.)  All of these documents necessarily

reflect Siemens' judgment on the most efficient and effective way to structure its operations and

to ensure that its employees and partners comply with its policies.  (*See id.*)

If released, a competitor could simply use the same materials with few modifications to

train ***its*** employees, without incurring any of the costs that Siemens did to prepare them.  As the

*Public Citizen II* court correctly held, release of these types of documents would allow

competitors to obtain "a free roadmap to what works . . . without violating the legal framework

of regulatory enforcement and laws that govern the industry, and what activities to avoid, and

release of this roadmap would allow competitors to avoid incurring the experiential costs

[Siemens] did in gaining the information."  *Public Citizen II*, 66 F. Supp. 3d at 210.

2.      *Disclosure of the Materials at Issue Would Impair the Government's Ability to Obtain Necessary Information in the Future*

All of the materials at issue in this litigation are confidential under Exemption 4 for the separate and independent reason that disclosure would "impair the government's ability to obtain necessary information in the future." *National Parks and Conservation Ass'n*, 498 F.2d at 770.

Where information is *required* to be submitted to the government, the government's interest is in ensuring its reliability and quality. *Critical Mass Energy Project*, 975 F.2d at 878. Courts have recognized that the threat of disclosure of confidential business information might encourage submitters "to be less forthcoming in their submissions, out of concern for both appearances and their own financial interests" and that "disclosure of potentially sensitive commercial and financial information, even where submissions of information are mandatory, would jeopardize the [government's] ability to rely on any such information that is submitted." *Judicial Watch, Inc. v. Export-Import Bank*, 108 F. Supp. 2d 19, 30 (D.D.C. 2000).

These interests are particularly acute where information is received from independent corporate monitors. Indeed, in 2009, United States Deputy Assistant Attorney General Gary G. Grindler testified that:

> In nearly all monitorships, the monitor is required to submit reports to the Department regarding the company's compliance with [the relevant agreement with the government], any potential breaches of the agreements, and the company's remedial efforts. In addition to these reports, in most cases, the Department maintains an open dialogue with the monitor and will meet with the monitor frequently to receive updates. These written and oral reports frequently contain . . . confidential proprietary information. For these reasons, the reports are designated as confidential. ***The confidentiality of these reports ensures*** that law enforcement investigations are protected and ***that the corporation feels free to provide the monitor access to its operations without fear that the process could be exploited by the corporation's competitors to acquire confidential or proprietary business information***.

Accountability, Transparency, and Uniformity in Corporate Deferred and Non-Prosecution

Agreements: Hearing before the H. Subcomm. on Commercial and Admin. Law of the H.

Comm. on the Judiciary, 111th Cong. 78 (2009) (prepared statement of Gary G. Grindler,

Deputy Ass't Att'y Gen., Crim. Div., U.S. Dep't of Justice), *available at*

http://www.justice.gov/ola/testimony/111-1/2009-06-25-crm-grindler-corporate-agreements.pdf

(emphasis added); *see also SEC. v. WorldCom, Inc.*, 273 F. Supp. 2d 431, 432 (S.D.N.Y. 2003)

(opining that the extent of its cooperation with its monitor allowed WorldCom "not just to clean

house but to put the company on a new and positive footing" and "not just to enjoin future

violations but to create models of corporate governance and internal compliance for this and

other companies to follow").

Courts have largely agreed with the DOJ's common sense view and allowed the

withholding of materials similar to those at issue here under the "substantial impairment" prong

of Exemption 4.  For example, in *Hersh & Hersh v. U.S. Dep't of Health and Human Services*,

the court determined that release of materials submitted to the government in connection with a

Corporate Integrity Agreement—including IRO reports—would impair the government's ability

to obtain similar information in the future.  No. C 06-4234, 2008 WL 901539, at *6 (N.D. Cal.

Mar. 31, 2008).  The court recognized that these reports "often include confidential or

proprietary information"  and credited the government's position that the specter of release of

these documents would make submitters "reluctant to submit complete information" and thus

"severely impair" the government's ability to "negotiate meaningful [Corporate Integrity

Agreements] in the future."  *Id.*; *see also M/A-Com Info. Sys., Inc. v. U.S. Dep't of Health &*

*Human Servs.*, 656 F. Supp. 691, 692-93 (D.D.C. 1986) (holding that release of materials

exchanged by the government and a company in an effort to settle debarment proceedings would impair the government's ability to carry out its governmental duties).[6]

The declarations submitted in this litigation by the government and F. Joseph Warin, U.S. counsel to the Monitor, underscore how release of the materials at issue would significantly impair the government's ability to obtain information of similar reliability and quality in the future.  According to Mr. Warin, "the Monitor's ability to effectively execute his Mandate depended on the Monitor and the Monitorship Team's ability to have open and unfettered communications with Siemens, including numerous discussions with individual Siemens employees or groups of employees on matters of extreme sensitivity." (F.J. Warin Decl. ¶ 27.) Indeed, "some of the most important information relevant to the execution of the Mandate . . . came directly from or was derived from what was learned in . . . interviews meetings, documents, and reviews." (*Id.*)  Siemens and its employees relied on the expectation that the Monitor (and later the government) would keep the documents and information received in the strictest of confidence. (*Id.*)

Moreover, disclosure of the materials at issue here would impair the government's ability to obtain necessary information in the future not only by "severely undermin[ing] the ability of monitors to openly and effectively communicate and obtain information from companies and their employees" but also by "severely undermin[ing] the ability of monitors to communicate openly and effectively and exchange detailed information with the government." (*Id.* ¶¶ 28, 30.)

---

[6] While the court in *Public Citizen I* reached a contrary conclusion, *Public Citizen I*, 975 F. Supp. 2d at 111-13, its holding has no application here.   The court focused its analysis on the effect of disclosure on pharmaceutical companies' incentives to report and self-disclose particular events, concluding that the penalties for breach were sufficient deterrents for non-cooperation. *Id.* at 112.  Here, in contrast, the accompanying declarations submitted by Mr. Warin and the DOJ make clear that that cooperation cannot be viewed through such a binary lens.

As Mr. Warin states, "[p]ublic disclosure of the kinds of materials requested in this case would lead to more limited access to companies' systems, tools, business practices, procedures, markets, and employees, or requests from the companies that communications about these matters be communicated to the government in less detail." (*Id.* ¶ 30.)  This, in turn, would "stifl[e] . . . communications between monitors and the government agencies to which they report, thereby depriving the agencies of the monitors' fulsome assessments, analyses, and evaluations" and ultimately "undercut[ting] the effective administration of justice." (*Id.* ¶¶ 30, 31.)

For all these reasons, release of the information at issue would critically impair the government's ability to obtain similar, reliable information in the future.

## II.    PORTIONS OF THE MATERIALS AT ISSUE ARE EXEMPT FROM DISCLOSURE UNDER EXEMPTION 6

Portions of the materials at issue that contain Siemens employee names and personal identifying information, and particularly information related to employee discipline,[7] are also protected from disclosure under Exemption 6.  Exemption 6 protects information about individuals in "personnel and medical files and similar files" under circumstances where disclosure "would constitute a clearly unwarranted invasion of personal privacy.  5 U.S.C. § 552(b)(6).  "The D.C. Circuit has interpreted this exemption broadly to exempt not just files, but also bits of personal information . . . the release of which would create a palpable threat to privacy." *Judicial Watch, Inc. v. U.S. Dep't of Justice*, No. 13-cv-0949, 2014 WL 1878022, at

---

[7] *Cawthorn v. U.S. Dep't of Justice,* No. 05-0567, 2006 WL 581250, at *2-4 (D.D.C. Mar. 9, 2006) (protecting information about doctors' malpractice and disciplinary history); *Cotton v. Adams*, 798 F. Supp. 22, 26 (D.D.C. 1992) ("[I]ndividuals have an interest in avoiding the embarrassment and potential harassment that may result from public disclosure of their association with [an] inquiry.").

*5 (D.D.C. May 12, 2014) (internal quotation marks omitted).  Here, release of information that is applicable to a particular individual is appropriately withheld under Exemption 6.[8]

## CONCLUSION

For the foregoing reasons, Siemens respectfully requests that this Court grant its motion for summary judgment.

Dated:   New York, NY
         March 22, 2016

DAVIS POLK & WARDWELL LLP

By:     /s/ Paul Spagnoletti

Paul Spagnoletti (*pro hac vice*)
Michael Scheinkman (*pro hac vice*)
Gerard McCarthy (*pro hac vice*)
450 Lexington Avenue
New York, NY  10017
Telephone: (212) 450-4000
E-mail: paul.spagnoletti@davispolk.com
E-mail: michael.scheinkman@davispolk.com
E-mail: gerard.mccarthy@davispolk.com

Raul F. Yanes (D.C. Bar No. 990221)
901 15th Street, N.W.
Washington, DC  20005
Telephone: (202) 962-7000
E-mail: raul.yanes@davispolk.com

*Attorneys for Defendant-Intervenor Siemens*
*Aktiengesellschaft*

---

[8] Exemption 7(C), which provides protection for law-enforcement information the disclosure of which "could reasonably be expected to constitute an unwarranted invasion of personal privacy," also protects this information.  5 U.S.C. § 552(b)(7)(C).