**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____ )
**100REPORTERS LLC**,                      )
                                           )
      Plaintiff,                 )
                                           )
v.                                         )     Civil Action No. 14-1264 (RC)
                                           )
**UNITED STATES DEPARTMENT**               )
**OF JUSTICE**,                            )
                                           )
      Defendant,                 )
                                           )
**SIEMENS AKTINGESELLSCHAFT**,             )
                                           )
      Defendant-Intervenor,      )
                                           )
**THEO WAIGEL**,                           )
                                           )
      Defendant-Intervenor.      )
_____ )

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THE UNITED**
**STATES DEPARTMENT OF JUSTICE'S MOTION FOR SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION………………………………………………………………………...1

BACKGROUND AND STATEMENT OF FACTS…………………………………………...4

I.    Siemens Engaged in a Worldwide Bribery Scheme that Was Caused,
In Part, by its Inadequate Compliance Program…………………………………..4

II.    Siemens Pleaded Guilty and Agreed that a Compliance Monitor Would
Review and Help Remediate its Compliance Program……………………………5

    A.    The Monitor Conducted an Extensive Review of Siemen's
Compliance Program and Provided Confidential Commercial
Information to the DOJ……………………………………………………6

    B.    All of the Information Exchanged Between Siemens and the
Monitor and the Monitor and the DOJ Was Kept Confidential
And None of It Was Filed with the Court…………………………………7

    C.    The DOJ Relied on the Monitor's Findings When Determining
That Siemen's Compliance Program Was Effective……………………...8

III.    Plaintiff Seeks the Same Information that the DOJ, the Monitor, and
Siemens Kept Confidential…………………………………………………………9

ARGUMENT…………………………………………………………………………10

I.    Legal Standard…………………………………………………………………...10

II.    The DOJ Properly Withheld Information Under Exemption (b)(5)
Because It Reveals Deliberations Through Which the DOJ and
SEC Respectively Determined Whether Siemens Satisfied the
Terms of the Settlement Documents…………………………………………...11

    A.    Exemption (b)(5) Permits the DOJ to Withhold Documents
That Would Reveal Deliberations Concerning Law Enforcement
Decisions……………………………………………………………11

    B.    Under the Consultant Corollary, the Deliberative Process Privilege
Exempts the Withheld Information form Disclosure……………………13

    C.    The DOJ Withheld Only Documents and Redacted Portions of
Documents that Were Part of the Deliberative Process…………………15

      D.      The Withheld Documents Are Predecisional and Deliberative.............16

      E.      Documents Exchanged with the SEC Fall Within the Inter-
                Agency Definition of Requirement of Exemption (b)(5)...................18

      F.      The DOJ Properly Withheld Information Under the Attorney
                Work Product Doctrine, Which is Part of Exemption (b)(5)...............19

III.    The DOJ Properly Withheld Information Under Exemption (b)(4)
       Because Records Contained Siemen's Confidential Commercial
       Information………………………………………………………………21

      A.      The DOJ Withheld Only Documents and Redacted Portions
                Of Documents that Included Siemen's "Commercial Information"
                Under Exemption 4……………………………………………………21

      B.      The Withheld Information Was Obtained From Siemens
                And the Monitor, Which Are "Persons" Under Exemption (b)(4).........24

      C.      The Withheld Information is "Confidential" Under Exemption (b)(4)....24

             1.      Disclosure Would Impair the DOJ's and SEC's Law
                   Enforcement Interests by Making It Difficult to Obtain
                   Reliable Information in the Future…………………………26

             2.      Disclosure Would Impair the DOJ's and SEC's Law
                   Enforcement Interest in Effective Enforcement of the FCPA,
                   Deterring Corporate Misconduct, and Promoting Rehabilitation..29

             3.      Disclosing the Withheld Information Would Cause Substantial
                   Competitive Harm to Siemens…………………………………...33

IV.    The DOJ Properly Withheld Personally Identifiable Information Under
       Exemptions (b)(6) and (b)(7)(C)……………………………………………35

V.     The DOJ's Search for Responsive Records Was Adequate……………….....37

VI.    The DOJ Satisfied its Duty to Segregate Responsive, Non-Exempt
       Information………………………………………………………………....38

CONCLUSION…………………………………………………………………..41

## TABLE OF AUTHORITIES

### *Federal Cases*

*9 to 5 Org. for Women Office Workers v. Bd. of Governors of the Fed. Reserve Sys.*,
  721 F.2d 1 (1st Cir. 1983)……………………………………………………………29,30

*Access Reports v. DOJ*,
  926 F.2d 1192 (D.C. Cir. 1991)......................................................................17

*Allnet Commc'n Servs. v. FCC*,
  800 F. Supp. 984 (D.D.C. 1992)......................................................................30

*Armstrong v. Executive Office of the President*,
  97 F.3d 575 (D.C. Cir. 1996)......................................................................39

*Badhwar v. Dep't of the Air Force*,
  829 F.2d 182 (D.C. Cir. 1987)......................................................................13

*Baker & Hostetler LLP v. U.S. Dep't of Commerce*,
  473 F.3d 312 (D.C. Cir. 2006)................................................................. 22, 23

*Bd. of Trade v. Commodity Futures Trading Comm'n*,
  627 F.2d 392 (D.C. Cir. 1980)......................................................................24

*Boeing Co. v. U.S. Dep't of Air Force*,
  616 F. Supp. 2d 40 (D.D.C. 2009)......................................................................33

*Charles v. U.S Dep't of Defense*,
  979 F. Supp. 2d 35 (D.D.C. 2013)......................................................................39

*Citizens for Responsibility and Ethics in Wash. v. DHS*,
  514 F. Supp. 2d 36 (D.D.C. 2007)......................................................................17

*Clark v. U.S. Dep't of Treasury*,
  No. 84-1873, 1986 WL 1234 (E.D. Pa. Jan. 24, 1986) ......................................30

*CNA Fin. Group v. Donovan*,
  830 F.2d 1132 (D.C. Cir. 1987)................................................................. 13, 33

*Coastal States Gas Corp. v. Dep't of Energy*,
  617 F.2d 854 (D.C. Cir. 1980)......................................................................12

*Comstock Int'l, Inc. v. Exp.-Imp. Bank*,
  464 F. Supp. 804 (D.D.C. 1979)......................................................................29

*Critical Mass Energy Project v. Nuclear Regulatory Comm'n*,
  975 F.2d 871 (D.C. Cir. 1992)................................................. 24, 25, 26, 28, 33

*Defenders of Wildlife v. U.S. Border Patrol*,
  623 F. Supp. 2d 83 (D.D.C. 2009)......................................................................16

*Defenders of Wildlife v. U.S. Dep't of the Interior*,
  314 F. Supp. 2d 1 (D.D.C. 2004) ............................................................ 10, 17-18

*Dep't of Defense v. Fed. Labor Relations Auth.*,
  510 U.S. 487 (1994) ................................................................................. 36

*Dep't of Interior v. Klamath*,
  532 U.S. ................................................................................................ 11, 13

*Essex Electro Engineers v. Secr'y of the Army*,
  686 F. Supp. 2d 91 (D.D.C. 2010) ........................................................... 33

*F.T.C. v. Boehringer Ingelheim Pharm.*,
  779 F.3d 142 (D.C. Cir. 2015) ................................................................. 19

*FTC v. Grolier*,
  462 U.S. 19 (1983) .................................................................................. 19

*Gardels v. CIA*,
  689 F.2d 1100 (D.C. Cir. 1982) ............................................................... 10

*Gov't Accountability Project v. U.S. Dep't of Justice*,
  852 F. Supp. 2d 14 (D.D.C. 2012) ........................................................... 20

*Gulf & W. Indus., Inc. v. United States*,
  615 F.2d 527 (D.C. Cir. 1979) ................................................................. 33

*Hanson v. U.S.
  AID*, 372 F.3d 286 (4th Cir. 2004) .......................................................... 13

*Hickman v. Taylor*,
  329 U.S. 495 (1947) ................................................................................. 19

*Hoover v. Dep't of the Interior*,
  611 F.2d 1132 (5th Cir. 1980) ................................................................. 13

*Horowitz v. Peace Corps*,
  428 F.3d 271 (D.C. Cir. 2005) ............................................................ 12, 36, 39

*Johnson v. Executive Office for U.S. Attorneys*,
  310 F.3d 771 (D.C. Cir. 2002) ................................................................. 39

*Judicial Watch v. Export-Import Bank*,
  108 F. Supp. 2d 19 (D.D.C. 2000) ....................................................... 26, 28, 30

*Judicial Watch, Inc. v. DOJ*,
  365 F.3d 1108 (D.C. Cir. 2004) ............................................................... 36

*Judicial Watch, Inc. v. DOJ*,
  432 F.3d 366 (D.C. Cir. 2005) ............................................................. 11, 19

*Judicial Watch, Inc. v. Food & Drug Admin.,*
499 F.3d 141 (D.C. Cir. 2006)................................................................12

*Judicial Watch, Inc. v. U.S. Dep't of Commerce,*
83 F. Supp. 2d 105 (D.D.C. 1999).................................................. 21, 24

*Jurewicz v. U.S. Dep't of Agric.,*
741 F. 3d 1326 (D.C. Cir. 2014)..........................................................34

*Lardner v. DOJ,*
No. 03-0180, 2005 WL 758267 (D.D.C. Mar. 31, 2005)....................13

*M/A-Com Info. Sys., Inc. v. U.S. Dep't of Health and Human Servs.,*
656 F. Supp. 691 (D.D.C. 1986).........................................................22

*Mapother v. DOJ,*
3 F.3d 1533 (D.C. Cir. 1993)..............................................................40

*McDonnell Douglas Corp. v. U.S. Dep't of the Air Force,*
375 F.3d 1182 (D.C. Cir. 2004)..........................................................33

*\*McKinley v. Board of Governors of Federal Reserve Sys.*
647 F.3d (D.C. Cir. 2011)............................................................ 13, 14

*Mead Data Cent., Inc. v. U.S. Dep't of the Air Force,*
566 F.2d 242 (D.C. Cir. 1977)............................................................38

*Nat'l Ass'n of Retired Fed. Employees v. Horner,*
879 F.2d 873 (D.C. Cir. 1989)............................................................37

*Nat'l Cable Television Ass'n v. F.C.C.,*
479 F. 2d 183 (D.C. Cir. 1973)...........................................................10

*Nat'l Ass'n of Home Builders v. Norton,*
309 F.3d 26 (D.C. Cir. 2002)..............................................................22

*Nat'l Inst. of Military Justice v. DOD,*
512 F.3d 677 (D.C. Cir. 2008)............................................................13

*Nat'l Parks and Conserv. Ass'n v. Morton,* 498 F.2d 765
(D.C. Cir. 1974)…………………………………………………….25

*Nat'l Security Archive v. CIA,*
752 F.3d 460 (D.C. Cir. 2014)............................................................12

*Newry Ltd. v. U.S. Customs and Border Prot. Bureau,*
No. Civ. 04-2110, 2005 WL 3273975 (D.D.C. July 29, 2005)...........34

*NLRB v. Sears, Roebuck & Co.,*
421 U.S. 132 (1975)..................................................................... 11, 12

v

*Oglesby v. U.S. Dep't of Army*,
   920 F.2d 57 (D.C. Cir. 1990)..............................................................................37

*Org. for Women Office Workers v. Bd. of Governors of the Fed. Reserve Sys.*,
   721 F.2d 1 (1st Cir. 1983)..................................................................................29

*Pinson v. U.S. Dep't of Justice*,
   -- F. Supp. 3d --, 2016 WL 614364 (D.D.C. Feb. 16, 2016) .................. 10-11, 38

*\*Pub. Citizen Health Research Grp. v. FDA*,
   704 F.2d 1280 (D.C. Cir. 1983).................................................... 22, 23, 24, 33-34

*Pub. Citizen, Inc. v. Office of Mgmt. and Budget*,
   598 F.3d 865 (D.C. Cir. 2010)...................................................................... 11-12

*\*Public Citizen Health Research Grp. v. NIH*,
   209 F. Supp. 2d 37 (D.D.C. 2002)................................................................ 25, 29

*\*Public Citizen v. U.S. Dep't of Health & Human Services*,
   975 F. Supp. 2d 81 (D.D.C. 2013) ("Public Citizen I") .............................. 22, 23

*Public Citizen v. United States Dept. of Health and Human Servs.*,
   66 F. Supp. 3d 196 (2014) ("Public Citizen II")........................................... 22-23

*Reliant Energy Power Generation, Inc. v. FERC*,
   520 F. Supp. 2d 194 (D.D.C. 2007)...................................................................39

*Renegotiation Bd. v. Grumman Aircraft*,
   421 U.S. 168 (1975)................................................................................... 12, 18

*Rodriguez v. U.S. Dep't of Army*,
   31 F Supp. 3d 218 (D.D.C. 2014).....................................................................36

*Roth v. Dep't of Justice*,
   642 F.3d 1161 (D.C. Cir. 2011).......................................................................36

*Ruston v. U.S. Dep't of Justice*,
   521 F. Supp. 2d 18 (D.D.C. 2007)....................................................................29

*SafeCard Servs., Inc. v. S.E.C.*,
   926 F. 2d 1197 (D.C. Cir. 1991)......................................................................11

*Schrecker v. Dep't of Justice*,
   349 F.3d 657 (D.C. Cir. 2003).................................................................... 36-37

*Soucie v. David*,
   448 F.2d 1067 (D.C. Cir. 1971).......................................................................13

*Tax Analysts v. IRS*,
   117 F.3d 607 (D.C. Cir. 1997).........................................................................19

*Thompson v. Dep't of the Navy*,
   No. 95-347, 1997 WL 527344 (D.D.C. Aug. 18, 1997)......................................17
*Tigue v. DOJ*,
   312 F.3d 70 (2d Cir. 2002) ....................................................................13
*Truitt v. Dep't of State*,
   897 F.2d 540 (D.C. Cir. 1990)................................................................38
*U.S. Dep't of State v. Wash. Post. Co.*,
   456 U.S. 595 (1982)............................................................................36
*United Technologies Corp. v. U.S. Dep't of Defense*,
   601 F.3d 557 (D.C. Cir. 2010)................................................................21
*Valencia-Lucena v. Coast Guard, FOIA/PA Records Mgmt.*,
   180 F.3d 321 (D.C. Cir. 1999)................................................................38
*Washington Post Co. v. HHS*,
   865 F. 2d 320 (D.C. Cir. 1989)................................................. 25, 26, 29, 30, 33
*Weisberg v. U.S. Dep't of Justice*,
   627 F.2d 365 (D.C. Cir. 1980)................................................................10
*Wolf v. CIA*,
   473 F.3d 370 (D.C. Cir. 2007)................................................................10
*Wolfson v. United States*,
   672 F. Supp. 2d 20 (D.D.C. 2009)...........................................................20

*Federal Statutes*

15 U.S.C. §§ 78m(b)(2)(A)................................................................................5
5 U.S.C. § 551(2) ..........................................................................................23
5 U.S.C. § 552(a)(4)(B) ..................................................................................10
5 U.S.C. § 552(b) ..........................................................................................38
5 U.S.C. § 552(b)(4)..........................................................................3, 9, 20-21, 24
5 U.S.C. § 552(b)(5)..........................................................................3, 11, 13, 19-20
5 U.S.C. § 552(b)(6)..........................................................................................3
5 U.S.C. § 552(b)(7)(C) ....................................................................................3

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                                    )
**100REPORTERS LLC**,                               )
                                                    )
      Plaintiff,          )
                                                    )
v.                                                  )       Civil Action No. 14-1264 (RC)
                                                    )
**UNITED STATES DEPARTMENT**                        )
**OF JUSTICE**,                                     )
                                                    )
      Defendant,          )
                                                    )
**SIEMENS AKTINGESELLSCHAFT**,                      )
                                                    )
      Defendant-Intervenor,  )
                                                    )
**THEO WAIGEL**,                                    )
                                                    )
      Defendant-Intervenor.  )
_____)

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THE UNITED
STATES' MOTION FOR SUMMARY JUDGMENT**

**<u>INTRODUCTION</u>**

From 2008 until 2012, as part of a plea agreement between Siemens AG and the

government, a Monitor selected and agreed upon by the parties reviewed and tested Siemens'

compliance program.  The Monitor reviewed thousands of pages of Siemens' confidential

commercial documents and interviewed hundreds of Siemens' employees.  Those employees

disclosed to the Monitor additional confidential commercial information about Siemens'

business operations.  The Monitor used that confidential and proprietary information to create

work plans, reports, and presentations about Siemens' compliance program that he then gave to

the Department of Justice.  None of that information was filed with the Court or disclosed to

anyone other than the DOJ and the Securities and Exchange Commission because that

1

information was intended to remain confidential.  At the end of the monitorship, when the DOJ

had to determine whether Siemens' new compliance program was effective, it relied on Siemens'

confidential commercial information and the Monitor's work plans and reports as part of its

deliberative process.

The Freedom of Information Act exempts from disclosure Siemens' confidential

commercial information that the Monitor gave to the DOJ.  Disclosing that information would

harm Siemens because it would expose Siemens' sensitive, commercial information even though

Siemens has sought to keep that information confidential in the normal course of its business and

has not disclosed it publicly or even to the court in its criminal case.  Disclosing that information

would also harm the DOJ's ability to obtain similar information from other companies in the

future and its ability to reduce recidivism of corporations that commit crimes.  Companies like

Siemens that have been convicted of crimes often need monitors to review their compliance

programs and ensure that those programs are effective.  If the information that a monitor gives

the DOJ can be obtained through FOIA, companies and their employees are not likely to be

candid with monitors.  This would harm the DOJ's enforcement efforts because the DOJ would

be less likely to receive reliable information from companies under monitorships.  Consequently,

the DOJ would have inadequate and insufficient information to determine whether companies

had improved their compliance programs as required by agreements between the companies and

the DOJ.

FOIA also exempts from disclosure information that the DOJ received from the Monitor

because the DOJ used that information in its internal deliberations when deciding whether

Siemens had adequately enhanced its compliance program.  Siemens had agreed to have a

monitor evaluate Siemens' compliance program and report to the DOJ about the effectiveness of

its program.  DOJ then used that information to determine whether Siemens had met its obligations under its agreement with DOJ.  FOIA protects from disclosure information that is used in internal deliberations in order to promote candid discussions and optimum decision-making inside government agencies.

Finally, FOIA exempts from disclosure documents that contain two types of personal identifying information.  The first type is personnel files when disclosure would create an unwarranted invasion of personal privacy.  The second type is documents that contain information compiled for law enforcement purposes that would create an unwarranted invasion of personal privacy.  In this case, the DOJ has redacted information that is exempted from disclosure under those provisions of FOIA.

The Court should grant summary judgment in favor of the DOJ because there is no genuine issue of material fact whether each of the withheld documents fits within one of the following statutory exemptions:  5 U.S.C. § 552(b)(4) (privileged and confidential commercial or financial information from Siemens); § 552(b)(5) (documents that the DOJ used in its deliberative process, and inter-agency or intra-agency memoranda and letters that are not subject to civil discovery); § 552(b)(6) (personnel files); and § 552(b)(7)(C) (documents compiled for law enforcement that could reasonably be expected to constitute an unwarranted invasion of personal privacy).

The DOJ joins in and incorporates by reference arguments made by the two Defendant-Intervenors in their separate motions for summary judgment and related submissions in support of its own summary judgment motion here.

## BACKGROUND AND STATEMENT OF FACTS[1]

**I.      Siemens Engaged in a Worldwide Bribery Scheme that Was Caused, in Part, by its Inadequate Compliance Program**

Siemens, a German engineering company, has several hundred thousand employees and operates in more than 100 countries.  *United States v. Seimens Aktiengesellschraft*, 08-cr-367 (RJL) (D.D.C.) (ECF No. 15) ("Statement of Offense") ¶ 45.[2]  Siemens and its subsidiaries develop, build, sell, and service equipment and systems in several industries.  *Id.* ¶ 1.  As an issuer of securities on the New York Stock Exchange, Siemens is subject to the United States' securities laws, including the Foreign Corrupt Practices Act (the "FCPA").  *Id.* ¶ 2.

In November 2006, German authorities began investigating allegations that Siemens had bribed foreign public officials.  United States' Sentencing Memorandum ("USA Sent. Mem.") (ECF No. 3) p. 2.  Soon after, Siemens began a sweeping global internal investigation and disclosed to the DOJ and SEC that it was investigating allegations of FCPA violations in several countries.  *Id.*  The DOJ's investigation uncovered evidence of systematic corruption by Siemens.  Statement of Offense ¶ 86.  The DOJ's investigation also revealed that the company's internal controls were inadequate, and that senior employees had circumvented those internal controls.  *Id.*

---

[1]      Additional supporting facts are contained in the declarations of Suzanna Moberly (a FOIA/PA Specialist), Tarek J. Helou (a DOJ attorney who is now working on the Siemens matter), Tracy Price (an SEC attorney who worked on the Siemens matter), Joseph Lipton (a former DOJ attorney who worked on the Siemens matter), F. Joseph Warin (U.S. counsel to the monitor), and Joel Kirsch (Vice President and Associate General at Siemens), which are all filed herein.

[2]      All citations to court documents, except citations to the Complaint in this case, are to *United States v. Seimens Aktiengesellschraft*, 08-cr-367 (RJL) (D.D.C.).

## II.     Siemens Pleaded Guilty and Agreed that a Compliance Monitor Would Review and Help Remediate its Compliance Program

In 2008, Siemens pleaded guilty to a two-count criminal information charging it with violating the internal controls and books and records provisions of the FCPA.[3]  Plea Agreement (ECF No. 14.)  Siemens and three of its subsidiaries agreed to pay fines totaling $450 million. United States' Amended Notice Regarding Corporate Monitorship ("Notice") (ECF No. 23) ¶ 3. In parallel investigations, Siemens also agreed to pay $350 million in disgorgement of profits to the Securities and Exchange Commission (*id.* ¶ 4) and approximately $856 million to the Munich Public Prosecutor's Office.  As part of its Plea Agreement with the government, Siemens agreed to submit to monitoring by an independent monitor, Dr. Theodore Waigel, who would assess and monitor Siemens' compliance program to reduce the risk of recurrence of misconduct, including evaluating Siemens' internal controls.  Plea Agreement ¶ 12.  The Monitor was assisted by U.S. counsel, F. Joseph Warin.  *Id.*  The Plea Agreement required the monitorship to last three years, and at the end of the three years, Siemens proposed extending it to four years, and the DOJ agreed.  Statement of Offense at Attachment 2 ¶¶ 1, 6; Declaration of Joseph Lipton ("Lipton Decl.") ¶ 8.

Like many FCPA matters, the Siemens case involved a company that engaged in a pattern of wrongdoing, which indicated systematic breakdowns in its anti-corruption compliance programs and internal control systems.  Declaration of Tarek Helou ("Helou Decl.") ¶ 7.  A compliance program is a formal program specifying a corporation's policies, procedures, actions, and processes that helps prevent and detect violations of laws and regulations.  *Id.*  The

---

[3]     The FCPA requires issuers of securities like Siemens to keep books and records that accurately reflect transactions and the disposition of company assets.  15 U.S.C. §§ 78m(b)(2)(A), 78m(b)(5), and 78ff(a).  The FCPA also requires those issuers to maintain a system of internal accounting controls that provide reasonable assurances that transactions are executed in accordance with management's authorization.

Monitor's primary responsibility was to assess and monitor Siemens' compliance program to ensure that it could address and reduce the risk of recurrence of the misconduct. *Id.* ¶ 8. The Monitor evaluated the effectiveness of the company's internal accounting controls, record-keeping, and financial reporting policies and procedures as they related to the company's ongoing compliance with the FCPA and other anti-corruption laws. *Id.* ¶ 9.

### A.   The Monitor Conducted an Extensive Review of Siemens' Compliance Program and Provided Confidential Commercial Information to the DOJ

Over a four-year period, the Monitor evaluated Siemens' compliance program by interviewing witnesses, reviewing documents, testing policies and controls, and making recommendations. Notice ¶ 7. The Monitor met with employees from all levels of the company, reviewed documents, assessed the company's internal audit function, reviewed its compliance program, and tested its internal controls. *Id.* Siemens gave the Monitor virtually unlimited access to its information, spending millions of dollars enhancing its compliance programs, agreeing to extend the Monitor's term to four years, and implementing all 152 of the Monitor's recommendations that were designed to improve Siemens' compliance program. Declaration of F. Joseph Warin ("Warin Decl.") ¶¶ 21, 23. At the beginning of each year (2008, 2009, 2010, and 2011), the Monitor gave the DOJ a work plan that identified the specific tasks he planned to undertake. Warin Decl. ¶ 25.a. At the end of each year (2009, 2010, 2011, and 2012), the Monitor prepared a written report that explained the work he had done and his findings. *Id.* ¶ 20. Siemens might not have taken these extraordinary measures had it known that the Monitor's reports, which contained its confidential and highly valuable commercial information and road maps of its internal controls, could become available to its competitors merely upon the filing of a FOIA request. *Id.* ¶ 27.c.

The DOJ relies on monitors because DOJ's limited resources are focused on investigating and prosecuting corporate crime, not acting as monitors.  Helou Decl. ¶ 16.  The Monitor gave the DOJ the relevant portions of the information that he compiled, which included confidential commercial and financial information that Siemens disclosed only to the Monitor.  Lipton Decl. ¶ 6; Warin Decl. ¶¶ 24, 25a.-d..  That information was generally conveyed through meetings with the DOJ and the Monitor's work plans and annual reports which informed the DOJ about Siemens' compliance program and the progress that the company was making toward enhancing its compliance program.  Lipton Decl., ¶ 5.

**B.      All of the Information Exchanged Between Siemens and the Monitor and the Monitor and the DOJ Was Kept Confidential and None of It Was Filed with the Court**

Throughout the Siemens monitorship, the DOJ attorneys worked with the Monitor and his U.S. counsel and communicated freely about a range of issues involving the monitorship. Lipton Decl. ¶ 6.  The DOJ attorneys understood that the Monitor's work product and their communications with him and his U.S. counsel would remain confidential and took steps to ensure that it remained confidential.  *Id.*  For example, Siemens did not publicly disclose the information that the Monitor gave to the DOJ.  Warin Decl. ¶ 24.  In addition, many of the Siemens documents that the Monitor provided to the DOJ were stamped "confidential" or had similar markings indicating that they were not disseminated outside the company other than to the Monitor and the DOJ as part of Siemens' Plea Agreement.  Warin Decl. ¶ 26.  Furthermore, the cover letters that the Monitor included with the documents that he sent to the DOJ requested that the documents be withheld under exemption (b)(4) because they were confidential commercial information.  *Id.*

### C.   The DOJ Relied on the Monitor's Findings When Determining that Siemens' Compliance Program Was Effective

The DOJ had internal discussions where its attorneys reviewed, considered, and deliberated on the information, recommendations, and opinions that the Monitor gave the DOJ. Lipton Decl. ¶ 7.  The DOJ had these discussions to evaluate whether the Monitor was carrying out his mandate and whether Siemens was complying with its obligations under the Plea Agreement.  *Id.*  The Monitor's work was crucial to this process.  *Id.*  The DOJ's deliberative process was driven largely by the information that the Monitor gave it, including the Monitor's conclusion whether the company's compliance program was effective.  *Id.* ¶¶ 7, 10.  The DOJ relied on the information gathered by the Monitor and the Monitor's input, such as his reporting, opinions, and recommendations, when suggesting changes to subsequent work plans and reviewing annual reports.  *Id.* ¶ 7.  The Monitor's information directly impacted the DOJ's analysis about whether Siemens had satisfied its obligations under the Plea Agreement and whether the monitorship should be continued for an additional year.  *Id.*

In late 2012, as the monitorship was drawing to a close, DOJ analyzed whether Siemens had fully complied with the terms of the Plea Agreement to determine whether the monitorship should end.[4]  *Id.* ¶ 9.  The DOJ met with the Monitor and his U.S. counsel about Siemens' compliance program and its progress; analyzed and discussed the information obtained from the Monitor and Siemens; and consulted with the SEC.  *Id.*  As a result of those efforts, on December 18, 2012, the DOJ filed a Notice advising the court that it concluded that Siemens had satisfied its obligations under the Plea Agreement.  *Id.* ¶ 10; Notice.  The Notice expressly

---

[4]      Before the monitorship was scheduled to end, Siemens voluntarily contacted DOJ to discuss extending it for one additional year, which the Plea Agreement contemplated but did not require.  Lipton Decl. ¶ 8.  Siemens' agreement to extend the monitorship contributed to the DOJ's decision-making process about whether Siemens had complied with the terms of the Plea Agreement.  *Id.*

premised the DOJ's decision and conclusion upon all of the Monitor's activities and information

presented to the DOJ, including the Monitor's initial review and three subsequent reviews of

Siemens' compliance program, his findings and recommendations documented in his four annual

reports, his on-site or remote reviews of Siemens' activities, his interviews and meetings with

Siemens employees, financial studies and testing, the Monitor's various other supporting

documents, and his certifications concerning the effectiveness of Siemens' anti-corruption

compliance program. Notice ¶¶ 7-11. The Notice also stated that the SEC had reached the same

conclusion concerning Siemens' compliance with the terms of the final judgment in the civil

case.

**III.  Plaintiff Seeks the Same Information that the DOJ, the Monitor, and Siemens Kept Confidential**

In 2013, Plaintiff submitted a FOIA request to the DOJ seeking internal records related to

the monitorship, including internal DOJ documents and documents exchanged with the Monitor

and his U.S. counsel.   Complaint ("Compl.") ¶ 18 (ECF No. 1). The DOJ denied Plaintiff's

request because the records were exempt from disclosure under FOIA. *Id.* ¶ 21. In 2014,

Plaintiff filed an administrative appeal, which was denied. *Id.* ¶ 22. Later that year, Plaintiff

filed this action. The DOJ thereafter produced portions of redacted documents to the Plaintiff

and filed a Vaughn index identifying the documents that it withheld. Suzanne Moberly

Declaration ("Moberly Decl.") ¶¶18-19. Plaintiff seeks the same information that all parties

involved – the DOJ, the Monitor, his U.S. counsel, and Siemens – kept confidential.

**ARGUMENT**

## I.    Legal Standard

This court recently addressed summary judgment in FOIA cases in *Pinson v. U.S. Dep't of Justice*, -- F. Supp. 3d --, 2016 WL 614364 (D.D.C. Feb. 16, 2016) (Contreras, J.).  As the Court noted, FOIA cases typically and appropriately are decided on motions for summary judgment. *Id.* at *5 (citing *Defenders of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 87 (D.D.C. 2009)).  In FOIA cases, a district court reviewing a motion for summary judgment conducts a *de novo* review of the record, and the responding agency bears the burden of proving that it has complied with its obligations under FOIA.  5 U.S.C. § 552(a)(4)(B).

"Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'" *Wolf v. CIA*, 473 F.3d 370, 374–75 (D.C. Cir. 2007) (quoting *Gardels v. CIA*, 689 F.2d 1100, 1105 (D.C. Cir. 1982)).  The defending agency will prevail on summary judgment if it proves "that each document that falls within the class requested either has been produced, is unidentifiable or is wholly exempt from the Act's inspection requirements." *Weisberg v. U.S. Dep't of Justice*, 627 F.2d 365, 368 (D.C. Cir. 1980) (internal quotation marks omitted) (quoting *Nat'l Cable Television Ass'n v. F.C.C.*, 479 F. 2d 183, 186 (D.C. Cir. 1973)).  Although the court must analyze all underlying facts and inferences in the light most favorable to the FOIA requester, a defendant may rely on declarations to obtain summary judgment when the declarations are reasonably detailed and non-conclusory.  *Pinson* at *5.  Declarations supporting an agency's motion for summary judgment "are accorded a presumption of good faith, which cannot be rebutted by 'purely speculative claims about the existence and discoverability of other documents.'" *Id.* (quoting *SafeCard Servs., Inc. v. S.E.C.*, 926 F. 2d 1197, 1200 (D.C. Cir. 1991)).

II.   **The DOJ Properly Withheld Information under Exemption (b)(5) Because It Reveals Deliberations through which the DOJ and SEC Respectively Determined Whether Siemens Satisfied the Terms of the Settlement Documents**

A.   **Exemption (b)(5) Permits the DOJ to Withhold Documents that Would Reveal Deliberations Concerning Law Enforcement Decisions**

Exemption (b)(5) lets the DOJ withhold "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). Exemption (b)(5) protects documents that are normally privileged in the civil discovery context. *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 149 (1975). It permits an agency to withhold documents under the deliberative process privilege and the attorney work-product doctrine. *Judicial Watch, Inc. v. DOJ*, 365 F.3d 1108, 1113 (D.C. Cir. 2004).

The deliberative process privilege protects "documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *See Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001) (internal quotations and citation omitted). The deliberative process privilege exists because "officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news." *Id.* at 8-9 (internal quotations and citations omitted). Its object is to enhance the quality of agency decisions by protecting open and frank discussion among those who make them. *Id.*

The deliberative process privilege protects materials if they are both predecisional and deliberative. *Pub. Citizen, Inc. v. Office of Mgmt. and Budget*, 598 F.3d 865, 874 (D.C. Cir. 2010). A document is predecisional "if it was generated before the adoption of an agency policy . . . ." *Judicial Watch, Inc. v. Food & Drug Admin.*, 499 F.3d 141, 151 (D.C. Cir. 2006) (internal quotations and citation omitted). A predecisional document is one "prepared in order to assist an

11

agency decisionmaker in arriving at his decision . . . ." *Renegotiation Bd. v. Grumman Aircraft*, 421 U.S. 168, 184 (1975). Predecisional documents include "recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect of the writer rather than the policy of the agency." *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980). A document is deliberative "if it reflects the give-and-take of the consultative process." *Id.* "The term 'deliberative' in this context means, in essence, that the communication is intended to facilitate or assist development of the agency's final position on the relevant issue." *Nat'l Security Archive v. CIA*, 752 F.3d 460, 463 (D.C. Cir. 2014).

A document satisfies this test if the withholding agency establishes "what deliberative process is involved, and the role played by the documents in issue in the course of that process." *Coastal States*, 617 F.2d at 868. An agency does not need to identify a specific decision in connection with each document because "[a]gencies are, and properly should be, engaged in a continuing process of examining their policies; this process will generate memoranda containing recommendations which do not ripen into agency decisions; and the lower courts should be wary of interfering with this process." *Sears*, 421 U.S. at 151 n. 18. Factual information may be protected where it is so thoroughly integrated with core deliberative material that its disclosure would expose or cause harm to the agency's deliberations. *See, e.g., Horowitz v. Peace Corps*, 428 F.3d 271, 277 (D.C. Cir. 2005) (protecting requested document where decision maker's thought processes are woven into document to such an extent that attempt at segregating information would reveal agency deliberations).

**B.      Under the Consultant Corollary, the Deliberative Process Privilege Exempts the Withheld Information from Disclosure**

As a threshold matter, to can rely on exemption (b)(5), DOJ must show that the withheld documents are inter-agency or intra-agency records.  The withheld documents the Monitor gave the DOJ meet that standard because exemption (b)(5) covers information from outside experts. *See, e.g., Nat'l Inst. of Military Justice v. DOD*, 512 F.3d 677, 681 (D.C. Cir. 2008) (protecting advice provided by individuals who gave military advice about terrorist trial commissions).[5] This is referred to as the "consultant corollary."  *See  Klamath*, 532 U.S. at 11; *Nat'l Inst. of Military Justice*, 512 F.3d at 682.  The consultant corollary, which applies to the Monitor in this case, is based upon the recognition that agencies frequently have a special need for the opinions and recommendations of outside experts.  *Soucie v. David*, 448 F.2d 1067, 1078 n.44 (D.C. Cir. 1971).  Courts have recognized that such expert advice can play "an integral function in the government's decision [making]."  *Hoover v. Dep't of the Interior*, 611 F.2d 1132, 1138 (5th Cir. 1980); *see also CNA Fin. Group v. Donovan*, 830 F.2d 1132, 1162 (D.C. Cir. 1987) ("[F]ederal agencies occasionally will encounter problems outside their ken, and it clearly is preferable that they enlist the help of outside experts skilled at unravelling their knotty complexities.").

---

[5]      *See also McKinley v. Board of Governors of Federal Reserve System*, 647 F.3d 331336-38 (D.C. Cir. 2011) (materials submitted by New York Federal Reserve Bank ("NYFRB") to the Fed to assist the Fed in determining whether to provide temporary loan to Bear Stearns during 2008 financial crisis were covered by consultant corollary; under governing laws, Fed and NYFRB shared common goal of maintaining sound and orderly financial system and Fed sought information from NYFRB to aid in its deliberative process); *Hanson v. U.S. AID*, 372 F.3d 286, 292 (4th Cir. 2004) (applying attorney-client and work product analysis to documents prepared by attorney hired by private company in contractual relationship with agency); *Tigue v. DOJ*, 312 F.3d 70, 78-79 (2d Cir. 2002) (protecting recommendations from U.S. Attorney's Office to Webster Commission, which was consultant to IRS); *Badhwar v. Dep't of the Air Force*, 829 F.2d 182, 184-85 (D.C. Cir. 1987) (upholding application of exemption (b)(5) to material supplied by outside contractors); *Lardner v. DOJ*, No. 03-0180, 2005 WL 758267, at *14-15 (D.D.C. Mar. 31, 2005) (protecting documents written by judges and special prosecutors whose opinions were solicited by agency).

In this case, the Monitor served in a capacity akin to independent outside experts that courts have found to be covered by the consultant corollary. Consequently, materials that he gave to the DOJ are intra-agency records and can be withheld under exemption (b)(5). The DOJ and SEC have a need for expert compliance monitors, because "many FCPA matters involve corporations whose employees engaged in a pattern of wrongdoing, which can indicate systemic breakdowns in the company's anti-corruption compliance programs and internal control systems. Helou Decl. ¶ 7. "[T]he Justice Department could not conduct the kind of reviews that monitors conduct because our limited resources are focused on investigating and prosecuting violations of the FCPA, not acting as monitors." *Id*. ¶ 15. Working through the mechanism of the settlement agreements, the DOJ and the SEC separately secured the specialized expertise and resources of Dr. Waigel and Mr. Warin to ensure that Siemens fulfilled its duty to implement an effective compliance program.[6] Lipton Decl. ¶¶ 5-7; Price Decl. ¶¶ 4-6; Warin Decl. ¶¶ 5-7. Like the NYFRB in *McKinley*, the Monitor and his U.S. counsel had a legally-mandated role to help the DOJ and SEC examine and evaluate the adequacy of Siemens' compliance program and, ultimately, determine whether to extend the monitorship or allow it to expire. 647 F.3d at 337. Rather than representing his own interests or those of another client in seeking a government benefit, the Monitor's only obligations were "to truth and its sense of what good judgment calls for, and in those respects [he] functions just as an employee would be expected to." *Klamath*, 532 U.S. at 12 n.4.

The Monitor submitted records to the DOJ and the SEC as part of the agencies' respective deliberative processes, and the DOJ relied on the Monitor's input. Indeed, the DOJ's

---

[6] The Siemens plea agreement required the Monitor to submit his work plans to the DOJ and Siemens, provided that the DOJ and Siemens could comment on the work plans, and required the Monitor to give the DOJ and Siemens copies of his reports. Statement of Offense at Attachment 2 ¶¶ 3, 4, 6.

"deliberative process is driven largely by the information that the Monitor provides it."  Helou

Decl. ¶ 12; *see also* Lipton Decl. ¶ 7.  Through his service, the Monitor provided an important

benefit to the DOJ and the public by boosting confidence that Siemens was implementing an

effective compliance program that significantly reduced the likelihood of recidivism.  Helou

Decl. ¶ 8; *see also* Warin Dec. ¶¶ 10, 25.c, 25.e. (Monitor functioned as independent consultant

or outside expert to DOJ and SEC).  Accordingly, the Monitor's documents are intra-agency

documents within the meaning of exemption (b)(5).

### C.    The DOJ Withheld Only Documents and Redacted Portions of Documents that Were Part of the Deliberative Process

The deliberative process privilege of exemption (b)(5) permits the DOJ to withhold

information containing the Monitor's strategy, opinions, analysis, evaluations, and reporting, as

well as the DOJ's and the SEC's related discussions and deliberations.  The DOJ withheld the

following types of documents:

- The Monitor's work plans and related documents.  The work plans contain the Monitor's opinions and strategy for approaching his responsibilities under his mandate, describe the core areas of Siemens he intended to review, and identify the means by which he intended to carry out his work.  They contain the Monitor's assessment of various geographic regions of Siemens' operations, and they identify the types of individuals he intended interview, meetings he planned to hold, documents he would review, countries where he would conduct site visits, and types of studies and audits he would conduct and the methodology he would use.
- The Monitor's yearly reports and exhibits.  The reports document the results of the Monitor's review over the preceding year, including his analysis of Siemens' business, organizational, and compliance structure; his analysis of Siemens' compliance policies, procedures, and practices; his evaluation of Siemens' efforts to develop and implement an effective compliance program; and his recommendations to Siemens across different compliance areas.
- The Monitor's presentations to the DOJ and SEC summarizing various aspects of his work, including his work plans, yearly reports, and audit methodology.  The presentations include information from documents that exemption (b)(5) covers.
- Emails and correspondence between the Monitor, the Monitor's counsel, DOJ attorneys, and SEC attorneys concerning various aspects of the monitorship, including issues raised at meetings and presentations.

- Emails involving DOJ attorneys and SEC attorneys concerning various aspects of the monitorship.
- Correspondence between the Siemens' Board and DOJ and SEC attorneys concerning its commitment to the goals of the monitorship.
- Siemens' compliance policies and descriptions of various aspects of its compliance program.
- Training materials for Siemens' employees about various aspects of its compliance programs.
- Draft court filings involving the Government's notice to the Court at the conclusion of the monitorship.

Declaration of Suzanna Moberly ("Moberly Decl."), ¶ 24.  These documents are predecisional and deliberative because they were generated as part of the DOJ's and SEC's respective deliberations to determine whether Siemens had an effective compliance program, as discussed further below.

### D.    The Withheld Documents Are Predecisional and Deliberative

The information that the Monitor gave to the DOJ and the DOJ's analysis of it meet the "predecisional" requirement of exemption (b)(5).  The information was generated throughout the four-year monitorship and before the DOJ concluded that Siemens had satisfied its obligations under the Plea Agreement.  *See* Lipton Decl. ¶ 10.  The Monitor prepared the documents and presentations that he gave to the DOJ for the purpose of helping the DOJ deliberate on whether Siemens had satisfied its obligations under the Plea Agreement.  *Id.*  In reaching this conclusion, in late 2012, DOJ analyzed whether Siemens had fully complied with the Plea Agreement, which included reviewing the Monitor's work product, conversations with the Monitor and his U.S. counsel about Siemens' compliance program and its progress, analyzing and discussing internally the information obtained from the Monitor and Siemens, and consulting with the SEC. *Id.* ¶ 9.[7]

---

[7] The Monitor's reports and other information thus effectively served as the DOJ's predecisional "briefing materials," which courts have consistently found are covered by the privilege.  *See,*

This analysis and the deliberations took place throughout the monitorship, not only at its end.  Lipton Decl. ¶ 7; *see also* Helou Decl. ¶ 12.  The Monitor's information played an essential role in DOJ's thinking and directly impacted DOJ's analysis about whether Siemens had satisfied its obligations under the terms of the Plea Agreement and whether the monitorship should be continued for an additional year.  Lipton Decl. ¶ 7; *see also* Helou Decl. ¶ 12; Warin Decl. ¶ 25.c.  The Monitor's information factored in this continuing process of agency decision-making, providing an independent basis for concluding that the withheld information was "predecisional."  *See Access Reports v. DOJ*, 926 F.2d 1192, 1196 (D.C. Cir. 1991) (upholding the use of privilege where withheld documents contributed to agency's decision-making process); *Defenders of Wildlife v. U.S. Dep't of the Interior*, 314 F. Supp. 2d 1, 18-19 (D.D.C. 2004) (protecting documents relating to ethics investigation that were prepared by Department of Interior and given to office of Government Ethics, which had final authority over investigation).

The withheld materials are also deliberative because they reflect the give-and-take between the Monitor and the DOJ, on the one hand, and the Monitor and the SEC, on the other, concerning the quality of Siemens' performance under the Plea Agreement.  The Monitor and his team communicated extensively and openly with the DOJ and with the SEC about many sensitive matters that they learned of from Siemens.  Lipton Decl. ¶¶ 5-6, Warin Decl. ¶ 25.c.  The Monitor's materials contain his analyses, evaluations, conclusions, and recommendations related to confidential business processes and other sensitive matters relevant to the DOJ's and

---

*e.g., Citizens for Responsibility and Ethics in Wash. v. DHS*, 514 F. Supp. 2d 36, 44 (D.D.C. 2007) (protecting briefing materials concerning ongoing response to Hurricane Katrina, which included proposed "solutions and approaches"); *Thompson v. Dep't of the Navy*, No. 95-347, 1997 WL 527344, at *4 (D.D.C. Aug. 18, 1997) (protecting materials created to brief senior officials who were preparing to respond to media inquiries, on basis that "disclosure of materials reflecting the process by which the Navy formulates its policy concerning statements to and interactions with the press" could stifle frank communications within agency).

SEC's respective deliberations.  Warin Decl. ¶ 25.c.  The DOJ conducted its own analysis of the adequacy of the Monitor's performance of his mandate and Siemens' compliance efforts and relied heavily upon the Monitor's input in making those judgments.

Disclosure of this information would expose and harm the DOJ's and SEC's respective deliberations.  Facts in the withheld information are thoroughly within the heartland of deliberative material, and their inclusion in the documents reflects the Monitor's efforts to distill material facts from an extremely large body of information.  *See* Warin Decl. ¶ 27.a (Monitor's reports based on interviews or meetings with more than 2,300 Siemens employees, 51,000 documents totaling more than 973,000 pages, and reviews of Siemens activities in or related to 39 countries).  Disclosure of this inextricably intertwined factual information would have a similarly deleterious effect on the deliberative process

### E.    Documents Exchanged with the SEC Fall within the Inter-Agency Definition of Requirement of Exemption (b)(5)

The DOJ is also withholding documents exchanged with the SEC because those documents fall within the inter-agency definition of exemption (b)(5).  For example, DOJ provided the SEC a draft of the Notice to the court regarding the termination of the monitorship and seeking the SEC's input.  *See Amended Vaughn* Index p. 152 (Doc. No. 005343).  "Predecisional documents" are not only those circulated within the withholding agency, but can also be those from an agency lacking decisional authority, like the SEC in this case, that advises another agency possessing such authority.  *See Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.*, 421 U.S. 168, 188 (1975); *Defenders of Wildlife v. U.S. Dep't of the Interior*, 314 F. Supp. 2d 1, 18-19 (D.D.C. 2004) (protecting documents relating to ethics investigation that were

prepared by Department of Interior and given to Office of Government Ethics, which had final

authority over investigation).[8]

### F.      The DOJ Properly Withheld Information under the Attorney Work Product Doctrine, which is Part of Exemption (b)(5)

Exemption (b)(5) also permits the DOJ to withhold information that is protected by the

attorney work product doctrine.  That doctrine covers material prepared in anticipation of

litigation or for trial by or for another party or by or for that other party's representative.

*Judicial Watch, Inc. v. DOJ*, 432 F.3d 366, 369 (D.C. Cir. 2005) (citations omitted).  As the

Supreme Court has recognized, "it is essential that a lawyer work with a certain degree of

privacy, free from unnecessary intrusion by opposing parties and their counsel."  *Hickman v.*

*Taylor*, 329 U.S. 495, 510 (1947).  When considering whether a document is prepared in

anticipation of litigation, the D.C. Circuit employs a "'because of' test, inquiring 'whether, in

light of the nature of the document and the factual situation in the particular case, the document

can fairly be said to have been prepared or obtained because of the prospect of litigation.'"

*F.T.C. v. Boehringer Ingelheim Pharm.*, 779 F.3d 142, 149 (D.C. Cir. 2015) (quoting *United*

*States v. Deloitte LLP*, 610 F.3d 129, 137 (D.C. Cir. 2010).

The protection is not limited to "the mental impressions, conclusions, opinions, or legal

theories of an attorney or other representative of a party concerning the litigation."  *FTC v.*

*Grolier*, 462 U.S. 19, 25 (1983) (citation omitted).  Thus, the distinction between "fact" and

"opinion" work product recognized in the civil discovery context is irrelevant in FOIA cases.  *Id.*

---

[8]      The DOJ joins in and incorporates by reference arguments made by Defendant-Intervenor Dr. Waigel in his separate motion for summary judgment and related papers, supporting the withholding of the contested information under FOIA Exemption (b)(5).

at 27; *see also Tax Analysts v. IRS*, 117 F.3d 607, 620 (D.C. Cir. 1997) (holding that the work product privilege "also protects factual materials prepared in anticipation of litigation").

In this case, the DOJ is withholding three types of documents based on the attorney work product doctrine.  First, the DOJ is withholding emails between DOJ attorneys that related to the monitorship.  Second, the DOJ is withholding draft versions of notices to the Court about the corporate monitorship and proposed order.  *Amended Vaughn* Index p. 160 (Doc. No. 005345-5350); *Id.* at p. 165 (Doc. No. 5352-5356 (draft of notice to be filed with the court)).  Courts in this district have consistently held that memoranda and emails sent between prosecutors in anticipation of prosecution are covered by the work-product doctrine.  *See Gov't Accountability Project v. U.S. Dep't of Justice*, 852 F. Supp. 2d 14, 26-27 (D.D.C. 2012) (holding as privilege documents prepared by DOJ criminal division attorneys that "discuss the attorney's impressions about the case, the evidence that would be needed to make a determination as to whether prosecution should be pursued, and his thoughts on possible next steps in the case"); *Wolfson v. United States*, 672 F. Supp. 2d 20, 30 (D.D.C. 2009) (holding a privilege documents that set for the attorneys' thoughts, impression, evidence development, legal theory, etc.).  The emails between DOJ attorneys and the draft notices to the Court were prepared in anticipation of litigation because they related to the DOJ's determination of whether Siemens had complied with the Plea Agreement.

Third, the DOJ is withholding email messages between DOJ attorneys and SEC attorneys.[9]  *See* Moberly Decl. Exh. G.  The withheld documents expressed the DOJ's views about the Siemens monitorship and when the monitorship would end.  *Amended Vaughn* Index p.

---

[9] As discussed above, the DOJ is also withholding emails between the SEC and the DOJ under the inter-agency memoranda and letters part of exemption (b)(5) and emails within the DOJ under the intra-agency part of exemption (b)(5).

152 (Doc. No. 0005343-5344).  The correspondence also discussed amending the criminal

judgment.  *Id.*  Although emails between SEC and DOJ attorneys would not always be

considered work product, they are in this case because those communications related solely to

the Monitor, who reported to the DOJ and upon whose work the SEC relied.

### III. The DOJ Properly Withheld Information Under Exemption (b)(4) Because the Records Contained Siemens' Confidential Commercial Information

Under exemption (b)(4), the DOJ may withhold from disclosure any information that is

"commercial or financial information obtained from a person and privileged or confidential."  5

U.S.C. 552(b)(4).  The DOJ sustains its burden of showing that exemption (b)(4) was properly

applied if it establishes that the withheld information is "(1) commercial or financial; (2)

obtained from a person; and (3) privileged and confidential."  *See United Technologies Corp. v.*

*U.S. Dep't of Defense*, 601 F.3d 557, 563 (D.C. Cir. 2010).

### A. The DOJ Withheld Only Documents and Redacted Portions of Documents that Included Siemens' "Commercial Information" Under Exemption 4

The DOJ is withholding the following categories of documents under FOIA Exemption

(b)(4).  *See* Moberly Decl. Exh. G:

- The Monitor's work plans and related documents.  These documents contain information about Siemens' compliance program, accounting controls, and business operations.
- The Monitor's yearly reports and exhibits.  These documents contain information about Siemens' compliance program, accounting controls, and business operations.
- The Monitor's presentations to the DOJ and SEC summarizing various aspects of his work, including work plans, yearly reports, and audit methodology.  These documents contain information about Siemens' compliance program, accounting controls, and business operations, much of which is in the Monitor's work plans and yearly reports.
- Emails and correspondence between the Monitor, the Monitor's counsel, the DOJ attorneys, and the SEC attorneys.  These documents contain information about Siemens' compliance program, accounting controls, and business operations.

- Emails involving the DOJ attorneys and the SEC attorneys.  These documents contain information about Siemens' compliance program, accounting controls, and business operations.
- Correspondence between the Siemens Board and DOJ and SEC attorneys.  These documents contain information about Siemens' compliance program, accounting controls, and business operations.
- Siemens' compliance policies and descriptions of various aspects of its compliance program.  These documents contain information about Siemens' compliance program and accounting controls.
- Training materials for Siemens' employees about various aspects of its compliance program.  These documents contain information about Siemens' compliance program, accounting controls, and business operations.

*See* Moberly Decl. Exh. G (a chart listing the categories of documents and corresponding document numbers on the *Amended Vaughn* Index).

Information is "commercial" if, "in and of itself," it serves a "commercial function" or is of a "commercial nature."  *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 38 (D.C. Cir. 2002) (internal citations omitted).  Records are "commercial" as long as the submitter has a "commercial interest" in them.  *Baker & Hostetler LLP v. U.S. Dep't of Commerce*, 473 F.3d 312, 319 (D.C. Cir. 2006).  Records "that actually reveal basic commercial operations, such as sales statistics, profits and losses, and inventories, or relate to the income-producing aspects of a business," fall within the scope of "commercial" information.  *Pub. Citizen Health Research Grp. v. FDA*, 704 F.2d 1280, 1290 (D.C. Cir. 1983).  Courts also consider a wide variety of other documents to be "commercial" under the FOIA.  *See Public Citizen v. U.S. Dep't of Health & Human Services*, 975 F. Supp. 2d 81, 107 (D.D.C. 2013)) (communications discussing unlawful promotion or misbranding of company's products); *Public Citizen v. United States Dept. of Health and Human Servs.*, 66 F. Supp. 3d 196 (D.D.C. 2014) ( "*Public Citizen II*") (reports submitted by independent experts pursuant to corporate integrity agreements describing companies' interactions with business partners and customers, procedures for disciplining employees, and information about implementation of compliance programs).  *See also M/A-Com*

*Info. Sys., Inc. v. U.S. Dep't of Health and Human Servs.*, 656 F. Supp. 691, 692 (D.D.C. 1986)

(drafts of documents showing accounting and other internal procedures). *Baker & Hostetler*, 473

F.3d at 319 (letters describing market conditions for domestic lumber companies); *Public Citizen*

*Health Research Grp.*, 704 F.2d at 1290 (health and safety records of company's products).

Here, the withheld information constituted Siemens' "commercial information." [10]  For

instance, the withheld information shows Siemens' financial controls and information about its

business operations, including valuation and projected profits for actual and potential projects,

and information about competitive bidding procedures. *See* Declaration of Joel Kirsch ("Kirsch

Decl.") ¶ 16-28.  *See also* Siemens' Mot. Intervene (ECF No. 13-1) at 7.  The withheld

information in the work plans includes Siemens' corporate structure, compliance program, and

internal control processes. *See, e.g., Amended Vaughn* Index Doc. No. 0001-28.  The

commercial information withheld in the Annual Reports includes information about Siemens'

leadership and corporate culture, compliance programs, policies, tools, processes and financial

controls. *See, e.g., Amended Vaughn* Index Doc. No. 00029-293.  The work plans, annual

reports, and emails identified above contain Siemens' confidential commercial information. *See*

*Public Citizen II*, 66 F. Supp. 3d at 215-16 (companies' business practices and corporate

structures are confidential commercial information).  Accordingly, DOJ properly determined that

the withheld information constitutes "commercial information" under FOIA Exemption (b)(4).

---

[10]     The DOJ joins in and incorporates by reference arguments made by Defendant-Intervenor
Siemens in its separate motion for summary judgment and related papers, which establish that
the information withheld constituted Siemens' confidential commercial information.

**B.      The Withheld Information Was Obtained From Siemens And The Monitor, Which Are "Persons" Under Exemption (b)(4)**

Under FOIA, information must be obtained from a "person" to be exempt from disclosure.  5 U.S.C. § 551(2).  FOIA includes corporations such as Siemens and individuals like Dr. Waigel in its definition of "person." *Id.* (defining a person includes an "individual, partnership, corporation, association, or public or private organization other than an agency").  It makes no difference that DOJ obtained much of Siemens' confidential commercial information from the Monitor rather than directly from the company, because the definition of "persons" is "sufficiently broad to encompass financial and commercial information concerning a third party" and applies "regardless of whether the information pertains to the commercial interest of the party that provided it, or the commercial interest of another." *Bd. of Trade v. Commodity Futures Trading Comm'n*, 627 F.2d 392, 405 (D.C. Cir. 1980) (holding that requested information is not required to relate solely to affairs of submitter).  Accordingly, Exemption (b)(4) clearly covers information obtained from Siemens (a corporation) and the Monitor (an individual) because both of them are "persons" for purposes of exemption (b)(4).

**C.      The Withheld Information is "Confidential" under Exemption (b)(4)**

To qualify for protection under FOIA Exemption (b)(4), the submitted information must be privileged or confidential.  *See, e.g., Pub. Citizen Health Research Group*, 704 F.2d at 1290. The applicable standard depends on whether the information was provided to the government voluntarily or under compulsion. *Judicial Watch, Inc. v. U.S. Dep't of Commerce*, 83 F. Supp. 2d 105, 110 (D.D.C. 1999).  When information is voluntarily disclosed to the government, it is considered confidential under Exemption 4 if it is the kind of information "that would customarily not be released to the public by the person from whom it was obtained." *Id.* (citing

*Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, 975 F.2d 871, 879 (D.C. Cir. 1992) (*en banc*)).[11]

Where the information is submitted to a federal agency involuntarily, a different test applies.[12] Under the involuntary test, "[c]ommercial or financial matter is 'confidential' for purposes of the exemption if disclosure of the information is likely to have either of the following effects: (1) to impair the Government's ability to obtain necessary information in the future; or (2) to cause substantial harm to the competitive position of the person from whom the information was obtained." *Nat'l Parks and Conserv. Ass'n v. Morton*, 498 F.2d 765, 770 (D.C. Cir. 1974) ("*National Parks I*"); *Falkenstein v. HUD*, 952 F. Supp. 2d 288, 294 (D.D.C. 2013) (noting that where the submission of the information was compelled, it is exempt from disclosure if disclosure "would be likely either (1) to impair the government's ability to obtain necessary information in the future; or (2) to cause substantial harm to the competitive position of the person from whom the information was obtained.").

In applying the *National Parks I* two-prong test, courts in the D. C. Circuit have "reaffirmed the central role a rough balancing test must play between the private and public interests when considering a withholding under Exemption 4." *Public Citizen Health Research Grp. v. NIH*, 209 F. Supp. 2d 37, 45 (D.D.C. 2002). Indeed, '[w]hen conducting this balancing, the Court is permitted to look beyond the two factors set forth in *National Parks I* (serious competitive harm and impairment of government information gathering)." *Id*. at 45. These other consideration, however, "'can be introduced into the balance only as factors weighing

---

[11]     To the extent that Siemens produced some of the withheld information voluntarily, the information should be kept confidential because the information is of a kind that Siemens would customarily not release to the public. *See* Kirsch Decl. ¶ 16 (noting that Siemens treats the documents as confidential and protects them from disclosure to both competitors and the public).

[12]     Although Siemens voluntarily pleaded guilty, once the court accepted its plea and adopted the plea agreement, its disclosures became involuntary submissions under the FOIA.

against disclosure in a manner similar to the two interests identified in *National Parks I*.'" *Id.* (quoting *Washington Post Co. v. HHS*, 865 F. 2d 320, 326 (D.C. Cir. 1989)). The Court is required to balance the public interest in disclosure against the private interest in withholding the information. *Id.* Indeed, the D.C. Circuit has noted that "[E]xemption 4 contemplates a straightforward balance of the pros and cons of disclosure in any particular case." *Washington Post*, 865 F. 2d at 328. The balancing of the "pros and cons" in this case weighs in favor of non-disclosure in this case.

### 1. Disclosure Would Impair the DOJ's and SEC's Law Enforcement Interests by Making It Difficult to Obtain Reliable Information in the Future

In *Critical Mass*, the D.C. Circuit held that, when disclosure is by compulsion, the focus of the impairment analysis should be on the risk that disclosure may adversely affect the "continued reliability" or "quality" of the information obtained by the government. 975 F.2d at 878. Subsequent decisions have linked confidentiality to the government's ability to receive accurate information. In *Judicial Watch v. Export-Import Bank*, 108 F. Supp. 2d 19 (D.D.C. 2000) ("*Ex-Im Bank*"), the plaintiff's FOIA request sought information about insurance applications that companies submitted to the Export-Import Bank. *Id.* at 30. The court affirmed the Export-Import Bank's withholding of the information under exemption (b)(4) and noted that the Bank treated the commercial and financial information confidentially because its disclosure would encourage exporters to be less forthcoming to the government in the future due to concerns about their appearance and their financial interest. *Id.* The court observed that the government "has a compelling interest in ensuring that information it receives is of the highest quality and reliability, and disclosure of potentially sensitive commercial and financial information, even where submissions of information are mandatory, would jeopardize the [government's] ability to rely on any such information that is submitted." *Id.* The court further

noted that a "lack of reliability would cripple the Bank's ability to make rational decisions regarding the viability of future export insurance transactions, thereby hindering the Bank's ability to fulfill its statutory purpose." *Id.* at 30.

Similarly, in this case, all of the parties deemed the information obtained from Siemens and the Monitor as confidential, and it was not shared outside of the DOJ or the SEC. Helou Decl. ¶ 10(c); Price Decl. ¶ 9; Warin Decl. ¶ 26 (documents submitted by Monitor marked "Confidential Treatment Requested Under FOIA by Siemens AG"). The confidentiality treatment fostered an environment where Siemens and its employees likely would be more forthcoming in dealing with the Monitor, and thus with the DOJ. *See* Helou Decl. ¶¶ 13-14; Warin Decl. ¶ 13; Price Decl. ¶ 13 (disclosure of confidential information would likely cause companies in monitorship programs to be less forthcoming).

The DOJ possesses a strong interest in ensuring that the information obtained from the compliance monitors, such as Dr. Waigel, is accurate and complete. Helou Decl. ¶ 13; Price Decl. ¶ 13. If the information that the DOJ obtains from monitors is subject to disclosure under FOIA, then the quality of the information that the Monitor receives from the affected companies will be diminished because it will be incomplete and less accurate. Helou Decl. ¶ 13. If the affected companies knew that the information relayed to the Monitor, and ultimately to the government, would be publicly disclosed, those companies less likely volunteer information with monitors, including reporting new misconduct or problems with their compliance programs. *Id.* ¶ 17. Consequently, this impairs the ability of the DOJ and SEC to reduce corporate criminal recidivism because the chilling effect also would hinder monitors' effectiveness in helping companies implement compliance programs. *Id.* at *¶ 15*; *see also* Price Decl. ¶ 13.

Moreover, the monitorship process would be harmed because companies and monitors would be reluctant to communicate candidly and openly for fear that information that they exchange will become public.  Helou Decl. at ¶ 14.  A monitor must be able to obtain truthful and timely confidential information from the affected company and its employees.  *Id.*  The assurance of confidentiality is particularly important when monitors deal with companies in jurisdictions where people view government entities – and especially law enforcement – with distrust.  *Id.*  The consequence of disclosing the confidential information at issue here would result in monitors and the DOJ receiving less credible or reliable information.  *Id.* ¶ 14; *see, e.g., Critical Mass*, 975 F.2d at 878 ( "[W]hen dealing with a FOIA request for information the provider is required to supply, the governmental impact inquiry will focus on the possible effect of disclosure on its quality . . . .").

Furthermore, the disclosure of documents here would deprive the agencies of the monitors' "fulsome assessments, analyses, and evaluations on which to base their determinations regarding corporate compliance." Warin Decl. ¶ 30. The lack of open communication by the affected companies, such as Siemens and its employees, would deprive DOJ of the ability to obtain quality and reliable information to make "rational decisions" regarding whether affected companies, such Siemens, have met their obligations under the negotiated agreement. *See Ex-Im Bank*, 108 F. Supp. 2d at 30.  In weighing the "pros and cons of disclosure" in this case tips in favor of non-disclosure because DOJ has shown that it has a compelling interest in maintaining the confidentiality of the information obtained through the monitorship programs to ensure that the government can continue to receive the highest quality and the most reliable information from other corporate defendants in the future.

2.    **Disclosure Would Impair the DOJ's and SEC's Law Enforcement Interest in
Effective Enforcement of the FCPA, Deterring Corporate Misconduct, and
Promoting Rehabilitation**

Courts applying the *National Parks I* test have held that information is confidential if its

disclosure would harm other governmental interests, besides an agency's need to gather quality

and reliable information in the future.  Among these protected agency interests are avoiding

disclosures that would interfere with agency's accomplishment of its statutory purpose. *See*

*Export-Import Bank*, 108 F. Supp. 2d at 30 (noting that disclosure would harm other

governmental interest such as the government's ability to fulfill its statutory purpose).

Disclosure of the documents here would undermine the ability of the DOJ and SEC to

effectively enforce the FCPA, deter corporate misconduct, and help rehabilitate wrongdoers  -

which are important governmental interests recognized by the FOIA.  As discussed above, when

engaging in "rough balancing"[13] between the public and private interests implicated by a

withholding under Exemption 4, courts are permitted to look beyond the two factors enunciated

in *National Parks I* (impairment of government information gathering or substantial competitive

harm to the submitter).  *See Public Citizen Health Research Grp.*, 209 F. Supp. 2d at 45 (citing

*Washington Post*, 865 F.2d at 326).  Courts have accordingly recognized a third prong of the

*National Parks I* test that protects other governmental interests.  *See, e.g., 9 to 5 Org. for Women*

*Office Workers v. Bd. of Governors of the Fed. Reserve Sys.*, 721 F.2d 1, 9-10 (1st Cir. 1983)

(noting that *National Parks I* does not limit the number of legitimate interests which are

protected by the exemption and the "Government should not be precluded from invoking the

protection of exemption 4 merely because the asserted interest is not precisely one of those two

---

[13]    The D.C. Circuit defines "rough balancing" to mean "that information will be withheld
only when the affirmative interests in disclosure on the one side are outweighed by the factors
identified  in *National Parks I* (and its progeny) militating against disclosure on the other side."
*Washington Post*, 865 F. 2d at 327.

identified in *National Parks I*").[14]  Citing *National Parks I*, the First Circuit observed that "[i]f it

can be demonstrated with particularity that a specific private or governmental interest will be

harmed by the disclosure of commercial or financial information, the Government should not be

precluded from invoking the protection of exemption 4 merely because the asserted interest is

not precisely one of those two identified in *National Parks I*." 721 F.2d at 9-10.  The First

Circuit further observed that "[t]he emphasis, however, should be placed on the potential harm

that will result from disclosure, rather than simply promises of confidentiality, or whether the

information has customarily been regarded as confidential." *Id.*  In that connection, the D.C.

Circuit noted that its cases "make [] clear that other interests can be introduced into the balance

only as factors weighing against disclosure, in a manner similar to the two interests identified in

*National Parks I*." *Washington Post*, 865 F. 2d at 327.  The government has the burden of

identify the "particular interest" and how that interest would be harmed by public disclosure.  *See*

*9 to 5*, 721 F.2d at 10. Recognizing this principle, this Court has held that impairment of an

agency's ability to carry out its statutory purpose is sufficient cause to justify a finding of

confidentiality within the context of Exemption 4.  *See, e.g., Export-Import Bank*, 108 F. Supp.

2d at 30 (citing *Comstock International (U.S.A.), Inc. v. Exp.-Imp. Bank*, 464 F. Supp. 804

---

[14]  *See also Ruston v. U.S. Dep't of Justice*, 521 F. Supp. 18, 20-21 (D.D.C. 2007) (implicitly relying upon third prong by protecting psychological testing material the release of which would "severely compromise" test validity and "likely … damage the value of investments made by" test creators); *Allnet Commc'n Servs. v. FCC*, 800 F. Supp. 984, 990 (D.D.C. 1992) (protecting computer models under third prong because disclosure would make providers of proprietary input data reluctant to supply such data to submitter, and without data computer models would become ineffective, which, in turn, would reduce effectiveness of agency's program); *aff'd on other grounds*, No. 92-5351, (D.C. Cir. 1994); *Clark v. U.S. Dep't of Treasury*, No. 84-1873, 1986 WL 1234, at *2-3 (E.D. Pa. Jan. 24, 1986) ("protecting identities of Flower Bond growers under third prong because government had legitimate interest in fulfilling "pre-FOIA contractual commitments of confidentiality" given to investors in order to ensure that pool of future investors willing to purchase government securities was not reduced; if that occurred, the pool of money from which government borrows would correspondingly be reduced, thereby harming national interest);

(D.D.C. 1979); *M/A-Com Information Systems, Inc. v. U.S. HHS*, 656 F. Supp. 691 (D.D.C. 1986)).

There are just such important governmental interests at stake here. First, disclosing the information sought by Plaintiff would harm the governmental interest in deterring and reducing corporate crime because it would disrupt the government's ability to ensure that companies like Siemens satisfy the obligations of their agreements with the government and develop effective compliance programs. *See* Helou Decl. ¶ 8; Price Decl. ¶ 11-12; Warin Decl. ¶¶ 27-31.

The DOJ and SEC need companies to agree to retain monitors because, unlike companies facing the "corporate death penalty," companies facing FCPA actions cannot be compelled to retain monitors with broad powers like those exercised by Dr. Waigel. Helou Decl. ¶ 16; Price Decl. ¶12. Additionally, DOJ does not have the resources to engage in expansive reviews that monitors, like Dr. Waigel, can perform. Helou Decl. ¶ 16. "Monitorships also allow the government the ability to tap into the resources of private law firms to advance government goals and objectives without expending significant government resources to do so, an advantage that would be drastically reduced or entirely lost if the categories of information at issue here are made publicly available" Warin Decl. ¶ 31(c). Monitorship programs are intended as prophylactically positive mechanisms" to ensure that companies comply with federal anti-corruption laws, reducing the risk of recidivism of corporate crime, and protecting the integrity of the market, from which corporations, their shareholders, and, among other entities, the public all benefit. Warin Decl. ¶ 31(a).

Therefore, monitors are needed to ensure that companies comply with federal anti-corruption laws, reducing the risk of corporate recidivism. Helou Decl. ¶8. If Siemens' employees could not have communicated with the Monitor confidentially, then they would have

been less forthcoming.  Warin Decl. ¶ 27(c).  Disclosure of the information sought by Plaintiff could lead future monitors to obtain incomplete information from companies, depriving the DOJ of the monitors' complete assessments, analyses, and evaluations on which to base their determinations regarding corporate compliance.  Warin Decl. ¶ 30.  This would make it more difficult for monitors and the DOJ to determine whether those companies had improved their compliance programs and satisfied the obligations of their agreements with the DOJ.

Second, disclosure would also undermine the interests of DOJ and the SEC in promoting rehabilitation of corporate wrongdoers.  The Siemens monitorship resulted in sweeping remedial action and organizational changes through which the Company became recognized as a worldwide leader in responsible corporate practices.  Warin Decl. ¶ 31(b).  As a result of the monitorship, among other things, Siemens developed and instituted new policies, procedures, trainings, and systems to foster and ensure effective compliance. Warin Decl. ¶ 31(b); Price Decl. ¶ 12 (monitorships help SEC to ensure corporate wrongdoers are being rehabilitated). That likely would not have happened – or at the very least would have happened to a significantly lesser degree – if Siemens and the Monitor would have been concerned that information that the Monitor gave to the DOJ would have been publicly disclosed.  Warin Decl. ¶ 29(c).  Indeed, disclosing the information that the Plaintiff requests could also make some companies less likely to voluntarily disclose misconduct to the DOJ in spite of other benefits that companies receive from voluntarily self-disclosing criminal conduct. Helou Decl.  ¶ 17; *see also* Price Decl. ¶ 12

At base, the declarations here amply demonstrate that disclosure of the confidential information obtained by the DOJ and the SEC during the monitorship period would impair the Government's law enforcement interests to obtain quality and reliable information in the future,

and seriously harm governmental compelling interests in deterring future corporate misconduct or rehabilitate companies found to have engaged in such unlawful activities.[15]

### 3. Disclosing the Withheld Information Would Cause Substantial Competitive Harm to Siemens

The information that the Monitor gave to the DOJ should also be withheld because disclosure "is likely . . . to cause substantial harm" to Siemens' competitive position. *Nat'l Parks*, 498 F.2d at 770.  To meet this standard, the Court needs to find only that substantial commercial harm is likely, not that it is certain to result from disclosure. *Boeing Co. v. U.S. Dep't of Air Force*, 616 F. Supp. 2d 40, 45 (D.D.C. 2009) (citing *McDonnell Douglas Corp. v. U.S. Dep't of the Air Force*, 375 F.3d 1182, 1187 (D.C. Cir. 2004)).  The Court does not need to conduct a sophisticated economic analysis of the likely effects of disclosure to find a likelihood of substantial commercial harm. *Pub. Citizen Health Group*, 704 F.2d at 1291.

Existence of potential competitive injury or economic harm is enough to show commercial harm. *Essex Electro Engineers v. Secr'y of the Army*, 686 F. Supp. 2d 91, 94 (D.D.C. 2010) (citing *Gulf & W. Indus., Inc. v. United States*, 615 F.2d 527, 530 (D.C. Cir. 1979).  Evidence of "actual competition and a likelihood of substantial competitive injury" is all that must be shown. *CNA Fin. Corp. v. Donovan*, 830 F.2d 1132, 1152 (D.C. Cir. 1987).

---

[15]     *Public Citizen I* held that disclosing information obtained involuntarily from companies facing the "corporate death penalty" would not impair the government's ability to obtain similar information in the future. *Critical Mass*, 975 F.2d at 105.  But this case is different for two reasons.  First, unlike in *Public Citizen I*, Siemens could challenge the government's evidence at trial or negotiate a disposition without a monitor.  Warin Decl. ¶ 31(d) (company may elect to litigate matters and refuse to agree to monitor); Helou Decl. ¶ 17 (DOJ cannot force companies to retain monitors).  Second, the DOJ has identified a specific "governmental interest" beyond the interest of obtaining reliable information in the future: deterring corporate crime.  By contrast, in *Public Citizen*, the parties did not identify any other governmental interests, and the court did not address any in its opinion. *See cf Washington Post*, 865 F.2d at 436 (noting that other factors "can be introduced into the balance only as factors weighing against disclosure").  In this case, DOJ has demonstrated that disclosure would impair the compelling interests of DOJ and SEC to deter corporate malfeasance and rehabilitate wrongdoers.  These interests outweigh the interest in disclosure of Siemens confidential commercial information.

Competitive injury consists of harm flowing from the affirmative use of proprietary information by competitors. *Pub. Citizen*, 704 F.2d at 1291 n.30.

In this case, the Court should consider Siemens' explanations why disclosure of its information would cause competitive harm. *See Newry Ltd. v. U.S. Customs and Border Prot. Bureau,* No. Civ. 04-2110, 2005 WL 3273975, at *3-4 (D.D.C. July 29, 2005) ("Courts have repeatedly rejected competitive harm claims [under exemption (b)(4)] when they are advanced *solely* by the defendant agencies." (emphasis added)).  DOJ has conducted its own analysis and concluded that disclosure would cause substantial competitive harm to Siemens.  The DOJ's assessment is important because courts "will generally defer to the agency's predictive judgments as to the repercussions of disclosure." *Jurewicz v. U.S. Dep't of Agric.*, 741 F. 3d 1326, 1331 (D.C. Cir. 2014).  For instance, the DOJ withheld the first annual report from disclosure because it contains details of "the Monitor's assessment of Siemens' anti-corruption compliance program and makes his recommendations." *Vaughn* Index Doc. No. 00029-293. That annual report "analyzes the business, organizational and compliance structure throughout the Company, and examines Siemens' compliance policies, procedures and practices." *Id.*  It also contains confidential information about Siemens' leadership, corporate culture, compliance programs, policies, tools, processes, and financial controls, including proprietary tools that the company developed to increase the efficiency of its compliance activities. *Id.*

Release of the annual reports would likely cause Siemens substantial competitive harm by letting its competitors use its proprietary information to its commercial disadvantage.  Kirsch Decl. ¶ 21.  If the Court were to release this information, Siemens' competitors would avoid the extraordinary costs that Siemens incurred in gaining the information, undercut Siemens' efforts

to deal honestly with foreign governments, and exploit vulnerabilities in Siemens' systems to

their own advantage. Moberly Decl. ¶ 22; *see also* Kirsch Decl. ¶ 24.[16]

## IV. The DOJ Properly Withheld Personally Identifiable Information under Exemptions (b)(6) and (b)(7)(C)

Because Exemptions (b)(6) and 7(C) cover personal information, the DOJ is redacting

personal identifying information from emails and correspondence between the monitor, his

counsel, DOJ attorneys, and SEC attorneys.  The DOJ redacted personal identifying information

as follows:

- Emails involving the DOJ attorneys and SEC attorneys.  Among other information, these documents contain personal information concerning government employees acting in their official capacity.

- Correspondence between the Siemens Board and the DOJ and SEC attorneys.  Among other information, these documents contain personal information concerning private individuals and government employees acting in their official capacity.

- Siemens compliance policies and descriptions of various aspects of its compliance programs.  Among other information, these categories of documents contain contact details for individuals who developed the training material and compliance programs.

- Training materials for Siemens employees on various aspects of its compliance programs.  Among other information, these categories of documents contain contact details for individuals who developed the training material and compliance programs.

- Draft court filings.  Among other things, this category of documents contains personal information concerning private individuals and/or government employees acting in their official capacity

The D.C. Circuit has noted that those exemptions are essentially the same, so the DOJ

addresses them together in this filing.  *Judicial Watch, Inc. v. DOJ*, 365 F.3d 1108, 1125 (D.C.

---

[16]     For each exemption, the DOJ will highlight only sample *Vaughn* Index entries to illustrate the appropriateness of each exemption.  The *Vaughn* Index and declarations submitted by the DOJ (including the declarations submitted by defendant-intervenors herein) provide a more detailed document-by-document exposition for each claimed FOIA exemption.

Cir. 2004); *Rodriguez v. U.S. Dep't of Army*, 31 F Supp. 3d 218, 230-31 (D.D.C. 2014)

(Contreras, J.) (discussing privacy balancing test under exemptions (b)(6) and (b)(7)(C)).

Exemption (b)(6) protects "personnel and medical files and similar files the disclosure of

which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. §

552(b)(6). Exemption (b)(6) protects individuals from the injury and embarrassment that can

result from the unnecessary disclosure of personal information. *Judicial Watch* 365 F.3d at

1126; *see also U.S. Dep't of State v. Wash. Post. Co.*, 456 U.S. 595, 599 (1982)). This Court has

recognized a broad concept of personal privacy, and even innocuous information is exempt from

disclosure under exemption (b)(6). *See, e.g., Horowitz*, 428 F.3d at 279. In that vein, "[t]he only

relevant public interest in the FOIA balancing analysis is the extent to which disclosure of the

information sought would she[d] light on an agency's performance of its statutory duties or

otherwise let citizens know what their government is up to." *Dep't of Defense v. Fed. Labor

Relations Auth.*, 510 U.S. 487, 497 (1994).

Similar to exemption (b)(6), exemption (b)(7)(C) permits the DOJ to withhold documents

compiled for law enforcement that could reasonably be expected to constitute an unwarranted

invasion of personal privacy. *Roth v. Dep't of Justice,* 642 F.3d 1161, 1167 (D.C. Cir. 2011).

Under exemption (b)(7)(C), the DOJ may redact the names, addresses, or other identifiers of

individuals mentioned in investigatory files to protect their privacy. *See Stern v. FBI*, 737 F.2d

84, 91–92 (D.C. Cir. 1984). Exemption (b)(7)(C) applies to requests for law enforcement

records unless there is an overriding public interest in disclosure. *See, e.g., Schrecker v. Dep't of

Justice,* 349 F.3d 657, 661 (D.C. Cir. 2003). The DOJ may withhold information identifying

private citizens mentioned in law enforcement records "unless disclosure is necessary in order to

confirm or refute compelling evidence that the agency is engaged in illegal activity." *Id.* at 661

(internal quotations and citations omitted).  That is not the case here.

Here, the redactions include, for instance, the names of DOJ prosecutors and related

contact information from an email message sent by a prosecutor (*Amended Vaughn* Index p. 162)

(Doc. No. DOJ00351)) and the names and contact information from an email message sent by a

prosecutor to attorneys at the SEC (*Amended Vaughn* Index p. 152 (Doc. No. DOJ005343)).  The

DOJ also redacted certain personal identifying information from documents transmitted by the

Monitor to attorneys at the DOJ and SEC.  *See Amended Vaughn* Index p. 132 (Doc. No. DOJ

0005313).  Disclosure of this type of personal identifying information would not shed light on

the DOJ's performance of its statutory duties.  Providing the personal identifying information to

Plaintiff, however, would constitute an unwarranted invasion of the personal privacy of these

government attorneys and other private third-parties referenced in the documents in this case.

*See Nat'l Ass'n of Retired Fed. Employees v. Horner*, 879 F.2d 873, 879 (D.C. Cir. 1989).

Accordingly, given that there is no competing or compelling interest in disclosing the personal

identifying information that would outweigh the privacy interests, the Court should uphold the

DOJ's invocation of exemptions (b)(6) and (b)(7)(C) in this case.

## V.     The DOJ's Search For Responsive Records Was Adequate

An agency must also "show that it made a good faith effort to conduct a search for the

requested records, using methods which can be reasonably expected to produce the information

requested."  *Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990).  The DOJ need not

"search every record system."  *Id.*  The DOJ can show that it conducted an adequate search by

relying on "[a] reasonably detailed affidavit [or declaration], setting forth the search terms and

the type of search performed, and averring that all files likely to contain responsive records (if

such records exist) were searched."  *Valencia-Lucena v. Coast Guard, FOIA/PA Records Mgmt.*,

180 F.3d 321, 326 (D.C. Cir. 1999). An agency fulfills its obligations to conduct an adequate

search for responsive records under FOIA "if it can demonstrate beyond material doubt that its

search was "reasonably calculated to uncover all relevant documents." *Valencia-Lucena*, 130

F.3d at 325  (citing *Truitt v. Dep't of State*, 897 F.2d 540, 542 (D.C. Cir. 1990)).

The DOJ searched a broad range of electronic and paper files, focusing on areas where

responsive documents were likely to be found, including:  (1) the personal computer drives of the

attorneys who were assigned to the Siemens prosecution, including the monitorship compliance

process; (2) the Fraud Section's shared computer drives, with the focus on attorneys assigned to

the Siemens matters; (3) the Fraud Section file room (for paper records); and (4) the database

containing archived emails of attorneys assigned to the Siemens matters.  *See* Moberly Decl. at

¶¶ 12-17.  The search was designed to capture broad categories of documents.  *Id.*  For instance,

the DOJ also searched its email database, using the names and titles of individuals involved in

the Siemens matters, keywords, and date ranges of the duration of the monitorship, from January

1, 2009 through December 30, 2012.  *Id.* at ¶¶ 15-16. The breadth and depth of the DOJ's search

for documents show that the DOJ conducted a reasonable and adequate search for responsive

records in this case.

### VI.    The DOJ Satisfied Its Duty to Segregate Responsive, Non-Exempt Information

FOIA requires that the DOJ release "any reasonably segregable portion of a record" after

applying the FOIA exemptions.  5 U.S.C. § 552(b).  Federal agencies are entitled to a

presumption that they complied with the obligation to disclose reasonably segregable material.

*See Pinson,* 2016 WL 29245, at *23 n.20  (Contreras, J.).  When non-exempt information is

"inextricably intertwined" with exempt information, reasonable segregation is not possible.  *See*

*Mead Data Cent., Inc. v. U.S. Dep't of the Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977).  An

agency may withhold an entire document – even portions that would not be exempt on their own

– if it demonstrates "that the nonexempt portions of the document are so inextricable from the exempt portions that [the] document is not reasonably segregable." *Charles v. U.S Dep't of Defense*, 979 F. Supp. 2d 35, 42 (D.D.C. 2013).  The DOJ has met its burden here because it has provided a detailed justification and not just conclusory statements.  *Id.*  A court may rely on government affidavits that show with reasonable specificity why documents withheld pursuant to a valid exemption cannot be further segregated for this reason.  *See Armstrong v. Executive Office of the President*, 97 F.3d 575, 578 (D.C. Cir. 1996).  The agency is not required to provide so much detail that the exempt material would be effectively disclosed.  *Johnson v. Executive Office for U.S. Attorneys*, 310 F.3d 771, 776 (D.C. Cir. 2002).

As for the deliberative process privilege, although the heartland of the privilege is information that would reveal the opinions, recommendations and evaluations of an agency (and its expert consultants), factual information may also be protected where it is so thoroughly integrated with core deliberative material that its disclosure would expose or cause harm to the agency's deliberations.  *See, e.g., Horowitz*, 428 F.3d at 277  (protecting requested document where the decisionmaker's "thought processes are woven into document to such an extent" that any attempt at segregating out information would reveal agency deliberations); *Reliant Energy Power Generation, Inc. v. FERC*, 520 F. Supp. 2d 194, 204 (D.D.C. 2007) (protecting documents related to factual investigation because release "would allow a reader to probe too deeply into the thought processes of the drafters and would have a chilling effect on communication between agency employees").  Similarly, agencies may withhold factual material in an otherwise "deliberative" document where, as the Monitor did here, the author of a document selects specific facts out of a larger group of facts, since this very act is deliberative in nature.  *See, e.g., Mapother v. DOJ*, 3 F.3d 1533 (D.C. Cir. 1993) (upholding protection for portions of report

consisting of factual material prepared for Attorney General's decision whether to allow former UN Secretary General to enter United States where that material "was assembled through an exercise of judgment in extracting pertinent material from a vast number of documents").

Here, DOJ reviewed each page of the contested documents to determine whether non-exempt information could be segregated.  Moberly Decl. ¶ 37.  As a result of this process, the DOJ determined that certain factual information was so inextricably intertwined with the core deliberative material that its release would reveal the confidential deliberations of the DOJ, SEC and the Monitor. *Id.* at ¶38.  The DOJ also determined that the factual information also reflected the Monitor's efforts to distill material facts from a much larger body of information, which was itself a deliberative act.  *Id.*

With respect to the records that were released in part to Plaintiff, all information not exempted from disclosure was segregated and the non-exempt portions were released.  Moberly Decl. ¶ 39.  Therefore, the records withheld by the DOJ, whether in whole or in part, have been carefully reviewed to identify reasonably segregable non-exempt information.  Moberly Decl. ¶ 36.  To that end, the DOJ has determined that no further segregation of meaningful information in the withheld documents can be done without disclosing information warranting protection under FOIA Exemptions. *Id.* at ¶ 39.

## CONCLUSION

For the foregoing reasons, the Court should grant Defendant Department of Justice's

Motion for Summary Judgment and dismiss this case with prejudice.

March 22, 2016.                              Respectfully submitted,

CHANNING D. PHILLIPS
D.C. BAR #415793
United States Attorney

DANIEL F. VAN HORN
D.C. BAR # 924092
Chief, Civil Division

By:      _____//s_____
JOHN C. TRUONG
D.C. BAR #465901
Assistant United States Attorney
555 4th Street, N.W.
Washington, D.C. 20530
Tel: (202) 252-2524
E-mail: John.Truong@usdoj.gov


_____//s_____
PETER C. SPRUNG
D.C. BAR #500760
Special Assistant United States Attorney
1301 New York Avenue, N.W.
Washington, D.C. 20007
Tel: (202) 305-4042
Fax: (202) 514-6117
E-mail: Peter.Sprung@usdoj.gov

Counsel for Defendant U.S. Department of Justice