## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **100REPORTERS LLC,** | ) |
| Plaintiff, | ) ) ) |
| v. | ) ) |
| **UNITED STATES DEPARTMENT OF JUSTICE,** | ) ) ) |
| Defendant, | ) ) |
| **SIEMENS AKTIENGESELLSCHAFT,** | ) ) |
| Defendant-Intervenor, | ) ) |
| **THEO WAIGEL,** | ) ) |
| Defendant-Intervenor. | ) ) |

Civil Action No. 14-1264 (RC)

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56 and Local R. 56.1, Plaintiff 100Reporters, LLC ("100Reporters"), by its attorneys, hereby moves for summary judgment on its Complaint seeking access to records under the federal Freedom of Information Act, 5 U.S.C. § 552 ("FOIA"), as there is no genuine issue of material fact and 100Reporters is entitled to a judgment as a matter of law.  Defendant United States Department of Justice improperly withheld agency records and failed to honor the procedural and substantive requirements of the FOIA.  In support of its motion, Plaintiff submits the attached memorandum of points and authorities, a statement of material facts not in genuine dispute, a response to Defendant's Joint Statement of Material Facts as to Which there Are No Genuine Issues, and a proposed order.

Dated this 22nd day of April, 2016.


Respectfully submitted,

DAVIS WRIGHT TREMAINE LLP


_____/s/ *Ronald G. London*_____
Ronald G. London – Bar No. 456284
Adam Shoemaker – Bar No. 998763
Davis Wright Tremaine LLP
1919 Pennsylvania Avenue N.W.
Suite 800
Washington, D.C. 20006

*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **100REPORTERS LLC,** ) | |
| ) | Civil Action No. 14-1264 (RC) |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| **UNITED STATES DEPARTMENT OF JUSTICE,** ) | |
| ) | |
| Defendant, ) | |
| ) | |
| **SIEMENS AKTIENGESELLSCHAFT,** ) | |
| ) | |
| Defendant-Intervenor, ) | |
| ) | |
| **THEO WAIGEL,** ) | |
| ) | |
| Defendant-Intervenor. ) | |

## PLAINTIFF'S CONSOLIDATED OPPOSITION TO DEFENDANT'S AND INTERVENORS' MOTIONS FOR SUMMARY JUDGMENT, AND MEMORANDUM IN SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR <u>SUMMARY JUDGMENT</u>

DAVIS WRIGHT TREMAINE LLP
Ronald G. London – Bar No. 456284
Adam Shoemaker – Bar No. 998763
1919 Pennsylvania Avenue, N.W.
Suite 800
Washington, D.C. 20006

*Attorneys for Plaintiff*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND AND PROCEDURAL HISTORY ................................................................ 3

    A.    Siemens' FCPA Violations ................................................................................ 3

    B.    The Monitor ....................................................................................................... 4

    C.    100Reporters' FOIA Request ........................................................................... 5

    D.    DOJ Response to Complaint for Judicial Review of FOIA Action ..................... 8

ARGUMENT ........................................................................................................................... 9

I.    FOIA EXEMPTION 4 HAS NOT BEEN PROPERLY INVOKED TO ALLOW
    DOJ TO WITHHOLD THE MATERIALS AT ISSUE ................................................ 11

    A.    DOJ's Allegations as to Confidentiality Are Vague and Conclusory.................. 12

    B.    Disclosure of the Withheld Materials Would Not Impair the Government's
        Ability to Obtain Necessary Information in the Future ....................................... 16

    C.    DOJ and Siemens Have Not Shown that Siemens Would Suffer
        Competitive Harm ............................................................................................. 18

        1.    DOJ Has Failed to Provide Support for its Claim of Competitive
            Harm .................................................................................................... 19

        2.    Siemens Has Not Shown that It Would Suffer Substantial
            Competitive Harm ................................................................................ 22

            a.    There Is No Reason to Believe that Disclosing the Details
                of Siemens' FCPA Compliance Plan Would Cause It
                Substantial Competitive Harm ...................................................... 22

            b.    Siemens Provides Insufficient Evidence that Release of the
                Withheld Information Would Provide Competitively
                Sensitive Information to Competitors ........................................... 26

II.    DOJ'S INVOCATION OF EXEMPTION 5 VIOLATES ITS OBLIGATIONS
    UNDER FOIA .......................................................................................................... 29

    A.    DOJ Did Not Identify the Formulation of Any Agency Policy to
        Legitimately Provide a Basis for the Deliberative Process Privilege ................. 29

i

B.    The Monitor's Submissions Do Not Fall under the Consultant Corollary ........... 32

C.    DOJ Improperly Withheld Non-Deliberative Materials Under Exemption 5....... 36

III.    FOIA EXEMPTIONS 6 AND 7(C) HAVE NOT BEEN PROPERLY INVOKED
TO ALLOW DOJ AND SIEMENS TO WITHHOLD INDIVIDUALS' NAMES
AND RELATED IDENTIFYING INFORMATION ....................................................... 37

A.    DOJ Has Not Shown the Balance of Interests Favors Withholding .................... 39

B.    DOJ Has Not Shown that Categorical Treatment of the Privacy Interests Is
Warranted........................................................................................................... 41

C.    The Value of Identifying Information in Investigating and Reporting to the
Public on Agency Operations is Significant ........................................................ 43

D.    DOJ Has Not Established that the Redacted Records Were Compiled for
Law Enforcement Purposes ................................................................................ 46

IV.    DOJ HAS NOT SATISFIED ITS BURDEN TO DEMONSTRATE THAT IT
RELEASED REASONABLY SEGREGABLE RESPONSIVE MATERIAL ................ 48

CONCLUSION.................................................................................................................... 49

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*ACLU v. CIA*,
   710 F.3d 422 (D.C. Cir. 2013) ................................................................21

*Animal Legal Def. Fund, Inc. v. Dep't of Air Force*,
   44 F. Supp. 2d 295 (D.D.C. 1999) ......................................................48, 49

*Arieff v. Dep't of Navy*,
   712 F.2d 1462 (D.C. Cir. 1983) ..............................................................10

*Armstrong v. Exec. Office of Pres.*,
   97 F.3d 575 (D.C. Cir. 1996) ..................................................................41

*Bennett v. DEA*,
   55 F. Supp. 2d 36 (D.D.C. 1999) ..............................................................1

*Biles v. HHS*,
   931 F. Supp. 2d 211 (D.D.C. 2013) ............................................20, 27, 28

*Billington v. DOJ*,
   233 F.3d 581 (D.C. Cir. 2000) ................................................................10

*Boeing Co. v. Dep't of Air Force*,
   616 F. Supp. 2d 40 (D.D.C. 2009) ..............................................21, 26, 27

*Campbell v. DOJ*,
   164 F.3d 20 (D.C. Cir. 1998) ......................................................10, 37, 47

*Citizens for Responsibility & Ethics in Wash. v. DOJ*,
   746 F.3d 1082 (D.C. Cir. 2014) ..............................................................46

*CNA Fin. Corp. v. Donovan*,
   830 F.2d 1132 (D.C. Cir. 1987) ..............................................................28

*Coastal States Gas v. DOE*,
   617 F.2d 854 (D.C. Cir. 1980) ..................................................12, 29, 31, 36

*COMPTEL v. FCC*,
   910 F. Supp. 2d 100 (D.D.C. 2012) ........................................................19

*Critical Mass Energy Project v. Nuclear Regulatory Comm'n*,
   975 F.2d 871 (D.C. Cir. 1992) ................................................................16

*Crooker v. ATF*,
    789 F.2d 64 (D.C. Cir. 1986) ........................................................................................46

*Ctr. for Auto Safety v. Dep't of Treasury*,
    --- F. Supp. 3d ---, 2015 WL 5726348 (D.D.C. Sept. 30, 2015) .............................................21

*Ctr. for Int'l Envtl. Law v. USTR*,
    237 F. Supp. 2d 17 (D.D.C. 2002) .......................................................................1, 10

*Ctr. for Nat'l Sec. Studies v. DOJ*,
    331 F.3d 918 (D.C. Cir. 2003) ........................................................................................47

*Dep't of Air Force v. Rose*,
    425 U.S. 352 (1976) ........................................................................................42

*Dep't of Interior v. Klamath Water Users Protective Ass'n*,
    532 U.S. 1 (2001) ........................................................................29, 32, 33

*Dep't of State v. Ray*,
    502 U.S. 164 (1991) ........................................................................................46

*DOD v. FLRA*,
    964 F.2d 26 (D.C. Cir. 1992) ........................................................................................45

*DOD v. FLRA*,
    510 U.S. 487 (1994) ........................................................................................40

*DOJ v. Reporters Comm. for Freedom of Press*,
    489 U.S. 749 (1989) ........................................................1, 10, 44, 45, 48

*DOJ v. Tax Analysts*,
    492 U.S. 148 (1989) ........................................................................................38

*Elec. Frontier Found. v. DOJ*,
    890 F. Supp. 2d 35 (D.D.C. 2012) ........................................................................................35

*EPA v. Mink*,
    410 U.S. 73 (1973) ........................................................................................36, 37

*Ethyl Corp. v. EPA*,
    25 F.3d 1241 (4th Cir. 1994) ........................................................................................30

*Fla. House of Representatives v. Dep't of Commerce*,
    961 F.2d 941 (11th Cir. 1992) ........................................................................................35

*FLRA v. DOT*,
    884 F.2d 1446 (D.C. Cir. 1989) ........................................................................................45

iv

*Gen. Elec. Co. v. Dep't of Air Force*,
   648 F. Supp. 2d 95 (D.D.C. 2009) ................................................................20, 27

*Gov't Accountability Project v. HHS*,
   691 F. Supp. 2d 170 (D.D.C. 2010) ......................................................................20

*Gulf & Western Indus. v. United States*,
   615 F.2d 527 (D.C.Cir. 1979) ...............................................................................18

*Hooker v. HHS*,
   887 F. Supp. 2d 40 (D.D.C. 2012) (*per curiam*),
   *aff'd*, No. 13-5280, 2014 WL 3014213 (D.C. Cir. May 13, 2014) .......................42

*In Defense of Animals v. HHS*,
   No. 99-3024, 2001 WL 34871354 (D.D.C. Sept. 28, 2001) ..................................15

*In re Sealed Case*,
   121 F.3d 729 (D.C. Cir. 1997) ..............................................................................36

*Johnson v. Exec. Office for U.S. Attorneys*,
   310 F.3d 771 (D.C. Cir. 2002) ..............................................................................48

*Judicial Watch, Inc. v. DOJ*,
   365 F.3d 1108 (D.C. Cir. 2004) ............................................................................38

*Judicial Watch, Inc. v. Exp.-Imp. Bank*,
   108 F. Supp. 2d 19 (D.D.C. 2000) ........................................................................17

*Judicial Watch, Inc. v. FDA*,
   449 F.3d 141 (D.C. Cir. 2006) .........................................................12, 13, 14, 15

*Jurewicz v. USDA*,
   741 F.3d 1326 (D.C. Cir. 2014) ............................................................................45

*King v. DOJ*,
   830 F.2d 210 (D.C. Cir. 1987) ..............................................................................47

*Martin v. DOJ*,
   488 F.3d 446 (D.C. Cir. 2007) ..............................................................................40

*Mead Data Cent., Inc. v. Dep't of Air Force*,
   566 F.2d 242 (D.C. Cir. 1977) ..............................................................................13

*Morley v. CIA*,
   508 F.3d 1108 (D.C. Cir. 2007) ......................................................................10, 40

*Military Audit Project v. Casey*,
   656 F.2d 724 (D.C. Cir. 1981) ..............................................................................42

*Mudge Rose Guthrie Alexander & Ferdon v. U.S. Int'l Trade Comm'n*,
   846 F.2d 1527 (D.C. Cir. 1988) ................................................................................19

*Multi Ag Media LLC v. USDA*,
   515 F.3d 1224 (D.C. Cir. 2008) ................................................................................37

*National Archives & Records Admin. v. Favish*,
   541 U.S. 157 (2004) ........................................................................................40, 44

*National Ass'n of Home Builders v. Norton*,
   309 F.3d 26 (D.C. Cir. 2002) ................................................................................38, 43

*National Parks & Conserv. Ass'n v. Kleppe*,
   547 F.2d 673 (D.C. Cir. 1976) ............................................................10, 13, 18, 20, 21

*National Parks & Conserv. Ass'n v. Morton*,
   498 F.2d 765 (D.C. Cir. 1974) ................................................................12, 16, 18

*News-Press v. Dep't of Homeland Sec.*,
   489 F.3d 1173 (11th Cir. 2007) ................................................................................38

*NLRB v. Robbins Tire & Rubber Co.*,
   437 U.S. 214 (1978) ................................................................................................46

*NLRB v. Sears, Roebuck & Co.*,
   421 U.S. 132 (1975) ..........................................................................................29, 30

*N.Y. Times Co. v. NASA*,
   920 F.2d 1002 (D.C. Cir. 1990) (*en banc*) ................................................................41

*Occidental Petrol. Corp. v. SEC*,
   873 F.2d 325 (D.C. Cir. 1989) ..........................................................................19, 28

*Oglesby v. Dep't of Army*,
   79 F.3d 1172 (D.C. Cir. 1996) ................................................................................49

*Pacific Architects & Eng'rs, Inc. v. Renegotiation Bd.*,
   505 F.2d 383 (D.C. Cir. 1974) ................................................................................28

*People for Ethical Treatment of Animals v. USDA*,
   No. CIV. 03 C 195-SBC, 2005 WL 1241141 (D.D.C. May 24, 2005) ................................20

*Petroleum Info. Corp. v. Dep't of Interior*,
   976 F.2d 1429 (D.C. Cir. 1992) ..........................................................................29, 30

*Playboy Enters., Inc. v. DOJ*,
   516 F. Supp. 233 (D.D.C. 1981), *aff'd in part, modified in part*,
   *Playboy Enters., Inc. v. DOJ*, 677 F.2d 931 (D.C. Cir. 1982) ................................30, 31, 36

*Playboy Enters., Inc. v. DOJ*,
  677 F.2d 931 (D.C. Cir. 1982) ....................................................................30, 36

*Prison Legal News v. Samuels*,
  787 F.3d 1142 (D.C. Cir. 2015) ..................................................................21, 42

*Public Citizen Health Research Grp. v. FDA*,
  704 F.2d 1280 (D.C. Cir. 1983) ..........................................................................18

*Public Citizen Health Research Grp. v. FDA*,
  964 F. Supp. 413 (D.D.C. 1997) ..........................................................................28

*Public Citizen v. HHS*,
  975 F. Supp. 2d 81 (D.D.C. 2013) .................................................17, 20, 27

*Sanders v. Obama*,
  729 F. Supp. 2d 148 (D.D.C. 2010) (*per curiam*), *aff'd sub nom. Sanders v.
  DOJ*, No. 10-5273, 2011 WL 1769099 (D.C. Cir. Apr. 21, 2011) .........................................31

*Senate of Commonwealth of P.R. v. DOJ*,
  823 F.2d 574 (D.C. Cir. 1987) ....................................................................29, 30

*Shell Oil Co. v. IRS*,
  772 F. Supp. 202 (D. Del. 1991) ..........................................................................35

*Shiller v. NLRB*,
  964 F.2d 1205 (D.C. Cir. 1992) ..........................................................................48

*Sims v. CIA*,
  642 F.2d 562 (D.D.C. 1980) ..........................................................................39

*Stern v. FBI*,
  737 F.2d 84 (D.C. Cir. 1984) .................................................37, 42, 47

*Sw. Ctr. for Biological Diversity v. USDA*,
  170 F. Supp. 2d 931 (D. Ariz. 2000) (D. Ariz. 2000),
  *aff'd*, 314 F.3d 1060 (9th Cir 2002) ..........................................................................36

*Union Leader Corp. v. Dep't of Homeland Sec.*,
  749 F.3d 45 (1st Cir. 2014) ..........................................................................45

*United States v. Erie Cty.*,
  763 F.3d 235 (2d Cir. 2014) ..........................................................................9

*United States v. Siemens Aktiengesellschaft*,
  No. 08-CR-367 (D.D.C.) .................................................1, 4, 7

*United States v. Siemens Bangladesh Ltd.*,
  No. 08-CR-369 (D.D.C.) ...........................................................................................1

*United States v. Siemens S.A. (Argentina)*,
  No. 08-CR-368 (D.D.C.) ...........................................................................................1

*United States v. Siemens S.A. (Venezuela)*,
  No. 08-CR-370 (D.D.C.) ...........................................................................................1

*United Tech. Corp. v. DOD*,
  601 F.3d 557 (D.C. Cir. 2010) ................................................................................27

*Vaughn v. Rosen*,
  484 F.2d 820 (D.C. Cir. 1973) ................................................................................11

*Vaughn v. Rosen*,
  523 F.2d 1136 (D.C. Cir. 1975) ..............................................................................36

*Wash. Post Co. v. HHS*,
  690 F.2d 252 (D.C. Cir. 1982) ..............................................................19, 39, 44

*Wash. Post Co. v. HHS*,
  865 F.2d 320 (D.C. Cir. 1989) ................................................................................12

*Washington Post Co. v. DOJ*,
  863 F.2d 96 (D.C. Cir. 1988) ..................................................................................39

*Wilderness Soc'y v. Dep't of Interior*,
  344 F. Supp. 2d 1 (D.D.C. 2004) ...........................................................................31

## Federal Statutes

5 U.S.C. § 552(a)(6)(B)(i)-(iii) ......................................................................................7

5 U.S.C. § 552(b)(4) ............................................................................................11, 13

5 U.S.C. § 552(b)(5) ....................................................................................................32

5 U.S.C. § 552(b)(6) ....................................................................................................37

5 U.S.C. § 552(b)(7)(A) ............................................................................................7, 8

5 U.S.C. § 552(b)(7)(C) ........................................................................................38, 48

## Rules

Fed. R. Civ. P. 56 ..........................................................................................................1

Local Rules 7(a), 7(b), 7(h), & 56.1 ............................................................................1

## Other Authorities

Alex Lawson, Law360, Siemens' $69M Fines Stand Despite Errors, EU High
    Court Says (Apr. 11, 2014), http://www.law360.com/articles/527037/siemens-
    69m-fines-stand-despite-errors-eu-high-court-says ...............................................25

Eric Lichtblau & Carter Dougherty, *Siemens to Pay $1.34 Billion in Fines*, N.Y.
    Times (Dec. 15, 2008), http://www.nytimes.com/2008/12/16/business/
    worldbusiness/16siemens.html?_r=0 .....................................................................4

ETHIC Intelligence, *Schneider Electric Morocco Awarded Anti-corruption
    compliance system certificate* (Dec. 17, 2014), http://www.ethic-
    intelligence.com/wp-content/uploads/2014-EI-Schneider-Electric-Morocco-
    Certification_Decision-to-Award-and-Register.pdf ...............................................25

ETHIC Intelligence, *Anti-corruption Compliance System Certificate awarded to
    Schneider Electric Nigeria* (Aug. 25, 2015), http://www.ethic-
    intelligence.com/news/9576-schneider-electric-nigeria-receives-anti-
    corruption-compliance-system-certificate/. ..........................................................25

GE Sustainability: Integrity & Compliance: Anti-Corruption,
    http://www.gesustainability.com/how-ge-works/integrity-compliance/anti-
    corruption/ .............................................................................................................24

Press Release, Department of Justice, Siemens AG and Three Subsidiaries Plead
    Guilty to Foreign Corrupt Practices Act Violations and Agree to Pay $450
    Million in Combined Criminal Fines (Dec. 15, 2008),
    https://www.justice.gov/archive/opa/pr/2008/December/08-crm-1105.html .......3, 4

Press Release, Department of Justice, Office of Public Affairs: ABB Ltd and Two
    Subsidiaries Resolve Foreign Corrupt Practices Act Investigation and Will
    Pay $19 Million in Criminal Penalties (Sept. 29, 2010) ........................................24

Press Release, SEC, SEC Charges General Electric and Two Subsidiaries with
    FCPA Violations (July 27, 2010), http://www.sec.gov/news/press/2010/2010-
    133.htm ..................................................................................................................24

Rockwell Automation Code of Conduct,
    http://literature.rockwellautomation.com/idc/groups/literature/documents/br/es
    ap-br010_-en-p.pdf ................................................................................................24

SEC, In the Matter of Rockwell Automation, Inc., Cease-and-Desist Order
    (May 3, 2011), https://www.sec.gov/litigation/admin/2011/34-64380.pdf ...........24

Siemens Annual Report 2015 ............................................................................................23

Toshiba, Toshiba Social Responsibility: Participation in UN Global Compact,
    http://www.toshiba.com/csr/phil_un.jsp ................................................................25

U.S. Department of Justice, Criminal Division, Fraud Section: The Fraud
   Section's Foreign Corrupt Practices Act Enforcement Plan and Guidance
   (rel. Apr. 5, 2016) ................................................................................................................23

Pursuant to Fed. R. Civ. P. 56 and Local Rules 7(a), 7(b), 7(h), & 56.1, Plaintiff 100Reporters LLC ("100Reporters"), by counsel, hereby submits its Memorandum in Support of 100Reporters' Motion for Summary Judgment and Opposition to Defendant's Motion for Summary Judgment ("Def. Mot."), Defendant-Intervenor Siemens Aktiengesellschaft's Motion for Summary Judgment ("Siemens Mot."), and Defendant-Intervenor Theo Waigel's Motion for Summary Judgment ("Monitor Mot.") (collectively, "Defendants," except where explicitly stated otherwise).   The Court should deny the Defendants' Motions and grant Plaintiff summary judgment on its Complaint seeking access to records under the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA"), as there is no genuine issue of material fact and 100Reporters is entitled to judgment as a matter of law.  *Bennett v. DEA*, 55 F. Supp. 2d 36, 38-39 (D.D.C. 1999).

## PRELIMINARY STATEMENT

This FOIA case arises from the Department of Justice's ("DOJ") settlement of the largest Foreign Corrupt Practices Act ("FCPA") enforcement action in U.S. history.   100Reporters filed the FOIA request at issue in this case (the "Request") under the Act's "fundamental purpose" of "assist[ing] citizens in discovering 'what their government is up to,'"[1] in hopes of understanding how DOJ evaluated the performance of Siemens Aktiengesellschaft ("Siemens AG") and three of its subsidiaries in Argentina, Bangladesh and Venezuela (all four collectively referred to hereinafter as "Siemens") under the terms of a plea agreement in which Siemens pled guilty to massive FCPA violations (the "Plea Agreement").[2]   As part of the Plea Agreement, Siemens agreed to engage a compliance Monitor (the "Monitor") who was charged with broadly evalu-

---

[1] *Ctr. for Int'l Envtl. Law v. USTR*, 237 F. Supp. 2d 17, 22 (D.D.C. 2002) (quoting *DOJ v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 773 (1989)).

[2] *United States v. Siemens Aktiengesellschaft*, No. 08-CR-367 (D.D.C.); *United States v. Siemens S.A. (Argentina)*, No. 08-CR-368 (D.D.C.); *United States v. Siemens Bangladesh Ltd.*, No. 08-CR-369 (D.D.C.); and *United States v. Siemens S.A. (Venezuela)*, No. 08-CR-370 (D.D.C.).

ating Siemens' performance under the Plea Agreement, and who made periodic reports to DOJ assessing Siemens' performance.

In response to 100Reporters' Request, DOJ, supported by Siemens and the Monitor, has engaged in excessive delay, and has released no substantive material, hiding behind broad-brush claims of exemption under FOIA Exemptions 4, 5, 6, and 7, to avoid disclosure of responsive documents.  As justification for its withholding, DOJ has provided only vague and conclusory statements that prevent 100Reporters from evaluating DOJ's claims that substantially all of the requested documents are exempt from disclosure under FOIA.

For example, under Exemption 4's protection for privileged or confidential commercial information, instead of describing an actual threat of competitive harm to Siemens that could result from disclosure, DOJ asks the Court to simply assume that any information about the company's compliance with the law would provide an unfair advantage to competitors.  Likewise, under Exemption 5, DOJ asks the Court to accept that the work of the Monitor – who was engaged and paid for by Siemens, and whom DOJ itself describes as only "akin" to an outside consultant – should be treated as intra-governmental communication for purposes of deliberative processes, which DOJ does not describe.  DOJ also asks the Court to approve its claims under Exemptions 6 and 7(C) that disclosing *any* portion of the materials that 100Reporters seeks would compromise various undescribed privacy interests of either government officials or corporate employees, between whose privacy interest DOJ draws no distinction.

DOJ's invocation of these FOIA exemptions is especially problematic given the similarly cursory treatment that it affords its duty to withhold only that information falling within the exemptions claimed while releasing all reasonably segregable non-exempt material.  DOJ's failure to do so is striking given that 100Reporters is not seeking truly confidential information

such as social security numbers, bank account numbers, names of confidential informants, or truly sensitive business information. As DOJ's conclusory justifications cannot satisfy its burden to justify withholding under FOIA, and because of the importance of public accountability in enforcement of the Plea Agreement, the Court should grant summary judgment to 100Reporters and order DOJ to release the records it has withheld.

## BACKGROUND AND PROCEDURAL HISTORY

### A.    Siemens' FCPA Violations

On December 15, 2008, Siemens pled guilty to the largest FCPA violation in U.S. history. Siemens AG and its subsidiaries were charged with and pled guilty to, among other things:

- falsification of books and records;
- improper payments to Iraqi officials involved in the U.S. Oil for Food Program;
- violations of recordkeeping requirements related to Siemens' overhaul of Argentina's national identity program; and
- conspiracy to violate FCPA anti-bribery provisions in efforts to obtain a telecommunications contract from the government of Bangladesh and a rail construction contract in Venezuela.

As DOJ described it, "beginning in the mid-1990s, Siemens AG engaged in systematic efforts to falsify its corporate books and records and knowingly failed to implement and circumvent existing internal controls."[3] The press release announcing the Plea Agreement quoted Acting Assistant Attorney General Matthew Friedrich as stating "[t]oday's filings make clear that for much of its operations across the globe, bribery was nothing less than standard operating procedure for Siemens." *Id.* As Linda Chatman Thomsen, Director of the SEC's Division of Enforcement, explained, "[t]his pattern of bribery by Siemens was unprecedented in scale and geographic reach. The corruption involved more than $1.4 billion in bribes to government

---

[3] Press Release, DOJ, Siemens AG and Three Subsidiaries Plead Guilty to Foreign Corrupt Practices Act Violations and Agree to Pay $450 Million in Combined Criminal Fines (Dec. 15, 2008), https://www.justice.gov/archive/opa/pr/2008/December/08-crm-1105.html.

officials in Asia, Africa, Europe, the Middle East and the Americas." *Id.* DOJ and the SEC together issued fines to Siemens totaling $800 million. Various penalties levied in Germany increased the total sanctions to $1.6 billion. The U.S. penalties set a record – which Siemens still holds – for violation of the FCPA, dwarfing the prior record of $44 million.[4]

### B.     The Monitor

In addition to paying record-setting fines, Siemens agreed to implement a company-wide program of corporate governance and compliance to root out the "systematic" corruption cited by DOJ. As part of this agreement, Siemens engaged Dr. Theodore Waigel, a former German Finance Minister, as an independent monitor to evaluate Siemens' performance under the terms of the Plea Agreement. Siemens suggested Dr. Waigel for this role, and paid for his work while he submitted his reports to DOJ. The Monitor was to perform this work for a period of up to four years. As Attachment 2 to the Statement of Offense explained:

> In his capacity as Monitor, Mr. Waigel was responsible for evaluat[ing] … the effectiveness of the internal controls, recordkeeping and financial reporting policies and procedures of Siemens as they relate to Siemens' current and ongoing compliance with the books and records, internal accounting controls and anti-bribery provisions of the FCPA and other applicable anti-corruption laws (collectively, the "anti-corruption laws") and tak[ing] such reasonable steps as, in his … view, may be necessary to fulfill the foregoing mandate.

Compl. Ex. B (Statement of Offense, Attachment 2 ¶ 1, *United States v. Siemens Aktiengesellschaft*, No. 08-CR-367 (D.D.C. Dec. 15, 2008) (ECF No. 15)).

On December 18, 2012, DOJ filed a "Notice Regarding Corporate Monitorship" with the criminal court in the Siemens case. Compl. Ex. C (Notice Regarding Corp. Monitorship, *United States v. Siemens Aktiengesellschaft*, No. 08-CR-367 (D.D.C. Dec. 18, 2012) (ECF No.

---

[4] *See* Eric Lichtblau & Carter Dougherty, *Siemens to Pay $1.34 Billion in Fines*, N.Y. Times (Dec. 15, 2008), http://www.nytimes.com/2008/12/16/business/worldbusiness/16siemens.html?_r=0.

23)).   In the notice, DOJ stated that Siemens AG had satisfied its obligations under the Plea

Agreement with respect to the corporate monitorship.   Dr. Waigel's monitorship was then ended.

The notice stated that during the course of his monitorship, Dr. Waigel had:

- conducted reviews of Siemens' anti-corruption compliance program and documented his findings and recommendations in four annual reports dated October 5, 2009, October 13, 2010, October 7, 2011, and October 12, 2012;

- conducted on-site or remote reviews of Siemens' activities in 20 countries;

- conducted limited or issue-specific reviews in or relating to an additional 19 countries;

- reviewed over 51,000 documents totaling more than 973,000 pages in 11 languages;

- conducted interviews of or meetings with over 2,300 Siemens employees;

- observed more than 180 regularly scheduled company events;

- spent the equivalent of over 3,000 auditor days conducting financial studies and testing; and

- made a total of 152 recommendations to improve Siemens' program for ensuring compliance with anti-corruption laws, all of which Siemens adopted and implemented without objection.

With completion of the monitorship, DOJ's involvement with the Siemens case ended, with the

company having instituted a more robust FCPA compliance program based on Dr. Waigel's

recommendations.   *See* Kirsch Decl. ¶¶ 7-8.

### C.      100Reporters' FOIA Request

100Reporters is a not-for-profit news media organization whose mission is to educate the

public through in-depth investigative reporting and journalism focused on corruption and wrong-

doing in the public and private sectors.   The organization was co-founded by former correspon-

dents for the New York Times and has been supported by the Ford Foundation.   100Reporters

aims "to raise the caliber, impact and visibility of citizen-driven investigative journalism, as a

means of promoting transparency and good government."   *See* "About 100Reporters,"

https://100r.org/about.  Its reporting, which is focused on corruption and public accountability, is published on 100Reporters' website and through news outlets including the New York Times, the Washington Post, the Denver Post, PRI's The World, and others, and has been viewed by more than 29 million readers.  *Id.*

On July 23, 2013, 100Reporters' investigative journalist Marjorie Valbrun submitted a FOIA request to DOJ's Criminal Division seeking records relating to the plea agreements in the Siemens prosecutions.  The requested DOJ records related to the Siemens sentencing memoranda and documents related to Dr. Waigel's evaluation of Siemens' compliance with the FCPA and other anti-corruption laws.  Specifically, Ms. Valbrun's Request sought:

> [A]ll relevant documents, including internal reports, emails, memos, notes, and other departmental correspondence, about the investigation, charges, sentences, fines, and settlement agreements related to the sentencing memorandum. I also request copies of the Corporate Compliance Statements that Siemens has filed with the DOJ under the terms of the compliance agreement outlined in the 2008 "Statement of Offense" filed in the U.S. District Court for the District of Colombia (United States of America v. Siemens Aktiengesellschaft)[;]

> [A]ll relevant documents related to the DOJ Monitor's evaluation of the effectiveness of the internal controls, record-keeping and financial reporting policies and procedures of Siemens, under the compliance agreement, as they relate to Siemens' current and ongoing compliance with the books and records, internal accounting controls and anti-bribery provisions of the FCPA and other applicable anticorruption laws[;]

> [A]ll relevant documents related to the following:

> * Steps the Monitor has taken to confirm compliance by Siemens.

> * Access to information, records, facilities and/or employees requested by the Monitor that fall within the scope of the "Mandate of the Monitor" under the agreement.

> * Initial and follow-up reviews of Siemens conducted by the Monitor under the agreement; written reports about the reviews; compliance work plans prepared by the Monitor, in consultation with Siemens AG and DOJ, and submitted to the DOJ for comment.

> \* Disclosures by Siemens to the Monitor concerning corrupt payments and related books, records, and internal controls[; and]

> [A]ll relevant documents related to the December 2011 charges against Siemens by the DOJ and the Securities and Exchange Commission.

Compl. Ex. D.

DOJ responded to this request by letter of August 9, 2013, in which it acknowledged receipt, assigned the Request a file number, and stated that the Criminal Division would take an extension of time to respond.  Compl. Ex. E.  DOJ claimed that the extension was justified on grounds that the Request presented "unusual circumstances," within the meaning of 5 U.S.C. § 552(a)(6)(B)(i)-(iii) because the Request required a search of another section of the Criminal Division. 100Reporters did not object to the extension.

On January 6, 2014, DOJ denied the Request on the asserted ground that the requested documents were exempt from disclosure under FOIA Exemption 7(A), 5 U.S.C. § 552(b)(7)(A). No further explanation was provided for this blanket denial, notwithstanding that blanket denials are disfavored under Exemption 7, or DOJ's obligation to set forth a basis for any denial in a manner that would permit a court to determine whether the exemption properly applied.

100Reporters administratively appealed the denial on February 20, 2014.  *See* Compl. Ex. G.  100Reporters also narrowed the original Request's scope to six categories of documents:

> 1. Copies of Corporate Compliance Statements that Siemens has filed with the DOJ under the terms of the compliance agreement outlined in the 2008 "Statement of Offense" (the "Compliance Agreement") filed in the U.S. District Court for the District of Columbia (*United States v. Siemens Aktiengesellschaft*, No. 1:08-cr-00367-RJL (D.D.C. 2008));

> 2. Any and all documents related to the DOJ Monitor's evaluation of the effectiveness of the internal controls, record-keeping and financial reporting policies and procedures of Siemens, under the Compliance Agreement, as they relate to Siemens' current and ongoing compliance with the books and records, internal accounting controls and anti-bribery provisions of the FCPA and other applicable anti-corruption laws;

3. Any and all documents and related steps the DOJ Monitor has taken to confirm compliance by Siemens;

4. Any and all information, records, facilities and/or employees requested by the DOJ Monitor that fall within  the scope of the "Mandate of the Monitor" under the Compliance Agreement;

5. Any and all initial and follow-up reviews of Siemens conducted by the DOJ Monitor under the Compliance Agreement, written reports about the reviews, and compliance work plans prepared by the DOJ Monitor, in consultation with Siemens AG and the DOJ, and submitted to the DOJ for comment; and,

6. Any and all disclosures by Siemens to the DOJ Monitor concerning corrupt payments and related books, records, and internal controls.  (Compl. Ex. G at 2.)

DOJ affirmed the denial of 100Reporters' Request by letter on April 22, 2014, and reasserted the

Criminal Division's position that DOJ "properly withheld this information in full because it is

protected from disclosure under FOIA pursuant to 5 U.S.C. § 552(b)(7)(A)."  Compl. Ex. H.

Again on administrative appeal, DOJ did not provide any further explanation for its denial.

###### D.     DOJ Response to Complaint for Judicial Review of FOIA Action

100Reporters initiated the instant suit with this Court on July 24, 2014.  DOJ filed its

answer on October 14, 2014, citing FOIA exemptions (b)(7)(A), and for the first time also

claiming its non-disclosure was justified under Exemption (b)(4) (confidential commercial and

financial information), Exemption (b)(5) (deliberative process privilege and attorney work-

product), and Exemptions (b)(6) and (b)(7)(C) (personal privacy), and Exemption (b)(7)(D) (law

enforcement records whose disclosure could reveal confidential sources).  *See* ECF No. 11.  On

December 3, 2014, the Court granted Siemens' and the Monitor's motions to intervene.  *See* ECF

No. 27.

On March 30, 2015, following numerous delays, DOJ produced two documents and two

videos it had belatedly deemed not exempt under any FOIA exemptions, and whose disclosure

was not objected to by Intervenors.  The documents included a PowerPoint presentation relating

to anti-corruption compliance activities and a brochure containing statements of two Siemens executive concerning integrity and ethics.  The two videos, which appear to have been released publicly prior to this suit, include a recording of a public 2009 Siemens' shareholders meeting and a public-relations-oriented video describing, in only the most general phrasing, the importance of anti-corruption efforts in the global private sector.

On October 15, 2015, following further delays,[5] DOJ provided 100Reporters and inter-venors a *Vaughn* index for the remaining withheld documents.  *See* ECF No. 47.  DOJ continued to withhold those documents in their entirety.  Subsequently, DOJ reviewed the documents and decided certain information should be released.  *See* ECF No. 48.  100Reporters consented to the re-review based only on the prospects of (a) obtaining some of the previously withheld material, and (b) the government determining some of the material would need to be designated for release over Defendant-Intervenors' objection.  On December 4, 2015, DOJ provided 100Reporters with the majority of the documents that had been previously withheld entirely.  However, these documents were so heavily redacted as to render them effectively withheld in full, and to prevent 100Reporters from gaining sufficient insight into the withholdings to determine whether any of the documents could be removed from disputed status.

## ARGUMENT

The records sought by 100Reporters detail how DOJ enforced the Plea Agreement that resolved the largest FCPA violation in history and contain the basis for DOJ's conclusion that Siemens had, within four years, satisfied all the terms of its rehabilitation.  The public interest in

---

[5] *See* ECF No. 41 (granting extension to DOJ of 60 days); ECF No. 43 (scheduling order setting deadline of September 17, 2015 for DOJ to produce *Vaughn* index); ECF No. 46 (scheduling order granting DOJ until October 15, 2015 to produce *Vaughn* index).  The briefing schedule for the motions for summary judgment was also delayed, again at DOJ request.  *See* ECF No. 52 (granting extension of 14 days); ECF No. 54 (granting extension of one week).

this material is clear.  *See United States v. Erie Cty.*, 763 F.3d 235, 242 (2d Cir. 2014) ("Access

to the compliance reports enables the public to understand, monitor, and respond to the progress

made towards altering what [DOJ], as enforcer of the nation's laws, alleged" were violations of

the law).  There is an undoubted public interest in understanding how DOJ applies and enforces

the FCPA through plea agreements like that which Siemens entered, and particularly what infor-

mation led DOJ to conclude Siemens successfully reformed so quickly and thoroughly.  The

Monitor presented DOJ with a summary account of the company's efforts to turn a culture of

"systematic corruption" into a model of legal compliance.  Dr. Waigel's reports clearly implicate

a core aspect of the public interest, and FOIA precludes blocking access to these materials absent

a clear showing they fall within the limited, narrow exemptions to the statute.

There is no dispute that "[p]roviding information material for monitoring the Govern-

ment's activities is the core purpose of the FOIA."  *Arieff v. Dep't of Navy*, 712 F.2d 1462, 1468

(D.C. Cir. 1983) (citation and internal quotation marks omitted).  Stated differently, FOIA seeks

to "assist citizens in discovering 'what their government is up to.'"  *Ctr. for Int'l Envtl. Law*, 237

F. Supp. 2d at 22 (quoting *Reporters Comm.*, 489 U.S. at 773).  Courts accordingly "'impose a

substantial burden on an agency seeking to avoid disclosure' through the FOIA exemptions.  As

such, exemptions from disclosure must be narrowly construed and 'conclusory and generalized

allegations of exemptions are unacceptable.'"  *Morley v. CIA*, 508 F.3d 1108, 1114 (D.C. Cir.

2007) (citations omitted).  An agency's showing will not suffice if it "merely recit[es] statutory

standards" or is "too vague or sweeping."  *Billington v. DOJ*, 233 F.3d 581, 584 (D.C. Cir. 2000)

(quoting *Campbell v. DOJ*, 164 F.3d 20, 30 (D.C. Cir. 1998)).  *See National Parks & Conserv.*

*Ass'n v. Kleppe*, 547 F.2d 673, 680 (D.C. Cir. 1976) ("*National Parks II*") ("Conclusory and

generalized allegations are [] unacceptable as a means of sustaining the burden … since such

allegations necessarily elude the beneficial scrutiny of adversary proceedings, prevent adequate appellate review and generally frustrate the fair assertion of rights under the Act.").

The public has a strong and undoubted interest in monitoring its government's effort to root out and eliminate "systematic corruption" of the type DOJ found throughout Siemens' operations.  Even in cases where the public interest in "monitoring the Government's activities" is less emphatic, FOIA requires an agency to provide a sufficiently detailed account of the documents that it seeks to exempt from the statutory presumption of disclosure, as well as an adequate justification supported by reasoned explanation that places the documents squarely within one of the law's narrow exemptions.  *See, e.g.*, *Vaughn v. Rosen*, 484 F.2d 820, 827 (D.C. Cir. 1973) (need for adequate specificity is closely related to assuring a proper justification by the agency).  When, as here, an agency offers only brief descriptions of records that it effectively withheld in full (thus allowing minimal insight via inference or context into the withholdings) and rote repetitions of legal standards as justification, the government has not met its burden. This is equally true with respect to DOJ's burden to demonstrate that it has released reasonably segregable responsive material, especially given that 100Reports is not seeking sensitive infor-mation about, *e.g.*, individuals, informants or whistleblowers, or Siemens' business operations. *See supra* 3-4.  In view of this, the FOIA compels the Court to order disclosure.

I.    **FOIA EXEMPTION 4 HAS NOT BEEN PROPERLY INVOKED TO ALLOW DOJ TO WITHHOLD THE MATERIALS AT ISSUE**

Defendants claim the materials 100Reporters seeks constitute withholdable confidential or privileged commercial information, but fail to make the necessary showing to carry their burden.  Def. Mot. at 21-33; Moberly Decl. ¶ 22; Siemens Mot. at 22.  A "commercial" docu-ment may only be withheld under Exemption 4 if it is "privileged" or "confidential."  5 U.S.C. § 552(b)(4).  A two-prong test is used to determine whether information involuntarily submitted

to a Federal agency is "confidential" for FOIA purposes.  "Commercial or financial matter is 'confidential' for purposes of the exemption if disclosure of the information is likely to have either of the following effects:  (1) to impair the Government's ability to obtain necessary information in the future; or (2) to cause substantial harm to the competitive position of the person from whom the information was obtained."  *National Parks & Conserv. Ass'n v. Morton,* 498 F.2d 765, 770 (D.C. Cir. 1974) ("*National Parks I*").  "Like all FOIA exemptions, exemption 4 is to be read narrowly in light of the dominant disclosure motif expressed in the statute."  *Wash. Post Co. v. HHS,* 865 F.2d 320, 324 (D.C. Cir. 1989).

Here, DOJ failed to carry its burden of identifying any characteristics of these materials that would make them confidential.  Its justifications are vague and conclusory, stating only that disclosure of the documents might provide some advantage to unnamed competitors and might drive other entities from providing thorough information to DOJ in similar circumstances.  Such assertions of confidentiality are too cursory and nonspecific to justify blanket withholding, and they do not provide the detailed showing required to support a finding of confidentiality.  DOJ's argument that disclosure could impair its ability to acquire similar information in the future is also conjectural and unsupported by legal authority or logic.  This is fatal to the invocation of Exemption 4.

### A.    DOJ's Allegations as to Confidentiality Are Vague and Conclusory

DOJ fails to carry its burden under Exemption 4 as an overarching matter because it has provided only insufficient, non-specific claims of an asserted right to withhold – mere reiteration of the legal standard as *ipse dixit* statements of justification.  *See* Def. Mot. at 24-35; Moberly Decl. ¶¶ 22-23.  In doing so, DOJ "fail[s] to supply … even the minimal information necessary to make a determination."  *Judicial Watch, Inc. v. FDA*, 449 F.3d 141, 150 (D.C. Cir. 2006) (quoting *Coastal States Gas v. DOE*, 617 F.2d 854, 861 (D.C. Cir. 1980)).  While Exemption 4

allows agencies to withhold "trade secrets and commercial or financial information obtained from a person and privileged or confidential," 5 U.S.C. § 552(b)(4), FOIA not only places the burden of proving the exemption squarely on the shoulders of the government, *Judicial Watch*, 449 F.3d at 146, it also requires it to "provide a relatively detailed justification, specifically identifying the reasons why a particular exemption is relevant and correlating those claims with the particular part of a withheld document to which they apply." *Id*. (quoting *Mead Data Cent., Inc. v. Dep't of Air Force*, 566 F.2d 242, 251 (D.C. Cir. 1977)).  *See also National Parks II*, 547 F.2d at 680 (citation and internal quotation marks omitted) (agency must provide more than "conclusory and generalized allegations of exemptions").

Yet DOJ has not offered any serious explanation as to the commercial or financial character of the material it refuses to disclose, let alone of the competitive injury their disclosure supposedly would cause.  For the most part, the agency offers only a laundry list of statements that the documents contain information related to Siemens' "compliance programs," "accounting controls," "business operations," and "corporate structure."  Def. Mot. at 21-23.  DOJ's declaration states only that:

> Release of these documents would likely cause Siemens substantial competitive harm by allowing its competitors to use the company's proprietary information to the competitors' commercial disadvantage.  Disclosure of confidential information about Siemens' compliance programs would provide a free roadmap as to which business practices Siemens has found may be conducted in international commerce without violating the FCPA and other anti-corruption laws, what activities to avoid, and how to build an effective compliance program and system of internal controls, etc.

Moberly Decl. ¶ 22.  It should go without saying that "et cetera" does not rise to the level of specificity required under the law.  And the other declarations submitted by DOJ do not address this claim at all.  *See* Helou Decl. ¶¶ 13-17.

The closest DOJ comes is when it cites the Kirsch Declaration, proffered by Siemens (which DOJ incorporates by reference), as claiming the withheld information shows "Siemens' financial controls and information about its business operations, including valuation and projected profits for actual and potential projects, and information about competitive bidding procedures."  Def. Mot. at 23 (citing Kirsch Decl. ¶¶ 16-28).  Yet even this fails to afford much beyond generalizations as to the subject matter of the documents. [6]  Instead of explaining itself, DOJ presents descriptions of records and justifications for their withholding that are so vague as to be meaningless.  Such platitudes "impede judicial review" by serving as "[b]road, sweeping claims of privilege without reference to the withheld documents."  *Judicial Watch*, 449 F.3d at 147.

Nor does DOJ's *Vaughn* index provide much additional detail.  Though the *Vaughn* index has heft, to be sure, the vast majority of its entries are repetitive, conclusory assertions that bear little relation to the details of the associated documents. Its boilerplate justification is that "[t]he document contains information that serves a commercial function and is of a commercial nature, and Siemens has a commercial interest in the information in that it is helpful or instrumental to its business interests," coupled with repetition of the opaque argument that the information could provide a compliance "roadmap" to competitors.  *E.g.*, *Vaughn* index entries for DOJ_0000029 to DOJ_0000293, p. 21.  While the document descriptions offer a modicum of insight into the nature of some of the records, there is no "how" and "why" provided that might give meaning to otherwise conclusory claims that disclosure is likely to cause substantial competitive injury.

---

[6]   And to the extent that these descriptions encompass details that do meet the standard for withholding under Exemption, those finer points would seem amenable to redaction rather than withholding the documents in full.  *See infra* § IV.

The brevity, opaqueness, and repetitiveness of the *Vaughn* index do not satisfy DOJ's duty to provide sufficiently detailed justification for withholding each document.  Although a few of DOJ's document descriptions provide details about the contents of the materials, even these rely on conclusory statements regarding the purportedly confidential material that do not provide the detailed support required for withholding.  *See, e.g.*, *Vaughn* index, Moberly Decl. Ex. F at DOJ_0000029 to DOJ_0000293 (explaining that "Siemens Compliance Monitorship Year One Report" contains "confidential information" regarding Siemens "leadership, corporate culture, compliance programs," and other broad categories).

Take one example that typifies DOJ's Exemption 4 justifications:  the document labeled "Siemens' Compliance Monitorship Year One Report," which was withheld virtually in full. Instead of providing any information on the document's subject matter, DOJ merely states that it "contains information that serves a commercial function and is of a commercial nature, and Siemens has a commercial interest in the information in that it is helpful or instrumental to business interests." *See* Moberly Decl. Ex. F, p. 40; *see also Vaughn* index, Moberly Decl. Ex. F at DOJ_0000029 to DOJ_0000293 (providing generic description of the purportedly commercial information contained in the document).  This description, and its accompanying justifications, are hopelessly generic and preclude the Court from "tying" the merits of the exemption to what DOJ seeks to withhold.  *Judicial Watch*, 449 F.3d at 150.  The statement is pure boilerplate – it contains no factual information whatsoever, and merely parrots a legal test, and thus cannot carry DOJ's burden under FOIA Exemption 4.  *See In Defense of Animals v. HHS*, No. 99-3024, 2001

WL 34871354, at *10 (D.D.C. Sept. 28, 2001).  And this boilerplate language is exactly the same

for every other Exemption 4 claim in the *Vaughn* index.[7]

### B.   Disclosure of the Withheld Materials Would Not Impair the Government's Ability to Obtain Necessary Information in the Future

The Exemption 4 justifications for withholding fail not only in their brevity, but in sub-

stance as well, insofar as DOJ claims that disclosing the records 100Reporters seeks could "harm

DOJ's ability to obtain similar information from other companies in the future and its ability to

reduce recidivism."  Def. Mot. at 2; *see also* Moberly Decl. ¶ 23.  The Helou Declaration claims

disclosure would harm the "extent and quality of the information that the monitor receives from

companies — and thus gives to the Justice Department" because employees are likely to be less

forthcoming if they fear doing so could "damage their employer and their standing at the com-

pany"  Helou Decl. ¶ 14; *see also* Price Decl. ¶ 13 ("A monitor's ability to determine whether

information is accurate and reliable would be limited if it did not have full access ….").

But as the D.C. Circuit observed, in an Exemption 4 case DOJ itself cites, when the

government compels the production of information, there is no concern about the possibility of

non-disclosure, but only over the potential "quality" of data produced.  *See Critical Mass Energy*

*Project v. Nuclear Regulatory Comm'n*, 975 F.2d 871, 873 (D.C. Cir. 1992) ("[B]ecause the

concessioners [were] *required* to provide this financial information ... there is presumably no

danger that public disclosure will impair the ability of the Government to obtain this information

in the future.'") (quoting *National Parks I*, 498 F.2d at 770) (cited Def. Mot. at 24).  The only

concern, rather, is that the quality of information provided to DOJ could be impaired.  This can-

not be the case, however, when the entity from which disclosure is sought faces an extreme

---

[7]  *See* all *Vaughn* index entries, excluding DOJ_0005292 to DOJ_0005297; DOJ_0005299 to DOJ_0005303; DOJ_005334 to DOJ_005342; DOJ_005345 to DOJ_005350; DOJ_005352 to DOJ_005356.

consequence for not providing accurate, thorough information, such as failure to satisfy a plea agreement, as would have been the circumstance in this case.

DOJ relies on *Judicial Watch, Inc. v. Exp.-Imp. Bank*, 108 F. Supp. 2d 19, 30 (D.D.C. 2000), to support its claim that disclosure here would encourage similarly-situated entities to be "less likely to volunteer information with monitors, including reporting new misconduct or problems with their compliance programs." Def. Mot. at 27. But that case is inapposite. The mandatory production it addressed was for information submitted by exporters under guaranteed loan, credit guarantee, and export insurance programs. 108 F. Supp. 2d at 29. The exporters participated in those programs on a voluntary basis in order to secure the benefits of those programs. This is a far cry from the circumstances Siemens faced when confronting whether to provide full and accurate information to DOJ under a plea agreement or face renewed criminal prosecution in which DOJ could compel disclosure through its subpoena power. *See* ECF No. 14. None of DOJ's declarations nor its memorandum grapples with this distinction. *See* Def. Mot. at 2; *see also* Moberly Decl. ¶ 23; Helou Decl. ¶¶ 13-16; Price Decl. ¶ 13.

The present situation is more like that in *Public Citizen v. HHS*, 975 F. Supp. 2d 81, 112 (D.D.C. 2013), involving pharmaceutical companies that had signed Corporate Integrity Agreements in lieu of prosecution, where this Court wrote: "With respect to the 'quality' of the submissions, the government is well-protected by the penalty terms of the CIAs for breaches of the reporting requirements." So, too, here. The Plea Agreement had penalty terms for non-compliance with the mandatory production of information, including the resumption of criminal proceedings without Siemens being able to withdraw its guilty plea. Siemens had every incentive, as would any similarly situated party, to ensure complete and forthright compliance with the monitorship – regardless of potential disclosure under FOIA. *See id*. at 113 ("[C]oncern about []

ability to negotiate future CIAs is, at most, minor, since the enticement for companies … to avoid the 'corporate death sentence' will continuing [*sic*] to be compelling.").

There accordingly is no reason to credit DOJ's claim that it would be difficult to obtain reliable information from a party similarly situated to Siemens in the future.  That party would face the same dire predicament Siemens risked if it declined to cooperate fully and accurately with the Plea Agreement's disclosure requirements.  The risk of impairing DOJ's ability to gather information or to induce companies facing criminal prosecution to enter similar monitoring arrangements is divorced from the reality that these companies face if they fail to cooperate, and dramatically understates the power of the U.S. government in these situations.

### C.  DOJ and Siemens Have Not Shown that Siemens Would Suffer Competitive Harm

Nor has either DOJ or Siemens offered sufficient evidence as required by Exemption 4 that disclosure of the materials sought by 100Reporters would "cause substantial harm to the competitive position" of Siemens in the marketplace.  *National Parks I*, 498 F.2d at 770.  To support non-disclosure under Exemption 4, the harm must be substantial, and the claim must be detailed.  Although "parties opposing disclosure need not 'show actual competitive harm,'" they must show a "likelihood of substantial competitive injury," *Public Citizen Health Research Grp. v. FDA*, 704 F.2d 1280, 1291 (D.C. Cir. 1983) (quoting *Gulf & Western Indus. v. United States*, 615 F.2d 527, 530 (D.C. Cir. 1979)); *National Parks II*, 547 F.2d at 679.  "Evidence revealing '[a]ctual competition and the likelihood of substantial competitive injury'" is required "to bring commercial information within the realm of confidentiality."  *Public Citizen Health Research*, 704 F.2d at 1291 (quoting *Gulf & Western*, 615 F.2d at 530).

The declarations provided by DOJ offer nothing but the type of "[c]onclusory and generalized" statements that the D.C. Circuit rejected in *Public Citizen*, 704 F.2d at 1291, in that

they explain only that disclosure of the records could provide unnamed competitors with some kind of insight into how Siemens follows the law.  *See* Moberly Decl. ¶ 22.  This is patently insufficient.  *See Occidental Petrol. Corp. v. SEC*, 873 F.2d 325, 342 (D.C. Cir. 1989) (requiring more than "conclusory statement" regarding substantial competitive harm); *Wash. Post Co. v. HHS*, 690 F.2d 252, 268-69 (D.C. Cir. 1982) ("[T]he government produced no evidence except a conclusory affidavit by the HHS director of personnel policy. Thus, the government has not yet established its Exemption 4 claim.").  DOJ must at the least provide some context by describing which aspects or characteristics of the withheld material could be used to give Siemens' competitors an unfair advantage, and how.  *See COMPTEL v. FCC*, 910 F. Supp. 2d 100, 117 (D.D.C. 2012) (requiring "additional description of the contents of the redacted information or reasons for non-disclosure").  DOJ fails to provide anything approaching that kind of detail.  Even with the benefit of the doubt given agency declarations, "deference does not mean blind acceptance." *Mudge Rose Guthrie Alexander & Ferdon v. U.S. Int'l Trade Comm'n*, 846 F.2d 1527, 1532 (D.C. Cir. 1988).  Absent more than the conclusory statements DOJ and Siemens offer, the Court must find the withheld materials are not confidential under FOIA.

1.    **DOJ Has Failed to Provide Support for its Claim of Competitive Harm**

In its attempt to show Siemens would suffer competitive harm, DOJ offers only the paltry statement that releasing the Monitor's annual reports would harm Siemens "by letting its competitors use its proprietary information to its commercial disadvantage." Def. Mot. at 34.  This statement is entirely insufficient to satisfy the burden of showing that Siemens would suffer competitive harm rising to a level that would permit withholding under Exemption 4.  Similarly, DOJ's declarations provide only a cursory statement alleging that this information could be used as a "free roadmap" that could allow competitors to avoid anti-corruption laws, without specify-

ing how the information would allow such unnamed competitors to do so.  *See* Moberly Decl. ¶ 22.  As this Court has written, where such a "conclusory statement says nothing about *how* the revelation of these [materials], now dating back to at least several years ago, would be used by competitors affirmatively to harm" the disclosing entity, withholding cannot be supported. *Public Citizen v. HHS*, 975 F. Supp. 2d at 115 (emphasis added).

To be sure, an agency "can establish a likelihood of substantial competitive injury by demonstrating disclosure would provide competitors with valuable insights into the company's operations, give competitors pricing advantages over the company, or unfairly advantage competitors in future business negotiations." *People for Ethical Treatment of Animals v. USDA*, No. CIV. 03 C 195-SBC, 2005 WL 1241141, at *7 (D.D.C. May 24, 2005) (citing *National Parks II*, 547 F.2d at 684).  But DOJ's vague, boilerplate statements provide no details about the nature of the alleged competitive harm, or its severity.  As with the agency in *Biles v. HHS*, 931 F. Supp. 2d 211, 230 (D.D.C. 2013), DOJ "does not even give examples of the extent of the harm or the type of harm that would occur if the requested data were released."  *See also Gov't Accountability Project v. HHS*, 691 F. Supp. 2d 170, 175-76, 178-79 (D.D.C. 2010) (agency failed to show "how" competitor would use data to its advantage or competitor's disadvantage). DOJ therefore offers no basis for the Court to determine that withholding is proper.  What the Court described in *Public Citizen* holds true here as well:

> The fundamental problem in this case is the lack of detail provided in the defendants' declarations and the *Vaughn* indices.  Mere conclusory statements regarding the alleged commercial nature and confidentiality of the records withheld is not sufficient to allow this Court to determine whether the withheld information is properly exempt under FOIA's Exemption 4.

*Public Citizen v. HHS*, 975 F. Supp. 2d at 118.

DOJ also provides no evidence Siemens faces "actual competition" in a line of business that could be harmed by disclosure, *General Electric Co. v. Dep't of Air Force*, 648 F. Supp. 2d

95, 102-03 (D.D.C. 2009), nor offers the required level of detail in describing what the alleged harm might comprise.  *See, e.g.*, *Boeing Co. v. Dep't of Air Force*, 616 F. Supp. 2d 40, 45 (D.D.C. 2009) (party resisting disclosure "must provide 'specific factual or evidentiary material' to support his claim that harm is likely to result.") (quoting *National Parks II*, 547 F.2d at 679). While it can be assumed Siemens faces competition in the marketplace, it is nonetheless DOJ's burden to describe that competition and to demonstrate how disclosure of the particular records at issue would result in a likelihood of harm in some specifically identified zone of competition.

The *Vaughn* index is as lacking as DOJ's declarations.  Where it should provide detailed explanations of the substantial competitive harm that could be expected following the disclosure of each document, DOJ instead offers only broad descriptions of most documents and the same, repeated, conclusory boilerplate justifications for each category.  Our analysis shows that each time Exemption (b)(4) is invoked, DOJ lists the same four paragraphs, regardless of the type of document or its contents.  Such an index "is, on the whole, entirely insufficient to show competitive harm [where] [i]t lists the same boilerplate, ambiguous descriptions and reasons for [] countless … documents." *Ctr. for Auto Safety v. Dep't of Treasury*, --- F. Supp. 3d ---, 2015 WL 5726348, at *15 (D.D.C. Sept. 30, 2015).  "While true that 'a *Vaughn* index may ... contain brief or categorical descriptions when necessary to prevent the litigation process from revealing the very information the agency hopes to protect,' cursory statements do not justify withholding even under categorical methodology." *Id.* (quoting *ACLU v. CIA*, 710 F.3d 422, 432 (D.C. Cir. 2013); *see Prison Legal News v. Samuels*, 787 F.3d 1142, 1149 (D.C. Cir. 2015)).  Ultimately, DOJ has not provided nearly enough detail to support a finding that Exemption 4 applies.

**2.      Siemens Has Not Shown that It Would Suffer Substantial Competitive Harm**

Siemens provides a lengthier argument than DOJ for why release of these materials might cause it serious commercial harm, but also ultimately fails to provide sufficient evidence to justify withholding or to take into account the context of why this information was submitted to the Monitor in the first place – Siemens' conduct resulting in a guilty plea to the largest violation of the FCPA in U.S. history.   Thus, even insofar as DOJ incorporates Siemens' arguments by reference, DOJ's burden under Exemption 4 remains unmet.

**a.      There Is No Reason to Believe that Disclosing the Details of Siemens' FCPA Compliance Plan Would Cause It Substantial Competitive Harm**

Siemens argues that releasing the information sought by 100Reporters would provide competitors a free "roadmap" of Siemens' FCPA compliance program, thereby allowing them to coopt the program without paying the "substantial investment cost" borne by Siemens, Siemens Mot. at 19, 22, but this claim does not bear scrutiny.   Notwithstanding the sparseness of the details that DOJ and Siemens have provided regarding the company's FCPA remediation efforts, it can be gathered that the compliance program resulting from Plea Agreement is not a one-size-fits-all model that could easily be copied by a competitor.   As admitted by Joel Kirsch, Siemens' North American Head of Compliance Regulatory Case Handling, "because the Siemens group of companies operates in nearly 200 countries around the world, its compliance program is tailored to ensure that the [] group…adheres to the local laws and regulations that govern its operations worldwide."   Kirsch Decl. ¶ 12.   Given this, Siemens' FCPA compliance program is not an "off-the-shelf" solution that could easily adopted by a competitor.

Just as its FCPA compliance program is "tailored" to address specific regions and indus-tries in which Siemens operates, it is necessarily tailored to address and correct the specific and

unique "systematic corruption" DOJ and the SEC uncovered. Def. Mot. at 4.  There is no reason to believe that a program designed to root out, correct and prevent the unique instances of corruption endemic across a multinational corporation of this scale would or could be easily adopted by a competitor, much less that a competitor "could simply use the same materials with few modifications to train *its* employees."  Siemens Mot. at 22 (emphasis in original).

The notion that one of Siemens' competitors would need to or want to copy Siemens' FCPA compliance program also is belied by the dominating presence that FCPA enforcement has taken on in corporate governance.  No rational business – let alone one that could seriously compete with Siemens – can operate without a carefully designed FCPA compliance program tailored to its own business (rather than to Siemens' operations).  As DOJ's Fraud Section stated in its April 5, 2016, FCPA Enforcement Plan and Guidance:  "the Department is intensifying its investigative and prosecutorial efforts by substantially increasing its FCPA law enforcement resources."  DOJ is increasing its FCPA unit by more than 50 percent,[8] and the FBI, the guidance notes, has "established three new squads of special agents devoted to FCPA investigations and prosecutions."  *Id.*  It would be foolhardy for any of Siemens' competitors to operate without a robust FCPA compliance plan, particularly insofar as DOJ's "demonstrated commitment to devoting additional resources to FCPA investigations and prosecutions should send a message to wrongdoers that FCPA violations that might have gone uncovered in the past are now more likely to come to light."  *Id.*

This message has been heard:  a survey of Siemens' acknowledged competitors shows that all of them either have been subject to FCPA or corruption-related investigations, have touted their anti-corruption programs, or both.  To wit, Siemens most recently listed ABB,

---

[8] U.S. Department of Justice, Criminal Division, Fraud Section: The Fraud Section's Foreign Corrupt Practices Act Enforcement Plan and Guidance (rel. Apr. 5, 2016).

General Electric, Rockwell, Schneider Electric, and Toshiba as major competitors.  *See* Siemens

Annual Report 2015 at p. 39.  A summary of each company's experience with anti-corruption

enforcement and compliance reflects a level of awareness that undercuts Siemens' argument that

its tailored compliance plan could be easily implemented by a competitor:

- In 2010, ABB pled guilty to FCPA violations and, according to the DOJ press release, "agreed to fully cooperate with investigations by U.S. and foreign authorities of the company's corrupt payments and to adhere to a set of enhanced corporate compliance and reporting obligations, which include the recommen-dations of an independent compliance consultant."[9]  ABB's "enhanced corporate compliance" obligations, will like Siemens', result in a compliance plan tailored to ABB based on the consultant's recommendations.

- Similarly, in 2010, General Electric settled a $23 million FCPA lawsuit brought by the SEC.[10]  The company now publicizes its compliance with anti-corruption laws on its website, writing that "[n]ever before have the risks been greater. Aggressive enforcement of the U.S. Foreign Corrupt Practices Act (FCPA) by the SEC and the U.S. Department of Justice remains the norm."[11]

- Rockwell, too, recently settled an FCPA suit with the SEC, following which it "undertook numerous remedial measures, including employee termination and disciplinary actions, enhancements to its internal controls and compliance program and conducted a broad, global review of its other operations."[12] Rockwell claims that "[w]e are against corruption in all forms and all of us must take an active role in ensuring it is not part of our business activities," and its publicly-available code of conduct includes a detailed series of questions and answers designed to train its employees on how to identify and avoid potential FCPA violations.[13]

---

[9]   Press Release, Department of Justice, Office of Public Affairs: ABB Ltd and Two Subsidiaries Resolve Foreign Corrupt Practices Act Investigation and Will Pay $19 Million in Criminal Penalties (Sept. 29, 2010).

[10]   *See* Press Release, SEC, SEC Charges General Electric and Two Subsidiaries with FCPA Violations (July 27, 2010), http://www.sec.gov/news/press/2010/2010-133.htm.

[11]  GE Sustainability: Integrity & Compliance: Anti-Corruption, http://www.gesustainability.com/how-ge-works/integrity-compliance/anti-corruption/.

[12]  SEC, In the Matter of Rockwell Automation, Inc., Cease-and-Desist Order (May 3, 2011), https://www.sec.gov/litigation/admin/2011/34-64380.pdf.

[13]  Rockwell Automation Code of Conduct, http://literature.rockwellautomation.com/idc/groups/literature/documents/br/esap-br010_-en-p.pdf.

- Schneider Electric settled claims with the European Court of Justice in 2014 related to price-fixing in a case also implicating Siemens.[14]  The company has since won awards for the "design and implementation" of programs to prevent corruption in Morocco and Nigeria.[15]

- Toshiba boasts of its adherence to the United Nations' Global Compact, which is designed to prevent corruption.[16]

The above reflects that, far from needing a free compliance "roadmap" from Siemens, the company's competitors are already sophisticated actors in the FCPA compliance sphere, and are thoroughly engaged in developing compliance practices tailored to their own operations.  And, to the extent the broad outlines of Siemens' FCPA compliance program might be revealed by disclosure of the records at issue, while it is insufficient to cause competitive, the availability of these general principles on compliance nonetheless inure to the public good.

Moreover, and in any case, neither DOJ nor Siemens provides sufficient information for the Court to accurately measure the actual cost of Siemens' FCPA compliance plan (and thus its purported value as a "free roadmap").  The "millions of dollars" DOJ and Siemens quote covers the entirety of the company's remediation efforts following its guilty plea.  Def. Mot. at 6; Siemens Mot. at 7.  This includes costs of engaging the Monitor to examine Siemens and root out "systematic corruption" that is presumably unique to this company.  Def. Mot. at 4.  And

---

[14]  *See* Alex Lawson, Law360, *Siemens' $69M Fines Stand Despite Errors, EU High Court Says* (Apr. 11, 2014), http://www.law360.com/articles/527037/siemens-69m-fines-stand-despite-errors-eu-high-court-says.

[15]  *See* ETHIC Intelligence, *Schneider Electric Morocco Awarded Anti-corruption compliance system certificate* (Dec. 17, 2014), http://www.ethic-intelligence.com/wp-content/uploads/2014-EI-Schneider-Electric-Morocco-Certification_Decision-to-Award-and-Register.pdf; ETHIC Intelligence, *Anti-corruption Compliance System Certificate awarded to Schneider Electric Nigeria* (Aug. 25, 2015), http://www.ethic-intelligence.com/news/9576-schneider-electric-nigeria-receives-anti-corruption-compliance-system-certificate/.

[16]  *See* Toshiba, Toshiba Social Responsibility: Participation in UN Global Compact, http://www.toshiba.com/csr/phil_un.jsp.

there is no evidence on specific costs of designing and implementing those features of Siemens'
FCPA compliance program that potentially that go beyond competitors' apparently robust pro-
grams and could therefore provide some incremental value.  Without such analysis, the Court has
no basis for concluding Siemens' competitors would reap any benefit, let alone enough to consti-
tute real competitive harm, from gaining access to information on Siemens' FCPA compliance.

> **b.**   **Siemens Provides Insufficient Evidence that Release of the Withheld Information Would Provide Competitively Sensitive Information to Competitors**

Siemens fares no better arguing that disclosure of the materials sought by 100Reporters
would, variously, allow competitors to (i) learn about Siemens' business, including its processes
and risk assessments, (ii) exploit strengths and weaknesses in Siemens' FCPA compliance
program, and (iii) gain access to contain competitively sensitive information unrelated to FCPA
compliance.  Siemens' Mot. at 19-21.  Like DOJ, Siemens fails to provide sufficient evidence to
support these claims, or to explain why narrow redactions could not adequately address concerns
about sensitive information, rather than withholding documents in full.  Far from offering the
"specific factual or evidentiary material" required to support claims that harm is likely to result,
*Boeing*, 616 F. Supp. 2d at 45, Siemens' memorandum in support of its motion and Kirsch
Declaration offer only general statements as to the type of harm it fears could arise from
disclosure of the materials.

For instance, Siemens writes:

> For example, the work plans describe Siemens' operations in particular countries
> and regions, listing detailed figures about orders and sales and the extent to which
> particular countries and business sectors relied on public sector customers.  As
> with the Monitor's reports, the release of the work plans and related documents
> would provide competitors with detailed information about how Siemens'
> compliance program works in practice, and its perceptions of the countries,
> sectors, and projects with higher corruption risks that competitors would be able
> to exploit to Siemens' detriment.

Siemens Mot. at 21 (citing Kirsch Decl. ¶ 24; Warin Decl. ¶¶ 21, 25). This recitation fails to identify any "actual competition," Siemens faces, *General Electric Co. v. Dep't of Air Force*, 648 F. Supp. 2d at 102-03, or to supply any "specific factual or evidentiary material," *Boeing*, 616 F. Supp. 2d at 45, to support its claim that harm is likely to result. And the Kirsch declaration provides no additional details or description of how disclosure of the materials 100Reporters seeks could actually harm Siemens.

In *Boeing*, the company provided the court a detailed chart explaining how a competitor could use the requested information from one section of the contract at issue to estimate the annual percent increase factor in Boeing's rates. Even so, because it did not similarly document the potential harm of disclosing other requested materials, the Court found Boeing had not met its burden of showing it was likely to suffer substantial competitive harm. *Boeing*, 616 F. Supp. 2d at 48. As the court explained:

> Despite Boeing's allegation that releasing the requested information would place a competitor in a "good position" to make a "good judgment," it fails to demonstrate, for the overwhelming majority of the requested information, how it would be possible for a competitor to make these "good judgments."

*Id.* Similarly, in *Biles*, 931 F. Supp. 2d at 223, the court wrote that "mere observations that disclosure will provide 'insight' into certain types of information fail to show *how* such 'insight' creates a likelihood of substantial competitive harm and are therefore insufficient to establish [a withholding agency's] burden of proof." Siemens has not offered any evidence that could lead the Court to such a conclusion here.

While it is undoubtedly true that the Monitor's reports reveal information about "systematic corruption" within Siemens, Def. Mot. at 4, "Exemption 4 does not guard against mere embarrassment in the marketplace or reputational injury." *Public Citizen v. HHS*, 975 F. Supp. 2d at 107 (quoting *United Tech. Corp. v. DOD*, 601 F.3d 557, 563 (D.C. Cir. 2010)); *see also*

*Occidental Petrol.*, 873 F.2d at 341 (the "right to an exemption, if any, depends upon the competitive significance of whatever information may be contained in the documents, not upon whether its motive is to avoid embarrassing publicity"); *CNA Fin. Corp. v. Donovan*, 830 F.2d 1132, 1154 (D.C. Cir. 1987) (public embarrassment to a company does not warrant withholding under Exemption 4).  Siemens' guilty plea involving "$1.4 billion in bribes to government officials in Asia, Africa, Europe, the Middle East and the Americas" has already publicly established "systematic corruption."  *See supra* at 4.  DOJ and Siemens must do more than allege potential harm generally – they must show a real likelihood of unfair competitive injury stemming from the release of actual confidential material that cannot be cured by selective redactions.

Ultimately, neither DOJ nor Siemens offer more than "mere observations" that disclosure could, in some unexplained fashion, cause Siemens harm.  *Biles*, 931 F. Supp. 2d at 223.  Such observations are not evidence, and sufficient evidence that Siemens faces substantial competitive harm from the release of this information is thus lacking.  Because DOJ fails to carry its burden to withhold these documents under Exemption 4, the Court should order their release. [17]

---

[17] Alternatively, 100Reporters respectfully requests that the Court conduct *in camera* review of the documents to determine if they support the conclusory assertions both that they contain commercial or financial information, and that disclosure would impair future information gathering.  If the documents do not support this conclusion, the Court should order them disclosed, *see Public Citizen Health Research Grp. v. FDA*, 964 F. Supp. 413, 415-16 (D.D.C. 1997), or at a minimum, order DOJ to provide a more detailed explanation before denying 100Reporters access.  *See Pacific Architects & Eng'rs, Inc. v. Renegotiation Bd.*, 505 F.2d 383, 384-85 (D.C. Cir. 1974).  In this respect, it also is notable that DOJ is required to disclose documents whose confidential data can be surgically redacted while permitting insight into, *e.g.*, how the Monitor reviewed Siemens' materials and what he found, yet DOJ's blanket claim that effectively none of that material is segregable is neither plausible nor justified.  *See* Moberly Decl. ¶¶ 38-39.  *See also* Section IV *infra*.

## II.   DOJ'S INVOCATION OF EXEMPTION 5 VIOLATES ITS OBLIGATIONS UNDER FOIA

DOJ's reliance on boilerplate recitation of legal standards and general lack of specificity is even more pronounced with respect to its Exemption 5 claims and precludes the agency from satisfying its burden here as well.  The D.C. Circuit has held that "Congress intended to confine exemption (b)(5) 'as narrowly as [is] consistent with efficient Government operation,'" *Senate of Commonwealth of P.R. v. DOJ*, 823 F.2d 574, 584 (D.C. Cir. 1987) (quoting *Coastal States*, 617 F.2d at 868); *see also Petroleum Info. Corp. v. Dep't of Interior*, 976 F.2d 1429, 1434 (D.C. Cir. 1992), and the Supreme Court has held it protects "those documents, and only those documents, normally privileged in the civil discovery context."  *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 149 (1975).  *See also Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 9 (2001) ("The point of Exemption 5 is not to protect Government secrecy ….").  This means for present purposes that, to invoke Exemption 5, the government bears the burden of identifying specifically the deliberative process, work-product or attorney client privileges that apply to each record redacted or withheld.  This it has failed to do.

### A.   DOJ Did Not Identify the Formulation of Any Agency Policy to Legitimately Provide a Basis for the Deliberative Process Privilege

All records that DOJ redacted or declined to release under FOIA Exemption 5 by invoking the deliberative process privilege were improperly withheld because DOJ has not made the requisite showing that they were pre-decisional or deliberative.  In order for the privilege to apply, an agency must have created the records (or information redacted or withheld) during its consideration of proposed action as part of the decision-making process.  *See Coastal States*, 617 F.2d at 866 (agency record is "deliberative" if it weighs "pros and cons of agency adoption of one viewpoint or another").  Such nondisclosure is justified only if the records are both predeci-sional, *i.e.*, "antecedent to the adoption of agency policy," *and* deliberative, *i.e.*, "actually …

related to the process by which policies are formulated." *Playboy Enters., Inc. v. DOJ*, 516 F. Supp. 233, 239 (D.D.C. 1981) ("*Playboy I*"), *aff'd in part, modified in part Playboy Enters., Inc. v. DOJ*, 677 F.2d 931 (D.C. Cir. 1982) ("*Playboy II*").   It is not enough that a record was prepared as part of agency consideration of some matter – it also must "bear on the formulation or exercise of policy-oriented judgment." *Ethyl Corp. v. EPA*, 25 F.3d 1241, 1248 (4th Cir. 1994) (quoting *Petrol. Info. Corp.*, 976 F.2d at 1435).

It is incumbent upon agencies making an Exemption 5 deliberative process claim to specify the action(s) to which redacted or withheld predecisional records relate in order to sustain nondisclosure. *Senate of P.R.*, 823 F.2d at 585.  It may be true "the privilege does not 'turn on the ability of an agency to identify a specific decision in connection with'" the material withheld, DOJ Mot. at 21 (quoting *Sears, Roebuck*, 421 U.S. at 151 n.18), but as even DOJ admits, it must at least "establish 'what deliberative process is involved and the role played by the documents in issue in the course of the process.'" *Id*. (quoting *Coastal States*, 617 F.2d at 868 (discussing, *inter alia*, *Sears, Roebuck*)).

DOJ offers a litany of vague references to its activity with the Monitor that fails both to "establish what deliberative process is involved" and to tie the records to the purported decision-making at issue.  DOJ states merely that "The Monitor submitted records to the DOJ and the SEC as part of the agencies' respective deliberative processes, and DOJ relied on the Monitor's input." Def. Mot. at 14.  The Moberly declaration likewise refers only to "deliberations" DOJ and the SEC had with the Monitor.  *See* Moberly Decl. ¶¶ 26-27.  And while the Helou declaration describes how a monitorship typically proceeds, it provides no specific claims about the deliberative process in *this* case.  *See* Helou Decl. ¶¶ 9-12.

The justifications in DOJ's *Vaughn* index, far from establishing what role each document played in a deliberative process, merely recite identical boilerplate. *See, e.g.*, Moberly Decl. Ex. F, p. 41. For every document, DOJ makes the same vague claim: that it "contains or relates to the opinions, recommendations and reporting of the Monitor … on legal matters, including whether Siemens was complying with its obligation under the settlement documents," and that "DOJ obtained the document prior to/in the course of making law enforcement and litigation decisions, and relied upon the information contained therein as part of its underlying deliberative process."[18] While some of the document descriptions in the *Vaughn* index provide information about the nature of the withheld documents and may support certain inferences, none provides the logical link to support a claim of deliberative process.[19] Even taking DOJ's citation to law enforcement proceedings as a deliberative process at face value, an unadorned reference to "making law enforcement and litigation decisions" does not suffice as identifying a deliberative process and the role the document played in it.[20]

---

[18] *See Vaughn* index entries for DOJ_0003341 to DOJ_0003345; DOJ_0003346 to DOJ_0003350; DOJ_0003885 to DOJ_0003887; DOJ_0003890 to DOJ_0003893; DOJ_0003894 to DOJ_0003897; DOJ_0005217 to DOJ_0005219; DOJ_0005221 to DOJ_0005223; DOJ_0005225 to DOJ_0005240; DOJ_0005242 to DOJ_0005260; DOJ_0005262 to DOJ_0005276; DOJ_0005277; DOJ_0005280 to DOJ_0005287; DOJ_0005289 to DOJ_0005290; DOJ_0005304 to DOJ_0005326; DOJ_0005328 to DOJ_0005332.

[19] *See, e.g.*, *Vaughn* index entry for DOJ_00004068 to DOJ_0004328 ("Siemens Compliance Monitorship Year One Report") ("The report contains the Monitor's strategy for approaching his mandate"). *Compare Coastal States*, 617 F.2d at 868 ("[A]gency has the burden of establishing what deliberative process is involved, and the role played by the documents in issue in the course of that process."); *Sanders v. Obama*, 729 F. Supp. 2d 148, 153-54 (D.D.C. 2010) (*per curiam*), *aff'd sub nom. Sanders v. DOJ*, No. 10-5273, 2011 WL 1769099 (D.C. Cir. Apr. 21, 2011) (court must draw all justifiable inferences in the nonmoving party's favor).

[20] *See Wilderness Soc'y v. Dep't of Interior*, 344 F. Supp. 2d 1, 11 (D.D.C. 2004) ("defendants have failed to identify a particular decision to which the documents relate, but rather, *inter alia*, vaguely suggest … they relate to 'wilderness issues,' 'wilderness review,' 'wilderness policy,' and 'wilderness matters'"); s*ee also Coastal States*, 617 F.2d at 868 ("Characterizing [ ]

The lack of specificity regarding what policy formulation was involved in the claims of exemption further preclude the Court from making the requisite findings in favor of DOJ to support nondisclosure.  First, because no policy-making activity is specified, there is no way the Court can place the records in a temporal framework to identify them as "antecedent to the adoption of agency policy," which is a prerequisite to finding them "*pre*-decisional."  *Playboy I*, 516 F. Supp. at 239 (emphasis added).  The ambiguity also precludes a finding the records were "deliberative" because without identification of the "process by which policies are formulated," there is no way to ascertain the documents' relation to the allegedly relevant process.  *Id*.  DOJ's repetitive, conclusory assertions cannot meet its burden of specifically identifying formulation of a policy that could provide the basis for the claimed privilege.  The fact that DOJ eventually concluded that Siemens had complied with its obligations under the Plea Agreement does not automatically satisfy the burden of showing the documents at issue were actually used in a predecisional manner, or how they were so used.

### B.       The Monitor's Submissions Do Not Fall under the Consultant Corollary

Even if DOJ's justifications for how Exemption 5 applies and the accompanying document descriptions were sufficiently detailed – which they are not, for reasons stated above – Exemption 5's deliberative process exemption does not apply to documents that were shared or originated with the Monitor.  For DOJ to withhold, it must show documents were "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency."  5 U.S.C. § 552(b)(5); *see also Klamath*, 532 U.S. at 8.  "To qualify, a document must [] satisfy two conditions: its source must be a Government

---

documents as 'predecisional' simply because they play into an ongoing [ ] process would be a serious warping of the meaning of the word.").

agency, and it must fall within the ambit of a privilege against discovery ….”  *Id*.  This ordinarily

would exclude material disclosed to non-governmental third parties.

In limited circumstances, however, courts have held communications between an agency

and outside consultants hired by the agency may be protected by the “consultant corollary” to

Exemption 5.  *Id.* at 11.  The consultant corollary applies when:

> the consultant does not represent an interest of its own, or the interest of any other
> client, when it advises the agency that hires it.  Its only obligations are to truth and
> its sense of what good judgment calls for, and in those respects the consultant
> functions just as an employee would be expected to do.

*Id.* at 10.  But the exception is not as broad as DOJ seeks to apply it here.

In *Klamath*, the Supreme Court declined to extend the consultant corollary to Indian

tribes that had submitted information at the request of the Bureau of Indian Affairs, because the

tribes were in a position to benefit from the ultimate decision for which the Bureau was gathering

the information.  DOJ’s claim of the consultant corollary for the Monitor here must fail as well,

where it argues “the Monitor served in a capacity *akin to* independent outside experts that courts

have found to be covered by the consultant corollary.”  Def. Mot. at 14 (emphasis added). *See

also* Helou Decl. ¶ 8; Warin Dec. ¶¶ 10, 25.c, 25.e. (arguing Monitor “effectively functioned” as

independent consultant or outside expert to DOJ and SEC).  The Monitor similarly argues that he

“functioned in a role ***akin*** to an independent consultant or outside expert” and that therefore “his

submissions to the DOJ and the SEC are covered by the consultant corollary under Exemption

5.”  Monitor Mot. at 20 (emphasis added).  But tellingly, ***none*** of the Defendants directly argue

that the Monitor ***is*** an outside expert to whom the consultant corollary clearly applies.

Yet on this basis, DOJ and the Monitor ask the Court to ***treat*** the Monitor *as* a consultant

for purposes of the consultant corollary, without offering any authority that would allow the

Court to hold that a person in this role, while perhaps “akin to” a consultant or “effectively

function[ing]" as one, should be treated as a consultant under Exemption 5.  Def. Mot. at 14.

Again, DOJ bears the burden of demonstrating that every narrow exemption to FOIA that it

claims fits the facts.  Merely opining that the Monitor's role was "close enough" to consulting

relationships that prior courts have found to be within Exemption 5 does not meet this burden.

And while the Monitor provides a somewhat more thorough argument as to why his role is

similar to an actual consultant, he likewise fails to show he fits within the limited extension of

the narrow Exemption 5. *See* Monitor Mot. at 16.  Rather, the Monitor at once echoes DOJ's

claim that he "functioned in a capacity *akin* to an independent consultant or outside expert,"

while also failing to show this is close enough to place the materials he collected and generated

within the consultant corollary.  *Id.* at 17.

Defendants also ignore indicia that the Monitor falls outside the consultant corollary.  For

example, the Monitor shared his work plans and annual reports with Siemens.  Such sharing is

inconsistent with the Monitor's purported role as a consultant reporting strictly to the govern-

ment on a confidential basis as the deliberative process requires.  *See infra* p. 35 (regarding

waiver of the deliberative process privilege).  And there is no assertion – nor can there be – that

Siemens, with which the Monitor shared the information provided to DOJ and the SEC, falls

under the consultant corollary.  *See id.*  Additionally, DOJ explains the Monitor's "mandate" as

being "to ensure that Siemens carried out its responsibilities under the plea agreement.  *See*

Defs.' Joint Statement of Material Facts at ¶ 34   *See also id.* ¶ 41 (discussing Monitor's

"mandate to ensure that Siemens' internal controls and anti-corruption compliance program

functioned effectively").  That the Monitor's primary function was directed toward Siemens,

rather than toward fulfilling (or helping to fulfill) an agency function at DOJ and/or the SEC,

further undercuts the Defendants' position.

Further, unlike any other cases in which the Court applied the consultant corollary, here the Monitor was actually engaged and paid not by the government, but by Siemens.  *See* Plea Agreement ¶ 12 ("Siemens AG agrees to engage the Monitor and retain the Independent U.S. Counsel within sixty (60) days from the date of the acceptance of this agreement by the Court."); *see also* Monitor's Mot. at 3.  DOJ has cited no cases in which an outside consultant, *hired and paid for* by a third party, has been deemed to fall within Exemption 5's consultant corollary. While 100Reporters does not seek to impugn the Monitor's work or impartiality (indeed it could have no basis for doing so, having not seen any of the work Siemens engaged him to produce), there is no support for concluding that the consultant corollary applies in this context.

Finally, Defendants fail to address the extent to which the present circumstances would operate as waiver of the deliberative process privilege as to documents originating or shared with the Monitor, regardless whether he falls within the consultant corollary.  On the one hand, if the Court finds the Monitor *was* a consultant for the purposes of Exemption 5's deliberative process privilege, by sharing records with Siemens, the government, working through its "consultant," waived that privilege.  *See Shell Oil Co. v. IRS*, 772 F. Supp. 202, 209 (D. Del. 1991) ("Where an authorized disclosure is voluntarily made to a non-federal party, whether or not that disclosure is denominated "confidential," the government waives any claim that the information is exempt from disclosure under the deliberative process privilege."); *Fla. House of Representatives v. Dep't of Commerce*, 961 F.2d 941, 946 (11th Cir. 1992) (same).  On the other hand, if (as 100Reporters submits) the Monitor falls outside the consultant corollary, DOJ has waived the deliberative process privilege for materials shared between the agency and the Monitor.  *Elec. Frontier Found. v. DOJ*, 890 F. Supp. 2d 35, 46 (D.D.C. 2012) ("[V]oluntary disclosure of privileged material to unnecessary third parties waives the deliberative process privilege for the

document or information specifically released") (quoting *In re Sealed Case*, 121 F.3d 729, 741

(D.C. Cir. 1997)) (citations and internal quotation and editing marks omitted).  In the end, there

is no way DOJ can invoke Exemption 5 via the deliberative process privilege for records sought

by 100Reporters that were shared or originated with the Monitor.

### C.      DOJ Improperly Withheld Non-Deliberative Materials Under Exemption 5

Invocation of Exemption 5's deliberative process privilege also fails because DOJ seeks

to apply it to non-deliberative material.  Exemption 5 allows an agency to withhold records that

are both predecisional, i.e., "antecedent to the adoption of agency policy," and deliberative, i.e.,

"actually … related to the process by which policies are formulated."  *Playboy I*, 516 F. Supp. at

239.  However, "a report does not become a part of the deliberative process merely because it

contains only those facts which the person making the report thinks material."  *Playboy II*, 677

F.2d at 935.  As the D.C. Circuit has held:

> It is not enough to assert, in the context of Exemption 5, that a document is used
> by a decisionmaker in the determination of policy.  Unevaluated factual reports or
> summaries of past administrative determinations are frequently used by decision-
> makers in coming to a determination, and yet it is beyond dispute that such docu-
> ments would not be exempt from disclosure.

*Vaughn v. Rosen*, 523 F.2d 1136, 1143 (D.C. Cir. 1975).  *See also EPA v. Mink*, 410 U.S. 73, 91

(1973) (refusing to extend deliberative process privilege protection to "factual material otherwise

available on discovery merely [on the basis that] it was placed in a memorandum with matters of

law, policy, or opinion"); *Coastal States*, 617 F.2d at 867 (citing *Mink*, 410 U.S. at 93); *Sw. Ctr.*

*for Biological Diversity v. USDA*, 170 F. Supp. 2d 931, 941 (D. Ariz. 2000) (release of "raw

research data" would not expose agency's deliberative process as data were not recommen-

dations, were not subject to alteration upon further agency review, and were not "selective" in

character) (D. Ariz. 2000), *aff'd*, 314 F.3d 1060 (9th Cir 2002).

DOJ has not presented a single page of substantive information sought by 100Reporters. It has not presented any evidence whatsoever, beyond conclusory statements, that the materials contain no "factual material otherwise available on discovery," *Mink*, 410 U.S. at 91, despite the Monitor's statement that the "materials submitted by the Monitor are replete with detailed information obtained as a result of his access to Siemens," including "factual information." *See* Monitor Mem. at 8.  The Monitor claims that all of this "factual information" is "thoroughly integrated into the Monitor's evaluations, opinions, and recommendations." *See id.* at 8-9.  But the document descriptions in the *Vaughn* index detail a body of facts – such as existence of site visits, *see Vaughn* index at DOJ_0004329 to DOJ_0004748, and timelines for the Monitor's activities, *id.* at DOJ_0000384 to DOJ_0000418 – that have been withheld wholesale without any effort at segregation. Without some evidence beyond the vague descriptions and boilerplate justifications of the *Vaughn* index, the Court cannot conclude that DOJ has met its burden under Exemption 5 of justifying its failure to produce this factual information.

## III.   FOIA EXEMPTIONS 6 AND 7(C) HAVE NOT BEEN PROPERLY INVOKED TO ALLOW DOJ AND SIEMENS TO WITHHOLD INDIVIDUALS' NAMES AND RELATED IDENTIFYING INFORMATION

DOJ invokes Exemptions 6 and 7(C) on the asserted ground of protecting personal privacy, but has not shown how the balance of interests favors withholding.  As a general matter, as the D.C. Circuit has explained, in the context of Exemption 6 there is a "presumption in favor of disclosure [that] is as strong as can be found anywhere in the Act."  *Multi Ag Media LLC v. USDA*, 515 F.3d 1224, 1227 (D.C. Cir. 2008) (citation and internal quotation marks omitted).  As to personal information in particular, and given the "presumption of openness inherent in FOIA," *Campbell*, 164 F.3d at 33, Exemption 6 allows withholding records only if disclosure will cause a "*clearly* unwarranted invasion of personal privacy."  *Stern v. FBI*, 737 F.2d 84, 91 (D.C. Cir. 1984) (emphasis in original) (citation and internal quotation marks omitted); 5 U.S.C.

37

§ 552(b)(6).  In deciding what constitutes a "clearly unwarranted privacy invasion," the Court must "balance the individual's right of privacy against the basic policy of opening agency action to the light of public scrutiny." *National Ass'n of Home Builders v. Norton*, 309 F.3d 26, 31, 32 (D.C. Cir. 2002) (citation and internal quotation marks omitted).  The burden remains on the government to justify any withholdings. *Id*.

In addition to Exemption 6, DOJ claims Exemption 7(C) in redacting names and personal identifying information of government attorneys and Siemens personnel from the documents at issue.  Def. Mot. at 35-37.  The invocation of Exemption 7(C) cannot serve as an alternative ground for affirming, because none of the documents at issue were created for law enforcement purposes, *see* § III.D., *infra*, and even if Exemption 7(C) applied, DOJ has failed to show that release of any individual's name "could reasonably be expected to constitute an unwarranted invasion of personal privacy," 5 U.S.C. § 552(b)(7)(C), for the same reasons as under Exemption 6.[21]  DOJ's burden in invoking both Exemptions 6 and Exemption 7(C) is substantial, and "[c]onsistent with the Act's goal of broad disclosure, these [FOIA] exemptions have been consistently given a narrow compass." *DOJ v. Tax Analysts*, 492 U.S. 148, 151 (1989).

A FOIA request that includes names or other individual identifying information "does not inherently and always constitute a 'clearly unwarranted' invasion of personal privacy." *News-Press v. Dep't of Homeland Sec.*, 489 F.3d 1173, 1199 (11th Cir. 2007).  Exemption 6 was intended to protect "intimate details" such as "marital status, legitimacy of children, identity of fathers of children, medical condition, welfare payments, alcoholic consumption, family fights,

---

[21]  100Reporters acknowledges the difference in Exemption 6 and Exemption 7(C) in that the latter omits "clearly" from the required showing, but we nevertheless address both exemptions together, as the D.C. Circuit "has deemed the privacy inquiry of Exemptions 6 and 7(c) to be essentially the same." *Judicial Watch, Inc. v. DOJ*, 365 F.3d 1108, 1125 (D.C. Cir. 2004).

and reputation." *Washington Post Co. v. DOJ*, 863 F.2d 96, 100 (D.C. Cir. 1988).  This is a far cry from identification of DOJ staff and Siemens employees that 100Reporters presumes is implicated here.  *See Wash. Post Co.*, 690 F.2d at 261 (disclosure of agency consultants' non-federal employment would be only a minimal invasion of privacy); *Wash. Post Co. v. DOJ*, 863 F.2d at 100 (Exemption 6 applies to disclosures of "an intimate personal nature," thus "[i]nfor-mation relating to business judgments and relationships does not qualify for exemption.  This is so even if disclosure might tarnish someone's professional reputation."); *Sims v. CIA*, 642 F.2d 562, 575 (D.D.C. 1980).

DOJ has also not explained how there could be any harm in identifying government attorneys whose names are presumably listed on publicly available opinions, pleadings, and docket sheets of the cases they handle.[22]  And to be clear, 100Reporters is not seeking truly confidential information such as social security numbers, bank account numbers, or names of confidential informants.  The mere invocation of Exemptions 6 and 7(C) cannot do DOJ's work for it:  to justify withholding, it must show the balance of interests weighs against disclosure.

### A.    DOJ Has Not Shown the Balance of Interests Favors Withholding

Even when the privacy interest held by individuals is more than *de minimis*, it must be balanced against the interest in openness.  Yet, in invoking Exemption 6, DOJ has failed to demonstrate why the Court should give any but the most minimal weight to the privacy interests here.  Here, too, DOJ offers only the most cursory and conclusory justification for withholding information under Exemption 6:

---

[22]  Unless they are confidential for other reasons, such as in the capacity of a confidential source or undercover agent, *e.g.*, Exemption 7(D).  However, though DOJ invoked Exemption 7(D) in its Answer, it appears to have abandoned that defense, as it did not offer any justification for 7(D) withholdings in its *Vaughn* index or declarations.

> Disclosure of this type of personal identifying information would not shed light on the DOJ's performance of its statutory duties.  Providing the personal identifying information to Plaintiff, however, would constitute an unwarranted invasion of the personal privacy of these government attorneys and other private third-parties referenced in the documents in this case.

Def. Mot. at 37.  Likewise, although DOJ's *Vaughn* index offers some details about the records in its document descriptions, when it comes to justifying their non-disclosure, it offers only the same conclusory assertions and boilerplate language that cannot suffice to justify withholding. The *Vaughn* index, its length notwithstanding, simply repeats verbatim, for each record alleged to contain personal information, the statement that:

> Disclosure could subject him/her to harassment both in the conduct of their official duties and private life…. [T]he mention of a private individual's name in a law enforcement file engenders comment and speculation and could produce an unfair stigma which could expose the individual to harassment or criticism.

All of DOJ's justifications for invoking Exemption 6 repeat the same general mantra – *i.e.*, that disclosure could potentially cause stigma.  This kind of high-level averment epitomizes what courts reject as agency showings consisting of no more than "conclusory and generalized allegations," that are "unacceptable."  *Morley*, 508 F.3d at 1114-15.  This being so, in order to justify withholding, DOJ must do more:  it must show a specific privacy interest tied to each individual or category of individuals.

Even insofar as the Supreme Court has concluded "Exemption 7(C) is more protective of privacy than Exemption 6," and thus establishes a lower bar for withholding material, *DOD v. FLRA*, 510 U.S. 487, 496 n.6 (1994); *see also Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 165-66 (2004), DOJ cannot reach even that threshold in this case.  *See supra* note 21. Courts find a cognizable privacy interest under Exemption 7(C) to protect private information of investigators, witnesses, informants, and suspects in criminal matters.  *E.g.*, *Martin v. DOJ*, 488

F.3d 446, 457 (D.C. Cir. 2007).   The privacy interests at stake in this case, however, are considerably weaker than those in other Exemption 7(C) cases.

Here, 100Reporters seeks identifying information regarding employees in the performance of duties *after* resolution of the criminal case – not individuals' rap sheets or other confidential information being used for law enforcement purposes.   In a similar vein, the wrongdoers within Siemens were identified and removed as part of the law enforcement process, so those identified in the remedial efforts in its wake are not akin to accused (or convicted) persons that Exemption 7(C) protects.   There is thus no risk that those individuals would be subjected to the stigma of involvement in a criminal matter that is typically found to support nondisclosure under Exemption 7(C), and that is even less the case (if that is even possible) as to the DOJ and other government officials who worked to enforce and uphold the law.   Invocation of Exemption 7(C) cannot justify DOJ's withholding any more than its reliance on Exemption 6.

### B.      DOJ Has Not Shown that Categorical Treatment of the Privacy Interests Is Warranted

In many ways, DOJ has opted to proceed categorically under Exemptions 6 and 7(C) by offering the same boilerplate analysis of the privacy interests (and nothing on the public interest) for each individual whose identity has been withheld.   *See supra* § III.A.   But in order to justify withholding under a categorical privacy claim, DOJ not only must explain what that claim is, for each individual or category, and characterize the harm threatened by disclosure,  it also "must at least supply some convincing reason why no matter what the context, … a privacy interest [] trumps any possible public interest advanced by disclosure."   *Armstrong v. Exec. Office of Pres.*, 97 F.3d 575, 582 (D.C. Cir. 1996).   While personal information need not be especially intimate or embarrassing to *trigger* Exemption 6 in the first instance, *e.g.*, *N.Y. Times Co. v. NASA*, 920 F.2d 1002, 1006 (D.C. Cir. 1990) (*en banc*), a *substantial* privacy interest inheres only when

information divulges something revealing or likely to lead to "embarrassment," "disgrace" or "practical disabilities, such as loss of employment or friends." *Dep't of Air Force v. Rose*, 425 U.S. 352, 377 (1976). Characterization of the privacy interest is thus necessary to assess it against the public interest in disclosure. [23]

DOJ makes no effort to distinguish between the privacy interests of the individuals it seeks to shield. Instead, it groups them all together as "the monitor, his counsel, DOJ attorneys, and SEC attorneys," along with members of the "Siemens Board," and "Siemens employees." [24] As the D.C. Circuit explained in *Prison Legal News*, the government cannot satisfy its burden when it "lump[s] the privacy interests of all claimants" together without addressing their particular privacy interests. 787 F.3d at 1149. Indeed, the privacy interests of agency employees are intrinsically lower when the primary purpose of FOIA is to provide information to the public about operation of the government. *See Stern*, 737 F.2d at 92 ("[T]he status of the individuals in this case as federal employees diminishes their privacy interests … because of the corresponding public interest in knowing how public employees are performing their jobs."). And the privacy interests necessarily differ between government employees charged with prosecuting Siemens or overseeing its plea arrangement and Siemens personnel who, *e.g.*, worked to ensure satisfaction of the plea agreement or who shared information. *See Prison Legal News*, 787 F.3d at 1150.

---

[23] *Hooker v. HHS*, 887 F. Supp. 2d 40, 60-61 (D.D.C. 2012) (*per curiam*) ("merely asserting in conclusory terms that disclosure of [] information would constitute an invasion of privacy … failed to articulate a substantial privacy interest") (citing *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981)) (internal quotation and editing marks omitted), *aff'd*, No. 13-5280, 2014 WL 3014213 (D.C. Cir. May 13, 2014).

[24] Def. Mot. at 35; *see also* Moberly Decl. at 12 (same); *Vaughn* index entries invoking Exemptions 6 and 7(C) including DOJ_005308 ("This document contains personal information concerning private individuals and/or government employees acting in their official capacity").

Even putting those inherent distinctions aside, there is no indication the identifying information of government attorneys and Siemens personnel are automatically the kinds of "intimate details" or "damaging information" that implicate significant privacy interests. *National Home Builders*, 309 F.3d at 32.  DOJ makes no effort to explain how disclosure would harm the individuals' privacy interest beyond such blanket statements as "[d]isclosure could subject him/her to harassment both in the conduct of their official duties and private life."  *See Vaughn* index entries invoking Exemptions 6 and 7(C) including DOJ_005311 to DOJ_005312. No explanation is given as to whether this refers to DOJ or SEC attorneys or Siemens employees, or why each category of individuals is subject to harassment or "unfair stigma."  *Id.* Nor does DOJ distinguish between the many combinations of individuals and documents (*e.g.*, a DOJ attorney addressed in an email from the Monitor, or a Siemens employee interviewed on a site visit), each of which potentially implicates a different level of privacy interest, heightened or lowered as the case may be.

In the absence of this analysis, DOJ asks the Court to hold that mere mention of *any* individual involved in this complex, multi-party compliance program, named in *any* of the documents withheld, exists under universal threat of harassment and stigma.  Such a holding is supported neither by law nor logic.  For these reasons, DOJ's blanket withholding cannot stand.

### C.     The Value of Identifying Information in Investigating and Reporting to the Public on Agency Operations is Significant

The showing offered by DOJ also gives short shrift to the public interest inherent in the identifying information withheld.  Without understanding which individuals are responsible for DOJ's enforcement of the FCPA, and in what respects, the public has little hope of holding the agency accountable for that task.  In evaluating DOJ's attempt to withhold information under Exemption 6, the Court must be cognizant of the extent to which names and identifying infor-

mation facilitate newsgathering and reporting that lead to granting the public even greater insight into "what their government is up to." *Reporters Comm.*, 489 U.S. at 773.  Particularly in a case involving violations of anti-corruption laws, the public has a strong interest in knowing exactly which officials are involved in assessing the violator's remediation efforts, the offices they hold, and the roles they played.  But here, DOJ has not even provided sufficient information for 100Reporters to determine whether the bulk of the withholdings under Exemptions 6 and 7(C) relate to government officials on the one hand, or employees of Siemens on the other.

There is no doubt the personal identifying information that DOJ redacted would facilitate 100Reporters' reporting that will help fulfill "the purpose of FOIA [of] permit[ting] the public to decide for itself whether [DOJ] action is proper." *Wash. Post v. HHS*, 690 F.2d at 264.  When an outside watchdog like 100Reporters examines a particular issue – here, DOJ's enforcement of the Siemens Plea Agreement – it uses methods different from governmental oversight, and can devote considerable attention to non-traditional areas of inquiry.  Without names, records from administrative agency proceedings can lose much of their analytical use.  Conversely, on receipt of unredacted documents describing DOJ enforcement of plea agreements, 100Reporters can develop additional information that sheds light on agency functions.  As the D.C. Circuit has explained, while the use to which agency records may be put ordinarily does not factor into analysis of whether they must be released, the need for balancing under Exemption 6 requires at least consideration of the use to which a requester might put the information that an agency seeks to withhold.  *See*, *e.g.*, *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157 (2004).

The need for the information claimed to be excluded from FOIA is directly analogous to the press's need for identifying information in other cases where a sufficient public interest was found, on that basis, to require disclosure.  As the First Circuit recently recognized, names

provide "more than mere 'information about private citizens … accumulated in [] governmental files [] that reveals little or nothing about an agency's [] conduct,'" but rather "enable [the press] to investigate public records …, potentially bringing to light" government operations.  *Union Leader Corp. v. Dep't of Homeland Sec.*, 749 F.3d 45, 56 (1st Cir. 2014) (distinguishing *Reporters Comm.*, 489 U.S. at 773).  Moreover, as alluded to above, where "names would *lead to additional information* that 'would shed further light on critical aspects of the government's handling of its [] duties,' allowing the newspaper 'to more fully *monitor*" agency conduct, the public interest tips the balance toward disclosure.  *Id*. at 55 (emphasis added) (citation omitted).  The D.C. Circuit, in the Exemption 6 public interest context, has similarly "recognized that disclosure of names and addresses of public employees could provide leads for an investigative reporter seeking to ferret out what the government is up to."  *DOD v. FLRA*, 964 F.2d 26, 29 (D.C. Cir. 1992) (quoting *FLRA v. DOT*, 884 F.2d 1446, 1452 (D.C. Cir. 1989)).

Another factor tilting the balance in favor of the public interest and toward disclosure is the extent to which the records at issue are the only source of the information withheld.  There is *no* public record of the matters discussed in the disputed documents.  "[U]nder the law of this circuit consideration of alternative sources of information is [] one factor that agencies and reviewing courts … consider in determining whether privacy-implicating information must be disclosed."  *DOD v. FLRA*, 964 F.2d at 28.  *See also id*. at 29 ("agencies and courts consider on the public interest side of the equation [] the extent to which there are alternative sources of information").

"The proper inquiry," as explained in *Jurewicz v. USDA*, 741 F.3d 1326, 1333-34 (D.C. Cir. 2014), "is whether the information 'sheds light' on government activities and whether it would "appreciably further" public understanding of the government's actions (quoting *Dep't of*

*State v. Ray*, 502 U.S. 164, 177-78 (1991)).   DOJ's enforcement of the Plea Agreement is the type of government action the public has an especially strong interest in monitoring. This interest tilts the balance against DOJ's categorical invocation of exemptions 6 and 7(C), and requires release of the withheld material.

### D.   DOJ Has Not Established that the Redacted Records Were Compiled for Law Enforcement Purposes

With respect to Exemption 7(C), in addition to failing to meet its substantive burden, DOJ has failed to carry its threshold burden of showing the records it seeks to withhold were compiled for law enforcement purposes. *Citizens for Responsibility & Ethics in Wash. v. DOJ*, 746 F.3d 1082, 1091 (D.C. Cir. 2014).   In its *Vaughn* index and declarations, DOJ posits that Exemption 7(C) allows withholding names because they appear "in a law enforcement file."[25] Whatever the merits of that point, *cf.*, *e.g.*, *Crooker v. ATF*, 789 F.2d 64, 66 (D.C. Cir. 1986) (Exemption 7 "was designed to eliminate 'blanket exemptions' for Government records simply because they were found in investigatory files compiled for law enforcement purposes") (quoting *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 236 (1978)), the information in question was generated in the course of evaluating Siemens' performance of its duties *after* the close of a criminal proceeding against it, and that evaluation process has itself been concluded for some time.  Taken together, these facts militate against proper invocation of Exemption 7(C) here.

At the outset, simply because the records that DOJ refuses to disclose are related to a concluded law enforcement proceeding does not make them law enforcement records.  *King v.*

---

[25] *See Vaughn* index entries for DOJ_0003341 to DOJ_0003345; DOJ_0003346 to DOJ_0003350;   DOJ_0003885   to   DOJ_0003887;   DOJ_0003890   to   DOJ_0003893; DOJ_0003894   to   DOJ_0003897;   DOJ_0005217   to   DOJ_0005219;   DOJ_0005221   to DOJ_0005223;   DOJ_0005225   to   DOJ_0005240;   DOJ_0005242   to   DOJ_0005260; DOJ_0005262   to   DOJ_0005276;   DOJ_0005277;   DOJ_0005280   to   DOJ_0005287; DOJ_0005289   to   DOJ_0005290;   DOJ_0005304   to   DOJ_0005326;   DOJ_0005328   to DOJ_0005332.

*DOJ*, 830 F.2d 210, 229 (D.C. Cir. 1987) (explaining that an FBI record did not automatically satisfy this threshold requirement "simply by virtue of the function [] the FBI serves").  To show a record was compiled for a law enforcement purpose, DOJ "must establish (1) 'a rational nexus between the investigation and one of the agency's law enforcement duties;' and (2) 'a connection between an individual or incident and a possible security risk or violation of federal law.'"  *Ctr. for Nat'l Sec. Studies v. DOJ*, 331 F.3d 918, 926 (D.C. Cir. 2003) (quoting *Campbell*, 164 F.3d at 32).  An agency investigation is considered to be for law enforcement purposes only if it "focuses directly on specifically alleged illegal acts, illegal actions of particular identified officials, acts which could, if proved, result in civil or criminal sanctions."  *Stern*, 737 F.2d at 89.  These criteria are not met in this case.

The Monitor's review of Siemens' compliance was not a criminal investigation.  Indeed, DOJ claims it needs monitors specifically because this kind of non-criminal monitoring lies outside its resources and expertise in criminal investigation.  Helou Decl. ¶ 15 ("[T]he Justice Department could not conduct the kind of reviews that monitors conduct because our limited resources are focused on investigating and prosecuting violations of the FCPA, not acting as monitors.").  And the fact that the records at issue address some degree of past misconduct by Siemens or its employees does not render them categorically subject to Exemption 7(C).  With the signing of the Plea Agreement, DOJ's investigation and criminal prosecution of Siemens came to a close.  *See* Plea Agreement at 11.  Siemens engaged and paid the Monitor as a condition of terminating the law enforcement action against it.  *See* Defs.' Joint Statement of Material Facts at 5.  To argue that the Monitor's reports were "part of" DOJ's terminated prosecution is a stretch, to say the least.

In the end, there is no continuing law enforcement purpose that would be served and the public interest in how this compliance process was enforced is paramount. *Reporters Comm*, 489 U.S. at 755-56 ("Exemption 7(C) excludes records or information compiled for law enforcement purposes, 'but only to the extent that the production of such [materials] ... could reasonably be expected to constitute an unwarranted invasion of personal privacy.'") (quoting 5 U.S.C. § 552(b)(7)(C). Because DOJ has not shown that these records were compiled for law enforcement purposes, it cannot withhold them under Exemption 7(C) any more than it can under Exemption 6.

## IV.   DOJ HAS NOT SATISFIED ITS BURDEN TO DEMONSTRATE THAT IT RELEASED REASONABLY SEGREGABLE RESPONSIVE MATERIAL

The documents DOJ produced are redacted so completely and seemingly indiscriminately as to make them valueless for purposes of discerning whether DOJ properly disclosed all non-exempt portions. DOJ is required to release all reasonably segregable material and provide a detailed justification for withholding assertedly non-segregable material. *See, e.g.*, *Johnson v. Exec. Office for U.S. Attorneys*, 310 F.3d 771, 776 (D.C. Cir. 2002). As this court held, "[s]o important is the segregability inquiry under FOIA that 'it is error for a district court to simply approve the withholding of an entire document without entering a finding on segregability, or the lack thereof.'" *Animal Legal Def. Fund, Inc. v. Dep't of Air Force*, 44 F. Supp. 2d 295, 301 (D.D.C. 1999) (quoting *Schiller v. NLRB*, 964 F.2d 1205, 1210 (D.C. Cir. 1992)).

Yet DOJ's justification for this failure to segregate is insufficient, providing only a conclusory statement that the:

> information is so inextricably intertwined with core deliberative material that its disclosure would reveal the protected deliberations of DOJ and the SEC. Moreover, the factual material reflects the Monitor's efforts to distill material facts from a much larger body of information, which was itself a deliberative act.

Moberly Decl. ¶ 38; *see also* Def. Mot. at 38-39.   This provides nowhere near the detail that would be required to enable the court to conclude that the agency has met its burden.

As the D.C. Circuit explained, "[b]ecause FOIA challenges necessarily involve situations in which one party (the government) has sole access to the relevant information, and that same party bears the burden of justifying its disclosure decisions, the courts ... require the government to provide as detailed a description as possible–without, of course, disclosing the privileged material itself–of the material it refuses to disclose." *Oglesby v. Dep't of Army*, 79 F.3d 1172, 1178 (D.C. Cir. 1996).   This Court has characterized this type of justification as "unsophisticated parroting of FOIA's statutory language" that is "patently insufficient." *Animal Legal Def. Fund*, 44 F. Supp. 2d at 301 (addressing government claim that no document was "reasonably segregable because it was so intertwined with protected material that segregation was not possible or its release would have revealed the underlying protected material.").   DOJ has not met its burden to disclose all non-exempt portions of the materials or justify non-disclosure.   As this is the case, the Court must find that 100Reporters is entitled to summary judgment on this point as well.

## CONCLUSION

For the foregoing reasons, Plaintiff 100Reporters respectfully requests that the Court grant Plaintiff summary judgment on its Complaint in this matter.

Dated this 22nd day of April, 2016.

Respectfully submitted,

DAVIS WRIGHT TREMAINE LLP

        /s/ *Ronald G. London*
Ronald G. London – Bar No. 456284
Adam Shoemaker – Bar No. 998763
Davis Wright Tremaine LLP
1919 Pennsylvania Avenue, N.W., Suite 800
Washington, D.C. 20006

*Attorneys for Plaintiff*

49

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| **100REPORTERS LLC,** | ) | |
| | ) | |
| | ) | Civil Action No. 14-1264 (RC) |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **UNITED STATES DEPARTMENT OF JUSTICE,** | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| **SIEMENS AKTIENGESELLSCHAFT,** | ) | |
| | ) | |
| Defendant-Intervenor, | ) | |
| | ) | |
| **THEO WAIGEL,** | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |
| | ) | |

**PLAINTIFF'S STATEMENT OF MATERIAL FACTS NOT IN GENUINE DISPUTE**

Pursuant to Local Rule 7(h), Plaintiff 100Reporters LLC ("100Reporters") submits this Statement of Material Facts Not in Genuine Dispute to supplement those facts in Defendants' Joint Statement of Material Facts as to Which There Are No Genuine Disputes (Dkt. 59-1).  *But see* Plaintiff's Response to Defendants' Joint Statement of Material Facts to Which There Are No Genuine Issues, at 2.

**PLAINTIFF'S FOIA REQUEST**

1.      By letter dated July 23, 2013 (*see* Compl. Ex. D), investigative journalist Marjorie Valbrun of 100Reporters submitted a FOIA Request ("the Request") to the United States Department of Justice ("DOJ") Criminal Division on behalf of herself and Plaintiff.

2.      By letter dated August 9, 2013 (*see* Compl. Ex. E), DOJ acknowledged receipt of Plaintiff's Request, assigned it file number CRM-201300626F, and stated that the Criminal Division would take an extension of time to respond to the Request. DOJ justified the extension of time on the grounds that the Request presented "unusual circumstances," within the meaning of 5 U.S.C. § 552(a)(6)(B)(i)-(iii), because the Request required the search of another section of the Criminal Division. 100Reporters did not object to the extension.

3.      By letter dated January 6, 2014 (*see* Compl. Ex. F), DOJ denied Plaintiff's Request on the grounds that the requested information was exempt from disclosure pursuant to FOIA Exemption 7(A), codified at 5 U.S.C. § 552(b)(7)(A). No further explanation was provided, nor was any detailed justification for withholding any supposedly non-segregable material.

4.      By letter dated February 20, 2014 (*see* Compl. Ex. G), Plaintiff, by and through counsel, administratively appealed the initial denial of the Request. This letter narrowed the original Request's scope to six categories of documents, and provided legal authority for their disclosure:

1. Copies of Corporate Compliance Statements that Siemens has filed with the DOJ under the terms of the compliance agreement outlined in the 2008 "Statement of Offense" (the "Compliance Agreement") filed in the U.S. District Court for the District of Columbia (*United States of America v. Siemens Aktiengesellschaft*, No. 1:08-cr-00367-RJL (D.D.C. 2008));

2. Any and all documents related to the DOJ Monitor's evaluation of the effectiveness of the internal controls, record-keeping and financial reporting policies and procedures of Siemens, under the Compliance Agreement, as they relate to Siemens' current and ongoing compliance with the books and records, internal accounting controls and anti-bribery provisions of the FCPA and other applicable anti-corruption laws;

3. Any and all documents and related steps the DOJ Monitor has taken to confirm compliance by Siemens;

2

4. Any and all information, records, facilities and/or employees requested by the DOJ Monitor that fall within the scope of the "Mandate of the Monitor" under the Compliance Agreement;

5. Any and all initial and follow-up reviews of Siemens conducted by the DOJ Monitor under the Compliance Agreement, written reports about the reviews, and compliance work plans prepared by the DOJ Monitor, in consultation with Siemens AG and the DOJ, and submitted to the DOJ for comment; and,

6. Any and all disclosures by Siemens to the DOJ Monitor concerning corrupt payments and related books, records, and internal controls.

(Compl. Ex. G at 2.)

5.      By letter dated April 22, 2014 (*see* Compl. Ex. H), DOJ affirmed the denial of Plaintiff's Request and reasserted the Criminal Division's position that DOJ "properly withheld this information in full because it is protected from disclosure under the FOIA pursuant to 5 U.S.C. § 552(b)(7)(A)." Again, DOJ did not provide any further explanation for its refusal to release any documents.

**FCPA VIOLATIONS AND COMPLIANCE BY SIEMENS' COMPETITORS**

6.      In its Siemens Annual Report 2015, Siemens identifies ASEA Brown Boveri ("ABB"), General Electric, Rockwell, Schneider Electric, and Toshiba as major competitors. *See* Siemens Annual Report 2015 at p. 39.

7.      In 2010, ABB pled guilty to violations of the Foreign Corrupt Practices Act ("FCPA") and, according to a DOJ press release, "agreed to fully cooperate with investigations by U.S. and foreign authorities of the company's corrupt payments and to adhere to a set of enhanced corporate compliance and reporting obligations, which include the recommendations of an independent compliance consultant."  Press Release, Department of Justice, Office of Public Affairs: ABB Ltd and Two Subsidiaries Resolve Foreign Corrupt Practices Act Investigation and Will Pay $19 Million in Criminal Penalties (Sept. 29, 2010).

3

8.      In 2010, General Electric settled a $23 million FCPA lawsuit brought by the Securities and Exchange Commission. *See* Press Release, SEC, SEC Charges General Electric and Two Subsidiaries with FCPA Violations (July 27, 2010), http://www.sec.gov/news/press/2010/2010-133.htm.

9.      General Electric's website states that "[n]ever before have the risks been greater. Aggressive enforcement of the U.S. Foreign Corrupt Practices Act (FCPA) by the SEC and the U.S. Department of Justice remains the norm."   GE Sustainability: Integrity & Compliance: Anti-Corruption,       http://www.gesustainability.com/how-ge-works/integrity-compliance/anti-corruption/.

10.      In 2011, Rockwell Automation ("Rockwell") settled an FCPA suit with the SEC. *See* SEC, In the Matter of Rockwell Automation, Inc., Cease-and-Desist Order (May 3, 2011), https://www.sec.gov/litigation/admin/2011/34-64380.pdf.

11.      Rockwell claims that "[w]e are against corruption in all forms and all of us must take an active role in ensuring it is not part of our business activities," and its publicly-available code of conduct includes a detailed series of questions and answers designed to train its employees on how to identify and avoid potential FCPA violations.  *See* Rockwell Automation Code  of  Conduct,     http://literature.rockwellautomation.com/idc/groups/literature/documents/br/esap-br010_-en-p.pdf at pp. 14-17.

12.      Schneider Electric settled claims with the European Court of Justice in 2014 related to price-fixing in a case also implicating Siemens.  *See* Alex Lawson, Law360, Siemens' $69M Fines Stand Despite Errors, EU High Court Says (Apr. 11, 2014), www.law360.com/articles/527037/siemens-69m-fines-stand-despite-errors-eu-high-court-says.

13.     Schneider Electric has won awards for the "design and implementation" of programs to prevent corruption in Morocco and Nigeria.  *See* ETHIC Intelligence, *Schneider Electric Morocco Awarded Anti-corruption compliance system certificate* (Dec. 17, 2014), http://www.ethic-intelligence.com/wp-content/uploads/2014-EI-Schneider-Electric-Morocco-Certification_Decision-to-Award-and-Register.pdf;     ETHIC     Intelligence,     *Anti-corruption Compliance System Certificate awarded to Schneider Electric Nigeria* (Aug. 25, 2015), http://www.ethic-intelligence.com/news/9576-schneider-electric-nigeria-receives-anti-corruption-compliance-system-certificate/.

14.     Toshiba claims to adhere to the United Nations' Global Compact, which is designed to prevent corruption.  *See* Toshiba, Toshiba Social Responsibility: Participation in UN Global Compact, http://www.toshiba.com/csr/phil_un.jsp.


Dated this 22nd day of April, 2016.


Respectfully submitted,

DAVIS WRIGHT TREMAINE LLP


           /s/ *Ronald G. London*
Ronald G. London – Bar No. 456284
Adam Shoemaker – Bar No. 998763
Davis Wright Tremaine LLP
1919 Pennsylvania Avenue N.W.
Suite 800
Washington, D.C. 20006

*Attorneys for Plaintiff*