## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| 100REPORTERS LLC, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 14-1264 (RC) |
| | : | | |
| v. | : | Re Document Nos.: | 57, 58, 59, 62 |
| | : | | |
| UNITED STATES | : | | |
| DEPARTMENT OF JUSTICE, | : | | |
| | : | | |
| Defendant, | : | | |
| | : | | |
| and | : | | |
| | : | | |
| SIEMENS AKTIENGESELLSCHAFT, | : | | |
| THEO WAIGEL, | : | | |
| | : | | |
| Defendant-Intervenors. | : | | |

## MEMORANDUM OPINION

### GRANTING IN PART AND DENYING IN PART DEFENDANT-INTERVENOR THEO WAIGEL'S MOTION FOR SUMMARY JUDGMENT; GRANTING IN PART AND DENYING IN PART DEFENDANT-INTERVENOR SIEMENS AKTIENGESELLSCHAFT'S MOTION FOR SUMMARY JUDGMENT; GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; DENYING PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT

## I. INTRODUCTION

This matter stems from the resolution of an international investigation of the corrupt

practices of Siemens Aktiengesellschaft ("Siemens").  In 2008, Siemens pleaded guilty to a two-

count information charging the company with violating the internal controls and books and

records provisions of the Foreign Corrupt Practices Act ("FCPA").  The court imposed a fine of

$448.5 million against Siemens, and imposed smaller fines against three Siemens subsidiaries

that pleaded guilty to separate charges.  Siemens also settled a parallel civil proceeding brought

by the United States Securities and Exchange Commission ("SEC") and agreed to pay $350

million in disgorgement of profits.

Among other things, the plea agreement resolving the criminal case required the company to hire an independent corporate compliance monitor to ensure that Siemens implemented an effective corporate governance system and complied with all applicable laws and regulations.  Siemens hired Dr. Theodore Waigel (the "Monitor") to serve as the corporate monitor.  Over several years, the Monitor conducted extensive investigation, review, and oversight of the compliance programs at Siemens.  During that process, the Monitor submitted a number of written reports to the United States Department of Justice ("DOJ"), including work plans at the start of each year and annual reports at the conclusion of each year.  DOJ and the Monitor also exchanged other communications regarding the monitorship.

In 2013, Plaintiff 100Reporters LLC, a non-profit dedicated to investigative journalism, submitted a Freedom of Information Act ("FOIA") request to the DOJ seeking records related to the monitorship.  DOJ denied the request, as well as an administrative appeal.  In 2014, 100Reporters brought this FOIA action before the Court.  The Court later permitted Siemens and the Monitor to intervene in this case.[1]  *See generally 100Reporters LLC v. U.S. Dep't of Justice*, 307 F.R.D. 269 (D.D.C. 2014), ECF No. 28.

Relying on a number of exemptions to FOIA, DOJ has produced portions of redacted documents, while withholding others in full.  100Reporters objects to those withholdings.  Now before the Court are separate motions for summary judgment filed by the Monitor, Siemens, and DOJ, and a cross-motion for summary judgment filed by 100Reporters.  *See generally* Monitor's Mot. Summ. J. ("Monitor Mot."), ECF No. 57; Def.-Intervenor Siemens Mot. Summ. J. ("Siemens Mot."), ECF No. 58; Def. U.S. Dep't Justice Mot. Summ. J. ("DOJ Mot."), ECF No. 59; Pl.'s Mot. Summ. J. ("100Reporters Cross-Mot."), ECF No. 62.

---

[1] The Court will refer to Siemens and the Monitor jointly as "Defendant-Intervenors."

For the reasons explained below, the Court finds that DOJ has justified the withholding

of certain information pursuant to Exemption 4 and the attorney work-product privilege

contained in Exemption 5.  The Court will grant the motions for summary judgment filed by

DOJ and Defendant-Intervenors on those issues.  At this time, the Court finds that DOJ has not

justified its withholdings under the deliberative process privilege contained in Exemption 5 or

under Exemptions 6 and 7(C), and will thus deny summary judgment on those issues.  The Court

will also order DOJ to produce certain representative documents for *in camera* review and will

deny summary judgment on the question of segregability.  Finally, the Court will deny the cross-

motion for summary judgment filed by 100Reporters.

## II.  BACKGROUND

The Court will begin its analysis by providing an overview of the facts giving rise to this

dispute before turning to the procedural history of this litigation.

### A.  Siemens and the FCPA Proceedings

Siemens is a "global technology company focusing on the areas of electrification,

automation, and digitialization."  Siemens Mot., Decl. of Joel Kirsch ("Kirsch Decl.") ¶ 2, ECF

No. 58-2.  Siemens and its subsidiaries operate in 192 countries and employ roughly 348,000

people.  Kirsch Decl. ¶ 2.

An international investigation of Siemens—led by U.S. and foreign law enforcement—

revealed a range of illegal conduct, including violations of anti-corruption laws and accounting

regulations committed by different Siemens business units over several years.  *See generally*

Statement of Offense, *United States v. Siemens Aktiengesellschaft*, No. 08-367 (D.D.C. Dec. 15,

2008), ECF No. 15 ("Statement of Offense").  In December 2008, Siemens entered into a plea

agreement with the DOJ and a consent decree with the SEC to resolve criminal and civil

allegations that Siemens and some of its subsidiaries committed certain violations of the FCPA.

*See* Plea Agreement, *United States v. Siemens Aktiengesellschaft*, No. 08-367 (D.D.C. Dec. 15,

2008), ECF No. 14 ("Plea Agreement"); Consent of Defendant Siemens, *SEC v. Siemens*

*Aktiengesellschaft*, No. 08-2167 (D.D.C. Dec. 12, 2008), ECF No. 1-2 ("Consent").[2]   Three

Siemens subsidiaries—based in Argentina, Bangladesh, and Venezuela—each separately pleaded

guilty to FCPA violations.  *See* Notice Regarding Corporate Monitorship, *United States v.*

*Siemens Aktiengesellschaft*, No. 08-367 ¶¶ 1–2 (D.D.C. Dec. 18, 2012), ECF No. 23

("Monitorship Notice").

Under the criminal plea agreements, Siemens agreed to pay fines totaling $450 million.[3]

*See* Plea Agreement ¶ 5.  Siemens also agreed to cooperate with U.S. and German law

enforcement agencies and to maintain compliance and ethics programs reasonably designed to

detect and deter violations of anti-corruption laws, including the FCPA.  Plea Agreement ¶¶ 10–

11.  Crucially for this case, Siemens also agreed to retain an independent monitor for a period of

up to four years to ensure that the company implemented an effective system of corporate

governance.  *See* Plea Agreement ¶ 12.  Similarly, Siemens agreed to engage a U.S. attorney,

F. Joseph Warin, to provide independent counsel to the Monitor.  Plea Agreement ¶ 12.  On

December 15, 2008, the court accepted Siemens' plea and issued a sentence as set forth in the

plea agreement.  The court's Judgment explicitly required Siemens to comply with the

---

[2] The Court notes that it "may take judicial notice of public records from other court proceedings." *Rocha v. Brown & Gould, LLP*, 101 F. Supp. 3d 52, 56 n.1 (D.D.C. 2015) (quoting *Lewis v. Drug Enf't Admin.*, 777 F. Supp. 2d 151, 159 (D.D.C. 2011)), aff'd, No. 15-7053 (D.C. Cir. Mar. 30, 2016).

[3] Siemens agreed to pay a fine of $448.5 million and the three subsidiaries agreed to pay a fine of $500,000 each.  *See* Monitorship Notice ¶ 3.

4

compliance and ethics program in the plea agreement.  *See* Judgment, *United States v. Siemens Aktiengesellschaft*, No. 08-367 at 4 (D.D.C. Dec. 30, 2008), ECF No. 17.

As part of the universal resolution, Siemens also reached a settlement of the parallel civil complaint filed by the SEC.  The SEC alleged that Siemens "engag[ed] in a widespread and systematic practice of paying bribes to foreign government officials to obtain business."  Compl., *SEC v. Siemens Aktiengesellschaft*, No. 08-2167 (D.D.C. Dec. 15, 2008) ¶ 1, ECF No. 3 ("SEC Compl.").  More specifically, the SEC alleged that Siemens made at least 4,283 payments totaling $1.4 billion to bribe foreign officials.  *See* SEC Compl. ¶ 2.  The SEC also alleged, among other things, that Siemens paid kickbacks to Iraqi ministries in connection with the sales of power equipment to Iraq under the United Nations Oil-for-Food Program.  *See* SEC Compl. ¶ 2.  Siemens settled the civil suit without admitting or denying the allegations of the complaint. *See* DOJ Mot., Decl. of Tracy Price ("Price Decl.") ¶ 3, ECF No. 59-8.  The final judgment did, however, enjoin Siemens from violating the FCPA and ordered Siemens to disgorge $350 million in profits.  *See* Final Judgment, *SEC v. Siemens Aktiengesellschaft*, No. 08-2167, §§ I, V (D.D.C. Dec. 18, 2008), ECF No. 4 ("Final Judgment"); Price Decl. ¶ 3.  Siemens also agreed to engage an independent monitor, *see* Final Judgment § IV, and SEC staff understood that Siemens would hire the same monitor to carry out the requirements of the civil settlement and the criminal plea agreement, *see* Price Decl. ¶ 4.

### B.  The Monitorship

As required by the civil settlement and the criminal plea agreement, Siemens engaged Dr. Theo Waigel to serve as the independent corporate monitor.  *See* Plea Agreement ¶ 12; Consent ¶ 3.  The terms of the plea agreement called on the Monitor to evaluate:

> the effectiveness of the internal controls, record-keeping and financial reporting policies and procedures of Siemens as they relate to Siemens' current and ongoing

> compliance with . . . provisions of the FCPA and other applicable anti-corruption
> laws . . . and take such reasonable steps as, in his or her view, may be necessary to
> fulfill the foregoing mandate.

Statement of Offense, Attach. 2 ¶ 1.

In furtherance of the Monitor's mandate, DOJ required that Siemens provide the Monitor with broad access to Siemens' confidential and commercially-sensitive information, documents, and records. *See* Statement of Offense, Attach. 2 ¶ 2. DOJ also expressly authorized Siemens to share privileged information with the Monitor subject to a non-waiver of privilege arrangement. *See* Statement of Offense, Attach. 2 ¶ 2(b). Similarly, Siemens was obligated to ensure that the Monitor could inspect all relevant documents, conduct on-site observations of Siemens' internal controls and internal audit procedures, meet with and interview employees, officers, and directors, and analyze and test Siemens' compliance programs and controls. *See* Statement of Offense, Attach. 2 ¶ 7.

Further, the plea agreement directed the Monitor to conduct an initial review of Siemens' anti-corruption compliance program and to prepare an initial report, followed by up to three subsequent reviews and reports. *See* Statement of Offense, Attach. 2 ¶ 3. The reports would "set[] forth the Monitor's assessment and mak[e] recommendations reasonably designed to improve the effectiveness of Siemens' program for ensuring compliance with the anti-corruption laws." Statement of Offense, Attach. 2 ¶ 4. The agreement set forth a process for Siemens to adopt or contest the Monitor's recommendations. *See* Statement of Offense, Attach. 2 ¶ 5. The agreement also called for the Monitor to undertake up to three annual follow-up reviews, and, at the conclusion of each follow-up review, to "certify whether the compliance program of Siemens, including its policies and procedures, [was] reasonably designed and implemented to detect and prevent violations within Siemens of the anti-corruption laws." Statement of Offense, Attach. 2 ¶ 6.

Finally, the agreements directed the Monitor to provide regular communications to the DOJ and the SEC by requiring the Monitor to submit a work plan to the agencies for comment prior to each year of the monitorship, *see* Statement of Offense, Attach. 2 ¶ 3, to provide the agencies with the Monitor's written reports following completion of each annual review cycle, *see* Statement of Offense, Attach. 2 ¶ 4, and to report any significant improper activities or violations of law discovered during the monitorship, *see* Statement of Offense, Attach. 2 ¶ 8. Although the plea agreement contemplated a four-year term for the monitorship, the agreement also provided that the term could be shortened or lengthened at the discretion of DOJ.  *See* Statement of Offense, Attach. 2 ¶ 6.

The Monitor ultimately conducted four annual reviews and documented his findings and recommendations in four reports dated October 5, 2009; October 13, 2010; October 7, 2011; and October 12, 2012.  *See* Monitorship Notice ¶ 7.  These written reports each reached "several hundred pages, with numerous footnotes and extensive appendices."  *See* Monitor Mot., Decl. of F. Joseph Warin ("Warin Decl.") ¶ 20, ECF No. 57-2.  During the four-year monitorship, "the Monitor made a total of 152 recommendations in over a dozen topic areas, such as third-party risks, financial controls, and compliance policies and training that . . . were 'reasonably designed to improve the effectiveness of Siemens' program for ensuring compliance with the anti-corruption laws.'"  Monitorship Notice ¶ 8 (quoting Statement of Offense, Attach. 2 ¶ 4). Siemens adopted all 152 recommendations.  *See* Monitorship Notice ¶ 8.  During the monitorship, the Monitor held annual meetings with the government "to review the findings and recommendations in the Monitor's annual reports."  Monitorship Notice ¶ 10.

The Monitor created a wide range of written submissions and communications during the monitorship.  The Monitor breaks these materials into five categories:

- First, a written work plan for each year of the monitorship, including associated documents and communications.  *See* Warin Decl. ¶ 25(a); *see also* DOJ Mot., Decl. of Joey Lipton ("Lipton Decl.") ¶ 5, ECF No. 59-7; Price Decl. ¶¶ 6, 9.

- Second, materials associated with in-person meetings between the Monitor and the DOJ and SEC for each year that work plans were reviewed and discussed. *See* Warin Decl. ¶ 25(b); *see also* Lipton Decl. ¶ 5; Price Decl. ¶ 9.

- Third, the Monitor's written report for each year of the monitorship, including associated documents and communications.  *See* Warin Decl. ¶ 25(c); *see also* Lipton Decl. ¶ 5; Price Decl. ¶¶ 6, 9.

- Fourth, materials associated with in-person meetings between the Monitor and the DOJ and SEC for each year that the Monitor's yearly review and resulting report were discussed. *See* Warin Decl. ¶ 25(d); *see also* Lipton Decl. ¶ 5; Price Decl. ¶ 9.

- Fifth, consultative communications between the Monitor and his independent U.S. counsel and attorneys from the DOJ Fraud Section.  *See* Warin Decl. ¶ 25(e); see also Lipton Decl. ¶¶ 5–6, 9; Price Decl. ¶ 9.

After four years, DOJ authorized the termination of the monitorship, concluding that Siemens had "satisfied its obligations under the plea agreement with respect to the corporate compliance monitorship."  Monitorship Notice ¶ 11.  DOJ specifically determined that Siemens had granted the Monitor broad access to its documents, projects, and employees:

> Over the course of those four years, the Monitor conducted on-site or remote reviews of Siemens' activities in 20 countries; conducted limited or issue-specific reviews in or relating to an additional 19 countries; reviewed over 51,000 documents . . . ; conducted interviews or meetings with 2,300 Siemens employees; observed over 180 regularly scheduled company events; and spent the equivalent of over 3,000 auditor days conducting financial studies and testing.

Monitorship Notice ¶ 7.

## C.  Plaintiff's FOIA Request

100Reporters is a non-profit news organization dedicated to investigative reporting.  *See* Compl., Ex. D at 1–2, ECF No. 1-4.  On July 23, 2013, Marjorie Valbrun, a reporter for 100Reporters, submitted a FOIA request to DOJ seeking records related to the investigation of

Siemens. *See* Compl., Ex. D at 1. Ms. Valbrun specifically requested "copies of the Corporate

Compliance statements that Siemens has filed with the DOJ under the terms of the compliance

agreement outlined in the . . . 'Statement of Offense.'" Compl., Ex. D at 1. The FOIA request

also asks for "all relevant documents related to the DOJ Monitor's evaluation of the effectiveness

of the internal controls, record-keeping and financial reporting policies and procedures of

Siemens," as well as all documents related to the "[s]teps the Monitor has taken to confirm

compliance by Siemens" and "[i]nitial and follow-up reviews of Siemens conducted by the

Monitor under the agreement." Compl., Ex. D at 1.

DOJ responded on August 9, 2013 and stated that it would extend the time limit to

respond because the request presented "unusual circumstances" as defined in 5 U.S.C.

§ 552(a)(6)(B)(i)–(iii). *See* Compl., Ex. E at 1, ECF No. 1-5. Then, in a one-page letter dated

January 6, 2014, DOJ refused to produce any responsive records. *See* Compl., Ex. F at 1, ECF

No. 1-6. DOJ explained that it had determined that "all responsive records are exempt from

disclosure pursuant to Exemption 7(A), which permits withholding records or information

complied for law enforcement purposes when disclosure could reasonably be expected to

interfere with enforcement proceedings." Compl., Ex. F at 1. Ms. Valbrun and 100Reporters

filed an administrative appeal on February 20, 2014. *See generally* Compl., Ex. G, ECF No. 1-7.

The administrative appeal also narrowed the FOIA request to six categories of documents:

> 1. Copies of Corporate Compliance Statements that Siemens has filed with the
> DOJ under the terms of the compliance agreement outlined in the 2008
> "Statement of Offense" (the "Compliance Agreement") filed in the U.S. District
> Court for the District of Columbia (*United States v. Siemens Aktiengesellschaft*,
> No. 1:08-cr-00367-RJL (D.D.C. 2008));
>
> 2. Any and all documents related to the DOJ Monitor's evaluation of the
> effectiveness of the internal controls, record-keeping and financial reporting
> policies and procedures of Siemens, under the Compliance Agreement, as they
> relate to Siemens' current and ongoing compliance with the books and records,

internal accounting controls and anti-bribery provisions of the FCPA and other
applicable anti-corruption laws;

3.  Any and all documents and related steps the DOJ Monitor has taken to confirm
compliance by Siemens;

4.  Any and all information, records, facilities and/or employees requested by the
DOJ Monitor that fall within the scope of the "Mandate of the Monitor" under the
Compliance Agreement;

5.  Any and all initial and follow-up reviews of Siemens conducted by the DOJ
Monitor under the Compliance Agreement, written reports about the reviews, and
compliance work plans prepared by the DOJ Monitor, in consultation with
Siemens AG and the DOJ, and submitted to the DOJ for comment; and,

6.  Any and all disclosures by Siemens to the DOJ Monitor concerning corrupt
payments and related books, records, and internal controls.

Compl., Ex. G at 2.

On April 22, 2014, DOJ affirmed the denial of the FOIA request in a brief letter.  *See*

Compl., Ex. H, ECF No. 1-8.  The denial of the administrative appeal again relied on Exemption

7(A).  *See* Compl., Ex. H at 1.

### D.  Procedural History of this Action

100Reporters brought this lawsuit against DOJ seeking to compel the production of

documents that are responsive to its FOIA request.  *See generally* Compl., ECF No. 1.  DOJ filed

an Answer to 100Reporters' Complaint.  *See generally* Answer, ECF No. 11.  DOJ raised one

affirmative defense—that the requested documents were exempt from disclosure under FOIA.

*See* Answer at 6.  DOJ again relied on Exemption 7(A), but also raised numerous other FOIA

exemptions for the first time, including Exemption 4, Exemption 5, Exemption 6, Exemption 7(C),

and Exemption 7(D).[4]  *See* Answer at 6.

---

[4] At this stage in the litigation, DOJ and Defendant-Intervenors do not rely on Exemption
7(A) or 7(D).

Soon after DOJ filed its Answer, Siemens and the Monitor filed separate motions to intervene in this action. *See* Siemens Mot. Intervene, ECF No. 13; Monitor Mot. Intervene, ECF No. 17. The Court granted both motions on December 3, 2014. *See generally 100Reporters LLC v. U.S. Dep't of Justice*, 307 F.R.D. 269 (D.D.C. 2014).

On March 30, 2015, DOJ produced responsive documents to 100Reporters for the first time. *See* DOJ Mot., Decl. of Suzanna Moberly ("Moberly Decl.") ¶ 19, ECF No. 59-3. The production included two videos and 17 pages of documents. *See* Moberly Decl. ¶ 19. Several months later, DOJ provided 100Reporters, Siemens, and the Monitor with a *Vaughn* index for the remaining withheld documents on October 15, 2015. *See* Def.'s Notice of Compliance, ECF No. 47. DOJ later released a second set of documents on December 4, 2015, totaling 101 pages of records released in full and 348 pages released in part. *See* Moberly Decl. ¶ 19; *see also* Status Report & Proposed Briefing Schedule at 2, ECF No. 49 ("Federal Defendant provided Plaintiff with some of the documents previously withheld entirely, largely redacted on December 4, 2015."). At that time, DOJ continued to withhold in full six video presentations and 4,293 pages of documents. *See* Moberly Decl. ¶ 19. DOJ submitted an Amended *Vaughn* Index with its motion for summary judgment filed on March 22, 2016. *See* Moberly Decl., Ex. F. ("Am. *Vaughn* Index"), ECF No. 59-4.

Now pending before the Court are four motions for summary judgment. DOJ, Siemens, and the Monitor each filed a motion for summary judgment on March 22, 2016. *See* Monitor Mot.; Siemens Mot.; DOJ Mot. Then, 100Reporters filed a cross-motion for summary judgment on April 22, 2016. *See* 100Reporters Cross-Mot.

### III.  LEGAL STANDARD

### A.  The Freedom of Information Act

Congress enacted FOIA so that citizens could discover "what their government is up to."

*U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 773 (1989)

(quoting *EPA v. Mink*, 410 U.S. 73, 105 (1973) (Douglas, J. dissenting)).  "[D]isclosure, not

secrecy, is the dominant objective of [FOIA]."  *U.S. Dep't of the Air Force v. Rose*, 425 U.S.

352, 361 (1976).  After an agency receives a request that "reasonably describes" records being

sought, 5 U.S.C. § 552(a)(3)(A), the agency must "conduct[] a search reasonably calculated to

uncover all relevant documents."  *Weisberg v. U.S. Dep't of Justice*, 705 F.2d 1344, 1351 (D.C.

Cir. 1983).  Then, FOIA requires the agency to disclose responsive records revealed by the

search, unless one of FOIA's nine statutory exemptions apply to material in the records.  *See* 5

U.S.C. § 552(b); *see also Elliot v. U.S. Dep't of Agric.*, 596 F.3d 842, 845 (D.C. Cir. 2010)

("[A]gencies may withhold only those documents or portions thereof that fall under one of nine

delineated statutory exemptions.").  The nine FOIA "exemptions are 'explicitly exclusive.'"

*U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 151 (1989) (quoting *FAA Adm'r v.

Robertson*, 422 U.S. 255, 262 (1975)).  And it is the agency's burden to show that withheld

material falls within one of these exemptions.  *See* 5 U.S.C. § 552(a)(4)(B); *see also Elliott*, 596

F.3d at 845.

### B.  Summary Judgment

"FOIA cases typically and appropriately are decided on motions for summary judgment."

*Defs. of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 87 (D.D.C. 2009) (citing *Bigwood v.

U.S. Agency for Int'l Dev.*, 484 F. Supp. 2d 68, 73 (D.D.C. 2007)).  In general, summary

judgment is appropriate where "the movant shows that there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

A "material" fact is one capable of affecting the substantive outcome of the litigation. *See*

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if there is

enough evidence for a reasonable jury to return a verdict for the non-movant. *See Scott v.*

*Harris*, 550 U.S. 372, 380 (2007).

When assessing a summary judgment motion in a FOIA case, a court makes a *de novo*

assessment of whether the agency has properly withheld the requested documents. *See* 5 U.S.C.

§ 552(a)(4)(B); *Judicial Watch v. U.S. Dep't of Homeland Sec.*, 598 F. Supp. 2d 93, 95 (D.D.C.

2009). To prevail on a motion for summary judgment, "the defending agency must prove that

each document that falls within the class requested either has been produced, is unidentifiable or

is wholly exempt from the Act's inspection requirements." *Weisberg*, 627 F.2d at 368 (quoting

*Nat'l Cable Television Ass'n v. FCC*, 479 F.2d 183, 186 (D.C. Cir. 1973)).

To meet its burden, a defendant may rely on declarations that are "relatively detailed and

non-conclusory." *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (quoting

*Ground Saucer Watch, Inc. v. CIA*, 692 F.2d 770, 771 (D.C. Cir. 1981)). The agency's

justification is typically contained in a declaration or affidavit, referred to as a "*Vaughn* index"

after the case *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973). A court will presume that an

agency's affidavits or declarations are submitted in good faith. *See SafeCard Servs.*, 926 F.2d at

1200. The purpose of a *Vaughn* index is "to permit adequate adversary testing of the agency's

claimed right to an exemption," *Nat'l Treasury Emps. Union v. U.S. Customs Serv.*, 802 F.2d

525, 527 (D.C. Cir. 1986) (citing *Mead Data Cent., Inc. v. U.S. Dep't of the Air Force*, 566 F.2d

242, 251 (D.C. Cir. 1977)), and therefore the index must contain "an adequate description of the

records" and "a plain statement of the exemptions relied upon to withhold each record," *id.* at 527 n.9.

"Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'" *Wolf v. CIA*, 473 F.3d 370, 374–75 (D.C. Cir. 2007) (quoting *Gardels v. CIA*, 689 F.2d 1100, 1105 (D.C. Cir. 1982)). Generally, a reviewing court should "respect the expertise of an agency" and not "overstep the proper limits of the judicial role in FOIA review." *Hayden v. Nat'l Sec. Agency/Cent. Sec. Serv.*, 608 F.2d 1381, 1388 (D.C. Cir. 1979). Nonetheless, "exemptions from disclosure must be narrowly construed . . . and conclusory and generalized allegations of exemptions are unacceptable." *Morley v. CIA*, 508 F.3d 1108, 1114–15 (D.C. Cir. 2007) (internal citation and quotation marks omitted).

## IV.  ANALYSIS

As DOJ correctly notes, 100Reporters has made no objection to the sufficiency of DOJ's search for responsive documents. *See* Def. U.S. Dep't Justice's Combined Reply & Opp'n ("DOJ Reply") at 31 n.13, ECF No. 72; *see also* Mem. P. & A. Supp. U.S. Dep't Justice's Mot. Summ. J. ("DOJ Mem.") at 37–38, ECF No. 59-2 (describing DOJ's search and arguing that it was adequate).[5] Similarly, neither DOJ nor Defendant-Intervenors have disputed 100Reporters' assertion that it exhausted its administrative remedies, as required by FOIA. *See* Compl. ¶ 4; *see generally* DOJ Mem. (failing to raise issue of exhaustion); Mem. P. & A. Supp. Monitor's Mot. Summ. J. ("Monitor Mem."), ECF No. 57-1 (same); Mem. P. & A. Supp. Siemens' Mot. Summ. J. ("Siemens Mem."), ECF No. 58-1 (same). The only issue before the Court is whether DOJ's decision to withhold certain responsive material was appropriate.

---

[5] DOJ subsequently filed a corrected brief, but states that the changes are cosmetic in nature. *See* Not. Corrected Mem. P. & A. Supp. U.S. Dep't Justice's Mot. Summ. J., ECF No. 61.

Specifically, DOJ continues to withhold certain documents—some in part and some entirely—pursuant to FOIA Exemptions 4, 5, 6, and 7(C), and 100Reporters argues that DOJ fails to show that it properly withheld information under those provisions.  For reasons explained below, the Court finds that DOJ has justified the withholding of certain information pursuant to Exemption 4 and the attorney work-product privilege contained in Exemption 5.  The Court will grant the motions for summary judgment filed by DOJ and Defendant-Intervenors on those issues.  At this time, the Court finds that DOJ has not justified its withholdings under the deliberative process privilege contained in Exemption 5 or under Exemptions 6 and 7(C), and will thus deny summary judgment on those issues.  The Court will also order DOJ to produce certain representative documents for *in camera* review and will deny summary judgment on the question of segregability.  Finally, the Court will deny the cross-motion for summary judgment filed by 100Reporters.

## A.  Exemption 4

Pursuant to FOIA Exemption 4, "trade secrets and commercial or financial information obtained from a person" that are "privileged or confidential" may be withheld from disclosure.[6] 5 U.S.C. § 552(b)(4).  Both DOJ and Siemens argue that the Exemption 4 withholdings are proper.  *See* Siemens Mem. at 12–26; DOJ Mem. at 21–35.  The Monitor has not presented any argument on this point, but "joins in and incorporates by reference the arguments by the DOJ and Siemens in their separate motions for summary judgment and related papers."  Monitor Mot. at 2 n.1.  In response, 100Reporters argues that DOJ has failed to carry its burden of establishing that the withholdings are proper.  *See* Pl.'s Consolidated Opp'n & Mem. Supp. Pl.'s Cross-Mot. Summ. J. ("100Reporters Mem.") at 11–28, ECF No. 62.

---

[6] No party asserts that the withheld information constitutes a trade secret.

An agency may rely on Exemption 4 if it can bear the burden of establishing that withheld materials are "(1) commercial or financial, (2) obtained from a person, and (3) privileged or confidential." *Pub. Citizen Health Research Grp. v. FDA*, 704 F.2d 1280, 1290 (D.C. Cir. 1983). The parties have not disputed that the materials at issue in this case were "obtained from a person," and FOIA defines person broadly to "include[] an individual, partnership, corporation, association, or public or private organization other than an agency." 5 U.S.C. § 551(2); *see also Judicial Watch, Inc. v. Exp.-Imp. Bank*, 108 F. Supp. 2d 19, 28 (D.D.C. 2000) ("[T]he term 'person' in the context of Exemption 4 applies to a wide range of entities . . . ."). Nor have the Defendant-Intervenors or DOJ claimed that the withheld documents are "financial." *See generally* DOJ Mem.; Monitor Mem.; Siemens Mem.

Thus, the Court's analysis will focus on the first and third prongs of the test. The Court will consider whether three categories of withheld documents described below contain information that is "commercial" and whether that information is also "privileged or confidential." The Court will address these two questions in turn.

1. Sufficiency of Showing that Withheld Documents Are "Commercial"

In the context of Exemption 4, the D.C. Circuit explained that courts should give the terms "commercial" and "financial" their ordinary meanings. *See Pub. Citizen Health Research Grp.*, 704 F.2d at 1290; *see also Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 38 (D.C. Cir. 2002). Withheld "information is commercial under this exemption if, in and of itself, it serves a commercial function or is of a commercial nature." *Nat'l Ass'n of Home Builders*, 309 F.3d at 38 (internal quotation marks and citations omitted).

Therefore, "records that actually reveal basic commercial operations, such as sales statistics, profits and losses, and inventories, or relate to the income-producing aspects of a

business," fall within the scope of "commercial" information.  *See Pub. Citizen Health Research Grp.*, 704 F.2d at 1290.  Courts have identified a range of information that plainly falls within this scope.  For example, records containing information on "revenue, net worth, income, and EBITDA" are commercial.  *See Kahn v. Fed. Motor Carrier Safety Admin.*, 648 F. Supp. 2d 31, 36 (D.D.C. 2009).  Courts have also upheld the withholding of loan application information, *see Rural Hous. All. v. U.S. Dep't of Agric.*, 498 F.2d 73, 79 (D.C. Cir. 1974), and customer lists, *see Greenberg v. FDA*, 803 F.2d 1213, 1216 (D.C. Cir. 1986).

However, in the context of Exemption 4, the term commercial "is *not* confined only to records that 'reveal basic commercial operations . . . or relate to the income-producing aspects of a business.'"  *Baker & Hostetler LLP v. U.S. Dep't of Commerce*, 473 F.3d 312, 319 (D.C. Cir. 2006) (quoting *Pub. Citizen Health Research Grp.*, 704 F.2d at 1290).  Instead, the D.C. Circuit has instructed that the exemption "reaches more broadly and applies (among other situations) when the provider of the information has a commercial interest in the information submitted to the agency."  *Id.*  Using that definition, the D.C. Circuit held that letters describing market conditions for domestic lumber companies "plainly contain commercial information within the meaning of Exemption 4."  *Id.* at 320.  In another case, the D.C. Circuit found that "documentation of the health and safety experience of [a company's] products" was commercial because such documentation was "instrumental in gaining marketing approval for their products."  *Pub. Citizen Health Research Grp.*, 704 F.2d at 1290.

Siemens argues that the information at issue here is "plainly commercial."  Siemens Mem. at 13, 15.  Siemens particularly relies on *Public Citizen v. United States Department of Health & Human Services* (*Public Citizen I*), 975 F. Supp. 2d 81 (D.D.C. 2013) and *Public Citizen v. United States Department of Health & Human Services* (*Public Citizen II*), 66 F. Supp.

3d 196 (D.D.C. 2014).  That litigation involved two pharmaceutical companies that resolved

civil and administrative fraud cases with the U.S. Department of Health and Human Services by

entering into Corporate Integrity Agreements.  *Pub. Citizen I*, 975 F. Supp. 2d at 88.  Among

other requirements, the agreements called for an independent party, called an Independent

Review Organization, to submit annual reports, which included "extensive, probing review of

[the companies'] confidential business systems and policies, as well as selected samples of

individual transactions," and "contained such information as the identity of customers and the

underlying business practices that gave rise to the need for corrective action."  *Id.* at 108.  As

Siemens correctly notes, the court determined that the reports prepared by the independent party

"include extensive information about the defendant-intervenors' marketing and sales programs

and contracting processes, and, consequently, are commercial."  *Id.* at 109.

Pointing to the *Public Citizen I* and *Public Citizen I* cases, Siemens argues that (1) the

Monitor's annual reports and related documents, (2) the Monitor's work plans and related

documents, and (3) Siemens' internal trainings, presentations, and compliance policies all

constitute commercial information.  *See* **Siemens Mem**. at 15–16.  DOJ states that it joins in

Siemens' argument and briefly makes its own argument that the withheld materials are

commercial in nature.  *See* **DOJ Mem**. at 23 & n.10.

100Reporters does not dispute the standard used to analyze whether material is

commercial.  Instead, 100Reporters takes issue with the rationales DOJ has put forward in

support of its withholdings.  100Reporters contends that "DOJ fails to carry its burden . . .

because it has provided only insufficient, non-specific claims of an asserted right to withhold."

**100Reporters Mem**. at 12.  100Reporters argues that the Exemption 4 withholdings are not

supported by "any serious explanation as to the commercial or financial character of the material

[DOJ] refuses to disclose." 100Reporters Mem. at 13.  Finally, 100Reporters asserts that DOJ's Amended *Vaughn* Index relies on boilerplate justifications for withholdings, as well as "repetitive, conclusory assertions that bear little relation to the details of the associated documents." 100Reporters Mem. at 14.

As an initial matter, 100Reporters' attack on the *form* of the Amended *Vaughn* Index and the accompanying affidavits, standing alone, is insufficient to defeat DOJ's and Siemens' claims that the materials at issue are commercial.  To be sure, 100Reporters is correct that FOIA requires the government to bear the burden of establishing the applicability of an exemption.  *See Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 861 (D.C. Cir. 1980) ("[T]he burden is on [the agency] to establish [its] right to withhold information from the public . . . .").  To carry that burden, the agency "must provide a relatively detailed justification, specifically identifying the reasons why a particular exemption is relevant and correlating those claims with the particular part of a withheld document to which they apply." *Mead Data Cent., Inc. v. U.S. Dep't of the Air Force*, 566 F.2d 242, 251 (D.C. Cir. 1977).  This requirement does not mean, however, that an agency can never rely on repetitive language.  The D.C. Circuit has recognized that, in certain cases, "categorization and repetition provide efficient vehicles by which a court can review withholdings that implicate the same exemption for similar reasons." *Judicial Watch, Inc. v. FDA*, 449 F.3d 141, 147 (D.C. Cir. 2006).  In fact, "particularity may actually impede court review" in those cases.  *Id.*  Nor is there necessarily any problem with an agency's *Vaughn* index tracking the statutory language of the relevant exemption.  *See Landmark Legal Found. v. IRS*, 267 F.3d 1132, 1138 (D.C. Cir. 2001).

In short, 100Reporters' challenges are not sufficient to defeat DOJ's withholdings on their face.  The Court's analysis of a *Vaughn* index is functional in nature.  *See Judicial Watch,*

*Inc.*, 449 F.3d at 148.  The D.C. Circuit has made clear that "materials provided by the agency may take any form so long as they give the reviewing court a reasonable basis to evaluate the claim of privilege." *Gallant v. NLRB*, 26 F.3d 168, 173 (D.C. Cir. 1994) (quoting *Delaney, Migdall & Young, Chartered v. IRS*, 826 F.2d 124, 128 (D.C. Cir. 1987)).  Therefore, the Court will consider DOJ's Amended *Vaughn* Index, the declaration provided by DOJ, and the declarations provided by Defendant-Intervenors, taken together, to determine whether the withheld materials are commercial for the purposes of Exemption 4.  The Court will evaluate three categories of documents in turn.

### a. Annual Monitor Reports and Associated Documents

First, the Court considers the Monitor's annual reports and associated documents, including presentations summarizing the reports and communications related to the reports.  The Court finds that this category of documents contains commercial information.

DOJ's declarant, Ms. Moberly, asserts that all of the information withheld under Exemption 4 "is 'commercial' . . . because it serves a commercial function and is of a commercial nature, and Siemens has a commercial interest in the information in that is helpful or instrumental to its business interests."  Moberly Decl. ¶ 22.  This conclusory statement, which refers to all of the Exemption 4 withholdings, is not dispositive on its own.  But additional evidence does support a finding that the annual monitor reports and associated materials contain commercial information.  Other declarations make clear that the Monitor's annual reports and associated documents include probing reviews of Siemens' business systems and practices.  *See* Kirsch Decl. ¶ 17; Warin Decl. ¶ 25(c).  Among other things, the reports describe and evaluate Siemens' compliance programs, including references to finance functions, mergers and acquisitions practices, and sales and marketing.  *See* Kirsch Decl. ¶ 18.  The reports also detail

actual "country operations, projects, contracts, and bids." Kirsch Decl. ¶ 19.  More specifically,

the annual reports "include observations and assessments with respect to particular M&A

transactions" and "identif[y] . . . particular Siemens business partners and provide[] Siemens'

assessment of the same." Kirsch Decl. ¶ 20(d), (f).

These descriptions of the information contained in the Monitor's annual report and

associated materials are sufficiently detailed to show that these materials, at the least, describe

specific transactions, projects, bids, and business partners.  Thus, the Court concludes that the

records "actually reveal basic commercial operations" and "relate to the income-producing

aspects of a business," and therefore contain "commercial" information for the purposes of

Exemption 4.  *See Pub. Citizen Health Research Grp.*, 704 F.2d at 1290; *see also Pub. Citizen I*,

975 F. Supp. 2d at 108 (finding that IRO reports are commercial because they include

information on "marketing and sales programs and contracting processes").

### b.  Monitor Work Plans and Associated Documents

Second, the Court considers the Monitor's work plans and related presentations and

documents.  The Court finds that this category of documents also contains information that is

commercial in nature.

These documents set forth the steps the Monitor planned to take to evaluate Siemens'

compliance programs.  *See* Kirsch Decl. ¶ 22; Warin Decl. ¶ 25(a).  Among other things, the

documents set forth "Siemens' operations, contracts, projects, and bids that the Monitor intended

to review."  *See* Kirsch Decl. ¶ 22.  The documents also reflect "Siemens' business operations,

structure, and compliance controls."  *See* Kirsch Decl. ¶ 24.  The Amended *Vaughn* Index

provides some additional details.  For example, the Monitor's first work plan describes "the

number of Siemens employees in each country, new orders, new government orders, joint

ventures and business partnerships, and Siemens' business development strategy across different sectors of the economy." DOJ_0000001, Am. *Vaughn* Index at 18.

The description of the subject matter of this category of withheld information is sufficiently specific to demonstrate that these materials pertain to business operations, including compliance programs, business partnerships, and order data. Therefore, the Court finds that this information, which "relate[s] to the income-producing aspects of a business," is "commercial" for the purposes of Exemption 4. *See Pub. Citizen Health Research Grp.*, 704 F.2d at 1290.

### c. Siemens Trainings, Compliance Policies, and Associated Documents

Third, the Court considers Siemens' internal compliance policies, training presentations, training modules, and other related materials. The Court finds that this category of documents also contains information that is commercial in nature.

These materials include information pertaining to internal training presentations for Siemens' employees covering the company's compliance programs and policies. *See* Kirsch Decl. ¶ 25. These materials also include "compliance policies and circulars," which discuss "internal regulations governing Siemens' interactions with third parties, reporting of compliance violations, and corporate discipline." Kirsch Decl. ¶ 27.

These compliance and training materials do not appear to directly "relate to the income-producing aspects of a business." *See Pub. Citizen Health Research Grp.*, 704 F.2d at 1290. But the D.C. Circuit has instructed that the exemption "reaches more broadly and applies (among other situations) where the provider of the information has a commercial interest in the information submitted to the agency." *Baker & Hostetler LLP v. U.S. Dep't of Commerce*, 473 F.3d 312, 319 (D.C. Cir. 2006). Information that is "instrumental" to a commercial interest is sufficiently commercial for the purposes of Exemption 4. *See Pub. Citizen Health Research*

*Grp.*, 704 F.2d at 1290.  In *Public Citizen II*, the court concluded that information about "the way the companies implement their compliance programs" was "sufficiently 'instrumental' to the companies' operations to qualify as 'commercial.'"  66 F. Supp. 3d at 208.  That logic is persuasive here.  Because the compliance and training documents include information that is instrumental to Siemens' operations, the Court finds that the information is "commercial" for the purposes of Exemption 4.

*          *          *

Thus, the Court finds that DOJ, relying in part on the declarations provided by Siemens and the Monitor, has met its burden of showing that each of the three categories of documents withheld pursuant to Exemption 4 are "commercial."  Next, the Court will turn to the second prong of the analysis, which considers whether withheld materials are also "confidential."

2.  Sufficiency of Showing that Withheld Documents Are "Confidential"

The Court previously noted that the third prong of Exemption 4 requires the agency to show that the information it has withheld is "privileged or confidential."  5 U.S.C. § 552(b)(4).  DOJ and Siemens have argued that the withheld material is "confidential" not privileged.  *See* Siemens Mem. at 16–26; DOJ Mem. at 24–35.  A court's analysis of whether information is confidential turns on whether the information was provided to the government voluntarily or involuntarily.  *See Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, 975 F.2d 871, 872 (D.C. Cir. 1992) (en banc).  Under this rule, information that is provided voluntarily "will be treated as confidential under Exemption 4 if it is of a kind that the provider would not

customarily make available to the public." *Id.*  In this case, however, the parties agree that the withheld information was provided involuntarily.[7]

In a case such as this, where the agency received material through an involuntary disclosure, that information is "confidential" for purposes of FOIA Exemption 4 if disclosure is likely (1) to impair the agency's ability to obtain the information in the future or (2) to cause substantial harm to the competitive position of the source of the information.  *See Nat'l Parks Conservation Ass'n v. Morton*, 498 F.2d 765, 770 (D.C. Cir. 1974); *see also Critical Mass*, 975 F.2d at 877 (reaffirming the *National Parks* test).  The agency may prevail by showing that either prong of the *National Parks* test applies.  DOJ and Siemens argue that both prongs apply.  *See* Siemens Mem. at 17–26; DOJ Mem. at 25–35.  100Reporters responds that disclosure would not impair the government's ability to obtain necessary information in the future and that DOJ and Siemens have not shown that disclosure would cause Siemens to suffer competitive harm.  *See* 100Reporters Mem. at 16–28.

The Court begins its analysis with the second prong and considers whether the release of the three categories of commercial information described above would also cause competitive harm to Siemens.  The relevant question is whether the agency or Siemens have sufficiently shown that release of the withheld information is likely to "cause substantial harm to the

---

[7] In a footnote, DOJ argues that "[t]o the extent that Siemens produced some of the withheld information voluntarily, the information should be kept confidential because the information is of the kind that Siemens would customarily not release to the public."  DOJ Mem. at 25 n.11.  However, all parties use the involuntary framework when analyzing this question, and DOJ also explains that "[a]lthough Siemens voluntarily pleaded guilty, once the court accepted its plea and adopted the plea agreement, its disclosures became involuntary submissions."  DOJ Mem. at 25 n.12.  At any rate, the voluntariness question turns on whether the agency had "actual legal authority" to compel a party to turn over documents or information.  *See Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 244 F.3d 144, 149 (D.C. Cir. 2001).  In this case, the civil settlement and criminal plea agreement provided that actual authority.

competitive position of the person from whom the information was obtained." *Nat'l Parks*, 498

F.2d at 770.  The party invoking Exemption 4 does not need "to prove disclosure certainly would

cause it substantial competitive harm, but only that disclosure would 'likely' do so." *McDonnell*

*Douglas Corp. v. U.S. Dep't of the Air Force*, 375 F.3d 1182, 1187 (D.C. Cir. 2004).

The likely harm must be *competitive*, however.  In other words, the exemption only

applies to "harm flowing from the affirmative use of proprietary information by *competitors*."

*Pub. Citizen Health Research Grp.*, 704 F.2d at 1291 n.30 (quoting Mark Q. Connelly, *Secrets*

*and Smokescreens: A Legal and Economic Analysis of Government Disclosures of Business*

*Data*, 1981 Wis. L. Rev. 207, 235–36 (1981)).  Reputational injury or embarrassment alone are

not cognizable under Exemption 4.  *See Occidental Petroleum Corp. v. SEC*, 873 F.2d 325, 341

(D.C. Cir. 1989) ("Occidental's right to an exemption, if any, depends upon the competitive

significance of whatever information may be contained in the documents, not upon whether its

motive is to avoid embarrassing publicity.").

The D.C. Circuit has explained that courts "generally defer to the agency's predictive

judgments as to 'the repercussions of disclosure.'"  *United Techs. Corp. v. U.S. Dep't of Def.*,

601 F.3d 557, 563 (D.C. Cir. 2010) (quoting *McDonnell Douglas*, 375 F.3d at 1191 n.4).

Nevertheless, when reviewing the sufficiency of declarations and *Vaughn* indices, merely

conclusory statements about competitive harm are insufficient.  *See Occidental Petroleum*, 873

F.2d at 342 (requiring more than a "conclusory statement" regarding substantial competitive

harm); *Pub. Citizen Health Research Grp.*, 704 F.2d at 1291 ("Conclusory and generalized

allegations of substantial competitive harm, of course, are unacceptable and cannot support an

agency's decision to withhold requested documents.").  In other words, "deference does not

mean blind acceptance." *Mudge Rose Guthrie Alexander & Ferdon v. U.S. Int'l Trade Comm'n*, 846 F.2d 1527, 1532 (D.C. Cir. 1988).

With that framework in mind, the Court turns to several arguments raised by the parties that relate to multiple categories of materials withheld pursuant to Exemption 4.  After resolving those issues, the Court will consider whether the release of information contained in each of the three categories of documents is likely to cause competitive harm to Siemens.

### a.  Competitive Harm Related to Disclosure of Siemens' Compliance Plan

The parties spend a significant portion of their briefing addressing whether disclosing the details of Siemens' compliance plan would cause competitive harm.  The Court will address these arguments in general, because they pertain to each category of documents at issue here.

100Reporters argues that disclosure of the plan would not harm Siemens, because the "compliance program is not an 'off-the-shelf' solution that could easily [be] adopted by a competitor."  100Reporters Mem. at 22.  Furthermore, 100Reporters argues that Siemens' competitors must already have compliance plans of their own because of "the dominating presence that FCPA enforcement has taken on in corporate governance."  100Reporters Mem. at 23.  100Reporters includes a list of references to competitor companies' experience with anti-corruption enforcement, including guilty pleas and civil settlements with U.S. law enforcement. 100Reporters Mem. at 24.  Finally, 100Reporters concludes that the costs Siemens incurred in creating its compliance and training programs are due to factors that are "presumably unique to this company" and that "there is no evidence on specific costs of designing and implementing those features of Siemens' FCPA compliance program . . .  that go beyond competitors'

apparently robust programs." [8]  100Reporters Mem. at 25–26.; *see also* Pl.'s Reply Supp. Cross-

Mot. Summ. J. ("100Reporters Reply") at 13, ECF No. 76 ("Siemens' unique business profile

and geographic reach, and its uniquely broad violation of the FCPA, necessarily mean its

compliance program is unique to the company, and not replicable or easily or fruitfully usable by

competitors.").

        In response, Siemens relies heavily on the *Public Citizen I* and *Public Citizen II* opinions.

*See* Consolidated Reply Mem. P. & A. Supp. Siemens' Mot. Summ. J. & Opp'n to Pl.'s Cross-

Mot Summ. J. ("Siemens Reply") at 4, ECF No. 71.  Pointing to those cases, Siemens argues that

disclosing Siemens' compliance and training materials "would provide [competitors] with a 'free

roadmap' as to how they might efficiently comply with the laws and regulations in the highly-

regulated spaces in which Siemens operates" without incurring the same costs.  Siemens Reply at

4–5.  Siemens argues that 100Reporters' position would "essentially undo Exemption 4" because

it fails to realize that "the mere fact that competitors do similar things in slightly different ways

does not diminish the competitive sensitivity of proprietary information."  Siemens Reply at 5.

Furthermore, Siemens contends that key parts of its compliance program *could* be directly

copied, with minimal changes, and used by competitors.[9]  Siemens Reply at 5.

---

        [8] For the first time in its reply brief, 100Reporters argues that Siemens has presented
details of its compliance program in public, and the company "cannot seek plaudits for its
commitment to compliance with the law while hiding the proof of that compliance behind claims
of potential competitive harm."  100Reporters Reply at 12.  As an initial matter, courts generally
will not entertain new arguments presented in a reply brief.  *See Campbell v. Nat'l Union Fire
Ins. Co.*, 130 F. Supp. 3d 236, 267 n.28 (D.D.C. 2015); *see also McBride v. Merrell Dow &
Pharm. Inc.*, 800 F.2d 1208, 1211 (D.C. Cir. 1986) ("Considering an argument advanced for the
first time in a reply brief . . . is not only unfair . . . but also entails the risk of an improvident or
ill-advised opinion on the legal issues tendered." (citation omitted)).  At any rate, there is likely a
difference between revealing exhaustive details of a company's compliance plan, and presenting
selected portions for a commercial purpose, such as bolstering the company's reputation.

        [9] DOJ provides limited argument on this point.

The Court finds that Siemens has the better argument here.  In the context of Exemption 4, the D.C. Circuit has stated the general principle that "competition in business turns on the relative costs and opportunities faced by members of the same industry," and thus, "there is a potential windfall for competitors to whom valuable information is released under FOIA." *Worthington Compressors, Inc. v. Costle*, 662 F.2d 45, 51 (D.C. Cir. 1981).  The bargains available to competitors taking advantage of FOIA, "could easily have competitive consequences."  *Id.*  In a case involving some similar facts, the court held that disclosure of FDA compliance information could pose a competitive risk because the materials were, "in a sense, a free roadmap as to what works in pharmaceutical marketing without violating the legal framework of regulatory enforcement and laws that govern the industry."  *Pub. Citizen II*, 66 F. Supp. 3d at 210.  In this case, Siemens' declarant similarly states that disclosure "would provide competitors with a roadmap of aspects of Siemens' best-in-class compliance system and allow those competitors to make affirmative use of the program . . . without incurring the substantial investment cost Siemens has incurred."  Kirsch Decl. ¶ 28.

100Reporters' arguments that Siemens is unique or that Siemens' competitors already have compliance plans misses the mark.  In fact, the court rejected a very similar argument in *Public Citizen II*.  That court explained that:

> The plaintiff's argument that this customization would render such information worthless to the defendant-intervenors' competitors . . . is equally unpersuasive. . . . This argument is belied by the importance the companies place on their compliance programs . . . and the general importance all companies place on best practices in corporate governance and structure.

*Pub. Citizen II*, 66 F. Supp. 3d at 215 n.24.  That logic is equally compelling in this case.  First, the Court notes that 100Reporters has not presented legal authority in support of its position. Second, 100Reporters' theory would gut Exemption 4.  Of course no two companies are exactly alike, and this proposed rule would effectively make identity a requirement before disclosure of

compliance materials could constitute harm.  That rule seems particularly problematic in a world of constantly changing regulatory environments and business climates, where companies must continue to invest in compliance and training to address emerging risks.  For these reasons, the Court finds that disclosure of Siemens' compliance plans and trainings can constitute a form of competitive harm.

### b.  Other General Arguments Raised by 100Reporters

100Reporters raises a number of other general arguments against DOJ's assertion that the withheld information is confidential for the purposes of Exemption 4.

First, 100Reporters repeatedly argues that the justifications for withholding information under Exemption 4 are "vague and conclusory," based on boilerplate language, and "too cursory and nonspecific."  100Reporters Mem. at 12.  Specifically, 100Reporters argues that DOJ's affidavits and Amended *Vaughn* Index provide insufficient detail for the Court to determine whether Siemens would suffer competitive harm.  *See* 100Reporters Mem. at 19–21.  According to 100Reporters, DOJ has not shown the severity or nature of the alleged competitive harm, or how a competitor could use the withheld information.  *See* 100Reporters Mem. at 20.  Next, 100Reporters argues that Siemens also fails to establish the same information.  The Court finds that a general, facial attack on the sufficiency of the withholdings is not the proper analysis.  To be sure, although "parties opposing disclosure need not 'show actual competitive harm,'" they must show a "likelihood of substantial competitive injury."  *Pub. Citizen Health Research Grp. v. FDA*, 704 F.2d 1280, 1291 (D.C. Cir. 1983) (quoting *Gulf & Western Indus. v. United States*, 615 F.2d 527, 530 (D.C. Cir. 1979)).  But the best way to test the agency's justifications is to consider specific materials at issue.  Thus, the Court will bear these principles in mind when it turns to the three categories of documents withheld pursuant to Exemption 4.

Second, 100Reporters argues that neither DOJ nor 100Reporters has established that

Siemens faces actual competition.  *See* 100Reporters Mem. at 20, 27.  Parties seeking

withholding of information must present evidence of "[a]ctual competition."  *Pub. Citizen Health*

*Research Grp.*, 704 F.2d at 1291 (alteration in original) (quoting *Gulf & Western*, 615 F.2d at

530).  But the evidence of competition can be general, and does not need to list specific

competitors, for example.  *See Gen. Elec. Co. v. Dep't of the Air Force*, 648 F. Supp. 2d 95,

102–03 (D.D.C. 2009) ("[E]vidence need not be of actual competition over *these particular*

*contracts*."); *see also Nat'l Parks Conservation Ass'n v. Morton*, 498 F.2d 765, 770–71 (D.C.

Cir. 1974) (noting that disclosure would be improper if the release of contract information would

harm a party's competitive position in a non-concession enterprise, even though the concessioner

faced no actual competition during the term of its contract with the government).  The party

seeking to prevent disclosure need only present evidence of actual competition and that

disclosure of the disputed information is likely to cause substantial competitive harm in the

future.  *See Gulf & Western*, 615 F.2d at 530; *see also McDonnell Douglas Corp. v. U.S. Dep't*

*of the Air Force*, 375 F.3d 1182, 1187 (D.C. Cir. 2004) (explaining that a party invoking

Exemption 4 need not "prove disclosure certainly would cause it substantial competitive harm,

but only that disclosure would 'likely' do so").

In this case, DOJ and Siemens have presented sufficient evidence of actual competition.

Although DOJ and Siemens do not specifically identify any competitors, the declarations make

repeated reference to Siemens' competitors.  *See* Kirsch Decl. ¶¶ 13, 15, 16, 21, 22, 24, 26, 28;

Moberly Decl. ¶ 22.  100Reporters seems to acknowledge this relatively intuitive point when it

refers to "a survey of Siemens' acknowledged competitors" and cites Siemens' annual investor

report.  100Reporters Mem. at 23–24.  Thus, the Court finds that Siemens faces actual

competition, and the risk of potential competitive harm will be considered in the context of each category of withheld materials.

Third, 100Reporters argues that "Exemption 4 does not guard against mere embarrassment in the marketplace or reputational injury." 100Reporters Mem. at 27 (quoting *Pub. Citizen I*, 975 F. Supp. 2d 81, 107 (D.D.C. 2013)). 100Reporters is correct. The D.C. Circuit has repeatedly made clear that embarrassment is not a legitimate grounds for withholding under Exemption 4. *See, e.g.*, *United Tech. Corp. v. Dep't of Defense*, 601 F.3d 557, 564 (D.C. Cir. 2010)); *CNA Fin. Corp. v. Donovan*, 830 F.2d 1132, 1154 (D.C. Cir. 1987). But the Court does not believe that DOJ has relied on embarrassment as a basis for withholding information. Certainly, the Court will not rely on the risk of embarrassment to Siemens when considering the categories of materials withheld under Exemption 4.

With these principles in mind, the Court turns to the three categories of documents withheld pursuant to Exemption 4.

### c. Annual Monitor Reports and Associated Documents

First, the Court considers the Monitor's annual reports and associated documents, including presentations summarizing the reports and communications related to the reports. The Court finds that this type of documents contains information that is likely to cause competitive harm to Siemens and is therefore "confidential."

The Monitor's annual reports and associated documents reveal extensive details about the inner workings of Siemens' business, including its compliance program. *See* Kirsch Decl. ¶ 17; Warin Decl. ¶ 25(c). The materials include the Monitor's assessment of and recommendations for various functional compliance areas, including:

(1) compliance policies; (2) anti-corruption training provided to Siemens employees; (3) proprietary compliance tools, including those that govern

confidential reporting, lines of approval authority, and competitive bidding; (4)
reporting of compliance violations; (5) guidelines, policies, and internal
investigations conducted with respect to compliance issues; (6) disciplinary
procedures; (7) finance and controllership functions; (8) contracting and
procurement with suppliers; (9) mergers and acquisitions; (10) mitigation of risks
related to third-party business partners; and (11) sales and marketing.

Kirsch Decl. ¶ 18.  The reports also detail materials that do not solely pertain to compliance

policies.  For instance, the reports also include "observations and assessment with respect to

specific Siemens' projects and customers," "observations and assessments with respect to

particular M&A transactions," and "particular Siemens business partners."  Kirsch Decl.

¶¶ 20(c), (d), (f).

Siemens' declarant states that the release of these materials would harm Siemens by

"provid[ing] competitors with a roadmap of Siemens' system and allow those competitors to

make affirmative use of the program . . . without incurring the substantial investment cost that

Siemens has incurred."  Kirsch Decl. ¶ 21.  The Court has previously determined that this sort of

harm is cognizable under Exemption 4.  *See supra* Part IV.A.2.a.  Siemens has invested

resources in creating its compliance plan, *see* Kirsch Decl. ¶ 8, and permitting competitors to

take advantage of that plan through FOIA constitutes a competitive harm.  *See Worthington

Compressors, Inc. v. Costle*, 662 F.2d 45, 51 (D.C. Cir. 1981).

The release of this information would likely cause other competitive harms.  For

example, these materials contain a wide range of information on Siemens' finance structure,

business partners, and customers.  *See* Kirsch Decl. ¶¶ 18, 20.  This information cuts to the core

of Siemens' business, and there is little doubt a competitor could rely on this information to

Siemens' detriment.[10]

---

[10] Siemens also argues that a competitor could use the disclosures to identify and exploit
weaknesses in Siemens' compliance program.  *See* Kirsch Decl. ¶ 21.  Siemens does not provide
any evidence as to how a competitor might do so, however.  The Court is even less persuaded by

The descriptions of the information contained in the Monitor's annual report and associated materials are sufficiently detailed to show that these materials relate to Siemens' compliance program, as well as other essential business interests.  Thus, the Court concludes that disclosure of the information would likely cause competitive harm to Siemens, and it is therefore "confidential" for the purposes of Exemption 4.  *See McDonnell Douglas Corp.*, 375 F.3d at 1187.

### d.  Monitor Work Plans and Associated Documents

Second, the Court considers the Monitor's work plans and related presentations and documents.  The Court finds that disclosure of information contained in this category of documents is likely to cause competitive harm to Siemens and is therefore "confidential."

These materials set forth the process that the Monitor planned each year in order to evaluate and improve Siemens' compliance programs.  *See* Kirsch Decl. ¶ 22; Warin Decl. ¶ 25(a).  In setting forth that plan, these materials detail "Siemens' operations, contracts, projects, and bids that the Monitor intended to review."  *See* Kirsch Decl. ¶ 22.  The documents reflect "Siemens' business operations, structure, and compliance controls," *see* Kirsch Decl. ¶ 24, as well as "the number of Siemens employees in each country, new orders, new

---

Siemens' argument that *counterparties* could use the disclosure to "identify and exploit strengths and weaknesses and could make it more difficult for Siemens to detect compliance violations." Siemens Mem. at 20 (citing Kirsch Decl. ¶ 21).  The D.C. Circuit has held that Exemption 4 only applies to "harm flowing from the affirmative use of proprietary information by *competitors*." *Pub. Citizen Health Research Grp.*, 704 F.2d at 1291 n.30 (emphasis in original) (quoting Mark Q. Connelly, *Secrets and Smokescreens: A Legal and Economic Analysis of Government Disclosures of Business Data*, 1981 Wis. L. Rev. 207, 235–36 (1981).  To the extent Siemens is likely to be harmed by counterparties seeking to thwart Siemens' compliance program, that harm does not flow from the use of propriety information by *a competitor*.  Nevertheless, Siemens has shown that the disclosure of information in this category of documents is likely to cause competitive harm for other reasons.

government orders, joint ventures and business partnerships, and Siemens' business development strategy across different sectors of the economy." DOJ_0000001, Am. *Vaughn* Index at 18.

These materials contain information that is likely to cause competitive harm for the same reasons as the Monitor's annual reports and associated materials. *See supra* Part IV.A.2.c. First, disclosing information in these documents would reveal details of Siemens' compliance plan, which is likely to cause competitive harm for the reasons set forth above. Second, these materials contain extensive information related to Siemens' operations, including, for example, detailed figures about orders and customers in different parts of the world. It is likely that a competitor would use this information to Siemens' detriment.[11]

The description of the subject matter of this category of withheld documents is sufficiently specific to demonstrate that these materials pertain to business operations, including compliance programs, business partnerships, and order data. Thus, the Court concludes that the information contained in these records would likely cause competitive harm to Siemens if disclosed, and it is therefore "confidential" for the purposes of Exemption 4. *See McDonnell Douglas Corp.*, 375 F.3d at 1187.

---

[11] These materials also include references to "employees the Monitor intended to interview." *See* Kirsch Decl. ¶ 22. The Court is not convinced that releasing the names of employees, identified only as potential subjects for interviews, is likely to cause competitive harm to Siemens. Neither Siemens nor DOJ has explained why releasing the names of these employees is likely to cause competitive harm. *See* Siemens Mem. at 21; DOJ Mem. at 33–34; Siemens Reply at 3–6; DOJ Reply at 22–25. The party invoking Exemption 4 bears the burden of proving the likelihood of competitive harm, and neither Siemens nor DOJ has shown that the release of these names would cause that harm. *See McDonnell Douglas Corp. v. U.S. Dep't of the Air Force*, 375 F.3d 1182, 1187 (D.C. Cir. 2004). For the reasons explained below, the Court also denies summary judgment with regard to the withholding of employee names pursuant to Exemption 7(C). *See infra* Part IV.C.2. Nevertheless, in light of the fact that DOJ and Defendant-Intervenors will have an opportunity to supplement their arguments with regard to Exemption 7(C), the Court concludes that it would be premature to reach the other prong of the *National Parks* test at this time.

### e. Siemens Trainings, Compliance Policies, and Associated Documents

Third, the Court considers Siemens' internal compliance policies, training presentations, training modules, and other related materials.  The Court finds that disclosure of information contained in this category of documents is likely to cause competitive harm to Siemens and is therefore "confidential."

These materials include internal training presentations for Siemens' employees covering the company's compliance programs and policies.  *See* Kirsch Decl. ¶ 25.  Among other things, the trainings discuss global anti-corruption laws, Siemens' due diligence practices, guidelines on gifts, and Siemens' contract approval process.  *See* Kirsch Decl. ¶ 25.  Aside from trainings, this category of documents includes "compliance policies and circulars."  Kirsch Decl. ¶ 27.  This subset of documents discuss "internal regulations governing Siemens' interactions with third parties, reporting of compliance violations, and corporate discipline."  Kirsch Decl. ¶ 27.

The Court finds that these materials are likely to cause competitive harm for the reasons stated above.  *See supra* Part IV.A.2.a.  The disclosure of a compliance plan constitutes a competitive harm because competitors are likely to take advantage of that plan without incurring the costs undertaken by the party who provided the documents to the government.  *See Pub. Citizen II*, 66 F. Supp. 3d at 210; *see also Worthington Compressors*, 662 F.2d at 51.  Thus, the Court concludes that the records would likely cause competitive harm to Siemens if disclosed, and they are therefore "confidential" for the purposes of Exemption 4.  *See McDonnell Douglas Corp.*, 375 F.3d at 1187.

*          *          *

Thus, the Court finds that DOJ, relying in part on the declarations provided by Siemens and the Monitor, has met the burden of showing that the release of information in each of the

three categories of documents withheld pursuant to Exemption 4 is likely to cause competitive

harm to Siemens.  Because the information satisfies the second prong of the *National Parks* test,

it is "confidential" for the purposes of Exemption 4.[12]  Pursuant to FOIA, "commercial or

financial information obtained from a person" that is "confidential" may be withheld from

disclosure.  5 U.S.C. § 552(b)(4).  Therefore, the Court grants summary judgment in favor of

DOJ and Defendant-Intervenors with regard to DOJ's withholding of the information described

here pursuant to Exemption 4.[13]

## B.  Exemption 5

DOJ has also withheld records in this case pursuant to FOIA Exemption 5.  Exemption 5

permits the withholding of "inter-agency or intra-agency memorandums or letters that would not

be available by law to a party other than an agency in litigation with the agency."  5 U.S.C.

§ 552(b)(5).  This exemption protects documents "normally privileged in the civil discovery

context," *Judicial Watch, Inc. v. U.S. Dep't of Justice*, 365 F.3d 1108, 1113 (D.C. Cir. 2004),

such as materials shielded by the attorney-client privilege, the attorney work-product privilege

and "what is sometimes called the 'deliberative process' privilege," *Dep't of the Interior v.*

---

[12] Because the Court finds that release of this information is likely to cause competitive
harm to Siemens, there is no need to address the other prong of the *National Parks* test, which
considers whether disclosure would make it difficult for the government to obtain reliable data in
the future.  Nor is there any need for the Court to address DOJ's argument that "[c]ourts have . . .
recognized a *third prong* of the *National Parks* . . . test that protects other governmental
interests."  DOJ Mem. at 29.

[13] The Court finds that DOJ properly withheld certain information in these documents,
but the Court's analysis does not apply to the entirety of the documents themselves.
100Reporters requests that the Court "conduct *in camera* review of the documents" and it also
argues that "DOJ's blanket claim that effectively none of the material is segregable is neither
plausible nor justified."  100Reporters Mem. at 28 n.17.  The Court will address segregability
and *in camera* review in greater detail below.  *See infra* Part IV.D.  In brief, DOJ must produce
certain representative documents for *in camera* review before the Court will determine whether
DOJ has produced all segregable factual information.

*Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001).  In other words, Exemption 5

covers "those documents, and only those documents, normally privileged in the civil discovery

context."  *Loving v. U.S. Dep't of Defense*, 550 F.3d 32, 37 (D.C. Cir. 2008) (citations omitted).

The two Exemption 5 privileges at issue in this case are the deliberative process privilege and the

attorney work-product privilege.

DOJ and the Monitor argue that DOJ has properly withheld materials under Exemption 5.

*See* Monitor Mem. at 10–20; DOJ Mem. at 11–21.  Siemens does not address Exemption 5 in its

briefs, but states that it "joins in and incorporates by reference the arguments" raised by DOJ and

the Monitor.  *See* Siemens Mot. at 1–2.  100Reporters raises a number of arguments in

opposition to the Exemption 5 withholdings.  For the reasons set forth below, the Court first

finds that the consultant corollary to Exemption 5 applies to the Monitor and its communications

with the government related to the monitorship.  Next, the Court concludes that DOJ has not

established that it properly relied on the deliberative process privilege.  The Court does,

however, find that DOJ's reliance on the attorney work-product privilege is justified.

### 1.  Consultant Corollary to Exemption 5

As a threshold issue, Exemption 5 only covers records that are "inter-agency or intra-

agency memorandums or letters."  5 U.S.C. § 552(b)(5).  In other words, the Supreme Court has

stated that, for Exemption 5 to apply to a document, the "source [of the withheld document] must

be a government agency."  *Klamath*, 532 U.S. at 2.  But that rule is not absolute.  Under what has

become known as the "consultant corollary," FOIA Exemption 5 can protect certain

communications between an agency and an outside consultant.

The D.C. Circuit has explained that "records of communications between an agency and

outside consultants qualify as 'intra-agency' for purposes of Exemption 5 if they have been

'created for the purpose of aiding the *agency's* deliberative process.'" *Pub. Citizen v. Dep't of Justice*, 111 F.3d 168, 170 (D.C. Cir. 1997) (emphasis in original) (quoting *Dow Jones & Co., Inc. v. Dep't of Justice*, 917 F.2d 571, 575 (D.C. Cir. 1990)); *see also Ryan v. Dep't of Justice*, 617 F.2d 781, 789–90 (D.C. Cir. 1981) ("When an agency record is submitted by outside consultants as part of the deliberative process, and it was solicited by the agency, we find it entirely reasonable to deem the resulting document to be an 'intra-agency' memorandum."). The D.C. Circuit has determined that it is "'irrelevant' whether the author of the documents is 'a regular agency employee or a temporary consultant.'" *Pub. Citizen v. Dep't of Justice*, 111 F.3d at 170 (quoting *Formaldehyde Inst. v. Dep't of Health and Human Servs.*, 889 F.2d 1118, 1122 (D.C. Cir. 1989)).

The Supreme Court addressed the consultant corollary in *Department of Interior v. Klamath Water Users Protective Association*, 532 U.S. 1 (2001). In a unanimous opinion, the Court noted that several circuits have adopted the consultant corollary to Exemption 5.[14] *Id.* at 9 (collecting cases from the Second, Fifth, and D.C. Circuits). Although the Court did not expressly endorse the consultant corollary, it described the parameters of the rule in a "typical[]"

---

[14] The Court also referred to Justice Scalia's dissent in *Department of Justice v. Julian*, which concluded that "[i]t is textually possible and . . . in accord with the purpose of the provision, to regard as an intra-agency memorandum one that has been received by an agency, to assist it in the performance of its own functions, from a person acting in a governmentally conferred capacity other than on behalf of another agency—*e.g.*, in a capacity as employee or consultant to the agency, or as employee or officer of another governmental unit (not an agency) that is authorized or required to provide advice to the agency." 486 U.S. 1, 18 n.1 (1998) (Scalia, J., dissenting). The majority opinion in *Julian* did not address that issue. *Id.* at 11 n.9 ("Respondents argue that presentence memorandums are not 'inter-agency' records for purposes of Exemption 5. The Court of Appeals did not address this issue, however, and we do not find it necessary to do so in light of our disposition today.").

case.[15]  *Id.* at 10; *see also id.* at 11, 12 & n.4 (referring to "typical" applications of the consultant

corollary).  The Court explained that, in a typical case, "the records submitted by outside

consultants played essentially the same part in an agency's process of deliberation as documents

prepared by agency personnel might have done."  *Id.* at 10.  The Court acknowledged that

consultants were independent and could have a definite point of view.  *Id.*  In the Court's view,

the critical factor was that "the consultant does not represent an interest of its own, or the interest

of any other client."  *Id.* at 11.  Instead, such a consultant's "only obligations are to truth and its

sense of what good judgment calls for."  *Id.*

    With that typical case in mind, the Court determined that the consultant corollary did not

apply to communications between the Bureau of Indian Affairs and certain Indian Tribes.  The

Court's reasoning turned on the fact that the Tribes communicated "with the Bureau [of Indian

Affairs] with their own, albeit entirely legitimate, interests in mind."[16]  *Id.* at 12; *see also id.* at

14 ("[T]he dispositive point is that the apparent object of the Tribe's communications is a

decision by an agency of the Government to support a claim by the Tribe that is necessarily

adverse to the interests of competitors.").

    Following *Klamath*, the D.C. Circuit has continued to recognize the consultant corollary.

*See Nat'l Inst. of Military Justice v. U.S. Dep't of Def.*, 512 F.3d 677, 682 (D.C. Cir. 2008)

("Given the Supreme Court's disclaimer and its reasoning, we perceive no basis to jettison our

binding Circuit precedent.").  Consistent with *Klamath*, the D.C. Circuit has focused on whether

---

    [15] The D.C. Circuit characterized the *Klamath* decision as "[a]ssuming without deciding
that the consultant corollary was valid."  *Pub. Empls. for Envtl. Responsibility v. U.S. Section,
Int'l Boundary & Water Comm'n*, 740 F.3d 195, 201 (D.C. Cir. 2014).

    [16] The Court also identified two cases, both decided by the D.C. Circuit, that it believed
"extend[ed] beyond what we have characterized as the typical examples" because they involved
parties who had their own independent interests.  *Klamath*, 532 U.S. at 12 n.4 (citing *Pub.
Citizen v. Dep't of Justice*, 111 F.3d 168; *Ryan*, 617 F.2d 781.

the purported consultants were advocating for their own interests.  *See Nat'l Inst. of Military Justice*, 512 F.3d at 683 ("Unlike the Indian tribes in Klamath, the individuals DoD consulted had no individual interests to promote in their submissions."); *McKinley v. Bd. of Governors of the Fed. Reserve Sys.*, 647 F.3d 331, 337–38 (D.C. Cir. 2011) ("Unlike the Indian tribes, the FRBNY '[did] not represent an interest of its own, or the interest of any other client, when it advise[d] the [Board].'" (alteration in original) (quoting *Klamath*, 532 U.S. at 11)).

The relevant question here is whether the Monitor falls within the parameters of the consultant corollary, as defined by the D.C. Circuit and the Supreme Court.  Although the Monitor is not a classic government contractor, the Court finds that the consultant corollary applies to materials the Monitor submitted to DOJ.

A DOJ attorney states that, in general, "[a] monitor's primary responsibility is to assess and monitor the company's compliance with the terms of the settlement agreement."  DOJ Mot., Decl. of Tarek Helou ("Helou Decl.") ¶ 8, ECF No. 59-6.  According to the same declarant, "the Justice Department could not conduct the kind of reviews that monitors conduct, because [the Department's] limited resources are focused on investigating and prosecuting violations of the FCPA."  Helou Decl. ¶ 16.  In this case, the civil settlement and criminal plea materials, which the relevant law enforcement agencies created and filed, required the Monitor to undertake an independent assessment of Siemens, its compliance with international anti-corruption rules, and its adherence to the plea and settlement agreement.  *See* Plea Agreement ¶ 12 ("Siemens AG agrees that as part of its continuing cooperation obligations and to ensure that Siemens AG implements an effective system of corporate governance and compliance with applicable laws and regulations going forward, Dr. Theodor Waigel will serve as an independent monitor . . . ."); Consent ¶ 3 ("The Monitor will . . . evaluate . . . the effectiveness of Siemens' internal controls,

record-keeping, and financial reporting policies and procedures . . . ."); Statement of Offense,

Attach. 2 (setting forth Monitor's responsibilities); *see also* Price Decl. ¶¶ 5, 13; Lipton Decl. ¶ 3.

The agreements gave the Monitor broad powers to request information, assess Siemens'

compliance program, and suggest reforms. *See* Statement of Offense, Attach. 2 ¶¶ 4, 6; *see also*

Warin Decl. ¶ 16; Price Decl. ¶¶ 5–8. Ultimately, the terms of the monitorship required the

Monitor to "certify whether the compliance programs of Siemens . . . is reasonably designed and

implemented to detect and prevent violations within Siemens of the anti-corruption laws."

Statement of Offense, Attach. 2 ¶ 6. Crucially, the plea and settlement agreement explicitly

called for the Monitor to submit both written work plans and follow-up reports to the

government annually. *See* Statement of Offense, Attach. 2 ¶ 3; Consent ¶ 5. The undisputed

evidence shows that the Monitor submitted those materials to the agencies, as required.

*See* Monitorship Notice ¶ 7; Warin Decl. ¶¶ 20–23; Lipton Decl. ¶ 5; Price Decl. ¶¶ 7–8.

The Monitor provided additional information through in person meetings, and other informal

communications. *See* Warin Decl. ¶ 25(b), (d), (e); Lipton Decl. ¶¶ 5–6.

In *Klamath*, the Court's consideration of the consultant corollary focused on one critical

factor: "the consultant does not represent an interest of its own, or the interest of any other

client." 532 U.S. at 11. Instead, the consultant corollary may apply where a purported

consultant's "only obligations are to truth and its sense of what good judgment calls for." *Id.*

The undisputed evidence shows that the monitorship, imposed by agreements with relevant law

enforcement agencies, gave the Monitor wide-ranging authority to evaluate Siemens' compliance

with the terms of the settlement agreement and with international anti-corruption laws. The

terms of the monitorship also explicitly required the Monitor to report to the government

regarding Siemens' compliance. The Monitor was not representing his own interests or the

interests of Siemens when communicating with the government. Instead, the plea and settlement agreement tasked the Monitor with the important job of exercising independent, fact-based judgment to evaluate Siemens' compliance and submit reports to the government detailing Siemens' compliance efforts.

100Reporters makes several arguments in opposition to this application of the consultant corollary, but none are ultimately persuasive. First, 100Reporters argues that DOJ and the Monitor do not "directly argue that the Monitor *is* an outside expert to whom the consultant corollary clearly applies," but instead only contend that the Monitor is "akin to" a consultant or "effectively function[ing]" as one. *See* 100Reporters Mem. at 33–34 (alteration in original) (quoting DOJ Mem. at 14 and Monitor Mem. at 17). Second, 100Reporters also notes that Siemens, not the government, paid the Monitor. *See* 100Reporters Mem. at 35. Third, 100Reporters raises a number of ways in which it contends the "Monitor's primary function was directed towards Siemens, rather than toward fulfilling (or helping to fulfill) an agency function." 100Reporters Mem. at 34. For one, 100Reporters notes that the Monitor shared work plans and annual reports with Siemens, which is inconsistent with a "purported role as a consultant reporting strictly to the government on a confidential basis."[17] 100Reporters Mem. at 34. For another, 100Reporters argues that the Monitor's mandate was actually to manage Siemens' compliance with the plea agreement, not to provide information to the government. *See* 100Reporters Mem. at 34. Last, 100Reporters contends that the terms of the monitorship calls for the Monitor to report "questionable or corrupt payments or . . . transfers" to Siemens'

---

[17] The Court addresses 100Reporters' argument that the Monitor's sharing of work plans and annual reports with Siemens waived the deliberative process privilege in greater detail below. *See infra* Part IV.B.2.b.

General Counsel or Audit Committee, and the Monitor need only report "significant violations of the law" to DOJ.  *See* 100Reporters Reply at 16 (quoting Statement of Offense, Attach. 2 ¶ 8).

While these arguments highlight ways in which the Monitor is different from a typical government consultant, they do not address the core question, which is whether the Monitor represented the interests of himself or Siemens, or instead, exercised independent judgment.  The D.C. Circuit has explained that "federal agencies occasionally will encounter problems outside their ken, and it clearly is preferable that they enlist the help of outside experts skilled at unravelling their knotty complexities.'"  *Nat'l Inst. of Military Justice*, 512 F.3d at 683 (quoting *Formaldehyde Inst. v. Dep't of Health and Human Servs.*, 889 F.2d 1118, 1122 (D.C. Cir. 1989)).  In those situations, the information provided is "no less valuable or confidential for the lack of compensation or formal contract."  *Id.* at 684.  In fact, the court made clear that "what matters is the nature of the relationship between the consultant and the agency, not the formalities observed."  *Id.* at 687.  In other words, the formal arrangements, including payment and the structure of the agreement to provide information, are not dispositive.

Following *Klamath*, the D.C. Circuit has repeatedly approved of the application of the consultant corollary where the party providing information to the agency was not advocating for itself or a client.  *See Nat'l Inst. of Military Justice*, 512 F.3d at 683; *McKinley*, 647 F.3d at 337–38.  Because the Monitor was exercising independent judgment, not advocating on its behalf or on behalf of Siemens, the Court finds that the consultant corollary applies and the Monitor's documents are intra-agency documents within the meaning of Exemption 5.[18]

---

[18] This conclusion is consistent with two other factors the D.C. Circuit has emphasized in the context of the consultant corollary.  First, "the expectation that communications will remain confidential is crucial to eliciting candid and honest advice from outside consultants."  *Nat'l Inst. of Military Justice*, 512 F.3d at 685.  Here, DOJ also expressly authorized Siemens to share privileged information with the Monitor subject to a non-waiver arrangement, *see* Statement of

2.  The Deliberative Process Privilege

DOJ has withheld documents pursuant to the deliberative process privilege incorporated in Exemption 5.  The deliberative process privilege "covers 'documents reflecting advisory opinions, recommendations, and deliberations comprising part of a process by which governmental decisions and policies are formulated.'"  *Klamath*, 532 U.S. at 8 (quoting *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150 (1975)).  The privilege is intended "to enhance the quality of agency decisions by protecting open and frank discussion among those who make them within the Government."  *Id.* at 9 (internal citation and quotation marks omitted).  The privilege "rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news."  *Id.* at 8–9; *see also Dow Jones & Co. v. U.S. Dep't of Justice*, 917 F.2d 571, 573–74 (D.C. Cir. 1990).

For the deliberative process privilege to apply, a court must first determine whether the withheld materials are both "predecisional" and "deliberative."  *Access Reports v. Dep't of Justice*, 926 F.2d 1192, 1194 (D.C. Cir. 1991) (internal quotation marks omitted).  Materials are "predecisional" if they are "generated before the adoption of an agency policy."  *McKinley v. FDIC*, 744 F. Supp. 2d 128, 138 (D.D.C. 2010) (quoting *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980)).  Materials are "deliberative" if they reflect "the give-and-take of the consultative process," *id.* (quoting *Coastal States*, 617 F.2d at 866), "by

---

Offense, Attach. 2, ¶ 2(b), and this litigation illustrates the lengths DOJ and Defendant-Intervenors will go to in an attempt to avoid disclosure.  Second, there has "been some indicia of a consultant relationship between the outsider and the agency . . . evidenced by the fact that the agency seeks out the individual consultants and affirmatively solicits their advice in aid of agency business."  *Nat'l Inst. of Military Justice*, 512 F.3d at 686.  Here, the plea and settlement agreement required Siemens to enter into a monitorship and explicitly required Dr. Waigel to serve as the Monitor.  *See* Plea Agreement ¶ 12.  These factors bolster the Court's conclusion that the consultant corollary applies in this case.

which the decision itself is made," *Jowett, Inc. v. Dep't of the Navy*, 729 F. Supp. 871, 875

(D.D.C. 1989) (quoting *Vaughn v. Rosen*, 523 F.2d 1136, 1144 (D.C. Cir. 1975)).  The "key

question" in determining whether the material is deliberative in nature "is whether disclosure of

the information would 'discourage candid discussion within the agency.'"  *Access Reports*, 926

F.2d at 1195 (quoting *Dudman Commc'ns Corp. v. U.S. Dep't of the Air Force*, 815 F.2d 1565,

1567–68 (D.C. Cir. 1987)).  Furthermore, an agency withholding information, "must establish

'what deliberative process is involved, and the role played by the documents in issue in the

course of that process.'"  *Senate of P.R. v. U.S. Dep't of Justice*, 823 F.2d 574, 585–86 (D.C. Cir.

1987) (quoting *Coastal States*, 617 F.2d at 868).

*a.  The Deliberative Process at Issue*

Ms. Moberly states that DOJ has withheld the following information pursuant to

Exemption 5 and the deliberative process privilege:

- Monitor's work plans and related documents . . . .
- Monitor's yearly reports and exhibits . . . .
- Monitor's presentations to DOJ and SEC summarizing various aspects of his work;
- Emails and correspondence between the Monitor, Monitor's counsel, DOJ attorneys, and SEC attorneys concerning various aspects of the monitorship;
- Emails involving DOJ attorneys and SEC attorneys concerning various aspects of the monitorship, including issues raised at meetings and presentations;
- Correspondence between the Siemens Board[19] and the DOJ and SEC attorneys concerning various aspects of the monitorship;
- Siemens compliance policies and descriptions of various aspects of its compliance programs;

---

[19] Although the Court cannot undertake a full analysis of the deliberative process privilege because DOJ has failed to identify the deliberative process at issue, the Court notes that the Monitor is covered by the consultant corollary.  *See supra* Part IV.B.1.  The Court's finding does not extend the consultant corollary to the Siemens Board.

- Training materials for Siemens employees on various aspects of its compliance programs; and

- Draft court filings involving the Siemens prosecution.

Moberly Decl. ¶ 24.

The Court first considers which deliberative process, if any, is linked to the withheld documents.  100Reporters argues that DOJ has not only failed to identify any deliberative process, but also failed to "tie the records to the purported decision-making at issue."  *See* 100Reporters Mem. at 29–30.  100Reporters contends that the declarations presented by DOJ are too vague, and do not provide specific claims regarding the deliberative process at issue in this case.  100Reporters Mem. at 30.[20]

The Court is persuaded by 100Reporters' argument that DOJ has not sufficiently identified the deliberative process or processes at issue.  "[T]o approve exemption of a document as predecisional, a court must be able 'to pinpoint an agency decision or policy to which the document contributed.'"  *Senate of P.R. v. U.S. Dep't of Justice*, 823 F.2d 574, 585 (D.C. Cir. 1987) (quoting *Paisley v. CIA*, 712 F.2d 686, 698 (D.C. Cir. 1983)).  To be sure, the Supreme Court has explained that "the need to protect pre-decisional documents does not mean that the existence of the privilege turns on the ability of an agency to identify a specific decision in connection with which a memorandum is prepared."  *Sears*, 421 U.S. at 151 n.18.  The Court

---

[20] 100Reporters also asserts that the Amended *Vaughn* Index, "far from establishing what role each document played in a deliberative process, merely recite[s] identical boilerplate." 100Reporters Mem. at 31.  The Court notes that the use of repetitive language is not necessarily prohibited, as long as an agency can adequately describe the nature of the deliberative process involved and the function and significance of the withheld material in that process.  *See Judicial Watch, Inc. v. FDA*, 449 F.3d 141, 147 (D.C. Cir. 2006) (explaining that "categorization and repetition provide efficient vehicles by which a court can review withholdings" and that "particularity may actually impede court review and undermine the functions served by a Vaughn index"); *see also Pub. Empls. for Envtl. Responsibility v. Envtl. Prot. Agency*, No. 14-2056, 2016 WL 5675410, at *9 (D.D.C. Sept. 30, 2016).

recognized that some deliberate processes would not ripen into agency decisions, and did not want to interfere with that process.  *See id.*  However, an agency must establish at least what deliberative *process* is involved and the role that withheld documents played in that process.  *See Formaldehyde Inst. v. U.S. Dep't of Health & Human Servs.*, 889 F.2d 1118, 1123 (D.C. Cir. 1989).  Furthermore, an agency must show that the document was "generated as part of a *definable* decision-making process."  *Gold Anti-Trust Action Comm., Inc. v. Bd. of Governors of the Fed. Reserve Sys.*, 762 F. Supp. 2d 123, 135-36 (D.D.C. 2011) (emphasis added) (citing *Petroleum Info. Corp. v. U.S. Dep't of the Interior*, 976 F.2d 1429, 1434 (D.C. Cir. 1992)); *see also Pub. Empls. for Envtl. Responsibility v. Envtl. Prot. Agency*, No. 14-2056, 2016 WL 5675410, at *6 (D.D.C. Sept. 30, 2016).

DOJ and the Monitor present evidence that purportedly shows that the withheld materials were created over the four years of the monitorship, and the law enforcement agencies relied on them when making decisions regarding Siemens' compliance with the plea and settlement agreement and with anti-corruption laws generally.  *See* Warin Decl. ¶¶ 11–12, 24; Lipton Decl. ¶¶ 5, 7, 9–10; Price Decl. ¶¶ 9–10.  For example, Mr. Lipton stated that the documents "helped DOJ determine whether the Monitor was fulfilling his mandate to ensure that Siemens carried out its responsibilities under the plea agreement."  Lipton Decl. ¶ 5.  The SEC also purportedly relied on communications with the Monitor "to determine whether Siemens was complying with its obligations under the Final Judgment, including whether Siemens' compliance program was reasonably designed and implemented to detect and prevent violations of the anti-corruption laws, and that further monitoring and review pursuant to the Final Judgment were no longer warranted."  Price Decl. ¶ 9.  Each Amended *Vaughn* Index entry that invokes the deliberative process privilege includes the same boilerplate language.  Among other things, each entry states:

> As a party to the plea agreement and in exercising its duty to enforce the FCPA, the DOJ and the SEC were engaged in a deliberative process in evaluating whether the Monitor was fulfilling his mandate and whether Siemens was complying with the plea agreement.  DOJ obtained the document prior to/in the course of making law enforcement and litigation decisions, and relied upon the information contained therein as part of its underlying deliberative process.

*See, e.g.*, DOJ_0005222, Am. *Vaughn* Index at 4.

The Court finds that this evidence is insufficient to define with the necessary specificity "what deliberative process is involved." *Coastal States*, 617 F.2d at 868.  In brief, DOJ's position is that "[t]he Monitor prepared the documents and presentations that he gave to the DOJ for the purpose of helping the DOJ deliberate on whether Siemens had satisfied its obligations under the Plea Agreement." DOJ Mem. at 16.  That view of the deliberative process at issue is overbroad.

The agency bears the burden of identifying the deliberative process at issue.  *See Coastal States*, 617 F.2d at 868.  This step is critical because a court can only analyze whether a record is both predecisional and deliberative in relation to the relevant deliberative process.  In other words, the timing of a record in relation to the adoption of agency policy is a crucial factor.  *See Judicial Watch, Inc. v. FDA*, 449 F.3d 141, 151 (D.C. Cir. 2006) ("We deem a document predecisional if 'it was generated before the adoption of an agency policy.'" (quoting *Coastal States*, 617 F.2d at 866)); *Nat'l Right to Work Legal Def. & Educ. Found., Inc. v. U.S. Dep't of Labor*, 828 F. Supp. 2d 183, 189 (D.D.C. 2011) ("The timing of a record is important in the analysis; communications made after a decision has been made and designed to explain that decision are not privileged under Exemption 5.").  Similarly, materials are "deliberative" if they reflect "the give-and-take of the consultative process," *McKinley*, 744 F. Supp. 2d at 138 (quoting *Coastal States*, 617 F.2d at 866), "by which the decision itself is made," *Jowett, Inc.*, 729 F. Supp. at 875 (quoting *Vaughn*, 523 F.2d at 1144).

The process identified by DOJ and Defendant-Intervenors is too nebulous to allow the Court to conduct the necessary analysis for each withheld record.  Although EPA is not required to link each document to a specific action, it must do more to tie the materials to some definable process.  *See Nat'l Sec. Counselors v. CIA*, 960 F. Supp. 2d 101, 189 (D.D.C. 2013) ("The individual entries in the CIA's *Vaughn* index, however, do not elaborate on the '*specific* deliberative process to which the withheld [document] contributed.'" (quoting *Elec. Frontier Found. v. U.S. Dep't of Justice*, 826 F. Supp. 2d 157, 168 (D.D.C. 2011))); *Trea Senior Citizens League v. U.S. Dep't of State*, 923 F. Supp. 2d 55, 68 (D.D.C. 2013) ("Such a broad and opaque description of the deliberative process involved does not provide the Court with enough detail about whether these documents are deliberative and predecisional."); *cf. Judicial Watch, Inc. v. U.S. Postal Serv.*, 297 F. Supp. 2d 252, 264 (D.D.C. 2004) ("It is not enough to say that the documents relate, in some way, to 'actions taken or proposed in response to the discovery of anthrax in the mail,' for if they did not, the documents would not be before the court at all." (citations omitted)).  Accepting DOJ and Defendant Intervenors' view of the deliberative process at issue would create a four-year umbrella effectively shielding all agency action from review without accounting for any subsidiary agency decisions.

For example, instead of being part of a broader process by which DOJ reached the decision to certify that Siemens complied with the terms of the plea and settlement agreement, each of the work plans appears to implicate a separate sub-decision—with a distinct deliberative process—about what work the Monitor should undertake for the relevant year of the monitorship.[21]  The agency bears the burden of identifying the deliberative process at issue, *see*

---

[21] It is hard to see how the individual work plans were part of the deliberative process for determining whether Siemens complied with the plea and settlement agreements.  Instead, they appear to be decisions in themselves.  If DOJ had concluded that Siemens failed to comply with

*Coastal States*, 617 F.2d at 868, and DOJ has failed to point to subsidiary decisions that fall underneath the nebulous umbrella process it has purported to identify.

The Court also notes that DOJ has withheld "Siemens compliance policies" and "[t]raining materials for Siemens employees" pursuant to the deliberative process privilege. Moberly Decl. ¶ 24. The privilege is intended "to enhance the quality of agency decisions by protecting open and frank discussion among those who make them within the Government." *Dep't of the Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 9 (2001) (internal citation and quotation marks omitted). Although the Court does not doubt that DOJ reviewed Siemens' compliance policies and training materials, it seems unlikely that disclosure would harm the quality of agency decisions because those documents exist independently of the Monitor's work and were not created for the purpose of agency decisionmaking. In other words, the mere consideration of a document does not bring it within the privilege if it does not "reflect[] the give-and-take of the consultative process." *Coastal States*, 617 F.2d at 866. Without greater clarity on what deliberative process is at stake, the Court cannot determine whether a particular record reflects that process.

For these reasons, the Court finds that DOJ has failed to carry its burden to "establish 'what deliberative process is involved, and the role played by the documents in issue in the course of that process.'" *Senate of P.R.*, 823 F.2d at 585–86 (quoting *Coastal States*, 617 F.2d at

---

the plea and settlement agreements because the year two work plan was inadequate, the Court suspects that Siemens would have cried foul. The Court is not thus convinced that the work plans are predecisional or that they reflect the give and take of the consultative process with respect to DOJ's ultimate compliance decision.

868).[22]  Thus, the Court denies DOJ and Defendant-Intervenors' motions for summary judgment

on the application of the deliberative process privilege.

Federal courts have the authority to order agencies to produce any records that have been

withheld improperly.  *See* 5 U.S.C. § 552(a)(4)(B); *see also Vaughn v. Rosen*, 484 F.2d 820, 824

(D.C. Cir. 1973) ("If the factual nature of the documents were so clearly established on the

record, then the court would inquire no further and would make the legal ruling as to whether

they fit within the defined exemption or exemptions.").  But, if a court finds that an "agency fails

to provide a sufficiently detailed explanation to enable the district court to make a *de novo*

determination of the agency's claims of exemption, the district court . . . has several options,

including inspecting the documents *in camera,* requesting further affidavits, or allowing the

plaintiff discovery."  *Spirko v. U.S. Postal Serv.*, 147 F.3d 992, 997 (D.C. Cir. 1998).  At this

time, the Court will permit DOJ and Defendant-Intervenors another opportunity to present

further affidavits, if the parties intend to continue to rely on the deliberative process privilege.

Thus, 100Reporters' cross-motion for summary judgment will also be denied on this issue,

pending possible supplementation by DOJ and Defendant-Intervenors.

Although the Court does not dictate the form of any supplemental affidavits or *Vaughn*

indices, DOJ must show, at the least:  "(1) the nature of the specific deliberative process

involved" (including whether that process resulted in a decision independent of, although related

to, the ultimate compliance decision), "(2) the function and significance of the document in that

process, and (3) the nature of the decisionmaking authority vested in the document's author and

---

[22] Because DOJ has failed to sufficiently identify the deliberative process or processes at issue, the Court cannot reach the questions of whether the withheld materials are predicisional or deliberative in nature.

recipient."[23]  *Nat'l Sec. Counselors*, 960 F. Supp. 2d at 189 (citing *Senate of P.R.*, 823 F.2d at 585–86; *Arthur Andersen & Co. v. IRS*, 679 F.2d 254, 257–58 (D.C. Cir. 1982); *Coastal States*, 617 F.2d at 867–68)).

### b.  Purported Waiver of the Deliberative Process Privilege

Although the Court finds that the withholdings pursuant to the deliberative process privilege have not been justified at this time, the Court will turn to a related issue disputed by the parties.  100Reporters also argues that "circumstances [of the monitorship] would operate as a waiver of the deliberative process privilege as to documents originating or shared with the Monitor."  100Reporters Mem. at 35.  100Reporters argues that, to the extent the Monitor was a consultant to the government, sharing records with Siemens would waive any privilege.  *See* 100Reporters Mem. at 35.  This argument is misplaced.

As the Monitor notes in its reply, *see* Consolidated Reply Supp. Monitor's Mot. Summ. J. & Opp'n Pl.'s Cross-Mot. at 4–5, ECF No. 70, the cases cited by 100Reporters stand for the proposition that voluntary disclosure to unnecessary third parties constitutes a waiver of the deliberative process privilege.  *See Elec. Frontier Found. v. Dep't of Justice*, 890 F. Supp. 2d 35, 46 (D.D.C. 2012) ("[V]oluntary disclosure of privileged material . . . to unnecessary third parties . . . waives the [deliberative process] privilege . . . . for the document or information specifically released." (alterations in original) (quoting *In re Sealed Case*, 121 F.3d 729, 741 (D.C. Cir. 1997) (per curiam))); *Shell Oil Co. v. IRS*, 772 F. Supp. 202, 206 (D. Del. 1991) ("[I]f an

---

[23] Although the parties have not raised this issue, the Court also notes that, in certain circumstances, "a document can lose its predecisional character—and the protections of the privilege—if an agency adopts the document as its own."  *See Judicial Watch, Inc. v. U.S. Dep't of Def.*, 847 F.3d 735, 739 (D.C. Cir. 2017).  DOJ's filings with the Court in the underlying Siemens case contain little independent analysis, and, instead, rely heavily on the Monitor's work.

authorized disclosure is made to a non-federal party and the disclosure is not necessary to effect

the purpose of the document, a waiver occurs."); *see also Fla. House of Representatives v. U.S.*

*Dep't of Commerce*, 961 F.2d 941, 946 (11th Cir. 1992) ("Where an authorized disclosure is

*voluntarily* made to a non-federal party, the government waives any claim that the information is

exempt from disclosure under the deliberative process privilege." (quoting *Shell Oil Co.*, 772

F. Supp. at 211)).  In other words, there is no waiver where the disclosure was both necessary

and required.[24]

In this case, the Monitor's disclosures to Siemens were clearly necessary.  The

monitorship imposed by the plea and settlement agreement called for the Monitor to carefully

analyze Siemens' business practices and provide recommendations for improvements.  *See*

Statement of Offense, Attach. 2 ¶¶ 3–4.  That process would have been impossible if the Monitor

could not communicate with Siemens.  Furthermore, the terms of the monitorship expressly

permitted Siemens, which presumably knows its business better than anyone, to comment on and

object to the Monitor's recommendations, ensuring meaningful participation by Siemens, which,

in turn, allowed the Monitor to make more informed decisions.  *See* Statement of Offense,

Attach. 2 ¶ 5.  Thus, the Court finds that communications between the Monitor and Siemens

were necessary to best effectuate the plea and settlement agreement and the monitorship.

Second, the Monitor's disclosures to Siemens were also clearly involuntary.  A court will

only find a waiver of the deliberative process privilege where the disclosure was voluntary.

*Mobil Oil Corp. v. EPA*, 879 F.2d 698, 700–01 (9th Cir. 1989); *Elec. Frontier Found.*, 890

F. Supp. 2d at 46.  In *Florida House of Representatives*, the Eleventh Circuit determined that a

---

[24] DOJ makes a similar argument in its reply brief.  *See* DOJ Reply at 11–12 ("[T]he Monitor's disclosures to Siemens were both required and necessary.").  100Reporters does not respond to this point in its reply brief.  *See* 100Reporters Reply at 14–17.

release was not voluntary when required by a court order.  *See* 961 F.2d at 946.  Here, the plea

and settlement agreement, which were approved by the court, required the Monitor to submit his

work plans and reports to Siemens.  *See* Statement of Offense, Attach. 2 ¶ 3; Consent ¶ 5.

Therefore, the Court finds that the disclosure was involuntary.  Because the disclosure of

information from the Monitor to Siemens was involuntary under the relevant court orders and

was necessary for the purposes of the plea and settlement agreement and the monitorship, the

Court concludes that the disclosures did not waive the deliberative process privilege.[25]

### 3.  Attorney Work-Product Privilege

Finally, the Court will consider the withholdings made pursuant to the attorney work-

product doctrine.  Documents "prepared in anticipation of litigation" are typically not

discoverable in civil litigation and are therefore exempt from disclosure under FOIA Exemption

5.  *See Shapiro v. U.S. Dep't of Justice*, 969 F. Supp. 2d 18, 27 (D.D.C. 2013) (quoting Fed. R.

Civ. P. 26(b)(3)(A)).  The attorney work-product doctrine protects "the mental impressions,

conclusions, opinions, or legal theories of an attorney," as well as "factual materials prepared in

anticipation of litigation."  *Tax Analysts v. IRS*, 117 F.3d 607, 620 (D.C. Cir. 1997) (quotation

marks omitted).  This rule is rooted in the principle that "it is essential that a lawyer work with a

certain degree of privacy, free from unnecessary intrusion by opposing parties and their

counsel."  *Hickman v. Taylor*, 329 U.S. 495, 510 (1947).

The D.C. Circuit has explained that the proper test considers "whether, in light of the

nature of the document and the factual situation in the particular case, the document can fairly be

---

[25] 100Reporters also contends that DOJ withheld purely factual, non-deliberative
information pursuant to the deliberative process privilege.  *See* 100Reporters Mem. at 36.
Generally, an agency should disclose severable and purely factual material.  *See Wolfe v. Dep't
of Health & Human Servs.*, 839 F.2d 768, 774 (D.C. Cir. 1988) (en banc).  The Court addresses
the question of segregability in greater detail below.  *See infra* Part IV.D.

said to have been prepared or obtained *because of* the prospect of litigation." *FTC v. Boehringer Ingelheim Pharms. Inc.*, 778 F.3d 142, 149 (D.C. Cir. 2015) (emphasis added) (quoting *United States v. Deloitte LLP*, 610 F.3d 129, 137 (D.C. Cir. 2010)).   The agency must establish that the records were created with a "subjective belief that litigation was a real possibility, and that belief must have been objectively reasonable." *In re Sealed Case*, 146 F.3d 881, 884 (D.C. Cir. 1998). Under this test, the agency must establish the following factors to justify its withholding: "(1) provide a description of the nature of and contents of the withheld document, (2) identify the document's author or origin, (3) note the circumstances that surround the document's creation, and (4) provide some indication of the type of litigation for which the document's use is at least foreseeable." *Ellis v. U.S. Dep't of Justice*, 110 F. Supp. 3d 99, 108 (D.D.C. 2015), *aff'd*, No. 15-5198, 2016 WL 3544816 (D.C. Cir. June 13, 2016).

In this case, DOJ states that it has withheld three categories of documents under the attorney work-product privilege.   First, DOJ states that is has withheld "emails between DOJ attorneys that related to the monitorship."   DOJ Mem. at 20.   Second, DOJ has withheld "draft versions of notices to the Court about the corporate monitorship and proposed order."   DOJ Mem. at 20.   Third, DOJ has withheld "email messages between DOJ attorneys and SEC attorneys."   DOJ Mem. at 20.   In its reply, DOJ notes that 100Reporters did not address DOJ's invocation of the attorney work-product privilege, and argues that 100Reporters, "therefore, concedes the arguments."   DOJ Reply at 10 n.3.

In fact, 100Reporters does not address the attorney work-product privilege in either of its briefs.   *See generally* 100Reporters Mem.; 100Reporters Reply.   Nevertheless, even if the nonmovant does not respond to a motion for summary judgment, the court cannot grant the motion for the reason that it was conceded.   *See Winston & Strawn, LLP v. McLean*, 843 F.3d

503, 505 (D.C. Cir. 2016) ("Under the Federal Rules of Civil Procedure, a motion for summary judgment cannot be 'conceded' for want of opposition. 'The burden is always on the movant to demonstrate why summary judgment is warranted.'" (quoting *Grimes v. District of Columbia*, 794 F.3d 83, 97 (D.C. Cir. 2015) (Griffith, J., concurring))). Therefore, the Court will consider the arguments raised by DOJ despite 100Reporters' lack of a response.

Based on DOJ's Amended *Vaughn* Index and the declaration of Ms. Moberly, the Court finds that DOJ properly withheld these records pursuant to the attorney work-product privilege. First, DOJ has provided "a description of the nature of and contents of the withheld document[s]." *Ellis*, 110 F. Supp. 3d at 108. Ms. Moberly sets forth generally that the withheld records "reflect[] communications and exchange of work-product among DOJ attorneys (and sometimes also SEC attorneys) assigned to the Siemens monitorship concerning various aspects of the monitorship, including the Monitor's work plans and annual reports and the length of the monitorship, and a draft of DOJ's notice concerning Siemens' compliance with its plea agreement." Moberly Decl. ¶ 29. Furthermore, each entry of the Amended *Vaughn* Index includes a description of the document that, while brief in some cases, provides a sufficiently detailed description of its contents. *See, e.g.*, DOJ_0005225, Am. *Vaughn* Index at 6 ("A draft of a letter to Dr. Theo Waigel and F. Joseph Warin designed to provide feedback on the Monitor's proposed work plan."); DOJ_005288, Am. *Vaughn* Index at 108 ("An email message to a DOJ trial attorney concerning the timing of the termination of the monitorship.").

Second, DOJ has sufficiently "identif[ied] the document's author or origin." *Ellis*, 110 F. Supp. 3d at 108. Ms. Moberly states that "[e]ach of the documents was prepared by an attorney who was acting at the behest of a client (the U.S. Government)." Moberly Decl. ¶ 29. Each entry of the Amended *Vaughn* Index also specifies the author or authors (sometimes

anonymously) of the relevant document.  *See, e.g.*, DOJ_0005288, Am. *Vaughn* Index at 111 ("Author(s): a DOJ trial attorney"); DOJ_0005291, Am. *Vaughn* Index at 120 ("Author: an SEC attorney").

Third, DOJ has sufficiently "note[d] the circumstances that surround the document's creation." *Ellis*, 110 F. Supp. 3d at 108.  Ms. Moberly explains that each of the withheld documents was created in connection with the Siemens monitorship.  *See* Moberly Decl. ¶ 29. The Amended *Vaughn* Index provides additional information for each document, which permits the Court to evaluate the circumstances surrounding the creation of each document, including the document's title, author, subject matter, and, where relevant, the recipient and date or time of a communication.  *See, e.g.*, DOJ_005235, Am. *Vaughn* Index at 14 ("A letter [from a DOJ trial attorney] to Dr. Theo Waigel and F. Joseph Warin acknowledging receipt of the Monitor's year one work plan and providing feedback on that document.  The letter discusses issues raised during the parties' April 1, 2009 meeting, including Monitor independence, Monitor recommendations to Siemens, the Monitor's engagement of a consultant, and forensic analysis of the company. The letter also contains DOJ's views on the role that Siemens' internal audit group will play in the monitorship. The letter indicates that a copy was sent to a DOJ trial attorney.");[26]

---

[26] Although disclosure to third parties typically destroys the attorney–client privilege, "the work product privilege is not automatically waived by any disclosure to a third party." *In re Sealed Case*, 676 F.2d 793, 809 (D.C. Cir. 1982).  Instead, "[t]hree main factors determine whether work-product protection has been waived: '(1) the party claiming the privilege seeks to use it in a way that is not consistent with the purpose of the privilege; (2) the party had no reasonable basis for believing that the disclosed materials would be kept confidential by the [government]; and (3) waiver of the privilege in these circumstances would not trench on any policy elements now inherent in this privilege.'"  *United States v. Williams Cos., Inc.*, 562 F.3d 387, 394 (D.C. Cir. 2009) (second alteration in original) (quoting *In re Subpoenas Duces Tecum,* 738 F.2d 1367, 1372 (D.C. Cir. 1984)).  No party has provided any reason to doubt that DOJ's reliance on the privilege is consistent with the purpose of the privilege, that DOJ reasonably believed the letter would be kept confidential, and that DOJ's reliance is consistent with the policy objectives of the privilege.

DOJ_005288, Am. *Vaughn* Index at 108 ("An email message [with the subject "Siemens Year 3 Report] to a DOJ trial attorney [sent by another DOJ trial attorney on September 6, 2011] concerning the timing of the termination of the monitorship").

Fourth and finally, DOJ has sufficiently "provide[d] some indication of the type of litigation for which the document's use is at least foreseeable." *Ellis*, 110 F. Supp. 3d at 108. Here, every document related to "the prospect of continuing litigation concerning Siemens' compliance with the plea agreement, the duration of the monitorship, etc." Moberly Decl. ¶ 29. Each entry of the Amended *Vaughn* Index that invoked the attorney work-product privilege indicated that the "document was prepared by an attorney . . . in anticipation of litigation or in connection with actual litigation, *i.e.*, *United States v. Siemens Aktiengesellschaft*, 08-cr-367-RJL (D.D.C.) and the implementation of the plea agreement therein." *See, e.g.*, DOJ_005225, Am. *Vaughn* Index at 7.

These documents are classic attorney work-product, and disclosure would risk putting the thoughts and strategies of agency counsel on public display. *See Hickman*, 329 U.S. at 510; *Ellis*, 110 F. Supp. 3d at 108. The records include analysis, recommendations, and strategic considerations created in connection with the underlying criminal cases. And, despite the fact that the documents were created after the entry of Siemens' plea and settlement, the materials are sufficiently prospective because they relate to the government's decision to accept the termination of the monitorship or to potentially raise other issues in the enforcement action. There is no doubt that the materials were created "because of the prospect of litigation." *Boehringer Ingelheim Pharms.*, 778 F.3d at 149 (quoting *Deloitte*, 610 F.3d at 137). The Court finds that DOJ has shown that the attorney work-product privilege applies to the withheld

materials.  Therefore, the Court grants summary judgment to DOJ with respect to its Exemption

5 withholdings under this privilege.

### C.  Exemptions 6 and 7(C)

Exemption 6 protects "personnel and medical files and similar files the disclosure of

which would constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C.

§ 552(b)(6).  Exemption 7(C) excludes "records or information compiled for law enforcement

purposes . . . to the extent that the production of such law enforcement records or information . . .

could reasonably be expected to constitute an unwarranted invasion of personal privacy."  *Id.*

§ 552(b)(7)(C).  Both exemptions require agencies and reviewing courts to "balance the privacy

interests that would be compromised by disclosure against the public interest in the release of the

requested information."  *Beck v. Dep't of Justice*, 997 F.2d 1489, 1491 (D.C. Cir. 1993) (quoting

*Davis v. Dep't of Justice*, 968 F.2d 1276, 1281 (D.C. Cir. 1992)).

Although the balancing test is applied to both Exemption 6 and 7(C), "'Exemption 7(C)

is more protective of privacy than Exemption 6' and thus establishes a lower bar for withholding

material."  *Prison Legal News v. Samuels*, 787 F.3d 1142, 1146 n.5 (D.C. Cir. 2015) (quoting

*ACLU v. U.S. Dep't of Justice*, 655 F.3d 1, 6 (D.C. Cir. 2011)); *see also U.S. Dep't of Def. v.*

*Fed. Labor Relations Auth.*, 510 U.S. 487, 496 n.6 (1994) ("Exemptions 7(C) and 6 differ in the

magnitude of the public interest that is required to override the respective privacy interests

protected by the exemptions.").  Specifically, "the balance tilts more strongly toward

nondisclosure in the context of Exemption 7(C) because 'Exemption 7(C)'s privacy language is

broader than the comparable language in Exemption 6 in two respects.'"  *Braga v. FBI*, 910 F.

Supp. 2d 258, 267 (D.D.C. 2012) (quoting *Reporters Comm.*, 489 U.S. at 756).  First, Exemption

6 "encompasses 'clearly unwarranted' invasions of privacy, while Exemption 7(C) omits the

adverb 'clearly.'"  *Id.*  Second, Exemption 7(C) lowers the risk of harm standard from "would" to "could reasonably be expected to" constitute an invasion.  *Id.*  The differences in the language between the two exemptions reflect Congress's decision to provide the government with "greater flexibility in responding to FOIA requests for law enforcement records or information" than in responding to requests for personnel, medical, and other similar files.  *See Reporters Comm.*, 489 U.S. at 777 n.22.

Accordingly, if the documents withheld and information redacted were "compiled for law enforcement purposes," the Court need engage only in an analysis of whether the defendant properly redacted information and withheld documents pursuant to Exemption 7(C).  *See People for the Ethical Treatment of Animals v. Nat'l Insts. of Health*, 745 F.3d 535, 541 (D.C. Cir. 2014) (confining its FOIA analysis to Exemption 7(C) because its "privacy language is broader than the comparable language in Exemption 6" (quoting *Reporters Comm.*, 489 U.S. at 756)); *Roth v. U.S. Dep't of Justice*, 642 F.3d 1161, 1173 (D.C. Cir. 2011) (finding "no need to consider Exemption 6 separately [where] all information that would fall within the scope of Exemption 6 would also be immune from disclosure under Exemption 7(C)"); *Rodriguez v. U.S. Dep't of the Army*, 31 F. Supp. 3d 218, 231 (D.D.C. 2014).  Therefore, as an initial matter, the Court must determine whether Exemption 7 applies to the withholdings in this case.

### 1.  Exemption 7 Threshold Question

"In order to withhold documents under Exemption 7, the agency must, as a preliminary matter" make a "threshold" showing demonstrating "that the records were compiled for a law enforcement purpose."  *Kay v. FCC*, 976 F. Supp. 23, 37 (D.D.C. 1997).  Agencies classified as law enforcement agencies, like the DOJ in this case, receive deference to their assertion that documents were compiled for a law enforcement purpose.  *See Pratt v. Webster*, 673 F.2d 408,

418 (D.C. Cir. 1982) (rooting deference in "the generally accurate assumption that federal agencies act within their legislated purposes").  A court's review of this threshold question is "necessarily deferential," but the review is "not vacuous."  *Id.* at 421.

To be sure, not every document compiled by a law enforcement agency is compiled for a law enforcement purpose.  *See, e.g.*, *Am. Immigration Council v. U.S. Dep't of Homeland Sec.*, 950 F. Supp. 2d 221, 245–46 (D.D.C. 2013) (relying on *Pratt* to reject ICE's argument that all of its records are compiled for a law enforcement purpose); *Benavides v. Bureau of Prisons*, 774 F. Supp. 2d 141, 146–47 (D.D.C. 2011) (relying on *Pratt* to reject a "per se" rule that all BOP documents are created for law enforcement purposes and finding that the recordings of inmates' telephone conversations were not compiled for law enforcement purposes).  Instead, the agency must establish "(1) 'a rational nexus between the investigation and one of the agency's law enforcement duties;' and (2) 'a connection between an individual or incident and a possible security risk or violation of federal law.'"  *Ctr. for Nat'l Sec. Studies v. U.S. Dep't of Justice*, 331 F.3d 918, 926 (D.C. Cir. 2003) (quoting *Campbell v. U.S. Dep't of Justice*, 164 F.3d 20, 32 (D.C. Cir. 1998); *see also Pratt*, 673 F.2d at 420 (setting forth the rational nexus test for the first time in this circuit).

In 1986, Congress amended Exemption 7 to broaden the reach of the threshold requirement from "*investigatory* records compiled for law enforcement purposes," 5 U.S.C. § 552(b)(7) (1982) (emphasis added), to simply "records or information compiled for law enforcement purposes," Anti-Drug Abuse Act of 1986, § 1802(a), Pub. L. No. 99-570, 100 Stat. 3207, 3207–48 (1986); *see also Tax Analysts v. IRS*, 294 F.3d 71, 79 (D.C. Cir. 2002).  The D.C. Circuit has made clear that, after the amendments, the *Pratt* test applies only "when an agency seeks to invoke Exemption 7 in a situation in which there is an ongoing law enforcement

'investigation,'" but in that context, it "is still good law." *Tax Analysts*, 294 F.3d at 77–78.

If there is no ongoing investigation, materials may still meet the threshold requirement of

Exemption 7 if they are akin to "guidelines, techniques, and procedures for law enforcement

investigations and prosecutions outside of the context of a specific investigation." *Id.* at 78.

100Reporters argues that "[t]he Monitor's review of Siemens' compliance was not a

criminal investigation." 100Reporters Mem. at 47.  Instead, 100Reporters contends that the

investigation into Siemens closed at the time the company signed the plea agreement and civil

settlement. *See* 100Reporters Mem. at 47.  100Reporters also points to DOJ's declarant who

states that DOJ "could not conduct the kind of reviews that monitors conduct because [DOJ's]

limited resources are focused on investigating and prosecuting violations of the FCPA."[27]  Helou

Decl. ¶ 16.

DOJ's response to 100Reporters on this point is brief.  DOJ argues that the records at

issue were compiled "pursuant to a plea agreement in a criminal case."  DOJ Reply at 26–27.

DOJ also contends that the criminal "case did not conclude[] with the entry of the plea

agreement, but rather remained open during the duration of the monitorship, as the plea

agreement imposed continuing duties on Siemens."  DOJ Reply at 26.  DOJ also points to a line

---

[27] In its reply, 100Reporters also relies on *Bristol-Myers Co. v. FTC*, 424 F.2d 935 (D.C. Cir. 1970).  *See* 100Reporters Reply at 18.  100Reporters quotes language from that decision that states "an agency cannot, consistent with the broad disclosure mandate of the Act, protect all its files with the label 'investigatory' and a suggestion that enforcement proceedings may be launched at some unspecified future date." *Bristol-Myers*, 424 F.2d at 940.  That court also determined that Exemption 7 would apply after the close of an investigation "[i]f further adjudicatory proceedings are imminent." *Id.*  This reference is not persuasive.  In fact, four years later, the D.C. Circuit stated that, "[i]t is established now that the Government need not show imminent adjudicatory proceedings or the concrete prospect of enforcement proceedings." *Rural Hous. All. v. U.S. Dep't of Agric.*, 498 F.2d 73, 80 (D.C. Cir. 1974) (quotation marks omitted).  Furthermore, to the extent that *Bristol-Myers* was not expressly rejected on this point, the opinion does not account for the last fifty years, including amendments to FOIA or *Pratt* and its progeny.

of cases suggesting that a court's analysis in this context should "focus . . . on how and under what circumstances the requested files were compiled, and whether the files sought relate to anything that can fairly be characterized as an enforcement proceeding." *Jefferson v. Dep't of Justice*, 284 F.3d 172, 176–77 (D.C. Cir. 2002) (citations and internal quotation marks omitted); *see also* DOJ Reply at 26.

Neither party has presented any authority directly analogous to the facts of this case. Instead, the Court turns to the general principles set forth by the D.C. Circuit. First, as a law enforcement agency, DOJ's assertion that these documents were compiled for a law enforcement purpose warrants deference. *See Pratt*, 673 F.2d at 418. Where the purported law enforcement purpose is an investigation, the agency must "establish "(1) 'a rational nexus between the investigation and one of the agency's law enforcement duties;' and (2) 'a connection between an individual or incident and a possible security risk or violation of federal law.'" *Ctr. for Nat'l Sec. Studies*, 331 F.3d at 926. Here, there is no doubt that DOJ has a duty to enforce the FCPA and Siemens committed an actual violation of federal law. The more difficult question is whether documents compiled after the entry of a guilty plea constitute a part of the investigation. Neither party has presented authority that specifically addresses this issue. The Court finds that the post-plea compilation in this case is part of an ongoing investigation, because DOJ had an ongoing responsibility to enforce the terms of the plea agreement and could bring additional enforcement action if Siemens failed to comply.

Even if the records were not compiled as part of an investigation, the Court would still find that they were compiled for a law enforcement purpose. As the Court explained above, Congress amended Exemption 7 to broaden the reach of the threshold requirement from "*investigatory* records compiled for law enforcement purposes," 5 U.S.C. § 552(b)(7) (1982)

(emphasis added), to simply "records or information compiled for law enforcement purposes,"
Anti-Drug Abuse Act of 1986, § 1802(a), Pub. L. No. 99-570, 100 Stat. 3207, 3207 (1986).  In
light of that change, the D.C. Circuit has applied Exemption 7 to "guidelines, techniques, and
procedures for law enforcement investigations and prosecutions outside of the context of a
specific investigation."  *Tax Analysts*, 294 F.3d at 78.  Here, compilation of the records at issue
was necessary to DOJ and the SEC's ongoing enforcement against Siemens, which did not
conclude until after the end of the monitorship.  *See generally* Monitorship Notice.[28]

For these reasons, and the deference owed to DOJ in this context, *see Pratt*, 673 F.2d at
418, the Court finds that the records compiled during the monitorship were compiled for a law
enforcement purpose.  Thus, the Court concludes that DOJ may rely on Exemption 7 in order to
withhold information.

## 2.  Exemption 7(C)

Under Exemption 7(C), a court first determines if there is a privacy interest in the
information to be disclosed.  *See ACLU v. U.S. Dep't of Justice*, 655 F.3d 1, 6–7 (D.C. Cir.
2011).  If the court finds a privacy interest, the next step is to balance the individual's privacy
interest against the public interest, considering only the public interest "that focuses on 'the
citizens' right to be informed about what their government is up to.'"  *Davis v. U.S. Dep't of
Justice*, 968 F.2d 1276, 1282 (D.C. Cir. 1992) (quoting *Reporters Comm.*, 489 U.S. at 773).  It is
the FOIA requester's obligation to articulate a public interest sufficient to outweigh the

---

[28] In a different context, the timing of a conviction is not dispositive of whether records
were compiled for a law enforcement purpose.  Specifically, several courts have made clear that
records created in connection with the Bureau of Prisons' responsibility to protect inmates, staff,
and the community are compiled for a law enforcement purpose, regardless of whether the
records are tied to any pending prosecution.  *See, e.g.*, *Pinson v. Dep't of Justice*, No. 12-1872,
2017 WL 663523, at *18 (D.D.C. Feb. 17, 2017); *Mingo v. U.S. Dep't of Justice*, 793 F. Supp.
2d 447, 453 (D.D.C. 2011); *Holt v. U.S. Dep't of Justice*, 734 F. Supp. 2d 28, 41 (D.D.C. 2010).

individuals' privacy interest, and the public interest must be significant.  *See Nat'l Archives &*

*Records Admin. v. Favish*, 541 U.S. 157, 172 (2004).

Courts have "long recognized" that a "mention of an individual's name in a law

enforcement file will engender comment and speculation and carries a stigmatizing connotation."

*Roth v. U.S. Dep't of Justice*, 642 F.3d 1161, 1174 (D.C. Cir. 2011) (quoting *Schrecker v. U.S.*

*Dep't of Justice*, 349 F.3d 657, 666 (D.C. Cir. 2003)).  For those reasons, substantial privacy

interests are implicated under exemption 7(C) for targets of law enforcement investigations,

potential defendants, witnesses, informants, and investigators.  *See SafeCard Servs. v. SEC*, 926

F.2d 1197, 1205 (D.C. Cir. 1991).  In fact, the D.C. Circuit has adopted "a categorical rule

permitting an agency to withhold information identifying private citizens mentioned in law

enforcement records, unless disclosure is 'necessary in order to confirm or refute compelling

evidence that the agency is engaged in illegal activity.'"  *Schrecker*, 349 F.3d at 661 (quoting

*SafeCard Servs.*, 926 F.2d at 1206).

Here, DOJ has withheld "private personal information" in a range of different documents.

*See* Moberly Decl. ¶¶ 30, 34.  According to DOJ, the withheld materials include information

pertaining to both law enforcement personnel and Siemens employees.  *See* DOJ Reply at 28.

DOJ explains that the withheld material includes "personal identifying information" pertaining to

(1) government employees found in emails involving DOJ and SEC attorneys, (2) private

individuals and government employees found in correspondence between the Siemens Board and

government attorneys, (3) individuals who developed Siemens' compliance programs and

training materials, and (4) various individuals identified in draft court filings.  *See* DOJ Mem. at

35.  In each instance, DOJ has withheld identical material under both Exemption 6 and

Exemption 7(C).  *See* Moberly Decl. ¶¶ 30, 34; *see generally* Am. *Vaughn* Index.

In identifying the private interests at stake, DOJ's declarant states generally that "[p]ublic identification of the DOJ and SEC personnel involved in the Siemens monitorship could subject them to harassment both in the conduct of their official duties and their private lives."  Moberly Decl. ¶ 32.  Ms. Moberly also states that "individuals—whether targets, suspects, or witnesses— have a strong interest in not being unfairly associated publicly with alleged criminal activity," and that "[t]he mention of a private individual's name in a law enforcement file engenders comment and speculation and could produce an unfair stigma which could expose the individual to harassment or criticism."  Moberly Decl. ¶ 32.  Each entry of the Amended *Vaughn* Index that invokes Exemption 6 and 7(C) includes identical language that states:

> This document contains personal information concerning private individuals and/or government employees acting in their official capacity whose release could reasonably be expected to "constitute an unwarranted invasion of personal privacy."  Disclosure could subject him/her to harassment both in the conduct of their official duties and private life.  The document also contains personal information concerning private individuals and/or government employees acting in their official capacity whose release would constitute a clearly unwarranted invasion of their personal privacy.  The mention of a private individual's name in a law enforcement file engenders comment and speculation and could produce an unfair stigma which could expose the individual to harassment or criticism.

DOJ_0005217, Am. *Vaughn* Index at 1.

As 100Reporters notes, the evidence presented in support of this assertion is relatively sparse, and DOJ does little to differentiate the privacy interests of different individuals, or even different groups, such as Siemens employees and government personnel.  *See* 100Reporters Mem. at 42.  DOJ responds that it has "adequately articulated the separate interest of government personnel and Siemens employees in avoiding unwarranted invasions of their personal privacy." DOJ Reply at 28 n.12 (citing Moberly Decl. ¶¶ 32, 35).  In fact, the relevant declaration merely states that identification of government personnel "could subject them to harassment both in the conduct of their official duties and their private lives," while identifying private individuals

"engenders comment and speculation and could produce an unfair stigma which would expose the individual to harassment or criticism." Moberly Decl. ¶ 32. These interests are substantially similar, and DOJ has made little effort, in its Amended *Vaughn* Index or its declarations, to differentiate the privacy concerns at stake. DOJ's failure to justify this categorical approach is fatal to its withholdings.

The D.C. Circuit has explained that categorical withholdings may be permitted where "the FOIA litigation process threatens to reveal 'the very information the agency hopes to protect.'" *Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Justice*, 746 F.3d 1082, 1088 (D.C. Cir. 2014) (quoting *ACLU v. CIA*, 710 F.3d 422, 432 (D.C. Cir. 2013)). In *Prison Legal News v. Samuels*, the Bureau of Prisons ("BOP") took a categorical approach to Exemption 6 withholdings, but the D.C. Circuit determined that BOP provided insufficient explanation of the disparate privacy rights involved.[29] 787 F.3d 1142 (D.C. Cir. 2015).

In that case, the plaintiff sought records of settlements paid by BOP, and BOP discussed the privacy interests implicated by different types of claims together, even though "the privacy interest of tort claimants will be different when they are claiming injury from a slip and fall as compared to a sexual assault." *Id.* at 1150. The BOP also grouped together all involved individuals, "fail[ing] to distinguish between redacting the identity of the alleged victim and the alleged perpetrator." *Id.* at 1150. Although the D.C. Circuit explained that categorical withholdings might be appropriate for individuals sharing similar privacy interests, such as

---

[29] *Prison Legal News* involved Exemption 6, and the Court noted that it had no reason to reach Exemption 7(C) because the district court below had relied exclusively on Exemption 6. 787 F.3d at 1146 n.5. Nevertheless, *Prison Legal News* relied on Exemption 7(C) cases to reject the BOP's categorical approach. *Id.* at 1149 (quoting *Citizens for Responsibility & Ethics in Washington v. U.S. Dep't of Justice*, 746 F.3d 1082, 1088 (D.C. Cir. 2014)). Although Exemption 7(C) is more protective than Exemption 6, the balancing processes are similar and the Court finds that the logic of *Prison Legal News* applies in the context of Exemption 7.

"medical professionals who treat inmates" or "prisoners who testify in FTCA claims," the court

determined that BOP's less precise method was insufficient. *Id.* at 1150–51; *see also Am.*

*Immigration Lawyers Ass'n v. Exec. Office for Immigration Review*, 830 F.3d 667, 675 (D.C.

Cir. 2016) ("Given the variety in types of complaints and circumstances of individual

immigration judges, not every judge has the same privacy interests at stake and not every

complaint would equally enlighten the public . . . .").

DOJ has done even less to distinguish the privacy interests at stake here.  First, it may

well be true that the identities of low-level Siemens employees should be withheld.  To be sure,

the D.C. Circuit has adopted "a categorical rule permitting an agency to withhold information

identifying private citizens mentioned in law enforcement records, unless disclosure is

'necessary in order to confirm or refute compelling evidence that the agency is engaged in illegal

activity.'"  *Schrecker*, 349 F.3d at 661–62 (quoting *SafeCard Servs.*, 926 F.2d at 1206).

And 100Reporters has not asserted any evidence, much less compelling evidence, that the

agency is engaged in illegal activity.  But DOJ has not differentiated the interests of these

individuals from others (*e.g.*, innocent third-party employees versus employees who committed

illegal acts).  Nor has DOJ articulated any subgroups of Siemens employees, and how their

interests might differ.

Second, DOJ has not differentiated the interests of regular Siemens employees and Board

Members.  DOJ has withheld personal information found in correspondence between the

Siemens Board and government attorneys.  The Court notes that all members of both Siemens'

Managing Board and Supervisory Board are listed on Siemens' website.  *See* Siemens, *Siemens*

*Management*, https://www.siemens.com/global/en/home/company/about/management.html (last

visited Mar. 31, 2017).  DOJ has not differentiated the privacy interests of members of the

Siemens Board, who have different privacy interests based on their public, high-level positions.

Third, DOJ has not differentiated the privacy interests of government employees,

including DOJ and SEC attorneys.  This category of individuals appears to include a subcategory

of attorneys who have entered appearances on the public docket on behalf of the government.

Although public officials "do not surrender all rights to personal privacy when they accept a

public appointment," courts have recognized that they "may have a somewhat diminished

privacy interest." *Citizens for Responsibility & Ethics in Washington v. U.S. Dep't of Justice*,

746 F.3d 1082, 1092 (D.C. Cir. 2014) (quoting *Quinon v. FBI*, 86 F.3d 1222, 1230 (D.C. Cir.

1996).  An Exemption 7(C) analysis may also take into account "the rank of the public official

involved."  *Kimberlin v. Dep't of Justice*, 139 F.3d 944, 949 (D.C. Cir. 1998).  Courts have

acknowledged that the "reason for generally protecting names in law enforcement records is the

risk of harassment, embarrassment, and reputational damage," but explained that those risks are

not applicable in the context of *every* government employee.  *See Kleinert v. Bureau of Land

Mgmt.*, 132 F. Supp. 3d 79, 93 (D.D.C. 2015).  DOJ has not done enough to differentiate the

interests of the various government employees in the context of this case.  Nor has DOJ made

clear how the interests of employees, particularly those who have publicly appeared on the

record, differ from one another.

Finally, DOJ has stated that it "redacted certain personal identifying information from

documents transmitted by the Monitor to attorneys at the DOJ and SEC."  DOJ Mem. at 37.

In support of that statement, DOJ cites an entry in the Amended *Vaughn* Index that states that the

record was "sent to Dr. Theo Waigel, two Siemens employees, and a Gibson Dunn & Crutcher

attorney."  DOJ_0005313, Am. *Vaughn* Index at 132.  To the extent that DOJ is withholding the

identities of the Monitor's counsel, or any further category of "[o]ther private third-parties," *see* DOJ Mem. at 37, DOJ must do more to differentiate those privacy interests as well.[30]

DOJ's failure to establish the different privacy interests at stake makes it impossible for the Court to balance the private interests with the public's interest in knowing "what their government is up to." *Reporters Comm.*, 489 U.S. at 773. Therefore, the Court must deny summary judgment with regard to DOJ's withholdings. If DOJ and Defendant-Intervenors intend to continue to rely on Exemption 7(C), they will have another opportunity to present further affidavits justifying the withholdings. Although DOJ is not necessarily prohibited from relying on categorical arguments, it should, at the least, "make a more particularized showing for defined subgroups." *See Am. Immigration Lawyers Ass'n*, 830 F.3d at 676; *see also Prison Legal News*, 787 F.3d at 1151–52. At this time, 100Reporters' cross-motion for summary judgment will also be denied on this issue.

## D. Segregable Factual Material and *In Camera* Review

The final issue that the Court must address is segregability. FOIA requires that "[a]ny reasonably segregable portion of a record . . . be provided to any person requesting such record after deletion of the portions which are exempt." 5 U.S.C. § 552(b). Under FOIA, "non-exempt portions of a document must be disclosed unless they are inextricably intertwined with exempt portions." *Mead Data Cent., Inc. v. U.S. Dep't of the Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977). An agency is not, however, required to segregate non-exempt material if "the excision of exempt information would impose significant costs on the agency and produce an edited document with little informational value." *Neufeld v. IRS*, 646 F.2d 661, 666 (D.C. Cir. 1981),

---

[30] To the extent that DOJ is withholding the identities of the Monitor's counsel, the Court notes that the Monitor and his counsel identify themselves in this case and argue not that they are private citizens, but that they are akin to government consultants.

*overruled on other grounds by Church of Scientology of Cal. v. IRS*, 792 F.2d 153 (D.C. Cir.

1986) (en banc).  The agency is "entitled to a presumption that [it] complied with the obligation

to disclose reasonably segregable material," *Hodge v. FBI*, 703 F.3d 575, 582 (D.C. Cir. 2013)

(alteration in original), but that does not excuse the agency from carrying its evidentiary burden

to fully explain its decisions on segregability, *see Army Times Pub. Co. v. U.S. Dep't of the Air

Force*, 998 F.2d 1067, 1068 (D.C. Cir. 1993).

      Here, DOJ argues that it is impossible to further segregate and release purely factual

material from withheld documents without disclosing information that is protected by FOIA

exemptions.  *See* DOJ Mem. at 38–40.  DOJ relies on Ms. Moberly's declaration, which states

that she has "reviewed each page of the material deemed responsive . . . to determine whether

there was any non-exempt information that could be reasonably segregated and released."

Moberly Decl. ¶ 37.  Ms. Moberly states that "some factual information" is being withheld under

the deliberative process privilege because it is "inextricably intertwined with core deliberative

material" and, "[m]oreover, the factual material reflects the Monitor's efforts to distill material

facts from a much larger body of information, which was itself a deliberative act."  Moberly

Decl. ¶ 38.  Aside from that information and information that has already been released, Ms.

Moberly states that "there is no segregable non-exempt information."  Moberly Decl. ¶ 39.

      The adequacy of an agency's *Vaughn* index is a crucial factor when a district court

undertakes a segregability analysis.  *See, e.g.*, *Loving v. U.S. Dep't of Defense*, 550 F.3d 32, 41

(D.C. Cir. 2008) (stating that "the description of the document set forth in the *Vaughn* index and

the agency's declaration that it released all segregable material" are "'sufficient for [the

segregability] determination'" (quoting *Johnson v. Exec. Office for U.S. Attorneys*, 310 F.3d 771,

776 (D.C. Cir. 2002))); *Johnson*, 310 F.3d at 776 (upholding agency's segregation efforts based

on "comprehensive *Vaughn* index" and "the affidavits of [agency officials]").  In this case, the

Court has determined that the Amended *Vaughn* Index and the declarations presented by DOJ

and Defendant-Intervenors are sufficient to justify DOJ's decision to withhold certain categories

of information pursuant to Exemption 4.  *See supra* Part.IV.A.  Whether the documents that have

been withheld in total or have been redacted beyond comprehension contain *only* those

categories of properly withheld information is a much more difficult question.  Furthermore, the

Court has determined that the Amended *Vaughn* Index and the declarations presented by DOJ

and Defendant-Intervenors are not sufficient to justify withholdings pursuant to the deliberative

process privilege or pursuant to Exemptions 6 and 7(C).  *See supra* Parts IV.B.2.a, IV.C.2.

    100Reporters requests the Court to "conduct *in camera* review of the documents to

determine if . . . they contain commercial or financial information, and that disclosure would

impair future information gathering."  100Reporters Mem. at 28 n.17.  "In making a

determination as to segregability . . . , a district court judge 'may examine the contents of . . .

agency records *in camera*.'" *Armstrong v. Executive Office of the President*, 97 F.3d 575, 577

(D.C. Cir. 1996) (second alteration in original) (quoting 5 U.S.C. § 552(a)(4)(B)).  The D.C.

Circuit has held that district courts have "broad discretion" to decide whether *in camera* review

is necessary to determine whether the government has met its burden.  *See id.*

    In light of the expansive withholdings in this case and the Court's denial of summary

judgment with regard to the deliberative process privilege, the Court will exercise its discretion

to require the production of representative documents for review *in camera*.  *See Lam Lek Chong

v. U.S. Drug Enf't Admin.*, 929 F.2d 729, 735 (D.C. Cir. 1991) (noting that *in camera* review is

appropriate "when agency affidavits are insufficiently detailed to permit meaningful review of

exemption claims"); *see also Horowitz v. Peace Corps*, 428 F.3d 271, 282 (D.C. Cir. 2005)

(noting that "whether to conduct an in camera review of a document is within the trial court's 'broad discretion'" (quoting *Spirko v. U.S. Postal Serv.*, 147 F.3d 992, 996 (D.C. Cir. 1998))). Specifically, DOJ shall provide the Court with one work plan and one annual report prepared by the Monitor, including all attachments to those two documents.  DOJ shall present the documents in a manner that makes clear to the Court which portions of the documents were redacted.  For each document presented to the Court for *in camera* review, DOJ shall either indicate that the document was redacted in full or identify specific portions of the document that were redacted by marking those portions with semi-transparent gray highlighting.  DOJ shall also indicate which exemptions apply to all redacted material.  For these reasons, the Court denies summary judgment to DOJ on the question of segregability, without prejudice, pending the Court's *in camera* review of representative documents.

## V.  CONCLUSION

For the foregoing reasons, the Monitor's Motion for Summary Judgment (ECF No. 57) is **GRANTED IN PART AND DENIED IN PART**, Siemens' Motion for Summary Judgment (ECF No. 58) is **GRANTED IN PART AND DENIED IN PART**, DOJ's Motion for Summary Judgment (ECF No. 59) is **GRANTED IN PART AND DENIED IN PART**, and 100Reporters' Cross-Motion for Summary Judgment (ECF No. 62) is **DENIED**.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  March 31, 2017                                    RUDOLPH CONTRERAS
                                                          United States District Judge