# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____
                                                    )
**100REPORTERS LLC**,                               )
                                                    )
      Plaintiff,          )
                                                    )
v.                                                  )    Civil Action No. 14-1264 (RC)
                                                    )
**UNITED STATES DEPARTMENT**                        )
**OF JUSTICE**,                                     )
                                                    )
      Defendant,          )
                                                    )
**SIEMENS AKTINGESELLSCHAFT**,                      )
                                                    )
      Defendant-Intervenor,  )
                                                    )
**THEO WAIGEL**,                                    )
                                                    )
      Defendant-Intervenor.  )
_____)


**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THE UNITED
STATES DEPARTMENT OF JUSTICE'S RENEWED MOTION FOR SUMMARY
JUDGMENT**

## I.    INTRODUCTION

In this Freedom of Information Act ("FOIA") matter, the Court denied Plaintiff 100Reporters LLC's cross-motion for summary judgment entirely.  The Court granted summary judgment in favor of Defendant Department of Justice ("DOJ") and Defendant-Intervenor Siemens under FOIA Exemption 4, holding that the release of Siemens' commercial confidential information would cause substantial competitive harm to the company.  *See 100Reporters v. U.S. Dep't of Justice*, -- F. Supp. 3d. --, 2017 WL 1299709, at *18 (D.D.C. Mar. 31, 2017) (Contreras, J.).  The Court also granted summary judgment in DOJ's favor on its assertion of FOIA Exemption 5 to withhold information protected under the attorney work-product doctrine.  *Id*. at *36.

The Court denied summary judgment on the remaining issues, including DOJ's assertion of FOIA Exemption 5 to withhold information under deliberative process privilege, FOIA Exemptions 6 and 7(C) to withhold personal identifying information of third parties, and arguments that the agency satisfied its segregability obligations.  *See 100Reporters*, 2017 WL 1299709, at *36.  The Court, however, permitted DOJ to renew its summary judgment motion to provide additional specific facts in support of employing FOIA Exemptions 5, 6, and 7(C) to withhold the records at issue in whole or in part.  The Court has ordered and received unredacted documents for *in camera* review for purposes of determining whether DOJ has met its segregation duties.

In support of its current renewed summary judgment motion, DOJ is submitting two additional declarations by Charles E. Duross ("Duross Decl.") and Mark F. Mendelsohn ("Mendelsohn Decl."), each of whom served as the head of DOJ's Foreign Corrupt Practices Act Unit.  These two declarants oversaw DOJ's work in the Monitorship.  As the Duross and

Mendelsohn declarations show, the Monitorship documents that Plaintiff seeks were integral to

DOJ's deliberative process in evaluating Siemens's performance of its obligations under the Plea

Agreement and the Monitorship.

      In addition, Mendelsohn and Duross oversaw and assessed the Monitor's work, including

his annual work plans and annual reports, to ensure that the Monitor faithfully carried out his

Mandate, as specified in the Plea Agreement.  That continuous deliberative process resulted in

not only the final decision that Siemens had complied with its Plea Agreement, but also resulted

in several independent, subsidiary decisions throughout the four years of the Monitorship that led

to the final decision over the Monitorship. DOJ could not have made those decisions without the

information in the Monitorship documents.  Putting those documents in the public domain will

decrease the amount and accuracy of information that DOJ receives from future monitorships,

which will ultimately inhibit DOJ's ability to reduce corporate crime.  For these reasons and

those set forth below, DOJ respectfully requests that the Court grant its renewed summary

judgment motion and enter judgment in DOJ's favor on all remaining claims.

## II.    FACTUAL BACKGROUND

      For the sake of brevity, DOJ respectfully refers the Court to its March 31 Memorandum

Opinion for the procedural and factual background of this FOIA case. *See 100Reporters*, 2017

WL 1229709, at *1-6.  Furthermore, in support of this renewed motion for summary judgment,

DOJ incorporates by reference the previously filed declarations of: Suzanna Moberly (ECF No.

59-3) and the exhibits attached thereto (ECF No. 60-1); Tarek J. Helou (ECF No. 59-6); Joey

Lipton (ECF No. 59-7); Tracy Price (ECF No. 59-8); Joel Kirsch (ECF No. 58-2); and F. Joseph

Warin (ECF No. 57-2).  DOJ also incorporates the arguments set forth in its Corrected

Memorandum of Points and Authorities in Support of the United States Department of Justice's

Motion for Summary Judgment (ECF No. 61-1), Combined Reply in Support of its Motion for

Summary Judgment and Opposition to Plaintiff's Cross-Motion for Summary Judgment (ECF

No. 72), and the Amended *Vaughn* Index (ECF No. 59-4), all previously filed with the Court.

## III.   STANDARD OF REVIEW

DOJ incorporates by reference the relevant "Legal Standard" set forth in the Court's

March 31 Memorandum Opinion for resolving motions for summary judgment in FOIA cases.

*See 100Reporters*, 2017 WL 1299709, at *6-7.

## IV.   ARGUMENT

**A.    DOJ Properly Withheld Information Under the Deliberative Process Privilege of Exemption 5 Because Disclosure of the Information Would Reveal DOJ's Deliberations, Which Occurred Throughout the Monitorship and Included Subsidiary Decisions Made at Specific Points, Concerning the Evaluation of Siemens' Efforts to Comply With Its Plea Agreement and the Monitor's Performance of His Mandate**

DOJ is withholding the following categories of records and information under the

Deliberative Process Privilege of Exemption 5:

(i)     The Monitor's work plans and related records;
(ii)    The Monitor's yearly reports and related records
(iii)   The Monitor's presentations to DOJ and SEC;
(iv)    Emails and Correspondence between the Monitor, the Monitor's Counsel, DOJ attorneys, and SEC attorneys;
(v)     Emails involving DOJ attorneys and SEC attorneys;
(vi)    Correspondence between the Siemens Board and DOJ attorneys and SEC attorneys; and
(vii)   Siemens compliance polices and descriptions of various aspects of its compliance program Training materials for Siemens' employees about various aspects of its compliance program.

*See* Moberly Decl. Exh. G (chart listing the categories of documents and corresponding document

numbers on the *Amended Vaughn* Index) (ECF No. 59-5).[1]

---

[1]      *See also* DOJ's "Corrected Memorandum of Points and Authorities in Support of the United States Department of Justice's Motion for Summary Judgment" (ECF No. 61-1) at 15-16 (ECF No. 61-1), cited hereinafter as "Corrected MSJ."

In its previous summary judgment motion, DOJ argued that it properly withheld the above listed records under the deliberative process privilege because their disclosure would reveal deliberations through which DOJ and the SEC respectively determined whether Siemens satisfied the terms of the plea agreement and settlement with the SEC. *See* Corrected MSJ at 11-18. In its March 31 Memorandum Opinion, the Court rejected this argument as being overbroad. *100Reporters*, 2017 WL 1229709, *24. The Court reasoned that accepting this argument would "create a four-year umbrella effectively shielding all agency action from review without accounting for any subsidiary agency decisions." *Id*. The Court added that DOJ had "failed to point to subsidiary decisions that fall underneath the nebulous umbrella process it has purported to identify." *Id*. at *25.

The Court stated that it would permit DOJ "to present further affidavits if it intended to continue to rely on the deliberative process privilege." *Id*. at *25. The Court instructed that, in those "further affidavits," "DOJ must show, at the least: (1) the nature of the specific deliberative process involved, including whether that process resulted in a decision independent of, although related to, the ultimate compliance decision; (2) the function and significance of the document in that process; and (3) the nature of the decision making authority vested in the document's author and recipient." *Id.* at *26 (citations and internal quotation marks omitted). As explained below, DOJ has now satisfied each of these three factors through the Duross and Mendelsohn Declarations.[2]

---

[2] Mendelsohn and Duross were both Deputy Chiefs in the Fraud Section of the Criminal Division of DOJ. Mendelsohn headed the investigation that led to the Siemens' guilty plea and negotiated the plea agreement, which included to the Monitorship. Mendelsohn Decl. ¶ 5. Mendelsohn supervised the first year of the Monitorship. *Id.* at ¶¶ 8-25. Duross inherited the Siemens Monitorship from Mendelsohn and supervised the remaining Years Two, Three and Four. *See generally* Duross Decl.

1.      <u>The Nature of the Specific Deliberative Processes Involved</u>

There were two specific deliberative processes involved during the Monitorship.  The first involved evaluations of Siemens' efforts to comply with its obligations under the plea agreement, and the second concerned assessments of the Monitor's performance of his Mandate. Mendelsohn Decl. ¶¶ 9-10; Duross Decl. ¶¶ 7, 9.  A chronology of key events and documents concerning these deliberative processes is described in Government Exhibit B.

(a)      <u>DOJ's Evaluations of Siemens' Efforts to Comply with Its Plea Agreement</u>

DOJ's evaluations of Siemens' efforts to comply with its obligations under the plea agreement were ongoing throughout the entire four-year period of the Monitorship.  These evaluations were also punctuated by subsidiary decisions made at specific points during each of the four years of the Monitorship.  Those subsidiary decisions occurred throughout the life of the monitorship as DOJ continually evaluated the Monitor's yearly work plans, annual reports, Powerpoint presentations, and other related records.  Duross Decl. ¶ 7; Mendelsohn Decl. ¶ 9; *see also* Declaration of Joey Lipton ("Lipton Decl.") ¶ 7 (ECF No. 59-7).

In addition to being continuous, the evaluations of Siemens' compliance efforts were also cumulative.  DOJ, assisted by the Monitor, evaluated Siemens' progress toward the end of each year of the Monitorship.  Mendelsohn Decl. ¶¶ 24-25; Duross Decl. ¶¶ 23-25, 32-33, 40-43; Lipton Decl. ¶ 6.  Regarding the second, third, and fourth years of the Monitorship, DOJ considered not only the annual reports and related records generated during each of those years, but also other information and records generated during those four years, which are herein. Duross Decl. ¶ 11.  DOJ did the same when, near the end of the fourth year of the Monitorship, it was considering whether to notify the Court in charge of the criminal case that Siemens had

satisfied its plea agreement obligations over the entire term of the Monitorship and that the

Monitorship may end.  Duross Decl. ¶¶ 11, 43.

   In making these assessments about Siemens, DOJ considered a variety of criteria, such as

(a) whether the company was taking its obligations under the Monitorship seriously; (b) whether

the company was deploying appropriate resources to work with the Monitor; (c) whether the

company was enhancing its compliance program and internal controls in a manner tailored to

address past violations; and (d) whether the company's compliance program addressed all of the

components delineated in Attachment 1 to the Plea Agreement, including increasing visible and

explicit executive support for compliance, improving policies and procedures, enhancing

training, bolstering resources and oversight, implementing stronger internal controls,

strengthening third-party due diligence, and establishing robust processes for reporting issues

and properly investigating them.  Duross Decl. ¶ 8.  At the end of each year of the Monitorship,

DOJ specifically concluded that Siemens had made significant progress towards complying with

its plea agreement.  Mendelsohn Decl. ¶ 25; Duross Decl. ¶¶ 24, 33, 42.  These periodic and

annual evaluations culminated in DOJ concluding that, with respect to the entire 4-year term of

the Monitorship, Siemens had satisfied the terms of its plea agreement concerning the

Monitorship.  Duross Decl. ¶ 43; Lipton Decl. ¶ 9.

   Each of these periodic and annual subsidiary decisions was the product of a consultative

process between DOJ, the Monitor, and the SEC.  For instance, after receiving the Year One

Annual Report, Mendelsohn  and the SEC attorneys attended a presentation where the Monitor

explained the report.  Mendelsohn Decl. ¶ 24.  During that presentation, Mendelson explained:

> At that meeting there was a robust discussion concerning the status of the
> Monitorship and Siemens' progress. We asked probing questions to
> ensure that we understood the report and recommendations. The facts
> admitted by Siemens in its plea agreement show a historically flawed

> corporate culture at Siemens and the complicity of certain members of senior management who had facilitated the Company's flagrant violations of anti-corruption laws including the FCPA. Consequently, we had an ongoing dialogue with Siemens, its counsel, and the Monitor to address the issues set forth in the Statement of Offense, and concerns about the Company's corporate culture. We raised these issues so that we could determine whether the Monitor and Siemens complied with certain of their obligations as set forth in Attachments 1 and 2 of the plea agreement.

Mendelsohn Decl. ¶ 24. As a result of these discussion, the Monitor added tasks to the Year Two Work Plan. *Id.* Up to that point, Mendelsohn concluded that Siemens was making progress toward complying with its obligations under the plea agreement. *Id.* ¶ 25. Another subsidiary decision was Duross' conclusion concerning Siemens' compliance progress during the second year of the Monitorship:

> Throughout this process, DOJ evaluated[,] … together with the Monitor, whether Siemens' efforts to date to comply with the plea agreement were adequate. After deliberating, among other things, upon all the information and records I had received to date, including the Monitor's work plans for Years One and Two, the Monitor's Reports for Years One and Two, the associated materials, the Monitor's certification concerning the effectiveness of Siemens' compliance program, the presentation materials from the December 9, 2010, meeting, and my conversations with Mr. Lipton, Mr. Warin, and SEC staff, I concluded that Siemens was making significant progress towards complying with its plea agreement.

Duross Decl. ¶ 24. These decisions, together with the records and information on which they rested, served as a basis of DOJ's continuing evaluation of Siemens' performance over the course of the four-year Monitorship, and DOJ's ultimate conclusion, at the end of the fourth year, that Siemens had complied with its plea agreement and that the Monitorship may end. Duross Decl. ¶¶ 24-25, 33, 43; Mendelsohn Decl. ¶ 25.

        B.     <u>DOJ's Assessments of the Monitor's Performance of His Mandate</u>

The second type of deliberative process involved assessing the Monitor's performance in executing his Mandate. Like DOJ's evaluations of Siemens' plea agreement compliance, DOJ's

assessments of the Monitor's work were ongoing, cumulative, and punctuated by specific deliberative decisions.  Duross Decl. ¶¶ 9-11.  DOJ assessed the Monitor's performance separately each year.  *See, e.g.*, Mendelsohn Decl. ¶ 25 (Year One Work Plan and Annual Report); Duross Decl. ¶¶ 15-17 (Year Two Work Plan); *id.* ¶¶ 32-33 (Year Three Report).  The specific deliberative decisions included whether the Monitor was appropriately carrying out his Mandate, whether the document at issue (e.g., a particular work plan or annual report) was appropriate, and whether the Monitor's work should proceed to the next step.  *See, e.g.*, Mendelsohn Decl. ¶¶ 15-18 (describing DOJ decision-making at time of issuance of Monitor's Year One Work Plan).  These decisions arose out of meetings and discussions with the Monitor and his U.S. counsel, discussions with the SEC counterparts, review of presentations and other related documents from the Monitor, and robust internal DOJ discussions.  Duross Decl. ¶ 9.

When DOJ conducted an assessment of a particular work plan or annual report, DOJ considered not only the work plan, annual report, and related records for the current year, but also other information and records generated in prior years.  Duross Decl. ¶ 12; Mendelsohn Decl. ¶ 25.  For instance, when evaluating the Year Two Work Plan, DOJ also reviewed the prior Year One Work Plan and Annual Report to ensure that the Monitor was not plowing the same ground and that he was planning to focus on how Siemens would implement the recommendations the Monitor made in the previous year.  Duross Decl. ¶ 15.

The criteria that guided DOJ's assessment of the Monitor's work plans and annual reports included: (a) whether the work plans provided an appropriately detailed and focused roadmap for the Monitor's upcoming reviews; (b) whether the work plans and reports were appropriately tailored to address Siemens' past improper conduct and specific to the company's business and corruption risk profile; (c) whether the Monitor was exercising sufficient independence and

utilizing the available resources; and (d) whether, overall, the work plans and annual reports enabled the Monitor – and by extension DOJ and the SEC – to evaluate the effectiveness of Siemens' internal controls, record-keeping and financial reporting policies and procedures as they related to the company's compliance with anti-corruption laws.  Duross Decl. ¶ 10; Mendelsohn Decl. ¶ 10.

Each time the Monitor issued a work plan or annual report, DOJ evaluated the Monitor's performance of his Mandate and the records at issue.  Thus, for example, after receiving the Monitor's Year One Work Plan, Mendelsohn and his colleague, Ms. Lori Weinstein, met with the Monitorship team, in which the Monitor's counsel, Joseph Warin,  summarized the Work Plan.  Mendelsohn Decl. ¶ 15.  As a result of that meeting, Warin and DOJ exchanged correspondence addressing the issues that DOJ raised during the presentation.  *Id*. at ¶¶ 15-17.  Mendelsohn explained,

> After reviewing the Year One Work Plan, consulting with Mr. Warin, SEC staff, and others, taking part in the April 1, 2009 Monitorship meeting, and reviewing the other information and records available to me, I concluded that the Year One Work Plan was reasonable in fulfilling that part of the plea agreement, that the Monitor's Year Two (sic) Review should proceed, and that the Monitor was faithfully discharging his mandate. These conclusions were the product of a consultative process between DOJ, the Monitor team, and the SEC. The conclusions and the underlying records and information served as a basis for DOJ's continuing evaluation of the Monitor's performance as the Monitorship proceeded.

Mendelsohn Decl. ¶ 18.   Duross also attests that, after receiving the Monitor's Year Two Work Plan and discussing it with his colleagues:

> I wanted to know whether the Work Plan would: (a) enable the Monitor to effectively carry out his Mandate as described in the plea agreement and inform DOJ how the Monitor was planning to proceed; (b) adequately inform Siemens concerning what was expected of it during the coming year; and (c) enable DOJ to assess the adequacy of Siemens' efforts to date to comply with the pertinent terms of its plea agreement.  More specifically, I wanted to how the Monitor's Year Two Review would differ from the

> Year One Review, so as to avoid duplicating his earlier efforts.  Also, given that Siemens had agreed to implement all of the Monitor's recommendations from the preceding year, I wanted to know how it would be determined that the company was doing so.

Duross Dec. ¶ 15.  At a Monitor presentation on the Year Two Work Plan held on February 23, 2010, "there was a broad and free-flowing discussion about the about the work plan and how the monitorship was progressing," which discussion covered, among other things, Duross's areas of concerns.  *Id.* ¶ 16.  Following the February 23 meeting,. Duross received a follow-up letter from Warin, which addressed each of the issues raised at the Monitor's February 23, 2010 presentation, and enclosed additional materials.  *Id.* ¶ 17.  After taking part in the Monitor's February 23 presentation concerning the Year Two Work Plan, reviewing Warin's follow-up letter, and discussing the matter with Lipton,. Warin and SEC staff, "[Duross] was satisfied that Warin had adequately address the concerns we had raised at the February 23 meeting, that the Year Two Work Plan was appropriate to carry out the terms of the Plea Agreement, that the Monitor's Year Two Review should proceed, and that the Monitor was appropriately discharging his Mandate." Duross Decl. ¶ 18.

   DOJ adopted the same approach throughout the four-year of the Monitorship - namely, conducting the above-described evaluations, based upon all the information that DOJ had received to that point, including the Monitor's work plans, presentations, correspondence, annual reports, and related records. DOJ then made a subsidiary decision concerning the adequacy of the Monitor's performance and work product for that particular year.  *See, e.g.*, Duross Decl. ¶ 28 (regarding Year Three Work Plan, after considering all the information and records received to date, DOJ concluded that the Monitor was appropriately carrying out his Mandate, the work plan was appropriate, and that the review should proceed); *id.* ¶ 33 (at end of third year, after considering existing records and information, including Monitor's Year Three Report and

certification regarding effectiveness of Siemens' compliance program, DOJ concluded that

Siemens was making significant progress towards complying with its plea agreement). Each of

these decisions was the product of a continuous consultative process between DOJ, the Monitor,

and the SEC. The decisions, together with the records and information on which they rested,

served as a basis of DOJ's continuing evaluation of the Monitor's performance over the course

of the Monitorship.

        2.     <u>The Nature of the Decision Making Authority Vested in the Withheld<br>Documents' Authors and Recipients</u>

The authors and recipients of the withheld records were key players in the deliberative

processes described above. As this Court found concerning the Monitor and his U.S. counsel,

Joseph Warin:

> The undisputed evidence shows that the monitorship, imposed by agreements with
> relevant law enforcement agencies, gave the Monitor wide-ranging authority to evaluate
> Siemens' compliance with the terms of the settlement agreement and with international
> corruption laws. The terms of the monitorship also explicitly required the monitor to
> report to the government regarding Siemens' compliance. … [T]he plea and settlement
> agreement tasked the Monitor with the important job of exercising independent, fact-
> based judgment to evaluate Siemens' compliance and submit reports to the government
> detailing Siemens' compliance efforts.

2017 WL 1229709, at *21. As a result, the Court held that the Monitor was DOJ's consultant for

purposes of the consultant corollary Exemption 5 and that the Monitor's documents are intra-

agency documents within the meaning of that exemption. *Id.* at *22.

Messers. Theo Waigel's and Warin's written work product played an essential role in

DOJ's decision-making and deliberative processes.   Lipton explained the Monitor's value to

DOJ's deliberations:

> The Monitor provided crucial assistance to DOJ in this process. DOJ relied on the
> information gathered by the and the Monitor's input, such as his reporting, opinions and
> recommendations, when suggesting changes to subsequent work plans and reviewing
> annual reports. That information played an essential role in DOJ's thinking and directly

impacted DOJ's analysis about whether Siemens had satisfied its obligations under the terms of the plea agreement and whether the monitorship should be continued for an additional year.

Lipton Decl. ¶ 7.  The Monitor's annual certifications that Siemens' compliance program was effective were especially critical to DOJ's deliberative process.  As Duross explained concerning the Monitor's certification in his Year Two Report:

> This certification was particularly important to DOJ because the certification represented the considered opinion of an expert on the subject of corporate compliance, and, as in other cases, involving compliance monitorships, the Monitor was staking his considerable reputation on this judgment.  Had the Monitor declined to make this certification, DOJ would have had to consider appropriate remedial action, including raising the issue with Siemens, requesting assistance of the Court, and possibly seeking to breach the plea agreement and reinstate the prosecution.

Duross Decl. ¶ 25.

The main DOJ decision-makers at DOJ were supervisors Mark Mendelsohn and Charles Duross.  As a Deputy Chief in the Fraud Section of the Criminal Division, Mendelsohn supervised the investigation and prosecution of Siemens under the FCPA and negotiated the plea agreement and its resulting compliance monitorship.  Mendelsohn Decl. ¶ 5.  He was intimately involved in and actively managed all aspects of the Siemens case, including the Monitorship, and he supervised a trial attorney who was assigned to work on the case.  *Id.* ¶¶ 5-6.  Duross inherited the Siemens monitorship from Mendelsohn when he left DOJ.  Like Mendelsohn, Duross "was a very hands-on supervisor and took an active role in the Siemens monitorship[,]" and he supervised a trial attorney, Lipton, who was assigned to the case.  Duross Decl. ¶ 4.  As their respective declarations reflect, Mendelsohn and Duross engaged in continuous deliberations on all issues surrounding the Monitorship and made all the key decisions concerning the adequacy of Siemens' efforts to comply with the plea agreement and the Monitor's performance of his Mandate.

3.     The Function and Significance of the Withheld Information in DOJ's Deliberative
       Processes

Each of the records identified above either played a crucial function in DOJ's decision-

making process or directly reflect its operation.  DOJ had to analyze all of the Monitor's work

product -- his work plans, annual reports, presentations, correspondence, and all related materials

-- in order to carry out its continuous assessments of Siemens' compliance efforts.

As explained in the Declaration of Tarek Helou ("Helou Decl."), a supervisor in the Fraud

Section:

> In the course of that evaluation, the Justice Department relies heavily on the information
> it receives from the monitor. The Justice Department's deliberative process is driven
> largely by the information the monitor provides it.  The Justice Department relies on that
> information when providing suggested changes to subsequent work plans and reviewing
> annual reports.  That information can directly impact the Justice Department's decision
> whether to (a) determine that the company has breached its obligations under the
> resolution; (b) continue a monitorship; (c) extend a monitorship that would otherwise
> have ended; or (d) terminate a monitorship because the company has complied with its
> obligations.

Helou Dec. ¶ 11; *see also* Duross Decl. ¶ 24 (noting that had the Monitor reported to DOJ that

Siemens was not in compliance, "DOJ would have had to consider appropriate remedial action

including raising the issue with Siemens, requesting the assistance of the Court, and possibly

seeking to breach the plea agreement and reinstate the prosecution.").  "DOJ could not conduct

the kind of reviews that monitors conduct, because [DOJ's] limited resources are focused on

investigating and prosecuting violations of the FCPA."  Helou Decl. ¶ 16.  DOJ also used the

Monitor's work product, including his annual reports, work plans, Powerpoint presentations,

correspondence, and supporting records and attachments, to determine whether the Monitor was

appropriately carrying out his Mandate and whether the Monitor's work should proceed to the

next step.  Indeed, those records (e.g., annual work plans and annual reports) were the essential

means by which DOJ took that measure.   For instance, in explaining the importance of the

Monitor's report, Mendelsohn stated that the Report "reflected the Monitor's considered opinions, recommendations, and deliberations concerning what Siemens had already accomplished by that time, and what additional steps the Company needed to take to implement an effective compliance program. The report reflected consideration of official DOJ guidance concerning interpretation of the FCPA."  Mendelsohn Decl. ¶ 23.

Moreover, the various emails and correspondence listed above, including communications between the Monitor, the Monitor's counsel, DOJ attorneys, and SEC attorneys, and internal communications between DOJ attorneys and SEC attorneys, also played an important role in DOJ's deliberative processes.  The communications capture the thought processes of DOJ decision-makers, their SEC colleagues, and the Monitor who was effectively serving as a consultant to DOJ and SEC.  As an example, Duross explained that "[a]fter taking part in the February 23, 2010, meeting, reviewing Warin's March 24, 2010, letter and enclosures, and discussing the matter with Lipton, Warin, and SEC staff, I was satisfied that. Warin had adequately addressed the concerns we had raised at the February 23, 2010, meeting, that the Year Two Work Plan was appropriate to carry out the terms of the plea agreement, that the Monitor's Year Two Review should proceed, and that the Monitor was appropriately discharging his Mandate."  Duross Decl. ¶ 18.[3]

---

[3]     These are merely a few illustrations of the significance of the various documents (including the annual work plans, annual reports, attachments and exhibits, and correspondence) in DOJ's on-going assessment of Siemens' and the Monitor's performance of their duties under the Plea Agreement.  Mendelsohn and Duross provide additional examples of how these documents aided them in deliberating and, ultimately, concluding that Siemens has satisfied the terms of its Plea Agreement. *See, generally,* Mendelsohn Decl. ¶¶ 12-29; Duross Decl. ¶¶ 14-45.

Releasing these records would directly expose sensitive internal discussions that were intended to be kept confidential under FOIA Exemption 5.  As explained below, the disclosure would also harm the government's ability to obtain information and to enforce criminal laws.

**B.      DOJ Properly Withheld Records and Information Under Exemption 4  Because They Contain Siemens' Confidential Commercial Information The Disclosure Of Which Would Impair DOJ's and SEC's Law Enforcement Interests By Making It More Difficult to Obtain Reliable Information in the Future and Impair Their Statutory Purposes of Effectively Enforcing the FCPA, Deterring Corporate Misconduct, and Promoting Corporate Rehabilitation**

Similar to its position on Exemption 5, DOJ is also withholding the following categories of documents under Exemption 4:

(i)      The Monitor's work plans and related documents.  These documents contain information about Siemens' compliance program, accounting controls, and business operations;

(ii)     The Monitor's yearly reports and exhibits.  These documents contain information about Siemens' compliance program, accounting controls, and business operations;

(iii)    The Monitor's presentations to DOJ and SEC summarizing various aspects of his work, including work plans, yearly reports, and audit methodology.  These documents contain information about Siemens' compliance program, accounting controls, and business operations, much of which is in the Monitor's work plans and yearly reports;

(iv)    Emails and correspondence between the Monitor, the Monitor's counsel, DOJ attorneys, and the SEC attorneys.  These documents contain information about Siemens' compliance program, accounting controls, and business operations.

(v)     Emails involving DOJ attorneys and the SEC attorneys.  These documents contain information about Siemens' compliance program, accounting controls, and business operations;

(vi)    Correspondence between the Siemens Board and DOJ and SEC attorneys.  These documents contain information about Siemens' compliance program, accounting controls, and business operations;

(vii)   Siemens' compliance policies and descriptions of various aspects of its compliance program.  These documents contain information about Siemens' compliance program and accounting controls; and

(viii)  Training materials for Siemens' employees about various aspects of its compliance program.  These documents contain information about Siemens' compliance program, accounting controls, and business operations.

*See* Moberly Decl. Exh. G (ECF No. 59-5).[4]

Here, the Court granted summary judgment in DOJ's favor on Exemption 4, holding that the agency "has met the burden of showing that the release of information in each of the three categories of documents withheld pursuant to Exemption 4 is likely to cause competitive harm to Siemens." *100Reporters*, 2017 WL 1229709, at *18.[5]  The Court further noted that because it found that the release of Siemens' three categories of documents would likely cause competitive harm to Siemens, it did not need to address the other prong of the *National Parks* test, which considers whether disclosure would impair the government's ability to obtain reliable information in the future. *Id.* at *18 n.12.  The Court then clarified that, although it found that DOJ properly withheld certain information under FOIA Exemption 4, the "analysis does not apply to the entirety of the document themselves." *Id.* at n.13.  Due to the Court's clarification, DOJ is renewing its summary judgment on the other prong of the *National Parks* test of FOIA Exemption 4 because disclosure of information not covered by the "competitive harm" prong would adversely impact DOJ's ability to collect reliable and quality information in the future and would impair its statutory purposes of effectively enforcing the FCPA, deterring corporate misconduct, and promoting corporate rehabilitation.[6]

---

[4]     *See also* Corrected MSJ at 21-22 (ECF No. 61-1).

[5]     The three categories of documents are: (i) Annual Monitor Report and Associated Documents; (ii) Monitor Work Plans and Associated Documents; and (iii) Siemens Trainings, Compliance Policies, and Associated Documents.  *See 100Reporters*, 2017 WL 1299709, at *9-11 (describing the three categories of documents).  These categories of documents encompass all of the eight enumerated categories listed above.

[6]     As explained, any residual information not covered by FOIA Exemption 4's competitive harm or impairment prongs is protected from disclosure under the deliberative process privilege of Exemption 5.  *See supra* Section IV.A.

1.      **The Withheld Information is "Confidential" under Exemption 4.**

To qualify for protection under FOIA Exemption 4, the submitted information must be privileged or confidential.  *See, e.g., Pub. Citizen Health Research Grp. v. FDA*, 704 F.2d 1280, 1290 (D.C. Cir. 1983).  As this Court stated in its March 31 Memorandum Opinion, where, as here, the agency received material through an involuntary disclosure, that information is "confidential" for purposes of Exemption 4 if disclosure is likely (1) to impair the Government's ability to obtain necessary information in the future or (2) to cause substantial harm to the competitive position of the person from whom the information was obtained." *100Reporters*, 2017 WL 1229709, *12.

In applying the *National Parks I* two-prong test, courts in the D. C. Circuit have "reaffirmed the central role a rough balancing test must play between the private and public interests when considering a withholding under Exemption 4."  *Public Citizen Health Research Grp. v. NIH*, 209 F. Supp. 2d 37, 45 (D.D.C. 2002).  Indeed, "[w]hen conducting this balancing, the Court is permitted to look beyond the two factors set forth in *National Parks I* (serious competitive harm and impairment of government information gathering)."  *Id*. at 45.  These other considerations, however, "'can be introduced into the balance only as factors weighing against disclosure in a manner similar to the two interests identified in *National Parks I*.'" *Id.* (quoting *Wash. Post Co. v. HHS*, 865 F. 2d 320, 326 (D.C. Cir. 1989)). The Court is required to balance the public interest in disclosure against the private interest in withholding the information. *Id*.  Indeed, the D.C. Circuit has noted that "[E]xemption 4 contemplates a straightforward balance of the pros and cons of disclosure in any particular case." *Wash. Post*, 865 F. 2d at 328.  The balancing of the "pros and cons" in this case weighs in favor of non-disclosure.

### (a)     Disclosure Would Impair DOJ's and SEC's Law Enforcement Interests by Making It Difficult to Obtain Reliable Information in the Future

In *Critical Mass Energy Project v. Nuclear Regulatory Comm'n, 975 F.2d 871, 879 (D.C. Cir. 1992) (en banc)),* the D.C. Circuit held that, when disclosure is by compulsion, the focus of the impairment analysis should be on the risk that disclosure may adversely affect the "continued reliability" or "quality" of the information obtained by the government.  975 F.2d at 878. Subsequent decisions have linked confidentiality to the government's ability to receive accurate information.

In *Judicial Watch v. Export-Import Bank*, 108 F. Supp. 2d 19 (D.D.C. 2000) ("*Ex-Im Bank*"), the plaintiff's FOIA request sought information about insurance applications that companies submitted to the Export-Import Bank.  *Id.* at 30.  The court affirmed the Export-Import Bank's withholding of the information under Exemption 4 and noted that the Bank treated the commercial and financial information confidentially because its disclosure would encourage exporters to be less forthcoming to the government in the future due to concerns about their appearance and their financial interest.  *Id.*  The court observed that the government "has a compelling interest in ensuring that information it receives is of the highest quality and reliability, and disclosure of potentially sensitive commercial and financial information, even where submissions of information are mandatory, would jeopardize the [government's] ability to rely on any such information that is submitted."  *Id.*  The court further noted that a "lack of reliability would cripple the Bank's ability to make rational decisions regarding the viability of future export insurance transactions, thereby hindering the Bank's ability to fulfill its statutory purpose."  *Id.* at 30.

A recent FOIA decision in this district, *Center for Digital Democracy v. Federal Trade Comm'n*, 189 F. Supp.3d 151 (D.D.C. 2016), provides additional support that disclosure of the

19

confidential information at issue would impair the government's capability to collect quality and reliable information from companies under monitorships.  In that case, the FTC argued that it had properly invoked Exemption 4 to withhold certain information provided by "safe harbor programs" (operators of children's website and on-line services) as required by agency regulations because disclosure likely would impair the agency's ability to gather information.  *Id.* at 164-65.  Endorsing the FTC's argument, the court stated that "[t]he potential for impairment in gathering information is not limited to the question whether an agency has power to compel disclosure in the future."  *Id.* at 160 (citing *Wash. Post Co.  v. Dep't of Health and Human Svcs.*, 690 F.2d 252, 269 (D.C. Cir. 1982).  "Rather, it encompasses the possibility that suppliers of information, as a consequence of public disclosure, will narrowly construe the government's requests and thereby seriously impair the government's information-gathering ability."  *Id.* (citing *Washing. Post*, 690 F.2d at 269).  The court explained that the FTC's reporting rule had limited mandatory disclosures, and the agency largely left it up to the safe harbor programs to voluntarily disclose additional information.  *Id.* at 165.  The court added that the text of the FTC's rule "leaves plenty of room for interpretation," and that the prospect of public disclosure would provide a disincentive to safe harbor programs to provide information that they consider proprietary or confidential to the FTC.  *Id.* (concluding that "the agency's significant interest in encouraging safe harbor programs to supply analyses, and like information, in future filings thus weighs against public disclosure.").

The logic of the decisions in *Ex-Im Bank* and *Center for Digital Democracy* applies with compelling force in this case. Here, all of the parties deemed the information obtained from Siemens and the Monitor confidential.  Consequently, it was not shared outside of DOJ or the SEC.  Mendelsohn Decl. ¶ 19; Duross Decl. ¶ 45; Price Decl. ¶ 9; Warin Decl. ¶ 26 (documents

submitted by Monitor marked "Confidential Treatment Requested Under FOIA by Siemens AG"). Treating the information as confidential was designed to give Siemens and its employees the necessary incentive to be fully forthcoming with the Monitor, and thus, with DOJ. Public disclosure, by contrast, would significantly reduce the willingness of monitored companies and their employees from sharing sensitive information with their monitors. *See* Helou Decl. ¶¶ 13-14; Warin Decl. ¶¶ 28-30; Price Decl. ¶ 13; Mendelsohn Decl. ¶ 30; Duross Decl. ¶ 46.

DOJ possesses a strong interest in ensuring that the information obtained from compliance monitors, such as Dr. Waigel, is accurate and complete. Helou Decl. ¶ 13; Price Decl. ¶ 13 (the SEC has a similar interest). If the information that DOJ obtains from monitors is subject to disclosure under FOIA, then the quality of the information that the Monitor receives from the affected companies will be diminished because it will be incomplete and less accurate. Helou Decl. ¶ 13; Mendelsohn Decl. ¶ 19, Duross Decl. ¶ 46-47. If information relayed to monitor, and ultimately to the government, could be publicly disclosed, companies would be less likely to volunteer information to monitors, including reporting new misconduct or problems with their compliance programs. Helou Decl. ¶ 17; Duross Decl. ¶ 46. Consequently, information that companies did provide would likely be less complete and thus less helpful to the government's analysis of monitorships. In addition, this would hinder DOJ and the SEC from reducing corporate criminal recidivism because the chilling effect also would make it difficult for monitors to help companies implement more effective compliance programs. Helou Decl. ¶15; *see also* Price Decl. ¶ 13, Mendelsohn Decl. ¶ 19, Duross Decl. ¶ 47.

Moreover, the monitorship process would be harmed because companies and monitors would be reluctant to communicate candidly and openly for fear that information that they exchange will become public. Helou Decl. at ¶ 14. A monitor must be able to obtain truthful

and timely confidential information from companies under monitorships and their employees. *Id.* The assurance of confidentiality is particularly important when monitors deal with companies in jurisdictions where people view government entities – and especially law enforcement – with distrust. *Id.* The consequence of disclosing the confidential information at issue here would result in monitors and DOJ receiving less reliable information. *Id.* ¶ 14; *see, e.g., Critical Mass*, 975 F.2d at 878 ( "[W]hen dealing with a FOIA request for information the provider is required to supply, the governmental impact inquiry will focus on the possible effect of disclosure on its quality [.]").

Furthermore, the disclosure of documents here would deprive the agencies of the monitors' "fulsome assessments, analyses, and evaluations on which to base their determinations regarding corporate compliance." Warin Decl. ¶ 30. The lack of open communication by the affected companies would deprive DOJ of the ability to obtain quality and reliable information to make "rational decisions" regarding whether affected companies have met their obligations under the negotiated agreement. *See Ex-Im Bank*, 108 F. Supp. 2d at 30. In weighing the "pros and cons of disclosure" in this case tips the scale in favor of non-disclosure because DOJ has shown that it has a compelling interest in maintaining the confidentiality of the information obtained through monitorships which will help to ensure that the government continues to receive high-quality and reliable information from other corporate defendants in the future.

**(b)     Disclosure Would Impair DOJ's and SEC's Law Enforcement Interest in Effective Enforcement of the FCPA, Deterring Corporate Misconduct, and Promoting Rehabilitation**

Courts applying the *National Parks I* test have held that information is confidential if its disclosure would harm other governmental interests, besides an agency's need to gather quality and reliable information in the future. Among these protected agency interests is avoiding

disclosures that would interfere with the agency's accomplishment of its statutory purpose; in this case, that purpose is enforcing criminal laws, one of the government's most important responsibilities. *See Export-Import Bank*, 108 F. Supp. 2d at 30 (noting that disclosure would harm other governmental interest such as the government's ability to fulfill its statutory purpose).

Disclosure of the documents here would undermine the ability of DOJ and SEC to effectively enforce the FCPA, deter corporate misconduct, and help rehabilitate wrongdoers -- which are important governmental interests recognized by FOIA. As discussed above, when engaging in "rough balancing"[7] between the public and private interests implicated by a withholding under Exemption 4, courts are permitted to look beyond the two factors enunciated in *National Parks I* (impairment of government information gathering or substantial competitive harm to the submitter). *See Public Citizen Health Research Grp.*, 209 F. Supp. 2d at 45 (citing *Wash. Post*, 865 F.2d at 326). Courts have accordingly recognized a *third prong* of the *National Parks I* test that protects other governmental interests. *See, e.g., 9 to 5 Org. for Women Office Workers v. Bd. of Governors of the Fed. Reserve Sys.*, 721 F.2d 1, 9-10 (1st Cir. 1983) (noting that *National Parks I* does not limit the number of legitimate interests which are protected by the exemption and the "Government should not be precluded from invoking the protection of exemption 4 merely because the asserted interest is not precisely one of those two identified in *National Parks I*").[8] Citing *National Parks I*, the First Circuit observed that "[i]f it can be

---

[7]     The D.C. Circuit defines "rough balancing" to mean "that information will be withheld only when the affirmative interests in disclosure on the one side are outweighed by the factors identified in *National Parks I* (and its progeny) militating against disclosure on the other side." *Wash. Post*, 865 F. 2d at 327.

[8]  *See also Ruston v. U.S. Dep't of Justice*, 521 F. Supp. 2d 18, 20-21 (D.D.C. 2007) (implicitly relying upon the third prong by protecting psychological testing material the release of which would "severely compromise" test validity and "likely … damage the value of investments made by" test creators); *Allnet Commc'n Servs. v. FCC*, 800 F. Supp. 984, 990 (D.D.C. 1992) (protecting computer models under third prong because disclosure would make

demonstrated with particularity that a specific private or governmental interest will be harmed by the disclosure of commercial or financial information, the Government should not be precluded from invoking the protection of exemption 4 merely because the asserted interest is not precisely one of those two identified in *National Parks I*." *9 to 5 Org.*, 721 F.2d at 9-10.  The First Circuit further observed that "[t]he emphasis, however, should be placed on the potential harm that will result from disclosure, rather than simply promises of confidentiality, or whether the information has customarily been regarded as confidential." *Id.*  In that connection, the D.C. Circuit noted that its cases "make [] clear that other interests can be introduced into the balance only as factors weighing against disclosure, in a manner similar to the two interests identified in *National Parks I*." *Wash. Post*, 865 F. 2d at 327.  The government has the burden of identify the "particular interest" and how that interest would be harmed by public disclosure.  *See 9 to 5 Org.*, 721 F.2d at 10. Recognizing this principle, this Court has held that impairment of an agency's ability to carry out its statutory purpose is sufficient cause to justify a finding of confidentiality within the context of Exemption 4.  *See, e.g., Export-Import Bank*, 108 F. Supp. 2d at 30 (citing *Comstock Int'l (U.S.A.), Inc. v. Exp.-Imp. Bank*, 464 F. Supp. 804 (D.D.C. 1979); *M/A-Com Information Sys., Inc. v. HHS*, 656 F. Supp. 691 (D.D.C. 1986)).[9]

---

providers of proprietary input data reluctant to supply such data to submitter, and without data computer models would become ineffective, which, in turn, would reduce effectiveness of agency's program); *aff'd on other grounds*, No. 92-5351 (D.C. Cir. 1994); *Clark v. U.S. Dep't of Treasury*, No. 84-1873, 1986 WL 1234, at \*2-3 (E.D. Pa. Jan. 24, 1986) ("protecting identities of Flower Bond growers under third prong because government had legitimate interest in fulfilling "pre-FOIA contractual commitments of confidentiality" given to investors in order to ensure that pool of future investors willing to purchase government securities was not reduced; if that occurred, the pool of money from which government borrows would correspondingly be reduced, thereby harming national interest);

[9] In its March 31Memorandum Opinion, the Court stated that, because it had found that release of withheld Siemens' confidential commercial information is likely to cause the company competitive harm, there was no need for the Court to consider DOJ's argument concerning a third prong of the *National Parks* test.  *100Reporters,* 2017 WL 1299709, at \*18 n.12.

Additional important governmental interests at stake here.  First, disclosing the information sought by Plaintiff would harm the governmental interest in deterring and reducing corporate crime because it would disrupt the government's ability to ensure that companies like Siemens satisfy the obligations of their agreements with the government and develop effective compliance programs.  *See* Helou Decl. ¶ 8; Price Decl. ¶ 11-12; Warin Decl. ¶¶ 27-31.

DOJ and the SEC need companies to agree to retain monitors because, unlike companies facing the "corporate death penalty," companies facing FCPA actions cannot be compelled to retain monitors with broad powers like those exercised by Dr. Waigel.  Helou Decl. ¶ 16; Price Decl. ¶12.  Additionally, DOJ does not have the resources to engage in expansive reviews that monitors, like Dr. Waigel, can perform. Helou Decl. ¶ 16.  "Monitorships also allow the government the ability to tap into the resources of private law firms to advance government goals and objectives without expending significant government resources to do so, an advantage that would be drastically reduced or entirely lost if the categories of information at issue here are made publicly available."  Warin Decl. ¶ 31(c).  Monitorships are intended as "prophylactically positive mechanisms" to ensure that companies comply with federal anti-corruption laws, reducing the risk of recidivism of corporate crime, and protecting the integrity of the market, from which corporations, their shareholders, and, among other entities, the public all benefit. Warin Decl. ¶ 31(a).

Therefore, monitors help ensure that companies comply with federal anti-corruption laws, reducing the risk of corporate recidivism. Helou Decl. ¶8.  If Siemens' employees could not have communicated with the Monitor confidentially, then they would have been less forthcoming. Warin Decl. ¶ 27(c).  Disclosure of the information sought by Plaintiff could lead future monitors to obtain incomplete information from companies, depriving DOJ of the monitors'

complete assessments, analyses, and evaluations on which to base their determinations regarding corporate compliance.  Warin Decl. ¶ 30.  This would make it more difficult for monitors and DOJ to determine whether those companies had improved their compliance programs and satisfied the obligations of their agreements with DOJ.   Mendelsohn Decl. ¶ 32; Duross Decl. ¶ 47.

Second, disclosure would also undermine the interests of DOJ and the SEC in promoting rehabilitation of corporate wrongdoers.  The Siemens monitorship resulted in sweeping remedial action and organizational changes through which Siemens became recognized as a worldwide leader in responsible corporate practices.  Warin Decl. ¶ 31(b).  As a result of the monitorship, among other things, Siemens developed and instituted new policies, procedures, trainings, and systems to foster and ensure effective compliance. Warin Decl. ¶ 31(b); Price Decl. ¶ 12 (monitorships help the SEC to ensure corporate wrongdoers are being rehabilitated); Mendelsohn Decl. ¶ 32.  That likely would not have happened – or at the very least would have happened to a significantly lesser degree – if Siemens and the Monitor would have been concerned that information that the Monitor gave to DOJ would have been publicly disclosed.  Warin Decl. ¶ 29(c).  Indeed, disclosing the information that the Plaintiff requests could also make some companies less likely to voluntarily disclose misconduct to DOJ in spite of other benefits that companies receive from voluntarily self-disclosing criminal conduct. Helou Decl.  ¶ 17; *see also* Price Decl. ¶ 12.

At base, the declarations here amply demonstrate that disclosure of the confidential information obtained by DOJ and the SEC during the monitorship would impair the Government's law enforcement interests in obtaining high-quality and reliable information in the future, and seriously harm the government's compelling interest in effectively enforcing the

FCPA, deterring corporate misconduct, and rehabilitating companies that have committed crimes.[10]

## C.      DOJ Has Properly Withheld Certain Personal Identifying Information Under Exemptions 6 and 7(C)

The Court denied DOJ's Motion for Summary Judgment under FOIA Exemptions 6 and 7(C), which protect the privacy interests of Siemens's employees and government employees. The Court observed that these two "exemptions require agencies and the reviewing courts to balance the privacy interest that would be compromised by disclosure against the public interest in the release of the requested information." *100Reporters*, 2017 WL 1229709, at *29 (internal quotation marks and citations omitted).  The Court noted that this balancing test applies to both FOIA Exemptions 6 and 7(C); however, Exemption 7(C) is more protective of privacy than Exemption 6 and thus it establishes a lower bar for withholding information.  *Id.* (internal quotation marks and citation omitted).  The Court then considered the threshold issues whether FOIA Exemption 7(C) applies in this case and concluded that DOJ may rely on this exemption to

---

[10]      *Public Citizen I* held that disclosing information obtained involuntarily from pharmaceutical companies facing the "corporate death penalty" would not impair the government's ability to obtain similar information in the future.  *Critical Mass*, 975 F.2d at 105. But this case is different for two reasons.  First, unlike the companies in *Public Citizen I*, Siemens could have elected to challenge the government's evidence at a trial or negotiate a disposition without a monitor.  Warin Decl. ¶ 31(d) (company may elect to litigate matters and refuse to agree to monitor); Helou Decl. ¶ 17 (DOJ cannot force companies to retain monitors); Mendelsohn Decl. ¶ 29 (disclosure would dissuade some companies from accepting a compliance monitorship as part of their plea agreement, to cause them to resist settlement altogether).  Second, DOJ has articulated a specific "governmental interest" beyond the interest of obtaining reliable information in the future: deterring corporate crime.  By contrast, in *Public Citizen*, the agency did not identify any other governmental interests, and the court did not address any in its opinion.  *Cf. Wash. Post*, 865 F.2d at 436 (noting that other factors "can be introduced into the balance only as factors weighing against disclosure").  In this case, DOJ has demonstrated that disclosure would impair the compelling interests of DOJ and the SEC in effectively enforcing the FCPA, deterring corporate malfeasance, and rehabilitating corporate wrongdoers.  These interests outweigh any public interest in disclosure of Siemens' confidential commercial information.

withhold information.  *Id.* at *30-32.  In arriving at this conclusion, the Court found that "the post-plea compilation in this case is part of an ongoing investigation, because DOJ had an ongoing responsibility to enforce the terms of the plea agreement and could bring additional enforcement action if Siemens failed to comply." *Id.* at *31.  The Court ultimately concluded that "the records compiled during the monitorship were compiled for a law enforcement purpose." *Id.* at *32.

The Court recognized that "the D.C. Circuit has adopted a categorical rule permitting an agency to withhold information identifying private citizens mentioned in law enforcement records, unless disclosure is necessary in order to confirm or refute compelling evidence that the agency is engaged in illegal activity."  *100Reporters*, 2017 WL 1229709, at *32 (internal quotation marks and citations omitted).  In that vein, the Court pointed out that Plaintiff failed to articulate any evidence, let alone compelling, evidence that DOJ had engaged in any illegal activity.  *Id.*  However, the Court observed that "DOJ has not differentiated the interests of these individuals from others (e.g., innocent third-party employees versus employees who committed illegal acts).  Nor has DOJ articulated any subgroups of Siemens employees, and how their interests might differ."  *Id.* at *34.  As an illustration, the Court noted that "DOJ has not differentiated the interests of regular Siemens employees and Board Members." *Id.* The Court noted that "all members of both Siemens' Managing Board and Supervisory Board are listed on Siemens' website." *Id.*[11]

---

[11]     The Court held that DOJ and SEC employees "may have a somewhat diminished privacy interest.  *100Reporters*, 2017 WL 1299709, at *34.  Given that DOJ has submitted declarations from various government employees who were involved in the prosecution of Siemens and the Monitorship, DOJ is no longer withholding those employees' names or office contact information.

Although the Court observed that "regular Siemens employees" and Siemens' "Board Members" may have different privacy interests, it is of no moment under Exemption 7(C) that these two groups of employees *may* have two different privacy interests.  The core issue is whether the release of these third-party employees' information would shed light on whether the government had engaged in any illicit conduct.  *Mezerhane de Schnapp v. USCIS*, 67 F. Supp. 3d 95, 104 (D.D.C. 2014) (observing that "[d]isclosure of the names of [third-party] individuals would not get Mezerhane any answers about possible agency misconduct, and would infringe upon the privacy interests of third parties not before the Court."). *See also Martin v. Dep't of Justice*, 488 F.3d 446, 457 (D.C. Cir. 2007) ("[T]hird parties who may be mentioned in investigatory files ... have an obvious and substantial privacy interest in their information."); *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1206 (D.C. Cir. 1991) ("We now hold categorically that, unless access to the names and addresses of private individuals appearing in files within the ambit of Exemption 7(C) is necessary in order to confirm or refute compelling evidence that the agency is engaged in illegal activity, such information is exempt from disclosure."); *Davis*, 968 F. 2d at 1282 ("[E]ven if a particular privacy interest is minor, nondisclosure remains justified where ... the public interest in disclosure is virtually nonexistent.").

In this case, as the Court observed, Plaintiff has not presented any evidence showing that the government had engaged in illegal activity.  *See 100Reporters*, 2017 WL 1299709, at * 34. Therefore, there is no evidence establishing that the release of personal information of regular Siemens' employees or its Board Members would shed light on purportedly illicit DOJ conduct. On other hand, these Siemens' employees (regular employees and Board Members) have a substantial privacy interest in not being identified in the various documents created and compiled during the monitorship, the then on-going criminal proceedings.  *See* Moberly Decl. ¶¶ 32, 35.

The privacy interests of these third-party individuals substantially outweigh any actual or perceived public interest in this case. Accordingly, the Court should grant summary judgment in DOJ's favor on this issue.

**D.**      **DOJ Satisfied Its Duty to Segregate Responsive, Non-Exempt Information**

FOIA requires that DOJ release "any reasonably segregable portion of a record" after applying the FOIA exemptions.  5 U.S.C. § 552(b).  When a federal agency segregates material, it is entitled to a presumption that it complied with its obligation to disclose reasonably segregable material.  *See Pinson v. U.S. Dep't of Justice,* No. 12-1872 (RC), 2016 WL 29245, at *23 n.20 (D.D.C. Jan. 4, 2016) (Contreras, J.).  When non-exempt information is "inextricably intertwined" with exempt information, reasonable segregation is not possible.  *See Mead Data Cent., Inc. v. U.S. Dep't of the Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977).  An agency may withhold an entire document – even portions that would not be exempt on their own – if it demonstrates "that the nonexempt portions of the document are so inextricable from the exempt portions that [the] document is not reasonably segregable."  *Charles v. U.S Dep't of Defense*, 979 F. Supp. 2d 35, 42 (D.D.C. 2013).

Here, the Court denied DOJ's summary judgment motion on the segregability issue, observing that in determining whether the agency has satisfied its segregability obligations courts may examine the records *in camera*. *100Reporters*, 2017 WL 1229709, at *36.  Consequently, the Court ordered DOJ to submit for *in camera* review one work plan and one annual report prepared by the Monitor, including all attachments to those two documents.  *Id.*  DOJ complied with that order and delivered to Chambers an unredacted copy of the Year Three Work Plan and Year Three Annual Report, with their attending exhibits. *See* Gov. Exh. A (May 1, 2017 transmittal letter).

As an initial matter, DOJ submits that it has satisfied its obligation by segregating non-exempt information and producing it to Plaintiff.  Indeed, the Court has affirmed DOJ's invocation of FOIA Exemption 4 to withhold Siemens' confidential commercial information, the release of which would cause substantial competitive harm to Siemens.  *See 100Reporters*, 2017 WL 1299709, at *10.  As discussed above, any other information outside of that "competitive harm" umbrella is protected from disclosure under the impairment prong of the *National Parks* test and/or Exemption 5's deliberative process privilege.  *See supra* Sections IV.A, B; *see also Mezerhane de Schnapp*, 67 F. Supp. 3d at 104 (holding that "[a]lthough [the defendant agency] asserted that Exemption 5 protected much of the disputed information, most of those records are also withheld under Exemptions 6, 7(C), or 7(E)—claims the Court has now decided in the agency's favor.  For those documents that overlap, the Court need not consider the additional applicability of Exemption 5—if a document is properly withheld under any FOIA exemption, the inquiry is over.").

The record shows that DOJ reviewed each page of the contested documents to determine whether non-exempt information could be segregated.  Moberly Decl. ¶ 37.  As a result of this process, DOJ determined that certain factual information was so inextricably intertwined with the core deliberative material that its release would reveal the confidential deliberations of DOJ, the SEC and the Monitor. *Id.* at ¶38.  DOJ also determined that the factual information also reflected the Monitor's efforts to distill material facts from a much larger body of information, which was itself a deliberative act.  *Id.*  DOJ is entitled to a presumption that its decisions relating to segregations were accurate.  *Pinson,* 2016 WL 29245, at *23 n.20).  With respect to the records that were released in part to Plaintiff, all information not exempted from disclosure was segregated and the non-exempt portions were released.  Moberly Decl. ¶ 39.  Therefore, the

records withheld by DOJ, whether in whole or in part, have been carefully reviewed to identify reasonably segregable non-exempt information.  Moberly Decl. ¶ 36.  Furthermore, the release of factual information that is so inextricably intertwined with Siemens' confidential commercial information would cause substantial competitive harm to Siemens and/or impair DOJ's ability to gather quality and reliable information in the future. Accordingly, no further segregation of meaningful information in the withheld documents could be done without disclosing information that FOIA protects from disclosure.  *Id.* ¶ 39.

## CONCLUSION

For the foregoing reasons, the Court should grant Defendant Department of Justice's Renewed Motion for Summary Judgment and dismiss this case with prejudice.

September 26, 2017                                    Respectfully submitted,

                                                     JESSIE K. LIU
                                                     D.C. Bar # 472845
                                                     United States Attorney

                                                     DANIEL F. VAN HORN
                                                     D.C. BAR # 924092
                                                     Chief, Civil Division

                                     By:     _____//s_____
                                                     JOHN C. TRUONG
                                                     D.C. BAR #465901
                                                     Assistant United States Attorney
                                                     555 4th Street, N.W.
                                                     Washington, D.C. 20530
                                                     Tel: (202) 252-2524
                                                     E-mail: John.Truong@usdoj.gov

_____//s_____
PETER C. SPRUNG
D.C. BAR #500760
Special Assistant United States Attorney
1301 New York Avenue, N.W.
Washington, D.C. 20007
Tel: (202) 305-4042
Fax: (202) 514-6117
E-mail: Peter.Sprung@usdoj.gov

Counsel for Defendant U.S. Department of Justice