# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| 100REPORTERS LLC, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 14-1264 (RC) |
| | : | | |
| v. | : | Re Document Nos.: | 83, 86 |
| | : | | |
| UNITED STATES | : | | |
| DEPARTMENT OF JUSTICE, | : | | |
| | : | | |
| Defendant, | : | | |
| | : | | |
| and | : | | |
| | : | | |
| SIEMENS AKTIENGESELLSCHAFT, | : | | |
| THEO WAIGEL, | : | | |
| | : | | |
| Defendant-Intervenors. | : | | |

## MEMORANDUM OPINION

### GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; GRANTING IN PART AND DENYING IN PART PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT

## I. INTRODUCTION

This matter arises from a Foreign Corrupt Practices Act ("FCPA") investigation of

Siemens Aktiengesellschaft ("Siemens") conducted by the United States Department of Justice

("DOJ") and Securities and Exchange Commission ("SEC").  As a result of the investigation, in

2008 Siemens pleaded guilty to violating the FCPA's internal controls and books and records

provisions.  The plea agreement imposed a large fine on Siemens and three subsidiaries, and it

required Siemens to hire an independent compliance monitor to ensure that it implemented an

effective corporate governance system and complied with all applicable anti-corruption laws and

regulations.

Siemens hired Dr. Theodore Waigel (the "Monitor") to serve as its compliance monitor. Pursuant to his mandate under the plea agreement, the Monitor conducted a multi-year review of Siemens' compliance programs.  Over four years he provided more than 150 recommendations to Siemens for ways to improve its compliance programs, and he submitted several written reports to DOJ, including work plans at the start of each year, summary reports at the end of each year, and status reports and other correspondence on an ongoing basis.  Each year, he also certified that Siemens was in compliance with the plea agreement's terms.

In 2013, Plaintiff 100Reporters LLC, a non-profit dedicated to investigative journalism, submitted a Freedom of Information Act ("FOIA") request to the DOJ seeking records related to the monitorship.  DOJ denied the request and an administrative appeal.  In 2014, 100Reporters brought this FOIA action before the Court.

DOJ has produced redacted documents falling within the scope of 100Reporters' request, while withholding others in full under certain FOIA exemptions.  100Reporters objects to those withholdings.  In 2016, DOJ and 100Reporters filed cross-motions for summary judgment, and this Court granted DOJ's motion in part and denied it in part, and it denied 100Reporters' motion.  The Court's ruling ratified DOJ's withholdings under FOIA Exemption 4 and the attorney work product privilege incorporated into Exemption 5, and it directed DOJ to provide additional factual support for the other exemptions on which it relied, including a representative sample of documents for *in camera* review.  Now before the Court are DOJ's renewed motion for summary judgment and 100Reporters' opposition.  *See generally* Mem. P. & A. Supp. U.S. Dep't Justice's Renewed Mot. Summ. J. ("DOJ Mem."), ECF No. 83-2; Pl.'s Opp'n ("100Reporters Mem."), ECF No. 86.

For the reasons explained below, the Court finds that DOJ's Exemption 4 withholdings are overbroad, and that while DOJ has justified the withholding of certain information under Exemptions 5, 6, and 7(C), DOJ's withholdings under those Exemptions are also overbroad. The Court will therefore grant in part DOJ's motions for summary judgment with respect to the Exemptions, but will deny DOJ's motion for summary judgment with respect to its obligation to segregate and disclose non-exempt material. Finally, the Court will grant in part and deny in part 100Reporters' cross-motion for summary judgment.

## II. BACKGROUND[1]

In July 2013, 100Reporters submitted a FOIA request to DOJ for records related to *Aktiengesellschaft, et al.*, 1:08-cr-367-RJL (D.D.C.), the criminal prosecution of Siemens. *See* Def.'s Statement of Material Facts ("DOJ Statement") ¶ 1, ECF No. 83-1. In February 2014, 100Reporters narrowed its request to the following records:

- "Corporate Compliance Statements" that Siemens filed with DOJ under Siemens' plea agreement;

- Documents relating to the Monitor's evaluation of the effectiveness of Siemens' anti-corruption compliance program;

- Documents relating to steps taken by the Monitor to confirm compliance by Siemens;

- Information, records, and facilities requested by the Monitor that fell within his mandate;

- The Monitor's work plans, reviews, and reports; and

- Disclosures made by Siemens to the Monitor concerning corrupt payments and related books, records, and internal controls violations.

DOJ Statement 4; Decl. of Suzanna Moberly ("Moberly Decl.") ¶ 9, ECF No. 59-3.

---

[1] For a more detailed overview of the FCPA proceeding and the monitorship underlying this dispute, refer to this Court's prior Memorandum Opinion, ECF No. 78.

Months later, in July 2014, 100Reporters brought this suit seeking to compel the production of documents that are responsive to its request. *See generally* Compl., ECF No. 1. DOJ's Answer raised one affirmative defense—that the requested documents were exempt from disclosure under FOIA—and it relied on FOIA Exemption 4, Exemption 5, Exemption 6, Exemption 7(A), Exemption 7(C), and Exemption 7(D) in support of that defense. *See* DOJ Answer at 6, ECF No. 11.[2]

In 2015, during the pendency of the litigation, DOJ produced two sets of responsive materials to 100Reporters totaling two videos and approximately 500 pages of documents, many of which were redacted. *See* Moberly Decl. ¶ 19; *see also* Status Report & Proposed Briefing Schedule at 2, ECF No. 49 ("Federal Defendant provided Plaintiff with some of the documents previously withheld entirely, largely redacted on December 4, 2015.").  DOJ continued to withhold in full six video presentations and 4,293 pages of documents. *See* Moberly Decl. ¶ 19. These materials are encompassed in: (1) four annual Reports prepared by the Monitor setting forth the Monitor's assessment of Siemens' compliance program and his recommendations for improvement of the same, and presentations and correspondence submitted about or in conjunction with the Monitor's reports and reviews; (2) four annual Work Plans prepared by the Monitor detailing the manner in which he intended to perform his reviews (some of which were attached as exhibits to the Monitor's annual reports), and associated correspondence, documents, and presentations; (3) Siemens training materials, internal presentations, and compliance policies; and (4) additional correspondence between the Monitor, DOJ, and SEC.  *See* DOJ Statement ¶ 27; Decl. of Joel Kirsch ("Kirsch Decl.") ¶¶ 16, 22, 25, 27, ECF No. 58-2; Declaration of F. Joseph Warin ("Warin Decl.") ¶ 25(a)-(e), ECF No 57-2.

---

[2] At this stage in the litigation, DOJ relies only on Exemptions 4, 5, 6, and 7(C).

In March and April 2016, the parties filed cross-motions for summary judgment regarding relevant information that DOJ did not disclose.  In their motions, the parties argued over whether DOJ was obligated to disclose four categories of information: (1) documents withheld pursuant to Exemption 4 as confidential commercial information; (2) documents withheld pursuant to Exemption 5's attorney work product privilege; (3) documents withheld pursuant to Exemption 5's deliberative process privilege; and (4) documents redacted pursuant to Exemptions 6 and 7(C) as records implicating the privacy interests of government employees, monitorship team members, Siemens employees, and third-party witnesses.  *See 100Reporters LLC v. DOJ*, 248 F. Supp. 3d 115, 133 (D.D.C. 2017).  On March 31, 2017, this Court granted in part and denied in part DOJ's motion for summary judgment and denied 100Reporters' cross-motion.  *See id.* at 167.

The Court granted summary judgment in favor of DOJ with regard to information withheld under Exemption 4 and information withheld under Exemption 5's attorney work product privilege.  *Id*. at 145, 158.  It held, however, that DOJ had failed to justify its withholdings under Exemption 5's deliberative process privilege, Exemption 6, and Exemption 7(C), and it denied DOJ's motion with respect to those Exemptions.  *Id*. at 154, 165.  It also held that DOJ's Amended *Vaughn* index[3] and declarations were inadequate in certain respects and did not permit the Court to assess whether documents were properly withheld under the Exemption 5 deliberative process privilege, nor did they permit the Court to assess whether DOJ had disclosed all reasonably segregable, nonexempt material.  *Id.* at 154, 166–67.  In its discretion, the Court

---

[3] *See* Moberly Decl., Ex. F. ("Am. *Vaughn* Index"), ECF No. 59-4.  As the Court explained in its prior Opinion, a "*Vaughn* index"—named after the case *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973)—contains the agency's justification for invoking a particular FOIA exemption.  *See 100Reporters*, 248 F. Supp. 3d at 132.

directed DOJ to provide supplemental submissions in support of its Exemption 5, deliberative

process withholdings showing "(1) the nature of the specific deliberative process involved, (2)

the function and significance of the document in that process, and (3) the nature of the decision-

making authority vested in the document's author and recipient." *Id.* at 154 (quoting *Nat'l Sec.*

*Counselors v. CIA*, 960 F. Supp. 2d 101, 189 (D.D.C. 2013)).  It also directed DOJ to provide

"one work plan and one annual report prepared by the Monitor, including all attachments to

those two documents" for *in camera* review.  *Id*. at 166.

DOJ has presented two new declarations and an "*Amended* Chronology of Events

Supporting the Deliberative Process Privilege" ("Am. Chronology"), and it provided the Court

with the Monitor's Year Three Work Plan, Year Three Report, and accompanying exhibits, all of

which have been reviewed by the Court *in camera*.  *See* Decl. of Mark F. Mendelsohn

("Mendelsohn Decl."), ECF No. 83-3; Decl. of Charles E. Duross ("Duross Decl."), ECF No. 83-

4; Am. Chronology, ECF No. 91-1; DOJ Correspondence Regarding *Ex Parte In Camera Filing*,

ECF No. 83-5.  Now before the Court are the parties' renewed cross-motions for summary

judgment.[4]

### III.  LEGAL STANDARD

FOIA "sets forth a policy of broad disclosure of Government documents in order 'to

ensure an informed citizenry, vital to the functioning of a democratic society.'"  *FBI v.*

*Abramson*, 456 U.S. 615, 621 (1982) (quoting *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S.

214, 242 (1978)).  "[D]isclosure, not secrecy, is the dominant objective of [FOIA]."  *U.S. Dep't*

---

[4] Although 100Reporters styled its response as a memorandum in opposition to DOJ's
motion for summary judgment, in that filing 100Reporters asks the Court to "grant summary
judgment" in its favor.  100Reporters Mem. at 26–27.  The Court therefore treats 100Reporters
memorandum in opposition as a cross-motion for summary judgment.

*of Air Force v. Rose*, 425 U.S. 352, 361 (1976).  FOIA mandates release of properly requested federal agency records, unless the materials fall squarely within one of nine statutory exemptions.  *Milner v. U.S. Dep't of Navy*, 562 U.S. 562, 565 (2011); *Students Against Genocide v. U.S. Dep't of State*, 257 F.3d 828, 833 (D.C. Cir. 2001) (citing 5 U.S.C. § 552(a)(3)(A), (b)).

"FOIA cases typically and appropriately are decided on motions for summary judgment." *Defs. of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 87 (D.D.C. 2009) (citing *Bigwood v. U.S. Agency for Int'l Dev.*, 484 F. Supp. 2d 68, 73 (D.D.C. 2007)).  The agency is entitled to summary judgment if no material facts are genuinely in dispute and the agency demonstrates "that its search for responsive records was adequate, that any exemptions claimed actually apply, and that any reasonably segregable non-exempt parts of records have been disclosed after redaction of exempt information." *Competitive Enter. Instit. v. EPA*, 232 F. Supp. 3d 172, 181 (D.D.C. 2017).  "This burden does not shift even when the requester files a cross-motion for summary judgment because 'the Government ultimately has the onus of proving that the documents are exempt from disclosure,' while the 'burden upon the requester is merely to establish the absence of material factual issues before a summary disposition of the case could permissibly occur.'" *Hardy v. ATF*, 243 F. Supp. 3d 155, 162 (D.D.C. 2017) (brackets omitted) (quoting *Pub. Citizen Health Research Grp. v. FDA*, 185 F.3d 898, 904–05 (D.C. Cir. 1999)).

To carry its burden, the agency must provide "a relatively detailed justification, specifically identifying the reasons why a particular exemption is relevant and correlating those claims with the particular part of a withheld document to which they apply." *Elec. Privacy Info. Ctr. v. DEA*, 192 F. Supp. 3d 92, 103 (D.D.C. 2016) (quoting *Mead Data Cent., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 251 (D.C. Cir. 1977)).  In conducting its review, a court may also rely on its own *in camera* examination of disputed documents to determine whether they

were properly withheld under the claimed statutory exemptions. *See* 5 U.S.C. § 552(a); *see also, e.g.*, *Citizens for Responsibility & Ethics in Washington v. Nat'l Archives & Records Admin.*, 715 F. Supp. 2d 134, 140–42 (D.D.C. 2010) (relying on the Court's *in camera* review to resolve whether documents had been properly withheld).  This Court reviews the agency's explanations *de novo*, and will endorse an agency's decision to withhold information if the justification for invoking a FOIA exemption "appears 'logical' or plausible.'" *Pinson v. DOJ*, 245 F. Supp. 3d 225, 239 (D.D.C. 2017) (quoting *Wolf v. CIA*, 473 F.3d 370, 374–75 (D.C. Cir. 2007)). Nonetheless, "exemptions from disclosure must be narrowly construed . . . and conclusory and generalized allegations of exemptions are unacceptable." *Morley v. CIA*, 508 F.3d 1108, 1114–15 (D.C. Cir. 2007) (citation and internal quotation marks omitted).

## IV. ANALYSIS

DOJ continues to withhold certain documents—some in part and some entirely—pursuant to FOIA Exemptions 4, 5, 6, and 7(C).  100Reporters argues that (1) DOJ has failed to show that it properly withheld information under Exemptions 5, 6, and 7(C); and (2) the documents at issue contain segregable non-exempt information that should be disclosed.  For reasons explained below, the Court holds that DOJ withheld information under Exemption 4 that is not within the scope of that Exemption.  The Court also holds that DOJ has justified the withholding of certain information pursuant to the deliberative process privilege contained in Exemption 5, and certain personal information pursuant to Exemptions 6 and 7(C), but that it similarly applied those Exemptions in an overbroad manner.  Accordingly, the Court holds that DOJ failed to fulfill its obligation to segregate and disclose non-exempt information.

## A.  Exemption 4

The first issue before the Court is whether DOJ's Exemption 4 withholdings are appropriately tailored.  Having completed its *in camera* review, the Court holds that certain withholdings are overbroad because they cover material that is not commercial in nature. Exemption 4 states that "trade secrets and commercial or financial information obtained from a person" that are "privileged or confidential" may be withheld from disclosure.  5 U.S.C. § 552(b)(4).  An agency may rely on Exemption 4 if it can establish that withheld materials are "(1) commercial or financial, (2) obtained from a person, and (3) privileged or confidential." *Pub. Citizen Health Research Grp. v. FDA*, 704 F.2d 1280, 1290 (D.C. Cir. 1983).

DOJ states that it has withheld information under Exemption 4 in the following categories of documents:

- The Monitor's work plans and related documents;

- The Monitor's annual reports and exhibits;

- The Monitor's presentations to DOJ and SEC summarizing various aspects of his work;

- Emails and correspondence between the Monitor, Mr. Warin, DOJ attorneys, and SEC attorneys concerning various aspects of the monitorship;

- Correspondence between the Siemens Board, DOJ and SEC attorneys concerning various aspects of the monitorship; and

- Siemens compliance policies, descriptions of its compliance programs, and compliance program training materials.

Moberly Decl. ¶ 20.  This Court previously granted summary judgment for DOJ regarding its

Exemption 4 withholdings in the following categories of documents:  (1) the Monitor's Reports

and associated documents; (2) the Monitor's Work Plans and associated documents; and (3)

Siemens' trainings, compliance policies, and associated documents.  *100Reporters*, 248 F. Supp.

3d at 144–45.  DOJ asserts that the categories of documents covered by the prior Memorandum

Opinion "encompass all of the eight enumerated categories listed above."  DOJ Mem. at 17 n.5.

The Court credits DOJ's assertion, particularly because 100Reporters has not challenged it.  *See*

*generally* 100Reporters Mem.

While the Court accepted DOJ's Exemption 4 rationale, it noted that "the Court's

analysis does not apply to the entirety of the documents themselves."  *100Reporters*, 248 F.

Supp. 3d at 145 n.13.  It consequently ordered DOJ to produce a representative Work Plan,

Report, and set of Report exhibits for *in camera* review.  *Id.*  Having inspected those materials,

the Court evaluates whether DOJ's Exemption 4 withholdings are sufficiently narrow for each

category of documents, beginning with the documents reviewed *in camera*.

### 1.   Documents Reviewed *In Camera*

The Court has now reviewed the Monitor's Year Three Work Plan, Year Three Report,

and the Report's associated exhibits *in camera*, and it has determined that DOJ's redactions to

these materials were overbroad because they cover some information that is not commercial.[5]

---

[5] DOJ has renewed its Exemption 4 argument under the theory that "disclosure of
information not covered by the 'competitive harm' prong [of the Exemption 4 framework laid
out in *National Parks Conservation Association v. Morton*, 498 F.2d 765, 770 (D.C. Cir. 1974)]
would adversely impact DOJ's ability to collect reliable and quality information in the future,"
and would therefore still be covered by Exemption 4.  DOJ Mem. at 15–16.  Both *National Parks*
"prongs," however, relate to whether information is "confidential" under Exemption 4, and they
both therefore require that the withheld information be "commercial or financial."  *Pub. Citizen
Health Research Grp. v. FDA*, 704 F.2d at 1290.  Because the Court holds that much of the

Withheld "information is commercial under [Exemption 4] if, in and of itself, it serves a commercial function or is of a commercial nature." *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 38 (D.C. Cir. 2002) (internal quotation marks and citations omitted). Therefore, Exemption 4 covers "records that actually reveal basic commercial operations, such as sales statistics, profits and losses, and inventories, or relate to the income-producing aspects of a business." *See Pub. Citizen Health Research Grp.*, 704 F.2d at 1290. And in the D.C. Circuit, Exemption 4 "reaches more broadly and applies (among other situations) when the provider of the information has a commercial interest in the information submitted to the agency." *Baker & Hostetler LLP v. U.S. Dep't of Commerce*, 473 F.3d 312, 319–20 (D.C. Cir. 2006) (holding that letters describing market conditions for domestic lumber companies "plainly contain commercial information within the meaning of Exemption 4"); see also *Pub. Citizen Health Research Grp.*, 704 F.2d at 1290 (holding that "documentation of the health and safety experience of [a company's] products" was commercial because such documentation was "instrumental in gaining marketing approval for their products"). Certain material in the Work Plan, Report, and exhibits is not commercial because it does not fall within the Circuit's "commercial interest" standard.

### a. Year Three Work Plan

DOJ and Siemens characterize the Work Plans as containing reams of information relating to Siemens' operations. For instance, Mr. Kirsch stated that the Plans detail "Siemens' operations, contracts, projects, and bids that the Monitor intended to review." *See* Kirsch Decl. ¶ 22. He also stated that they reflect "Siemens' business operations, structure, and compliance

---

redacted information is not commercial, DOJ's renewed argument does not alter the Court's analysis.

controls." *Id.* ¶ 24.  Similarly, the Amended *Vaughn* Index states that the Monitor's Year One Work Plan describes "the number of Siemens employees in each country, new orders, new government orders, joint ventures and business partnerships, and Siemens' business development strategy across different sectors of the economy."  DOJ_0000001, Am. *Vaughn* Index at 18.

The Court's *in camera* review, however, has revealed that the Year Three Work Plan consists mostly of general descriptions of the Monitor's past and future activities with very few details about Siemens' business operations.  The Plan is broken into eight sections, which the Court has analyzed as follows:

- Section I is the Work Plan's Introduction.  It has been produced un-redacted.

- Sections II and III, entitled "The Year One Review" and "The Year Two Review," contain summary statistics and general descriptions of the Monitor's activities in prior years, noting, for instance, that the Monitor "collected, reviewed, and analyzed approximately 10,000 Company documents totaling approximately 140,000 pages," and that the Monitor "observed more than twenty regularly scheduled compliance-related meetings."  They contain no information about Siemens' business operations, competitive landscape, or compliance programs.

- Section IV, entitled "The Compliance Monitor's Mandate and Year Three Review," describes the obligations of Siemens and the Monitor under the plea agreement, and it generally describes the Monitor's "risk-based approach," again without providing any information about Siemens' operations or compliance programs.

- Section V, entitled "Substantive Structure of the Year Three Review," describes the seventeen "thematic focus areas" that guided the Monitor's evaluation.  One paragraph in this Section, on page 12 of the Plan, lists Siemens' purchasing volume, number of

supplier relationships, and number of supplier accounts.  Aside from this business

information, however, this Section lays out each thematic focus area without reference to

Siemens' business operations or its compliance policies.

- Section VI, entitled "Methodology of the Year Three Review," describes the Monitor's

  tools for conducting his evaluation, including document inspection, on-site observation,

  informational meetings, analyses, studies, and testing.  Again, while this Section

  describes the type of employees the Monitor planned to interview, it does not include

  specific employee names, nor does it list specific Siemens sectors and business units that

  were targeted for interviews.

- Section VII, entitled "Countries of Interest," describes the specific countries targeted by

  the Monitor for analysis.  It includes, for each country, "the number of Siemens

  employees in each country, new orders, new government orders, joint ventures and

  business partnerships, and Siemens' business development strategy across different

  sectors of the economy."  DOJ_0000001, Am. *Vaughn* Index at 18.

- Finally Section VIII, the Monitor's "Proposed Schedule," lays out specific deadlines for

  the Monitor's evaluation.  Again, it contains no commercial information.

Other than the "Countries of Interest" Section, the Work Plan does not reveal "basic

commercial operations" that "relate[] to the income-producing aspects of [Siemens'] business."

*See Pub. Citizen Health Research Grp.*, 704 F.2d at 1290.  And unlike the types of information

held to be commercial in this Circuit's more expansive reading of Exemption 4, for instance

letters describing market conditions, or "documentation of the health and safety experience of [a

company's products]," the descriptions of the Monitor's activities do not elaborate on Siemens'

business or describe its competitive landscape.  *See Baker & Hostetler LLP*, 473 F.3d at 319;

*Pub. Citizen Health Research Grp.*, 704 F.2d at 1290.  The Monitor's process and methodology are not "instrumental" to Siemens' commercial interests, and therefore do not fall within the scope of Exemption 4.  *Id.*  DOJ therefore may only redact Section VII, "Countries of Interest," under Exemption 4, and it must remove the remaining Exemption 4 redactions.

### b.  Year Three Report

To a lesser degree, the Monitor's Year Three Report also contains subsections wholly unrelated to Siemens' commercial operations.  Chapter Four of the Report, entitled "The Monitor's Year Three Review and Recommendations," provides the Monitor's analysis, opinions, and recommendations for each thematic focus area identified in the Work Plan.  Unlike in the Work Plan, much of this chapter in the Report was properly withheld under Exemption 4 because it contains detailed analyses of Siemens' business operations, and how those operations addressed each focus area.  However, the chapter also includes subsections covering "General Principles and Good Practices," which contain analyses of industry best practices and guidance obtained from FCPA decisions involving different companies.  Those subsections do not discuss Siemens' business operations.  Nor do they relate to the Monitor's actions with respect to Siemens.  They are summaries of third party behaviors, useful as a reference source.  They do not "reveal [Siemens'] basic commercial operations," and DOJ has failed to demonstrate that Siemens otherwise has a commercial interest in the information related to other companies.  *Id.* They may not be redacted under Exemption 4.

DOJ properly redacted the remaining portions of the Report.  Chapter One is an introduction describing specific Siemens compliance initiatives and business decisions.  Chapter Two contains details of the Monitor's Year Three activities, with references to specific Siemens business operations.  Chapter Three, entitled "Financial Controls in Times of Crisis," describes

Siemens' response to geopolitical crises in various countries, including specific steps taken by specific business units. These Chapters "actually reveal basic commercial operations, such as sales statistics, profits and losses, and inventories, or relate to the income-producing aspects of a business." *See Pub. Citizen Health Research Grp.*, 704 F.2d at 1290. And Chapters Five and Six, entitled "Evaluation of Implementation of the Monitor's Year One [and Two] Recommendations," describe changes to Siemens' compliance policies. They document "the way [Siemens] implement[ed] [its] compliance programs," which in this Circuit is "sufficiently 'instrumental' to the [company's] operations to qualify as 'commercial.'" *Pub. Citizen Health Research Grp. v. HHS*, 66 F. Supp. 3d 196, 208 (D.D.C. 2014). To the extent the Report contains other material that is arguably non-exempt, it is "inextricably intertwined with exempt portions" such that it need not be un-redacted. *Mead Data Cent., Inc.*, 566 F.2d at 260.

### c. Year Three Report Exhibits

The Year Three Report exhibits also contain non-commercial information that DOJ has improperly redacted under Exemption 4. Exhibit A is the Year Three Work Plan, which should receive the same treatment as the standalone Work Plan discussed above. Exhibit B contains the Monitor's Work Plans for his evaluations of Siemens' headquarters and specific countries. They include general descriptions of the Monitor's past and future activities that are very similar to descriptions in the primary Work Plan described above, and their redactions should be rolled back in accordance with DOJ's changes to the Work Plan redactions. To the extent that they contain Siemens' business operations information similar to the information contained in the "Countries of Interest" Section of the Work Plan, that information may remain redacted. Exhibits C, D, and E concern Siemens compliance policies and programs, and are therefore

commercial information.  *See Public Citizen Health Research Grp. v. HHS*, 66 F. Supp. 3d at

208.  They may remain redacted under Exemption 4.

## 2.  Documents Not Reviewed *In Camera*

The Court's prior Memorandum Opinion established that DOJ was justified in redacting

the following categories of documents under Exemption 4:

- The Monitor's presentations to DOJ and SEC summarizing various

  aspects of his work;

- Emails and correspondence between the Monitor, Mr. Warin, DOJ

  attorneys, and SEC attorneys concerning various aspects of the

  monitorship;

- Correspondence between the Siemens Board, DOJ and SEC attorneys

  concerning various aspects of the monitorship;

- Siemens compliance policies and descriptions of various aspects of its

  compliance programs; and

- Siemens compliance program training materials

*See 100Reporters*, 248 F. Supp. 3d at 145; Moberly Decl. ¶ 20.  As discussed in Section D,

below, the Court holds that DOJ must reprocess these documents and ensure that their redactions

are consistent with the Court's guidance regarding the documents reviewed *in camera*.

It is also unclear whether DOJ's Exemption 4 withholdings and redactions are

coextensive with its Exemption 5 withholdings and redactions for documents not reviewed *in

camera*.  To the extent that more material has been withheld under Exemption 5 than Exemption

4, DOJ's Exemption 5 arguments regarding each of these categories are discussed in the

following section.

## B. Exemption 5, Deliberative Process Privilege

DOJ contends that it has properly withheld documents and redacted information pursuant to FOIA Exemption 5's deliberative process privilege.  The Court agrees in part.  Exemption 5 permits an agency to protect "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency."  5 U.S.C. § 552(b)(5).  It incorporates the deliberative process privilege, which "protects documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which government decisions and policies are formulated."  *Loving v. U.S. Dep't of Def.*, 550 F.3d 32, 38 (D.C. Cir. 2008) (internal quotation marks omitted).  "The deliberative process privilege rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news, and its object is to enhance 'the quality of agency decisions,' by protecting open and frank discussion among those who make them within the Government."  *U.S. Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8–9 (2001) (quoting *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 151 (1975)).  It also "helps to prevent premature disclosure of proposed policies and protects against public confusion through the disclosure of documents suggesting reasons for policy decisions that were ultimately not taken."  *Judicial Watch, Inc. v. U.S. Postal Serv.*, 297 F. Supp. 2d 252, 258–59 (D.D.C. 2004).

"To fall within the deliberative process privilege, materials must bear on the formulation or exercise of agency policy-oriented judgment."  *Petroleum Info. Corp. v. U.S. Dep't of Interior*, 976 F.2d 1429, 1435 (D.C. Cir. 1992).  A record only qualifies for this privilege if it is both "predecisional" and "deliberative."  *Access Reports v. DOJ*, 926 F.2d 1192, 1194 (D.C. Cir. 1991).  "A document is predecisional if it is 'generated before the adoption of an agency

policy.'" *McKinley v. FDIC*, 744 F. Supp. 2d 128, 138 (D.D.C. 2010) (quoting *Coastal States Gas Corp. v. U.S. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980)).  A document is "deliberative" if it reflects "the give-and-take of the consultative process."  *Coastal States*, 617 F.2d at 866.

As a threshold matter, to withhold information under the privilege an "agency must establish 'what deliberative process is involved, and the role played by the documents in issue in the course of that process.'"  *Senate of P.R. ex rel. Judiciary Comm. v. DOJ*, 823 F.2d 574, 585–86 (D.C. Cir. 1987) (quoting *Coastal States*, 617 F.2d at 868).  "In addition to explaining the 'function and significance of the document(s) in the agency's decision-making process,' the agency must describe 'the nature of the decision-making authority vested in the office or person issuing the disputed document(s), and the positions in the chain of command of the parties to the documents.'"  *Elec. Frontier Found. v. DOJ*, 826 F. Supp. 2d 157, 168 (D.D.C. 2011) (quoting *Arthur Andersen & Co. v. IRS*, 679 F.2d 254, 258 (D.C. Cir. 1982)).  The Court may also rely on its own *in camera* inspection of documents to discern whether the deliberative process privilege applies.  *See Phillippi v. CIA*, 546 F.2d 1009, 1012–13 (D.C. Cir. 1976) ("It is clear that the FOIA contemplates that the courts will resolve fundamental issues in contested cases on the basis of *in camera* examinations of the relevant documents.").

DOJ states that it has withheld information in the following categories of documents pursuant to the deliberative process privilege:

- The Monitor's work plans and related materials;

- The Monitor's yearly reports, exhibits, and related materials;

- Emails and correspondence between the Monitor, Mr. Warin, DOJ
  attorneys, and SEC attorneys concerning various aspects of the
  monitorship;

- Correspondence between the Siemens Board, DOJ, and SEC attorneys
  concerning various aspects of the monitorship;

- Siemens compliance policies, descriptions of its compliance programs,
  and compliance program training materials; and

- Draft court filings involving the Siemens prosecution.[6]

Moberly Decl. ¶ 24.  DOJ has reasserted that these withholdings are justified by the deliberative

process privilege, and it has presented additional factual material supporting its invocation of that

privilege, including a sampling of documents for *in camera* review.  *See* DOJ Mem. at 4–6.

100Reporters argues that "[d]espite the opportunity to bolster its case, DOJ has still failed to

satisfy its burden necessary to withhold information under the deliberative process privilege."

100Reporters Mem. at 4.

The Court first considers whether DOJ has sufficiently identified the deliberative

processes at issue and the role played by the documents in the course of those processes.  It then

determines whether the withheld information is predecisional and deliberative.  For the reasons

set forth below, the Court holds that DOJ's reliance on the deliberative process privilege is

justified only in part, because certain withheld information is not predecisional or deliberative.

---

[6] In its prior Memorandum Opinion, this Court held that DOJ properly withheld the draft
filings under the attorney work product privilege also included in FOIA Exemption 5.  The Court
declines to evaluate whether they may also be withheld under the deliberative process privilege
because "if a document is properly withheld under any FOIA exemption, the inquiry is over."
*Mezerhane de Schnapp v. U.S. Citizenship and Immigration Servs.*, 67 F. Supp. 3d 95, 104
(D.D.C. 2014).

### 1.  The Deliberative Process at Issue

In its prior Memorandum Opinion, this Court held that the Monitor's materials were intra-agency documents subject to Exemption 5,[7] but that DOJ had not "sufficiently identified the deliberative process or processes at issue" to allow the Court to fully evaluate DOJ's deliberative process invocation.  *100Reporters*, 248 F. Supp. 3d at 149–50.  It noted that DOJ's characterization of the deliberative process—whether Siemens had satisfied its obligations under the plea agreement—would "create a four-year umbrella effectively shielding all agency action from review."  *Id*. at 153.  The process identified was "too nebulous to allow the Court to conduct the necessary analysis for each withheld record."  *100Reporters*, 248 F. Supp. 3d at 153.

Without reaching the questions of whether the withheld materials are predecisional or deliberative, the Court permitted DOJ to supplement the record to show "(1) the nature of the specific deliberative process involved (including whether that process resulted in a decision independent of, although related to, the ultimate compliance decision), (2) the function and significance of the document in that process, and (3) the nature of the decision-making authority vested in the document's author and recipient."  *Id*. at 154 (quoting *Nat'l Sec. Counselors* 960 F. Supp. 2d at 189).  It also directed DOJ to provide the Court with one Work Plan and one annual

---

[7] The Court held that the Monitor was a "consultant corollary" to DOJ, making the Monitor's documents "intra-agency," but it did not extend consultant corollary status to the Siemens Board.  *100Reporters*, 248 F. Supp. 3d at 151 n.19.  In its renewed motion, DOJ has failed to establish that the Siemens Board did not "represent an interest of its own" in its communications with DOJ and SEC, and therefore it again fails to obtain consultant corollary status for the Board.  *See Klamath Water,* 532 U.S. at 11 (noting that the critical factor in evaluating a consultant corollary argument is whether the consultant executed independent judgment).  DOJ has not put forth any other argument for why correspondence from the Siemens Board should be considered intra- or inter-agency documents.  Accordingly, the correspondence, DOJ_0003888 to DOJ_0003889, cannot be withheld or redacted under the deliberative process privilege.

Report prepared by the Monitor, including the Report's exhibits, so that the Court could review

DOJ's privilege invocations *in camera*. *100Reporters*, 248 F. Supp. 3d at 166. DOJ has refined

its characterization of the deliberative processes at issue, it has supplemented the record with

additional declarations and a chronology of events relevant to its deliberative process argument,

and it submitted the Monitor's Year Three Work Plan, Year Three Report, and the Report's

exhibits for the Court's *in camera* review.

The parties dispute whether DOJ's supplemented record has addressed the Court's

concerns raised in the prior Memorandum Opinion. DOJ argues that it "has now satisfied each

of [the Court's] three factors through the Duross and Mendelsohn Declarations." DOJ Mem. at

6. 100Reporters contends that "[w]hile it has used more words to describe the deliberative

processes it has invoked, DOJ's showing adds little that would allow the Court to find that each

of the three criteria it identified has been satisfied." 100Reporters Mem. at 6. The Court is not

persuaded by 100Reporters' contention. For the reasons set forth below, the Court holds that

DOJ has sufficiently described the nature of the specific deliberative processes involved, the

nature of the decision-making authority vested in the documents' authors and recipients, and the

function and significance of the documents to the processes.

*a. The Nature of the Specific Deliberative Processes Involved*

DOJ's supplemented record is sufficient to identify the specific deliberative processes

underlying its Exemption 5 withholdings. For a document to be evaluated under Exemption 5 "a

court must be able 'to pinpoint an agency decision or policy to which the document

contributed.'" *Senate of P.R.*, 823 F.2d at 585 (quoting *Paisley v. CIA*, 712 F.2d 686, 698 (D.C.

Cir. 1983)). The agency therefore has the burden to demonstrate that each withheld document

was "generated as part of a definable decision-making process." *Gold Anti–Trust Action Comm.,*

*Inc. v. Bd. of Governors of the Fed. Reserve Sys.*, 762 F. Supp. 2d 123, 135–36 (D.D.C. 2011);
*see also Coastal States*, 617 F.2d at 868.  A "broad and opaque description of the deliberative
process involved does not provide the Court with enough detail about whether these documents
are deliberative and predecisional." *Trea Senior Citizens League v. U.S. Dep't of State*, 923 F.
Supp. 2d 55, 68 (D.D.C. 2013).

DOJ asserts that the documents at issue supported two deliberative processes during the
monitorship, each of which involved continuous sub-decisions, and it has supplemented the
record with detailed declarations and a chronology describing these processes.  DOJ Mem. at 6.
100Reporters argues that DOJ's showing "does little to describe 'the nature of the specific
deliberative process involved' beyond adding more words to the overbroad descriptions this
Court rejected."[8]  100Reporters Mem. at 7.  The Court is satisfied with DOJ's supplemented
factual record.

First, DOJ argues that it evaluated on a continuous basis, punctuated by yearly sub-
decisions, Siemens' ongoing efforts to comply with its obligations under the plea agreement.
Duross Decl. ¶ 7; Mendelsohn Decl. ¶ 9.  In making this determination, DOJ analyzed (1)
whether Siemens committed any further crimes; (2) whether Siemens continued to assist in
DOJ's ongoing investigations of Siemens officers and employees; (3) whether Siemens
cooperated with the Monitor by making its records, facilities, and personnel available to the

---

[8] 100Reporters also argues that the Court did not grant DOJ "leave" to argue that there
were two specific deliberative processes covered by the information withheld under Exemption
5.  100Reporters Mem. at 7 n.5.  The Court notes that while DOJ did not explicitly bifurcate the
deliberative processes in its prior briefing, the Amended *Vaughn* Index does state that "the DOJ
and the SEC were engaged in a deliberative process in evaluating [(1)] whether the Monitor was
fulfilling his mandate and [(2)] whether Siemens was complying with the plea agreement."  *See
e.g.* DOJ_0003188, Am. *Vaughn* Index at 106–07.  DOJ's refined argument is permissible.

Monitor; and (4) whether Siemens' compliance program and internal controls met the minimum requirements set forth in the plea agreement.  *See* Mendelson Decl. ¶ 9; Duross Decl. ¶ 7–8.

Second, DOJ argues that it evaluated on a continuous basis, again punctuated by yearly sub-decisions, whether the Monitor was "fulfilling his mandate to ensure that Siemens carried out its responsibilities under the plea agreement."  Decl. of Joey Lipton ("Lipton Decl.") ¶ 5, ECF No. 59-7; Duross Decl. ¶ 9, Mendelsohn Decl. ¶ 10.  More specifically, DOJ assessed (1) whether the Monitor's work plans would enable the Monitor, DOJ, and SEC to evaluate the quality and effectiveness of Siemens' compliance with anti-corruption laws in the coming years; and (2) how successfully the Monitor had discharged his mandate over the course of the previous year.  Mendelson Decl. ¶ 10.  In making this determination, DOJ analyzed, among other factors, (1) whether the Monitor's work plans were appropriately detailed to provide Siemens notice of the Monitor's movements within the company; (2) whether the Monitor's work plans and reports focused on Siemens' past improper conduct; (3) the Monitor's use of available resources and the evolution of his approach year-by-year.  Duross Decl. ¶ 10.

The DOJ's supplemented materials show that each deliberative process involved sub-decisions after each year of the monitorship.  Specifically, DOJ decided (1) whether Siemens breached its obligations under the resolution; (2) whether the monitorship should continue; (3) whether the monitorship should be extended; or (4) whether the monitorship should be terminated because Siemens complied with its obligations.  Helou Decl. ¶ 12.  Mr. Mendelson and Mr. Duross stated that these sub-decisions arose from meetings between the Monitor, DOJ, and SEC to discuss the Monitor's Work Plans and Reports, status reports supplied by the Monitor, exchanges of drafts and written feedback, and email discussions.  *See e.g.* Mendelson Decl. ¶ 26; Duross Decl. ¶ 33; Helou Decl. ¶ 11.  DOJ made the decisions "with significant input

from the monitor and significant reliance on the information [provided by the Monitor]".  Helou Decl. ¶ 12.

The Mendelson and Duross Declarations also identify approximately when sub-decisions were made.  For instance, Mr. Duross stated that after receiving the Monitor's Year Two Report on October 13, 2010, reviewing presentation materials from a December 9, 2010 meeting between DOJ, SEC and the monitorship team, and deliberating upon additional materials and conversations with the Monitor, he "concluded that Siemens was making significant progress towards complying with its plea agreement."  Duross Decl. ¶¶ 20–24.  Similarly, Mr. Mendelsohn stated that after "reviewing the Year One Work Plan, consulting with Mr. Warin, SEC staff, and others, taking part in the April 1, 2009 monitorship meeting, and reviewing the other information and records available to me, I concluded that the Year One Work Plan was reasonable in fulfilling that part of the plea agreement, that the Monitor's Year Two Review should proceed, and that the Monitor was faithfully discharging his mandate."  Mendelsohn Decl. ¶ 18.

This evidence is sufficient to define the deliberative processes involved in DOJ's oversight of the monitorship.  As DOJ noted in its reply brief, courts in this District have upheld deliberative process assertions on the basis of less detailed showings.  For instance, the court in *Wisdom v. U.S. Trustee Program* allowed an agency to withhold, under Exemption 5, documents pertaining to "the performance review process" for a bankruptcy trustee.  266 F. Supp. 3d 93, 105 (D.D.C. 2017).  Similarly, the court in *Maydak v. DOJ* allowed an agency to withhold documents generated as part of the agency's identified "continuing process ... [in making] decisions regarding [plaintiff's] placement, security level and classification."  362 F. Supp. 2d 316, 326 (D.D.C. 2005); *see also Judicial Watch, Inc. v. DOJ*, 306 F. Supp. 2d 58, 71 (D.D.C.

2004) (holding that the agency's identified process of "discussion and analysis concerning priorities and the way to structure research, on evaluating impact and implications of Enron for purposes of developing policy," was sufficient to invoke the deliberative process privilege). Here, DOJ has more precisely described the "specific deliberative process[es] to which the withheld [documents] contributed." *Elec. Frontier Found.*, 826 F. Supp. 2d at 168.

100Reporters, on the other hand, relies on Exemption 5 cases in which agencies described their deliberative processes in much less detail, more akin to DOJ's first showing in this case. *Nat'l Sec. Counselors* involved, rather ironically, a FOIA request for documents related to an agency's treatment of FOIA requests, and the court found insufficient the agency's description of the deliberative process at issue as "the process by which the [agency] comes to a final determination in response to FOIA requests." 960 F. Supp. 2d at 189–90. The court stated that the agency was required to elaborate on the "specific deliberative process to which the withheld [document] contributed," and its general description was "particularly problematic in the FOIA processing context because, in responding to a FOIA request, an agency often must make several different types of decisions, e.g., withholding decisions, fee-waiver decisions, expedited processing decisions, and others." *Id.* at 190. In its first summary judgment motion in this case, DOJ similarly failed to "point to subsidiary decisions that fall underneath the nebulous umbrella process" it identified, but it has now supplemented the record to detail the two processes at issue, the standards and criteria guiding those decisions, and the timing and content of the sub-decisions associated with those processes. *100Reporters*, 248 F. Supp. 3d at 153. The other cases put forward by 100Reporters on this issue involved similarly nebulous agency process descriptions. *See Judicial Watch*, 306 F. Supp. 2d at 70 (holding insufficient a reference

to "various ongoing policy issues"). In contrast to these conclusory descriptions, DOJ's detailed

showing is sufficient to describe the nature of the deliberative processes involved.

> b. *The Nature of the Decision-Making Authority Vested in the Withheld Documents' Authors and Recipients*

DOJ's supplemented record is also sufficient to identify the "nature of the decision-

making authority vested in the withheld documents' authors and recipients." *Nat'l Sec.*

*Counselors*, 960 F. Supp. 2d at 189. "The identity of the parties to the [document at issue] is

important; a document from a subordinate to a superior official is more likely to be

predecisional, while a document moving in the opposite direction is more likely to contain

instructions to staff explaining the reasons for a decision already made." *Coastal States*, 617

F.2d at 868; *see also Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.*, 421 U.S. 168, 184–85

(1975); *Elec. Frontier Found. v. DOJ*, 739 F.3d 1, 9 (D.C. Cir. 2014) (holding that an opinion

from DOJ's Office of Legal Counsel was predecisional because the author was "not authorized to

make decisions about the FBI's investigative policy, so the OLC Opinion cannot be an

authoritative statement of the agency's policy").

DOJ has demonstrated that the monitorship team advised DOJ, but did not have ultimate

decision-making authority. In general, "[a] monitor's primary responsibility is to assess and

monitor the company's compliance with the terms of the settlement agreement." Helou Decl. ¶

8. Siemens' Statement of Offense established that the Monitor's Reports would "set[] forth the

Monitor's assessment and mak[e] *recommendations* reasonably designed to improve the

effectiveness of Siemens' program for ensuring compliance with the anti-corruption

laws." Statement of Offense, *United States v. Siemens Aktiengesellschaft*, No. 08–367, Attach. 2

¶ 4 (D.D.C. Dec. 15, 2008), ECF No. 15 (emphasis added). Mr. Warin acted in a similar

advisory capacity, as he "was retained by Siemens as Independent U.S. Counsel to the Monitor

to provide counsel regarding compliance with the FCPA and to assist the Monitor in the performance of his duties and responsibilities as set forth in the [DOJ and SEC] agreements." Warin Decl ¶ 8; Helou Decl. ¶ 4.  He stated that the materials "authored and submitted by the Monitor and the monitorship team, as well as our communications with the DOJ and SEC, were… part of a consultative process by which the Monitor and the monitorship team reported and provided input to the government agencies… on which the DOJ and the SEC based their determinations."  Warin Decl. ¶ 12.

DOJ has also demonstrated that the documents' recipients had decision-making authority. The Amended Deliberative Process Chronology identifies documents' recipients and the specific dates on which they were transmitted.  *See e.g.* Am. Chronology at 7–8 ("Joseph Warin sends a letter to Chuck Duross, Joey Lipton, Kara Brockmeyer, Tracy Price, and Robert Dodge advising that the monitorship will be executed as outlined in the Year Four Work Plan.").  Mr. Mendelsohn and Mr. Duross, recipients of the documents at issue, both stated that they were the primary DOJ decision-makers tasked with evaluating Siemens' compliance with the plea agreement, and that they were heavily involved in that evaluation.  Mendelsohn Decl. ¶¶ 5–6; Duross Decl. ¶ 4.  Mr. Lipton and Ms. Weinstein, also frequent recipients of the documents, were the DOJ trial attorneys charged with day-to-day oversight of the monitorship.  Lipton Decl. ¶ 3; Mendelsohn Decl. ¶ 5.  Ms. Price, another frequent recipient, was an Assistant Director in the SEC's FCPA Unit, responsible for SEC's supervision of the monitorship.  Price Decl. ¶ 1.

100Reporters unconvincingly argues that DOJ has not made a proper showing because it only describes the decision-making authority of *some* of the documents' recipients. 100Reporters Mem. at 14–16.  The Court notes that the DOJ's *Amended* Deliberative Process Chronology names nearly every recipient of the Work Plans, Reports, and related documents.

Furthermore, DOJ need only provide the Court "enough information to determine whether the deliberative process privilege applies." *Pub. Employees for Envtl. Responsibility v. EPA*, 213 F. Supp. 3d 1, 15 (D.D.C. 2016). 100Reports cites to no case holding that DOJ must go beyond this standard, which it has met by describing the decision-making authority of the documents' most senior recipients.

 *c. The Function and Significance of the Withheld Information in DOJ's Deliberative Processes*

The Court also holds that DOJ's supplemented record is sufficient to identify the function and significance of the documents at issue. To allow for proper review of an agency's deliberative process claim, the agency must explain the withheld documents' function and significance to the specific deliberative processes identified. *See Arthur Andersen*, 679 F.2d at 259; *Elec. Frontier Found.*, 826 F. Supp. 2d at 167–68. This context is necessary for the Court to evaluate whether material is predecisional, because "if documents are not a part of a clear 'process' leading to a final decision on the issue, ... they are less likely to be properly characterized as predecisional." *Coastal States*, 617 F.2d at 868. Further, the function and significance of a document to the agency's decision-making process is an important factor in determining whether a document is bound up in the decision-making process, and thus potentially privileged, or whether it reflects a summary of a decision already-made, and thus not privileged. *See Taxation With Representation Fund v. IRS*, 646 F.2d 666, 678–79 (D.C. Cir. 1981) (requiring the disclosure of documents indexed, compiled, and consulted as sources of agency law by IRS employees). "The need to describe each withheld document when Exemption 5 is at issue is particularly acute because 'the deliberative process privilege is so dependent upon the individual document and the role it plays in the administrative process.'" *Animal Legal Def. Fund, Inc. v. U.S. Dep't of Air Force*, 44 F. Supp. 2d 295, 299 (D.D.C. 1999) (quoting *Coastal States*, 617 F.2d at 867).

DOJ argues that its supplemented materials show that the withheld documents "either played a crucial function in DOJ's decision-making process or directly reflect its operation." DOJ Mem. at 14. 100Reporters contends that DOJ's descriptions are "conclusory" and fail "to discuss the specific role that the documents played in the deliberative process described by the government." 100Reporters Mem. at 12. DOJ's argument carries the day.

Mr. Mendelsohn described in detail how the Monitor's Work Plans, meetings, and communications with DOJ and SEC served as the basis of DOJ's continuing evaluation of the Monitor's performance. For instance, Mr. Mendelson stated that he and Ms. Weinstein met with the monitorship team on April 1, 2009 to discuss the Monitor's progress:

> Mr. Warin made a presentation summarizing the main parts of the Work Plan, and there was a robust discussion about the Work Plan and how the Monitorship was progressing . . . Additionally, we discussed the importance of the Monitor's independence and the various tools, including external and internal resources at his disposable to carry out his mandate.

Mendelsohn Decl. ¶ 15. Following the meeting, DOJ and SEC provided feedback to the monitorship team, sought additional information, and received an updated Work Plan. Mendelsohn Decl. ¶¶ 16–18. Finally, based on this back-and-forth, Mr. Mendelsohn concluded that "the Year One Work Plan was reasonable in fulfilling that part of the plea agreement, that the Monitor's Year Two Review should proceed, and that the Monitor was faithfully discharging his mandate." Mendelsohn Decl. ¶ 18. Mr. Duross describes a similar process for the Year Two Work Plan, Duross Decl. ¶¶ 14–18, Year Three Work Plan, Duross Decl. ¶¶ 26–30, and Year Four Work Plan, Duross Decl. ¶¶ 34–38.

Mr. Duross described a similar process for how DOJ utilized the Monitor's Reports and related materials to evaluate Siemens' compliance with the plea agreement. For instance, he stated that the Monitor issued his Year Two Report on October 13, 2010, after which he reviewed the report, exhibits, and the Monitor's certification. Duross Decl. ¶ 20; *see also* Am.

Chronology at 4.  Mr. Lipton then met with the monitorship team, SEC, and Siemens' financial

control procedures, finance audit group, and compliance group in Munich, Germany on

December 9, 2010 to discuss the Report's findings and recommendations.  Duross Decl. ¶ 22,

Am. Chronology at 4.  Finally,

> [a]fter deliberating, among other things, upon all the information and records I
> had received to date, including the Monitor's work plans for Years One and Two,
> the Monitor's Reports for Years One and Two, the associated materials, the
> Monitor's certification concerning the effectiveness of Siemens' compliance
> program, the presentation materials from the December 9, 2010, meeting, and my
> conversations with Mr. Lipton, Mr. Warin, and SEC staff, I concluded that
> Siemens was making significant progress towards complying with its plea
> agreement and that the Monitor was carrying out his Mandate effectively.

Duross Decl. ¶ 24.

For documents aside from the Monitor's Work Plans, Reports, and associated materials,

DOJ's *Vaughn* Index, supplemented by the Amended Deliberative Process Chronology and

DOJ's declarations, describe the documents' content and when and under what circumstances

they were considered by DOJ.  For instance, the *Vaughn* Index describes an April 13, 2009 email

from a DOJ attorney to the monitorship team as "concerning DOJ feedback on the Monitor's

draft work plan."  *See* DOJ_0005222, Am. *Vaughn* Index at 4.  Similarly, it describes a February

8, 2011 letter from the Monitor to DOJ and SEC attorneys as "setting forth the Monitor's

judgment concerning the sufficiency of the work plan relative to his mandate."  DOJ_0005277,

Am. *Vaughn* Index at 93.

These showings are sufficient for the Court to evaluate the documents' functions.  Courts

in this District have established that agency declarations properly detail documents' functions

and roles when they describe the documents, specify that they were involved in a specific agency

decision, and state that they were considered by the relevant agency decision-makers.  *See Taylor

Energy Co. LLC v. U.S. Dep't of Interior Bureau of Ocean Energy Mgmt.*, 271 F. Supp. 3d 73,

30

95–97 (D.D.C. 2017) (holding that an agency properly supported its deliberative process withholdings with a declaration describing documents sent to agency decision-makers as containing "tentative views" on whether the agency should take specific actions); *Citizens for Responsibility & Ethics in Washington v. DOL*, 478 F. Supp. 2d 77, 82 (D.D.C. 2007) (noting that the agency's declarant was "accorded a presumption of good faith" regarding a document's role) (internal citation omitted).  In accordance with that principle, Mr. Duross and Mr. Mendelshon characterized the Monitor's Work Plans, Reports, and related materials as containing opinions regarding Siemens' compliance with the plea agreement and proposals for how the Monitor's mandate should be carried out, and they stated that they relied on those opinions and proposals when making decisions.

Again, 100Reporters relies on cases in which agencies submitted far more nebulous descriptions of the function and significance of documents than the DOJ's showing here. *Hunton & Williams LLP v. EPA* involved boilerplate, sparse *Vaughn* index assertions that, for instance, withheld documents reflected "analysis, recommendations, and opinions that were considered as part of the Agency's decision-making process prior to its actions," and the agencies involved did not submit additional factual materials providing context for how documents functioned within the deliberative processes identified.  248 F. Supp. 3d 220, 242–45 (D.D.C. 2017).  The agency involved in *Animal Legal Def. Fund* offered "not a single description of any of the withheld documents."  44 F. Supp. 2d at 299.  And the agencies in *Nat'l Sec. Counselors* failed to provide details about the decision-making processes at issue that would allow the court to place documents within those processes.  960 F. Supp. 2d at 190–91.  Here, to the contrary, DOJ has provided detailed descriptions of the deliberative processes at issue and how the withheld documents fit into those processes.

## 2.  Evaluation of DOJ's Deliberative Process Argument

Because DOJ has provided sufficient context for the Court to evaluate its deliberative

process withholdings, the Court turns to that evaluation.  To justify withholding information

pursuant to the deliberative process privilege, an agency must demonstrate that the information is

both (1) predecisional; and (2) deliberative.  *Coastal States*, 617 F.2d at 866.  The D.C. Circuit

has suggested that "the agency must make the additional showing that disclosure would cause

injury to the decision-making process." *Nat'l Sec. Archive v. CIA*, 859 F. Supp. 2d 65, 70

(D.D.C. 2012),*aff'd*, 752 F.3d 460 (D.C. Cir. 2014) (citing *Army Times Publ'g Co. v. U.S. Dep't

of Air Force*, 998 F.2d 1067, 1071 (D.C. Cir. 1993)).  "The cases in this area are of limited help .

. . because the deliberative process privilege is so dependent upon the individual document and

the role it plays in the administrative process." *Coastal States*, 617 F.2d at 867.  However, the

cases do establish certain principles to guide the Court's evaluation.

The evaluation of whether information is predecisional involves both temporal and

qualitative elements.  Documents are predecisional if they are "generated before the adoption of

an agency policy." *McKinley*, 744 F. Supp. 2d at 138 (quoting *Coastal States*, 617 F.2d at 866).

They must also be "prepared in order to assist an agency decision maker in arriving at his

decision." *Grumman*, 421 U.S. at 184.  Predecisional documents include "recommendations,

draft documents, proposals, suggestions, and other subjective documents which reflect the

personal opinions of the writer rather than the policy of the agency." *Coastal States*, 617 F.2d at

866.  Documents that provide suggestions regarding ongoing agency processes are more likely to

be predecisional.  *See Maydak*, 362 F. Supp. 2d at 326 (protecting information concerning a

federal inmate that was used by agency officials as part of the continuing process of making

decisions regarding the inmate's status); *Wisdom*, 266 F. Supp. 3d at 105–06 (upholding the use

of privilege where the withheld documents consisted of "discussions, deliberations, opinions and recommendations regarding" an evaluation of a bankruptcy trustee). But documents that embody final agency decisions are not predecisional. *Rockwell Int'l Corp. v. DOJ*, 235 F.3d 598, 602–03 (D.C. Cir. 2001) (noting that "as a general principle[, an] action taken by the responsible decision maker in an agency's decision-making process which has the practical effect of disposing of a matter before the agency is 'final' for purposes of FOIA," and therefore not exempt).

The evaluation of whether information is deliberative requires an analysis of how the information was used, and how it related to the deliberative process at issue. Deliberative information "reflects the give-and-take of the consultative process." *Coastal States*, 617 F.2d at 866. The analysis hinges on "whether disclosure of the information would 'discourage candid discussion within the agency,'" *Access Reports*, 926 F.2d at 1195 (quoting *Dudman Commc'ns Corp. v. U.S. Dep't of Air Force*, 815 F.2d 1565, 1567–68 (D.C. Cir. 1987)), and whether the information "makes recommendations or expresses opinions on legal or policy matters." *Vaughn*, 523 F.2d at 1143–44. The mere fact that a document was "in the most general sense, part of an intra-agency discussion relating" to an agency decision, does not necessarily establish that the document was deliberative. *Citizens for Responsibility & Ethics in Washington v. DHS*, 648 F. Supp. 2d 152, 158–59 (D.D.C. 2009) (holding that requests for factual information relating to a decision, and requests for assistance in gathering such information, were not deliberative).

A thorough evaluation of an agency's deliberative process withholdings is necessary because the "purpose of Exemption 5 is 'to protect the deliberative process of the government, by ensuring that persons in an advisory role would be able to express their opinions freely to agency decision-makers without fear of publicity [that might] ... inhibit frank discussion of

policy matters and likely impair the quality of decisions.'" *Bureau of Nat'l Affairs, Inc. v. DOJ*, 742 F.2d 1484, 1497 (D.C. Cir. 1984) (quoting *Ryan v. DOJ*, 617 F.2d 781, 789–90 (D.C. Cir. 1980). "Such harm cannot be merely presumed," but must be demonstrated by the agency. *Judicial Watch,* 297 F.Supp.2d at 259 (internal citation omitted). Therefore, "[a]n agency cannot meet its statutory burden of justification by conclusory allegations of possible harm. It must show by specific and detailed proof that disclosure would defeat, rather than further, the purposes of the FOIA." *Mead Data Cent., Inc.*, 566 F.2d at 258.

Applying the principles to this case, the Court holds (1) that the Monitor's final Work Plans are neither predecisional, nor deliberative, although drafts and other preliminary materials are; (2) that portions of the Reports and Report exhibits are not deliberative; and (3) that Siemens' training and compliance materials are not deliberative. Each category of documents is discussed in turn below.

### a. Work Plans

DOJ may withhold drafts, feedback, presentations, and other preliminary materials related to the Work Plans, but the final Work Plans are not predecisional with respect to the Monitor's mandate because they represent a final agency sub-decision, and they are not deliberative with respect to Siemens' compliance with the plea agreement because they do not make recommendations or express opinions regarding that process.

DOJ asserts that the Work Plans were generated to assist the primary DOJ decision-makers—Mr. Mendelsohn and Mr. Duross—in determining, on a yearly basis, whether the Monitor's performance was satisfactory and whether his process was sufficient to generate information and recommendations necessary to allow DOJ to properly supervise Siemens. DOJ Mem. at 9–12. For instance, the Amended Deliberative Process Chronology indicates that Mr.

Warin sent a draft of the Year Two Work Plan to Mr. Mendelsohn on February 8, 2010 in advance of a February 23 presentation of that plan involving DOJ and SEC. Am. Chronology at 3; Duross Decl. ¶ 15. The plan "reflected the Monitor's opinions, recommendations, and deliberations concerning what steps he should take during the second year of the monitorship to enable him to fulfill his Mandate." Duross Decl. ¶ 15; Warin Decl. ¶ 25(a). Mr. Duross reviewed the Work Plan with his subordinate, Mr. Lipton, and evaluated whether it would "enable the Monitor to effectively carry out his Mandate as described in the plea agreement and inform DOJ concerning how the Monitor was planning to proceed." Duross Decl. ¶ 15; Lipton Decl. ¶ 5. The monitorship team followed up with additional materials on March 24. Am. Chronology at 3; Duross Decl. ¶ 17. Mr. Duross stated that only after reviewing and evaluating the initial draft of the Work Plan, attending the presentation and posing follow up questions, and receiving follow up materials, did he determine that "the Year Two Work Plan was appropriate to carry out the terms of the plea agreement, that the Monitor's Year Two Review should proceed, and that the Monitor was appropriately discharging his Mandate. Duross Decl. ¶ 18.

DOJ's factual submissions are sufficient to show that the Work Plan-related preliminary materials are predecisional and deliberative. Exchanges of Work Plan drafts, presentations, related communications, and feedback from meetings before DOJ and the Monitor finalized each Work Plan were "antecedent to the adoption of an agency policy," the final Work Plan. *Ancient Coin Collectors Guild v. U.S. Dep't of State*, 641 F.3d 504, 513 (D.C. Cir. 2011). They included the "recommendations, draft documents, proposals, suggestions, and other subjective documents" necessary to formulate a final Work Plan; the types of documents that exemplify the deliberative process privilege. *Coastal States*, 617 F.2d at 866. The Vaughn index and Chronology also indicate that they were, for the most part, sent from an adviser—the

35

monitorship team—to decision makers at the DOJ and SEC, which further indicate their predecisional nature. *See Tax Analysts v. IRS*, 152 F. Supp. 2d 1, 24–25 (D.D.C. 2001) (protecting memoranda "written by a component office without decision-making authority to a different component office" that had such authority).

However, each final Work Plan synthesized the predecisional materials that governed its drafting into a final policy document, which was not predecisional. In other words, under DOJ's characterization of the deliberative process at issue—evaluating whether each Work Plan was appropriate to carry out the plea agreement's mandate—each final Work Plan *was* the final agency document representing DOJ's sub-decision and laying out its information-gathering framework going forward. Such final agency documents are not predecisional. *Rockwell*, 235 F.3d at 602–03. And those documents, particularly documents describing the framework for an agency's decision making process, are therefore not protected by the deliberative process privilege. *See Public Citizen, Inc. v. OMB*, 598 F.3d 865, 875–76 (D.C. Cir. 2010) (holding that "[d]ocuments reflecting [the agency's] formal or informal policy on how it carries out its responsibilities" should not be withheld, and that "an agency's application of a policy to guide further decision-making does not render the policy itself predecisional"); *Sterling Drug, Inc. v. FTC*, 450 F.2d 698, 707–08 (D.C. Cir. 1971) (affirming the agency's withholding of drafts and memoranda written by individual agency employees, but requiring disclosure of memoranda "emanating from [the agency] as a whole . . . they are presumably neither argumentative in nature nor slanted"). Therefore, the final Work Plans are not predecisional with respect to the Monitor's mandate.

Furthermore, the final Work Plans were not deliberative with respect to DOJ's evaluation of Siemens because they were too attenuated from that process. The D.C. Circuit's decision in

*Mapother v. DOJ* is instructive of how courts should evaluate work plans and summaries that are related to an agency's decision making process. In that case, the D.C. Circuit contemplated whether to require disclosure of a report providing the U.S. Attorney General with information necessary to decide whether to prevent an individual from entering the country. 3 F.3d 1533, 1536 (D.C. Cir. 1993). Holding that the report was properly redacted under the deliberative process privilege, even though much of it was a factual compilation, the Circuit noted that a "'salient characteristic' of information eligible for protection under [the] deliberative process privilege is its 'association with a significant *policy* decision.'" *Id.* at 1539 (quoting *Petroleum Info. Corp. v. U.S. Dep't of Interior*, 976 F.2d 1429, 1437 (D.C. Cir. 1992)). The report was therefore deliberative because it was "assembled through an exercise of judgment in extracting pertinent material from a vast number of documents for the benefit of an official called upon to take discretionary action." *Id.* A portion of the report, however, was not deliberative because as a factual summary it "reflect[ed] no point of view," and therefore its "relation to any Justice Department deliberations [was] simply too attenuated to be protected by the deliberative process privilege." *Id.* at 1540.

The Court's *in camera* review indicates that the Work Plans were not closely related to DOJ's determination of whether Siemens complied with the plea agreement in a given year. They summarized past actions taken by the Monitor, described specific actions the Monitor would take in the coming year, and provided facts about the Siemens subsidiaries to be analyzed. They did not, however, contain recommendations or policy judgments regarding whether or not Siemens was in compliance with the plea agreement, and they did not contain any meaningful "point of view" regarding Siemens' compliance. *See Mapother*, 3 F.3d at 1540; *Playboy Enterprises, Inc. v. DOJ*, 677 F.2d 931, 936 (D.C. Cir. 1982) (distinguishing materials prepared

to assist an agency in "mak[ing] a complex decision" from materials "prepared only to inform");
*Edelman v. SEC*, 172 F. Supp. 3d 133, 158–59 (D.D.C. 2016) (rejecting the agency's Exemption
5 argument for withholding a memorandum describing the agency's decision making process
without making recommendations); *Judicial Watch, Inc. v. USPS*, 297 F. Supp. 2d 252, 262–63
(D.D.C. 2004) (denying summary judgment with respect to the agency's deliberative process
redactions because, although the materials involved a "give-and-take," the agency did not
"clearly identify the chronologies themselves as factual or policy-oriented").  Because DOJ has
not clearly demonstrated that the Work Plans make "recommendations or express[] opinions on
legal or policy matters," the Court cannot hold that they are deliberative.  *Vaughn*, 523 F.2d at
1144.

While courts in this District have held in certain circumstances that work plans are
covered by the deliberative process privilege, those plans are typically drafts or are not sub-
decisions in and of themselves, and they more closely relate to the final agency decision at issue
than the Work Plans.  For instance, in *Hornbostel v. U.S. Dep't of Interior*, the court evaluated
whether an agency could withhold under Exemption 5 certain documents, including work plans,
related to a real estate project.  305 F. Supp. 2d 21, 25–26 (D.D.C. 2003).  The court held that the
work plans could be withheld because they were "part of the group thinking and preliminary
actions . . . related to the formulation of the policy decisions behind the proposed project."  *Id.* at
31.  Similarly, in *Citizens for Responsibility & Ethics in Washington v. DHS*, the court held that
materials related to hurricane evacuation plans and catastrophic planning initiatives could be
withheld because many of them were proposals rather than final work plans, and they dictated
the agency's response to a natural disaster.  514 F. Supp. 2d 36, 44–46 (D.D.C. 2007).  In both of
those cases, the work plans dictated the agency's actions regarding the process at issue.  Here, on

the other hand, the final Work Plans dictated DOJ's steps to compile information that it would then use in its decision making process.[9]   Accordingly, they were not deliberative with respect to DOJ's evaluation of Siemens.

### b.  Annual Reports

The Annual Reports and related drafts, communications, and presentations are in large part predecisional and deliberative.  Each October, the Monitor issued a Report consisting of a detailed summary of his analyses over the previous year; an overview of specific actions taken by Siemens in response to crises; recommendations for improvements to Siemens' policies that would enhance its compliance with the plea agreement; an evaluation of Siemens' implementation of prior recommendations; and a certification that Siemens' compliance program was effective.  *See* Am. Chronology at 4–5; DOJ_0000419, Am. *Vaughn* Index at 56.  The monitorship team then met with DOJ and SEC to present the Report and engage in a "robust discussion" of the Report and related materials, which were circulated to DOJ and SEC.  *See e.g.* Am. Chronology at 4–5; Warin Decl. ¶¶ 25(b)–(d); Mendelsohn Decl. ¶ 24.  The Reports, and the monitorship team's related communications with DOJ and SEC, were generated to assist the primary DOJ decision-makers in deciding, on a yearly basis, whether to (1) inform the court that Siemens had breached the terms of its plea agreement; (2) continue the monitorship as planned; (3) extend the monitorship; or finally (4) inform the court that Siemens had complied with its obligations and no longer required the Monitor's oversight.  Helou Decl. ¶ 11.  Mr. Duross and

---

[9] The final Work Plans are analogous to a court's final dispositions of discovery disputes. Those dispositions may have some bearing on the court's later summary judgment decision, but they are too attenuated to be considered deliberative with respect to summary judgment.  *See Wolfe v. HHS,* 839 F.2d 768, 775 n.8 (D.C. Cir. 1988) (noting that "courts have long looked by analogy to the needs of their own decision-making processes to assess claims of privilege based on the needs of executive decision-making").

Mr. Mendelsohn stated that only after considering the Monitor's certifications, Reports and related materials, and correspondence from all prior monitorship years did they make this decision. *See e.g.* Duross Decl. ¶ 33, Mendelsohn Decl. ¶ 25.

DOJ's factual submissions, in combination with the Court's *in camera* review, indicate that the Reports and related materials were generated before the agency's yearly sub-decisions regarding Siemens' compliance, and that they then played a key role in facilitating those decisions. The Reports "detail[ed] the Monitor's assessments of the development and implantation [of] Siemens' anti-corruption compliance program . . . and the Monitor's recommendations to Siemens." DOJ_0000419, Am. *Vaughn* Index at 56. Drafts of the Reports, DOJ's feedback, and related presentations and communications embody the collaborative process by which the Reports were finalized. These materials therefore contained the "recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency" that the D.C. Circuit considers core Exemption 5 material. *Coastal States*, 617 F.2d at 866. Because they made recommendations, proposed courses of action, expressed opinions, and reflected feedback relevant to DOJ's evaluations of the Monitor and Siemens, each of these records "necessarily reflects the give-and-take of the agency's deliberative process." *AFGE v. U.S. Dep't of Commerce*, 907 F.2d 203, 208 (D.C. Cir. 1990).

DOJ has also sufficiently detailed the harm to its decision-making processes that could arise from disclosure of the Reports and related materials. First, several declarants stated that disclosure of correspondence and documents exchanged between and among the monitorship team, DOJ, and SEC relating to whether Siemens was complying with the plea agreement could chill such deliberations. Lipton Decl. ¶ 6; Mendelsohn Decl. ¶¶ 29–30; Warin Decl. ¶¶ 28–30.

Chilling of frank, robust discussion of policy matters is exactly the type of harm Exemption 5 is intended to guard against.  *See Lewis-Bey v. DOJ*, 595 F. Supp. 2d 120, 133 (D.D.C. 2009) (upholding non-disclosure of ATF agents' recommendations to superiors regarding the strengths and weaknesses of agency action, because disclosure would chill such recommendations).

Second, the declarants stated that Siemens provided much of the information used to generate the Reports, and that public disclosure of such information is likely to chill companies' provision of that information.  Helou Decl. ¶ 13; Price Decl. ¶ 13; Duross Decl. ¶¶ 46–47; Mendelsohn Decl. ¶ 32.  This assertion is well taken.  Companies provide full access to monitors on the condition that the information they share will remain confidential.  *See* Helou Decl. ¶ 14; Warin Decl. ¶ 26 (noting that certain documents were submitted bearing the marking, "Confidential Treatment Requested Under FOIA"); DOJ_0002039, Am. *Vaughn* Index at 66 (identifying a presentation "describing the role of middle management in Siemens' anti-corruption program," stamped with the statement, "for internal use only").  If they believe that potentially sensitive information will not remain confidential, they are unlikely to provide it.

If monitored companies are not as forthcoming with information in the future, agency decision makers will be forced to rely on lower-quality information.  Impairment of the quality of agency decision making weighs in favor of withholding material under FOIA Exemption 4, *Nat'l Parks Conservation Ass'n*, 498 F.2d at 770, but courts in this District have also taken that consideration into account when evaluating deliberative process withholdings.  *See Bloomberg, L.P. v. SEC*, 357 F. Supp. 2d 156, 169 (D.D.C. 2004) (protecting notes taken by SEC officials at a meeting with companies subject to SEC oversight; holding that release would "severely undermine" SEC's ability to gather information from regulated entities and in turn undermine

SEC's ability to deliberate on the best means to address policymaking concerns in such areas). That consideration weighs in favor of withholding the Reports here.

While much of the Year Three Report was properly redacted under Exemption 5, the "General Principles and Good Practices" subsections, which summarize industry best practices and guidance obtained from FCPA decisions involving different companies, are not deliberative. These subsections were no doubt beneficial to Siemens in crafting its policies, and helpful for DOJ as a point of comparison, but they summarize behaviors and agency decisions that were made previously and that are unrelated to Siemens.  The deliberative process privilege does not protect "documents that merely state or explain agency decisions." *Judicial Watch, Inc. v. HHS*, 27 F. Supp. 2d 240, 245 (D.D.C. 1998).  These subsections are therefore not covered by the deliberative process privilege and may not be redacted under Exemption 5.

### c. Report Exhibits

Unlike the Reports and related materials, the Report exhibits reviewed by the Court *in camera* are not deliberative because they contain purely factual material or are too attenuated from DOJ's decision making process to be considered deliberative.  The Year Three Report exhibits A, B, and C include the Monitor's Year Three Work Plan and final versions of certain sector-specific work plans.  As discussed above, such materials may not be withheld under the deliberative process privilege.  Exhibits D and E contain lists of Siemens' compliance trainings, meetings, and walkthroughs.  They are akin to the chronology that the Circuit ordered disclosed in *Mapother* because they "reflect[] no point of view," and merely recite facts.  3 F.3d at 1536. The Amended *Vaughn* index indicates that other Reports included similar exhibits.  For instance, the Year One Report included "the Siemens Business Conduct guidelines," and "the English translation of a memorandum about informational meetings given in advance to participants."

DOJ_0004329, Am. *Vaughn* Index at 25.  While these materials may be redacted under

Exemption 4 as commercial information, they may not be redacted under Exemption 5.

### d.  Siemens Training Materials

Similarly, Siemens' compliance and training materials are not deliberative because they

do not reflect the "give-and-take of the consultative process."  *Coastal States*, 617 F.2d at 866.

The DOJ's factual submissions indicate that the Monitor sent these documents to DOJ as

reference material, but they were originally generated by Siemens.  *See* DOJ_005248, Am.

*Vaughn* Index at 36 (describing a letter enclosing a "copy of Siemens' employee training

program.").  DOJ does not indicate that they were revised pursuant to the process of evaluating

Siemens, nor does it indicate that it provided any feedback on those materials.

The Court does not doubt that DOJ reviewed Siemens' compliance policies and training

materials during its decision-making process, but again, mere consideration of a document in

relation to an identified deliberative process does not automatically pull that document within the

privilege's scope.  *See Pub. Emps. For Envtl. Responsibility v. EPA*, 288 F. Supp. 3d 15, 26–27

(D.D.C.) (holding that an agency could not withhold an email discussion of a relevant study,

despite the agency's contention that the discussion "played some role in decisions" because the

agency failed to show that it was "generated as part of a definable decision-making process")

(quoting *Gold Anti-Trust Action Comm., Inc. v. Bd. of Governors of the Fed. Reserve Sys.*, 762 F.

Supp. 2d 123, 136 (D.D.C. 2011).  These materials may not be redacted or withheld under

Exemption 5.

*          *          *

For the foregoing reasons, the Court holds that DOJ has shown that certain categories of

intra-agency information were both predecisional and deliberative, but it failed to make that

43

showing with respect to other categories.  The Court therefore grants in part summary judgment in favor of DOJ's Exemption 5 withholding of this information.

More specifically, DOJ has justified its Exemption 5, deliberative process withholdings within the following categories of documents:

- The Monitor's yearly Reports—both drafts and final versions—with the exception of the "General Principles and Good Practices" subsections in the Year Three Report reviewed *in camera*, and similar subsections in the other Reports;

- The Monitor's Draft Work Plans

- The Monitor's presentations to DOJ and SEC regarding the Reports, Work Plans, and his evaluation of Siemens' compliance with the plea agreement; and

- Emails and correspondence amongst the Monitor, Mr. Warin, DOJ attorneys, and SEC attorneys related to the Reports and Work Plans, including feedback and proposed amendments to those documents.

On the other hand, DOJ has not justified its Exemption 5, deliberative process withholdings within the following categories of documents:

- The Monitor's final Work Plans;

- The "General Principles and Good Practices"  subsections of the Year Three Report, and subsections in other Reports containing similar material;

- Exhibits to the Monitor's Reports;

- Siemens' compliance policies, descriptions of its compliance programs, videos related to its compliance programs, and its compliance training materials.

To the extent that DOJ's Exemption 5 withholdings in these categories of documents are not covered by other Exemptions, DOJ may not withhold the information. As discussed below, in the Court's segregability section, DOJ must reexamine the withheld and redacted documents to ensure that its Exemption 5 withholdings comply with the guidance set forth in this section.

### C. Exemptions 6 and 7(C)

DOJ also argues that it has properly withheld personal information pursuant to FOIA Exemptions 6 and 7(C). This Court agrees in part.

The Court previously held that DOJ may rely on Exemption 7(C) to justify withholding personal information because the records at issue were compiled for a law enforcement purpose. 248 F. Supp. 3d at 161. "'Exemption 7(C) is more protective of privacy than Exemption 6' and thus establishes a lower bar for withholding material." *Prison Legal News v. Samuels*, 787 F.3d 1142, 1146 n.5 (D.C. Cir. 2015) (quoting *ACLU v. DOJ*, 655 F.3d 1, 6 (D.C. Cir. 2011)). Thus, because DOJ relies on Exemptions 6 and 7(C) coextensively, Moberly Decl. ¶ 34, the Court need engage only in an analysis of whether DOJ properly redacted information and withheld documents pursuant to Exemption 7(C). *See Roth v. DOJ*, 642 F.3d 1161, 1173 (D.C. Cir. 2011) (noting that there is "no need to consider Exemption 6 separately [where] all information that would fall within the scope of Exemption 6 would also be immune from disclosure under Exemption 7(C)"); *Kleinert v. Bureau of Land Mgmt.*, 132 F. Supp. 3d 79, 91 (D.D.C. 2015)

("[W]hen an agency cites both exemptions to justify a set of redactions, courts often first analyze those redactions under Exemption 7(C), turning to Exemption 6 only if necessary.").

Exemption 7(C) excludes "records or information compiled for law enforcement purposes . . . to the extent that the production of such law enforcement records or information . . . could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). When evaluating Exemption 7(C) withholdings, a court first must determine if there is a privacy interest in the information to be disclosed. *See ACLU*, 655 F.3d at 6–7. If the court finds a privacy interest, it must balance that privacy interest against the public interest in disclosing the information, considering only the public interest "that focuses on 'the citizens' right to be informed about what their government is up to.'" *Davis v. DOJ*, 968 F.2d 1276, 1282 (D.C. Cir. 1992) (quoting *DOJ v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 773 (1989)). It is the FOIA requester's obligation to articulate a public interest sufficient to outweigh the privacy interest, and the public interest must be significant. *See Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 172 (2004).

DOJ states that it has redacted personal information, under Exemptions 6 and 7(C), in the following types of documents:

- Monitor's Work Plans;

- Monitors Reports and exhibits;

- Emails and correspondence between the Monitor, Mr. Warin, DOJ, and SEC attorneys;

- Correspondence between the Siemens Board, DOJ, and SEC attorneys;

- Siemens compliance policies and descriptions of its compliance programs;

- Siemens training materials; and

- Draft court filings.

Moberly Decl. ¶ 30.  The Court's *in camera* review of the Year Three Work Plan, Report, and exhibits indicates that the personal information withheld consisted of names and job titles of Siemens executives, non-executive employees, third parties, and members of the monitorship team involved in witness interviews.  After the Court's prior Memorandum Opinion, DOJ agreed to disclose the names and office contact information of DOJ and SEC employees involved in the Siemens monitorship.  DOJ Mem. at 28 n.11; 100Reporters Mem. at 17; *see also* Am. Chronology at 2 ("Joseph Warin sends a letter to Mark Mendelsohn, Lori Weinstein, Cheryl Scarboro, Tracy Price, Denise Hansberry, and Reid Muoio").  DOJ continues to withhold personal information of the remaining categories of individuals.

The Court will first discuss the privacy interests at stake, then balance those interests against the public interest served by disclosure of the withheld personal information.  For the reasons stated below, the Court holds that DOJ properly withheld personal information related to Siemens non-executive employees and third-party witnesses, but improperly withheld such information related to the monitorship team and Siemens executives, including Board Members.

### 1. Privacy Interest

Exemption 7(C) may be applied on a categorical basis.  *See Reporters Comm.*, 489 U.S. at 777.  To justify such an approach, however, DOJ must identify categories of individuals whose personal information has been withheld, and it must explain the privacy interests of each category so that the Court can evaluate whether the statutory requirements for exemption are satisfied for that category.  *See Prison Legal News*, 787 F.3d at 1149–50; *100Reporters*, 248 F. Supp. 3d at 165.  Only then can the Court conduct the necessary balancing of the privacy interests in nondisclosure against the public interest in disclosure.

In this Court's prior Memorandum Opinion, it noted that DOJ identified several categories of individuals whose personal information has been redacted, but "made little effort, in its Amended *Vaughn* Index or its declarations, to differentiate the privacy concerns at stake." *Id.* at 163.  Ms. Moberly stated that identification of government personnel "could subject them to harassment both in the conduct of their official duties and their private lives," while identification of private individuals "engenders comment and speculation and could produce an unfair stigma which would expose the individual to harassment or criticism," Moberly Decl. ¶ 32, but she did not describe how these potential harms could impact the different groups of individuals whose information was withheld.  For instance, DOJ did not differentiate the interests of "regular Siemens employees and Board Members."  *100Reporters*, 248 F. Supp. 3d at 164.  The Court held that "DOJ's failure to establish the different privacy interests at stake makes it impossible for the Court to balance the private interests with the public's interest in knowing 'what their government is up to.'"  *Id.* at 165 (quoting *Reporters Comm.*, 489 U.S. at 773).

DOJ has now more precisely categorized its Exemption 7(C) withholdings, but it has again failed to fully flesh out the privacy interests for each category.  In its reply brief, it states that it is now withholding the following categories of personal information: (1) "Siemens Representatives," including senior executives, management, and lower level employees; (2) monitorship team members; and (3) other third parties.  U.S. Dep't Justice's Reply Supp. Renewed Mot. Summ. J. ("DOJ Reply") at 14, ECF No. 91.   These categories can more simply be broken down into: (1) members of the monitorship team; (2) Siemens non-executives and other third-party witnesses; and (3) Siemens executives, including Board Members.  DOJ argues that members of the monitorship team are "akin to law enforcement investigators" and have the

privacy interests of such investigators.  *Id*. at 18.  It argues that Siemens non-executive

employees and third-party witnesses have the privacy interests of law enforcement witnesses

because they supplied key information to the monitor and DOJ.  *Id*. at 16–17.  And it argues that

"Siemens board members . . . possess similar substantial privacy interests [to non-executive

employees] by virtue of their role as private individuals and law enforcement witnesses."  *Id*. at

17.

 100Reporters correctly notes that the DOJ's "additional affidavits—from Messrs.

Mendelsohn and Duross—concern only DOJ's invocation of the deliberative process under

Exemption 5."  100Reporters Mem. at 18.  Aside from statements in its reply brief and Ms.

Moberly's declaration, DOJ provides no more specific reasons *why* the categories of personal

information should be afforded the privacy interests claimed.  After analyzing DOJ's conclusory

arguments with respect to each category, the Court holds that Siemens non-executive employees

and third parties have a substantial privacy interest in nondisclosure of their personal

information, but the monitorship team and Siemens executives do not.

### a.  *Monitorship Team Members*

 Monitorship team members have a *de minimis* privacy interest in the nondisclosure of

their personal information.  DOJ argues that these individuals are akin to law enforcement

investigators, and that in the D.C. Circuit their personal information may categorically be

withheld unless 100Reporters puts forth "compelling evidence that the agency engaged in illegal

activity."  DOJ Reply at 15 (quoting *SafeCard Servs. v. SEC*, 926 F.2d 1197, 1206 (D.C. Cir.

1991)).  The Court grants that the Circuit's precedent suggests this view.  "The D.C. Circuit has,

after all, 'consistently supported nondisclosure of names or other information identifying

individuals appearing in law enforcement records, including investigators, suspects, witnesses,

and informants.'"  *Kleinert*, 132 F. Supp. 3d at 93 (quoting *Schrecker v. DOJ*, 349 F.3d 657, 661

(D.C. Cir. 2003)).  However, DOJ still must show that the "broad privacy rights" afforded to

"suspects, witnesses, and investigators" are implicated with respect to the individuals whose

personal information it seeks to redact here.  *See SafeCard*, 926 F.2d at 1205 (quoting *Bast v.

DOJ,* 665 F.2d 1251, 1254 (D.C. Cir. 1981)).

In light of these principles, the Court is not persuaded that the monitorship team has a

substantial privacy interest in nondisclosure of their names and titles.  While "[i]t is easy to see

why [the dangers of disclosure] often exist for investigators, suspects, witnesses, and

informants… especially (though not exclusively) in the context of criminal investigations," DOJ

has failed to demonstrate *why* the monitorship team faces such dangers here.  *Kleinert*, 132 F.

Supp. 3d at 93 (internal quotation marks omitted).  Private sector FCPA attorneys actively solicit

monitorship business, and they advertise their participation in FCPA cases.  *See* Gibson, Dunn &

Crutcher LLP, *Biography: F. Joseph Warin*, https://www.gibsondunn.com/lawyer/warin-f-

joseph/ (last visited May 7, 2018) ("Served as FCPA counsel for first non-US compliance

monitor in connection with one of the largest ever FCPA resolutions.").  Furthermore, DOJ has

now disclosed the names and addresses of the government attorneys working hand-in-hand with

the monitorship team, and it has disclosed the name of the Monitor and his U.S. counsel.  *See

generally* Am. Chronology.

DOJ's conclusory reasoning regarding the monitorship team's privacy interest is

essentially indistinguishable from reasoning rejected in other recent cases in this District.  For

instance, in *Stonehill v. IRS*, an agency sought to withhold under Exemption 7(C) the name of a

revenue agent who participated in an investigation of the plaintiff.  534 F. Supp.2d 1, 11 (D.D.C.

2008).  In support of that withholding, the agency put forth the "generic reasons that disclosure

'could cause harassment and/or undue embarrassment or could result in undue public attention which would constitute an unwarranted invasion of personal privacy.'" *Id.* The court acknowledged that the revenue agent could have a privacy interest, but it held that the agency could not withhold the agent's name because "the government offers no explanation as to *why* disclosure of this particular agent's name would cause embarrassment, undue harassment, etc." *Id.* at 12. Similarly, in *United Am. Fin., Inc. v. Potter,* the court held that an agency could not withhold the names of Office of Inspector General special agents where the agency's declarations "set forth no factual basis to support any concerns of harassment, intimidation, or physical harm." 667 F. Supp. 2d 49, 60 (D.D.C. 2009). Because DOJ has failed to delineate the specific harm faced by the monitorship team from the disclosure of their personal information, and because it has released the personal information of similarly-situated individuals, the privacy interests for this group are *de minimis*.

### b. Siemens Non-Executives, and Other Third Parties

Siemens non-executive employees and other third parties have a substantial privacy interest in non-disclosure of their personal information. DOJ argues that "the Siemens representatives and employees who provided information to the Monitor are akin to law enforcement witnesses, who have substantial privacy interests in avoiding disclosure of the fact that they provided information in a law enforcement proceeding and in avoiding the disclosure of any information that would tend to identify them." DOJ Reply at 16. At the very least, according to DOJ, these employees are entitled to the privacy protections of private third parties. *Id.* at 17. With respect to this class of individuals, DOJ's argument is well taken.

"Exemption 7(C) takes particular note of the 'strong interest' of individuals, whether they be suspects, witnesses, or investigators, 'in not being associated unwarrantedly with alleged

criminal activity.'" *Dunkelberger v. DOJ*, 906 F.2d 779, 781 (D.C. Cir. 1990) (quoting *Stern v. FBI*, 737 F.2d 84, 91–92 (D.C. Cir. 1984)).  That interest "extends to persons who are not the subjects of the investigation but who may nonetheless have their privacy invaded by having their identities and information about them revealed in connection with the investigation." *Computer Prof'ls for Social Responsibility,* 72 F.3d at 904. Accordingly, Exemption 7(C) "affords broad privacy rights" to witnesses and informants in criminal investigations.  *Senate of the Com. of P.R. on Behalf of Judiciary Comm. v. DOJ,* 823 F.2d 574, 588 (D.C. Cir. 1987); *see also Piper v. DOJ,* 374 F. Supp. 2d 73, 78–79 (D.D.C. 2005) ("[I]ndividuals who provide information to the law enforcement authorities . . . have a privacy interest and their identities have traditionally been protected from disclosure by Exemption 7(C).")

Accordingly, employee-witnesses have a substantial privacy interest in nondisclosure of their personal information.  For instance, in *Brown v. EPA*, this Court held that the privacy interest of employee-witnesses in an agency's internal investigation was substantial "because disclosure could subject them to unwarranted questioning concerning the [agency] investigation, subpoenas issued by private litigants in civil suits, and harassment from co-workers or other individuals."  384 F. Supp. 2d 271, 278 (D.D.C. 2005) (quoting *Croskey*, 9 F. Supp. 2d at 12).  Similarly, in *L&C Marine Transp., Ltd. v. United States*, the 11th Circuit protected the names of employee-witnesses interviewed by the defendant agency during an investigation because disclosure "could cause one or more of them problems at their jobs and with their livelihood," and it noted that "[t]here can be little doubt that an employee will feel more free to talk with federal law enforcement officials about possible employer violations if he feels his name will not be attached to his statements."  740 F.2d 919, 922–23 (11th Cir. 1984).

The Siemens employees—both mid-level managers and lower level personnel—and other third-party witnesses played an important role in the Siemens investigation's success.  Mr. Warin stated that the Monitor and his team met with over 2,300 such individuals in service of his evaluation of Siemens, and while not all those individuals' names are contained in DOJ's records, a fair number of them are.  *See* Warin Decl. ¶ 22, DOJ Reply at 14.  DOJ's declarations suggest that these meetings and the cooperation of Siemens' employees were key aspects of the Monitor's evaluation process, and therefore key aspects of DOJ's monitorship oversight.  Warin Decl. ¶ 27(c); Duross Decl. ¶ 46; s*ee also* Notice Regarding Corporate Monitorship, *United States v. Siemens Aktiengesellschaft*, No. 08-cr-367 (RJL) (D.D.C.) (ECF No. 23).  The employee witnesses and third-party witnesses face potential harassment and retaliation from their superiors for disclosing information about the company.  *See Brown*, 384 F. Supp. 2d at 278.  They therefore have a substantial privacy interest in the non-disclosure of their personal information, particularly because the potential for harassment may make potential witnesses reluctant to consent to interviews, which could chill agencies' ability to gather information.

### c. *Siemens Executives*

Finally, Siemens executives, including Board Members, have a *de minimis* privacy interest in the non-disclosure of their personal information.  Like its argument regarding the monitorship team's privacy interest, DOJ's argument with respect to this category fails to describe the harm that Siemens executives would face should their personal information be un-redacted, except to claim that disclosure could "engender comment and speculation and could produce an unfair stigma which could expose the individual to harassment or criticism."  *See* DOJ_0003888, Am. *Vaughn* Index at 143–144.  Siemens' plea and monitorship is public knowledge, as are the names of Siemens' executives and Board members.  DOJ has gone so far

as to specifically identify the titles of executives participating in redacted correspondence. *See* DOJ_0003888, Am. *Vaughn* Index at 143–144 ("A letter from the Chairman of the Supervisory Board of Siemens and the President and CEO of Siemens, respectively").  DOJ has failed to make a "particularized showing" of why Siemens' executives have a privacy interest in nondisclosure of their personal information, in light of the substantial volume of publicly available personal information related to their involvement in the monitorship. *Am. Immigration Lawyers Ass'n v. Exec. Office for Immigration Review*, 830 F.3d 667, 675 (D.C. Cir. 2016).  Its declarations "set forth no factual basis to support any concerns of harassment, intimidation, or physical harm," that would justify a stronger privacy interest. *United Am. Fin., Inc.*, 667 F. Supp. 2d at 60.

## 2.  Public Interest Balancing

The public interest in disclosure of the personal information at issue here weighs in favor of disclosing the names of monitorship team members and Siemens executives, but not Siemens non-executives and third parties.  Having analyzed the privacy interests at issue, the Court must balance those interests against the public interest in disclosing the redacted personal information, considering only the public interest "that focuses on 'the citizens' right to be informed about what their government is up to.'" *Davis*, 968 F.2d at 1282.  "[T]he relevant question" in this public interest analysis "is not whether the public would like to know the names… but whether knowing those names would shed light on [DOJs] performance of its statutory duties." *McGehee v. DOJ*, 800 F. Supp. 2d 220, 234 (D.D.C. 2011); *see also Reporters Comm.*, 489 U.S. at 773.

100Reporters claims that disclosure of the personal information at issue would assist the public in evaluating whether "DOJ's Monitorship program is an effective way of rehabilitating bad corporate actors and that it can act as an effective deterrent against future corporate

malfeasance." 100Reporters Mem. at 20. With respect to the monitorship team, it argues that "[t]he public has a strong interest in knowing exactly which officials are involved in assessing the violator's remediation efforts, the offices they hold, and the roles they played." *Id.* at 19. It also argues that knowledge of Siemens employee and third-party witness names "will enable Plaintiff to learn about the scope of the monitorship, whether the DOJ and Monitor investigated all of the business units implicated in the FCPA violations, and would inform the public as to the intrusiveness of monitorships in general." *Id.* at 20–21. This information would also "facilitate Plaintiff's reporting" and "[a]llow follow-up that sheds light on the effectiveness of the monitorship program." *Id.* at 20, 24–25. DOJ simply contends that the only public interest sufficient to overcome the privacy interests at stake is "to 'shed . . . light on the unlawful conduct of any Government agency or official." DOJ Reply at 21 (quoting *Peay v. DOJ*, No. 04-1859, 2006 WL 83497, at *4 (D.D.C. Jan. 12, 2006)).

100Reporters correctly asserts that courts have occasionally found a cognizable public interest in disclosure of personal information in cases that do not involve government misconduct, but those cases involved either public interests closely tied to the personal information withheld, or overbroad withholdings. For instance, the D.C. Circuit has ordered DOJ to disclose personal information about individuals subjected to warrantless cell phone tracking because that information would allow the public to evaluate "the kinds of crimes the government uses cell phone tracking data to investigate" and "how often prosecutions against people who have been tracked are successful, thus shedding some light on the efficacy of the technique." *ACLU*, 655 F.3d at 12–15. Without this information, the public could not evaluate the "scope and effectiveness of warrantless cell phone tracking as a law enforcement tool." *Id.* at 13. Likewise, in *Citizens for Responsibility & Ethics in Washington v. DOJ*, the court held that

DOJ could not categorically withhold under Exemption 7(C) all records concerning its publicly known investigation of a member of the House of Representatives because "[t]he public needs to know how DoJ carried out its statutory duties to investigate allegations of bribery and corruption of members of Congress." 840 F. Supp. 2d 226, 236 (D.D.C. 2012).

Unlike the clear link in *ACLU* between the personal information sought and the public interest, here it is unclear exactly how the names and job titles of Siemens non-executives and third-party witnesses would shed light on DOJ's performance above and beyond other available information. 100Reporters claims that the information "will enable Plaintiff to learn about the scope of the monitorship," 100Reporters Mem. at 20–21, but the public already has access to information revealing the scope of the monitorship and the extent of the monitor's intrusiveness into Siemens' operations. *See* Notice Regarding Corporate Monitorship, *United States v. Siemens Aktiengesellschaft*, No. 08-cr-367 (RJL) (D.D.C.) (ECF No. 23 ) ("the Monitor conducted on-site or remote reviews of Siemens' activities in 20 countries… reviewed over 51,000 documents totaling more than 973,000 pages in 11 languages; [and] conducted interviews of or meetings with over 2,300 Siemens employees."). There is not an "appropriate nexus" between disclosure of the personal information of Siemens employees and third-party witnesses and the public's interest in the "intrusiveness of monitorships" sufficient to overcome the substantial privacy interest in nondisclosure. *Seized Prop. Recovery, Corp. v. U.S. Customs and Border Prot.*, 502 F. Supp. 2d 50, 59–60 (D.D.C. 2007) ("[A]ny documents containing information about [the agency's] performance or behavior would advance this purpose regardless of whether they contained the names and addresses of individuals whose property was subject to forfeiture."). Accordingly, DOJ is justified in withholding this information under Exemption 7(C).

On the other hand, the public interest in disclosing the names of monitorship team members and Siemens executives outweighs the *de minimis* privacy interest in non-disclosure of that information.  The public has an interest in the identities of government employees and advisers charged with overseeing a significant FCPA investigation, because the seniority and experience of those individuals is a strong indication of how seriously DOJ considered its responsibility to ensure that Siemens complied with its plea agreement.  This interest outweighs the *de minimis* privacy interest held by the monitorship team.  Similarly, the public has an interest in understanding how DOJ interacted with the key Siemens decision makers, particularly since the public already knows that such interactions occurred.  *See Citizens for Responsibility and Ethics in Washington v. DOJ*, 840 F. Supp. 2d at 236 (holding that DOJ could not withhold personal information of an investigation target where the "investigation of him is not a secret and . . . he himself publicly announced the results of that investigation and discussed his involvement in the proceedings").  This interest outweighs the *de minimis* privacy interest held by Siemens executives, including the Board of Directors.

*          *          *

For the foregoing reasons, the Court holds as follows.  First, DOJ has justified its Exemption 7(C) withholding of the personal information of Siemens non-executives and third-party witnesses because those individuals have a substantial privacy interest in nondisclosure, and 100Reporters has not asserted a public interest sufficient to overcome that privacy interest.  Second, DOJ has failed to justify its Exemption 7(C) withholding of the personal information of members of the monitorship team and Siemens executives, including the Board of Directors, because it failed to demonstrate that those individuals have more than a *de minimis* privacy interest in nondisclosure, and disclosure would allow the public to evaluate DOJ's approach to

the monitorship.  Because the Exemption 7(C) bar for withholding information is lower than the Exemption 6 bar, DOJ also cannot justify its coextensive Exemption 6 withholding of this information.

### D.  Segregation of Non-Exempt Material

The final issue the Court must address is segregability.  Because "the focus of FOIA is information, not documents . . . an agency cannot justify withholding an entire document simply by showing that it contains some exempt material."  *Mead Data Cent., Inc.*, 566 F.2d at 260.  Rather, FOIA requires the agency to release "[a]ny reasonably segregable portion of a record . . . after deletion of the portions which are exempt."  5 U.S.C. § 552(b); *see also Mead Data Cent., Inc.*, 566 F.2d at 260 ("It has long been a rule in this Circuit that non-exempt portions of a document must be disclosed unless they are inextricably intertwined with exempt portions.").  "Before approving the application of a FOIA exemption, the district court must make specific findings of segregability regarding the documents to be withheld."  *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1116 (D.C. Cir. 2007).  The agency is "entitled to a presumption that [it] complied with the obligation to disclose reasonably segregable material," *Hodge v. FBI*, 703 F.3d 575, 582 (D.C. Cir. 2013), but that does not excuse the agency from carrying its evidentiary burden to fully explain its decisions on segregability.  *See Army Times Pub. Co. v. U.S. Dep't of Air Force*, 998 F.2d 1067, 1068 (D.C. Cir. 1993).

The parties disagree about whether DOJ has properly segregated and produced non-exempt material.  100Reporters speculates that several disputed documents contain purely factual material that can likely be segregated from properly withheld information.  *See* 100Reporters Mem. at 26; *cf. Army Times Publ'g Co. v. U.S. Dep't of Air Force*, 998 F.2d 1067, 1071 (D.C. Cir. 1993) ("Exemption 5 applies only to the deliberative portion of a document and not to any

purely factual, non-exempt information the document contains."). 100Reporters also challenges

the adequacy of DOJ's segregability explanations. *See* 100Reporters Mem. at 25–26. DOJ, on

the other hand, argues that the records "have been carefully reviewed to identify reasonably

segregable non-exempt information," and that "no further segregation of meaningful information

in the withheld documents could be done without disclosing information that FOIA protects from

disclosure." DOJ Mem. at 30–32.

In its prior Memorandum Opinion, this Court declined to evaluate whether DOJ had

properly segregated and disclosed non-exempt material because DOJ had not yet met its burden

of justifying its Exemption 5, 6, and 7(C) withholdings. *100Reporters*, 248 F. Supp. 3d at 166.

Rather, the Court exercised its discretion to require the production of a sampling of responsive

documents for *in camera* review. *Id.* (citing *Lam Lek Chong v. DEA*, 929 F.2d 729, 735 (D.C.

Cir. 1991) (noting that *in camera* review is appropriate "when agency affidavits are insufficiently

detailed to permit meaningful review of exemption claims"); *see also Bonner v. U.S. Dep't of

State*, 928 F.2d 1148, 1151 (D.C. Cir. 1991) ("Representative sampling is an appropriate

procedure to test an agency's FOIA exemption claims when a large number of documents are

involved."). It directed DOJ to provide "one work plan and one annual report prepared by the

Monitor, including all attachments to those two documents," presented "in a manner that makes

clear to the Court which portions of the documents were redacted" and indicating "which

exemptions apply to all redacted material." *100Reporters*, 248 F. Supp. 3d at 166–67.

As discussed above, the Court's *in camera* review has revealed that DOJ has not properly

segregated and produced non-exempt material. DOJ improperly withheld a significant portion of

the Year Three Work Plan on both Exemption 4 and Exemption 5 grounds, and it also

improperly withheld certain portions of the Report and Report exhibits. DOJ's failure to

properly segregate the *in camera* documents gives the Court reason to "doubt [Ms. Moberly's]

declaration and the supplemental *Vaughn* index" with respect to DOJ's compliance with its

segregability obligations.  *See Bigwood v. DOD*, 132 F. Supp. 3d 124, 151 (D.D.C. 2015)

(holding that a court may rely on an agency's declarations when evaluating segregability,

"[a]bsent contrary evidence within the record or a showing of bad faith on the part of the

agency").  This is particularly true because DOJ has not supplemented its *Vaughn* index or

provided additional declarations regarding its process of segregating and producing non-exempt

information.

Accordingly, DOJ must reexamine its withholdings and redactions in light of the Court's

guidance, it must remove redactions that are not justified under the FOIA Exemptions, and it

must produce the non-exempt material.  *See Bonner*, 928 F.2d at 1154 ("[I]f the error rate for the

sample of 63 documents should prove to be unacceptably high, the [agency] must then reprocess

all of the over 1,700 documents at issue."); *Clemente v. FBI*, 854 F. Supp. 2d 49, 58–59 (D.D.C.

2012) (ordering the agency to reexamine non-sample documents because of the error rate in the

agency's sample *Vaughn* index); *Nat. Immigration Project of Nat. Lawyers Guild v. DHS*, 868 F.

Supp. 2d 284, 298 (S.D.N.Y. 2012) ("Rather than review the hundreds of pages at issue to

specify exactly what the Government must disclose . . . the Court orders the Government to

reexamine these documents, as well as the documents yet to be produced, and to make

disclosures according to the principles described in this opinion.").  The parties must submit a

joint status report no later than 30 days from today proposing a schedule for DOJ's disclosure of

information that can no longer be withheld.  Further, if, after DOJ reexamines the documents and

releases non-exempt material to 100Reporters, 100Reporters still disputes DOJ's withholdings,

the parties are directed to submit a joint status report scheduling further proceedings to bring this litigation to an end.

## V.  CONCLUSION

For the foregoing reasons, DOJ's Motion for Summary Judgment (ECF No. 83) is **GRANTED IN PART AND DENIED IN PART**, and 100Reporters' Cross-Motion for Summary Judgment (ECF No. 86) is **GRANTED IN PART AND DENIED IN PART**.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  June 13, 2018                                                    RUDOLPH CONTRERAS
                                                                        United States District Judge